IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| TRINA WILKINS; JAMES BISHOP; LISA BISHOP; AMBER BRITTON; TONI CORDOVA; JOHN CORTINA; JILL CORTINA; GEORGE DEMKO; DOVAN HELTON; MARY HELTON; NATE BROOKS; SYDNEY JOHNSON; PLAINTIFF D.J.; DAMON LAFORCE; MICHAEL MASULA; ERIN MASULA; JAMES MATTHEWS; THOMAS OLSZEWSKI; DARLENE COOKINGHAM; THOMAS STANZIANO; WENDY STANZIANO; EDDIE VIERS, individually as surviving spouse of Teresa Viers, deceased, AND as Personal Representative of the ESTATE OF TERESA VIERS; WILLIAM MCNEW; JEANNE WALLACE individually as surviving spouse of Joseph Wallace, deceased, AND as Personal Representative of the ESTATE OF JOSEPH WALLACE; JAMES WALLACE; and SAMUEL WALLACE; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| GENZYME CORPORATION; | ) ) |
| Defendant. | ) ) |

No: 4:20 – cv – 00051 – TWP - DML

Judge Tanya W. Pratt

Class Action

*Electronically Filed*

## SECOND AMENDED COMPLAINT

AND NOW come the Plaintiffs, by and through their counsel, C. Allen Black, Esquire and Jonathan M. Gesk, Esquire, and hereby file this Second Amended Complaint as follows:

## PARTIES

1.     Plaintiff Trina Wilkins is an adult individual who currently resides in Charlestown, Indiana, and is a citizen of Indiana, but for purposes of *lex loci delicti* was a resident and citizen of Carrolton, Kentucky and Indiana.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.  She was delivered and injected with defective Fabrazyme from 2009 to 2012.  Plaintiff's clinical status has deteriorated as the Fabry disease has accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria:   immunological sensitization to Fabrazyme, anaphylactic infusion reactions, venous collapse, vascular thrombosis, neuropathy, chronic pulmonary obstructive disease, chronic debilitating fatigue, multiple transischemic attacks, chronic gastrointestinal distress including uncontrollable diarrhea, Fabry crises, depression, seizures, and recurrent urinary and kidney infections, pulmonary granuloma, and as a result of infection, MRI spots were detected on Plaintiff's liver, indicative of hepatitis.  "Low dose" also caused antibody sensitization to Fabrazyme making it impossible for her to resume full dose treatment in the spring of 2012 with Fabrazyme as she had before the "low dosing" began.  After the spring of 2012, she had to be administered Fabrazyme in the cardiac intensive care unit for 24-48 hour observation instead of the normal infusion center because a return to full dose caused severe life threatening reactions every time she received it, unlike her infusion prior to the shortage.  The Fabrazyme lots she was injected with contained Vesivirus 2117 which injured her by inducing Vesivirus-induced vesiculating chronic

non-anaphylactic rashes that are not treatable with steroids, and substantially increasing her risk of developing fulminating Vesivirus infection, and Vesivirus induced hematological cancer.  Plaintiff's life expectancy has been shortened due to taking "low dose" Fabrazyme because she relied on the expertise of Genzyme which had, and continues to have, a confidential special relationship of ongoing trust and medical care with her.  Plaintiff was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in co-pays to her insurance company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect.  The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold.  Trina Wilkins was in privity with Genzyme throughout her treatment with her Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose" Fabrazyme], ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.

2.     Plaintiff James Bishop is an adult individual with Fabry disease who currently resides in Westfield, Massachusetts, and is a citizen of Massachusetts.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.  However, he was delivered and injected with defective Fabrazyme from 2009 to 2012.  In 2013 and 2015, he was delivered and again injected with defective Fabrazyme containing Vesivirus.  Plaintiff's clinical status has deteriorated as the Fabry disease accelerated due

to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria that includes but is not limited to: immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, acroparesthesias, chronic debilitating fatigue, heat intolerance, nephropathy, vestibular balance disorder, proteinuria, atrial fibrillation requiring cardioversion, and chronic gastrointestinal distress including uncontrollable diarrhea.   The Fabrazyme lots he was injected with contained vesivirus 2117 which injured him by inducing Vesivirus-induced vesiculating chronic non-anaphylactic rashes untreatable with steroids, an increased risk of developing fulminating Vesivirus infection, and Vesivirus induced hematological cancer.   Plaintiff's life expectancy has been shortened due to taking "low dose" Fabrazyme because he relied on the expertise of Genzyme which had, and continues to have, a confidential special relationship of ongoing trust and medical care with him.   Plaintiff was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in yearly co-pays to his insurance company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect.   The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold.   The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold.   James Bishop was in privity with Genzyme throughout his treatment with his Genzyme case care coordinators (including Joyce Sundstrom, Nichole Gomes, Andrea

Conley, Karen Foley, Carolyn Finocchiaro, Paulomi Dave-Potter, and Kimberly Lehner) as well as being registered in the Genzyme sponsored Fabry Registry Clinical Trial where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose" Fabrazyme], ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.

3.      Plaintiff Lisa Bishop is an adult individual who currently resides in Westfield, Massachusetts and is a citizen of Massachusetts, and is the spouse of James Bishop.

4.      Plaintiff Amber Britton is an adult individual with Fabry disease who currently resides in Kirkland, Washington and is a citizen of Washington.  Plaintiff was prescribed FDA-approved doses of Fabrazyme in 2009.  Due to the progression of untreated Fabry, she had severe atrial fibrillation that rendered her unconscious while driving on September 12, 2010.  The passenger was able to bring the car to a safe stop.  However, Genzyme refused to sell Fabrazyme to her at any dose until 2011, despite granting the requests for others in lesser need or those having alternative medication.  In 2013 and 2015, she was delivered and injected with defective Fabrazyme containing Vesivirus.  The Fabrazyme lots she was injected with contained Vesivirus 2117 which injured her by substantially increasing the risk of developing fulminating Vesivirus infection and Vesivirus induced hematological cancer.  Plaintiff's life expectancy has been shortened due Genzyme's delay in providing Fabrazyme because she relied on the expertise of Genzyme which had, and continues to have, a confidential special relationship of ongoing trust and medical care with her.  Plaintiff was also injured by

paying over $80,000 for medically worthless Fabrazyme.  The contaminated Fabrazyme she bought was medically worthless because it was unsafe to administer to humans at the purity it was sold.  Amber Britton was in privity with Genzyme throughout her treatment (and lack thereof) with her Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose" Fabrazyme], ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.

5.      Plaintiff Toni Cordova is an adult individual with Fabry disease who currently resides in Reno, Nevada and is a citizen of Nevada.  Genzyme refused to grant her access to Fabrazyme until January 2011 despite granting the requests for others in lesser need or those having alternative medication.  She was delivered and injected with defective "low dose" Fabrazyme from 2010 to 2012. In 2013 and 2015, she was again delivered and injected with defective Fabrazyme containing Vesivirus.  Plaintiff's clinical status has deteriorated as the Fabry disease has accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria: immunological sensitization to Fabrazyme, stroke, transischemic attacks presenting as strokes, white matter deposition in the brain (inflammatory foci), neuropathic pain, chronic debilitating fatigue, and chronic gastrointestinal distress including uncontrollable diarrhea.  The Fabrazyme lots she was injected with contained vesivirus 2117 which injured her by inducing Vesivirus-induced vesiculating chronic non-anaphylactic rashes that are not

treatable with steroids, and substantially increasing her risk of developing fulminating Vesivirus infection, and Vesivirus induced hematological cancer. Plaintiff's life expectancy has been shortened due Genzyme's delay in providing Fabrazyme and in only subsequently providing "low dose" Fabrazyme because she relied on the expertise of Genzyme which had, and continues to have, a confidential special relationship of ongoing trust and medical care with her. Plaintiff was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in co-pays to her insurance company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect. The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold. Toni Cordova was in privity with Genzyme throughout her treatment with her Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose Fabrazyme], ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.

6. Plaintiff John Cortina is an adult individual with Fabry disease was a resident and citizen of Brewster, New York at the time of receiving contaminated and low-dose Fabrazyme, but now is a citizen of North Carolina. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009. He was delivered and injected with defective Fabrazyme from 2009 to 2012. In 2013 and 2015, he was delivered and again injected with defective Fabrazyme containing Vesivirus. Plaintiff's clinical

status has deteriorated as the Fabry disease has accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria: immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, acroparesthesias and cardiovascular hypertension.  The Fabrazyme lots he was injected with contained vesivirus 2117 which injured him by substantially increasing his risk of developing fulminating Vesivirus infection, and Vesivirus induced hematological cancer. Plaintiff's life expectancy has been foreshortened due Genzyme providing "low dose" Fabrazyme because he relied on the expertise of Genzyme which had, and continues to have, a confidential special relationship of ongoing trust and medical care with him. Plaintiff was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in co-pays to his insurance company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect.  The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold.  The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold.  John Cortina was in privity with Genzyme throughout his treatment with his Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose

Fabrazyme],   ClinicalTrials.gov   Identifier:   NCT00196742   available   at

https://clinicaltrials.gov/ct2/show/NCT00196742.

7.     Plaintiff Jill Cortina is an adult individual who currently is a citizen of

North Carolina and is the spouse of John Cortina.

8.     Plaintiff George Demko is an adult individual with Fabry disease who

currently resides in Pittsburgh, Pennsylvania, and is a citizen of Pennsylvania.  Plaintiff

was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.  He was

delivered and injected with defective "low-dose" Fabrazyme from 2009 to 2012.  In 2013

and 2015, he was again delivered and injected with defective Fabrazyme containing

Vesivirus.  Plaintiff's clinical status has deteriorated as the Fabry disease accelerated due

to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and

exacerbation of at least the following physical injuries:  immunological sensitization to

Fabrazyme, vascular globotriaosylceramide deposition, neuropathic pain, memory loss,

arterial blockage, vesivirus-induced vesicular rashes, and chronic debilitating fatigue.

The Fabrazyme lots he was injected with contained vesivirus 2117 which injured him by

inducing Vesivirus-induced vesiculating chronic non-anaphylactic rashes untreatable

with steroids, an increased risk of developing fulminating Vesivirus infection, and

Vesivirus induced hematological cancer.  Plaintiff's life expectancy has been shortened

due to taking "low dose" Fabrazyme because he relied on the expertise of Genzyme

which had, and continues to have, a confidential special relationship of ongoing trust and

medical care with him.  Plaintiff was also damaged by paying over $200,000 for medically

worthless Fabrazyme in the aggregate and additional money in co-pays to his insurance

company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect. The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold. The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold. George Demko was in privity with Genzyme throughout his treatment with his Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose Fabrazyme]." ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.

9. Plaintiff Mary Helton is an adult individual with Fabry disease who currently resides Charlestown, Indiana and is a citizen of Indiana. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009. She was delivered and injected with defective "low-dose" Fabrazyme from 2009 to 2012. In 2013 and 2015, she was again delivered and injected with defective Fabrazyme containing Vesivirus. Plaintiff's clinical status has deteriorated as the Fabry disease has accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria: immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, transischemic attacks presenting as stroke, intracranial hypertension, optic nerve swelling, vision loss, hearing loss, neuropathic pain, multiple Fabry Crises, cardiac

arrhythmia, chronic debilitating fatigue, and progression of kidney disease. Her injuries include Vesivirus-induced vesiculation rashes, an increased risk of developing fulminating Vesivirus infection and Vesivirus induced hematological cancer.   The Fabrazyme lots she was injected with contained vesivirus 2117 which injured her by inducing Vesivirus-induced vesiculating chronic non-anaphylactic rashes that are not treatable with steroids, and substantially increasing her risk of developing fulminating Vesivirus infection, and Vesivirus induced hematological cancer.   Plaintiff's life expectancy has been shortened due to taking "low dose" Fabrazyme because she relied on the expertise of Genzyme which had, and continues to have, a confidential special relationship of ongoing trust and medical care with her.   Plaintiff was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in co-pays to her insurance company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect.   The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold.   The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold.   Mary Helton was in privity with Genzyme throughout her treatment with her Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose Fabrazyme]," ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.

10.     Plaintiff Nate Brooks currently resides in Charlestown, Indiana, and is a citizen of Indiana, and is the spouse of Mary Helton.

11.     Plaintiff Donovan Helton is an adult individual with Fabry disease who currently resides in Clinton, Indiana.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.  He was delivered and injected with defective "low-dose" Fabrazyme from 2009 to 2012.  Plaintiff's clinical status has deteriorated as the Fabry disease accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria:  immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, heart arrhythmia, chronic debilitating fatigue, heat intolerance, transischemic attacks, proteinuria, multiple Fabry crises, and neuropathic pain.  The Fabrazyme lots he was injected with contained vesivirus 2117 which injured him by substantially increasing his risk of developing fulminating Vesivirus infection, and Vesivirus induced hematological cancer.  Plaintiff's life expectancy has been shortened due to taking "low dose" Fabrazyme because he relied on the expertise of Genzyme which had, and continues to have, a confidential special relationship of ongoing trust and medical care with him.  Plaintiff was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in co-pays to his insurance company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect.  The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold.  The

"low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold. Donovan Helton was in privity with Genzyme throughout his treatment with his Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose Fabrazyme], : ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.  Plaintiff was a minor at the time of filing his complaint.

12.     Plaintiff D.J. ("Plaintiff D.J.") is a minor with Fabry disease, represented by and through guardians Chastity and Jeremy Johnson, who currently resides in Wise, Virginia and is a citizen of Virginia.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.  He was delivered and injected with defective "low-dose" Fabrazyme from 2009 to 2012.  In 2013 and 2015, he was delivered and again injected with defective Fabrazyme containing Vesivirus.  Plaintiff's clinical status has deteriorated as the Fabry disease has accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria:  immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, hypohidrosis and debilitating fatigue.  The Fabrazyme lots he was injected with contained vesivirus 2117 which injured him by substantially increasing his risk of developing fulminating Vesivirus infection, and Vesivirus induced hematological cancer.  Plaintiff's life expectancy has been shortened due to taking "low dose" Fabrazyme because he relied on

the expertise of Genzyme which had, and continues to have, a confidential special relationship of ongoing trust and medical care with him.  Plaintiff was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in co-pays to his insurance company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect.  The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold.  Plaintiff D.J. was in privity with Genzyme throughout his treatment with his Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose Fabrazyme], : ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.  Plaintiff was a minor at the time of filing his complaint.

13.     Plaintiff Sydney Johnson, also known as Sydney Holmes-Dowdy is an adult with Fabry disease who currently resides in Wise, Virginia and is a citizen of Virginia.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.  She was delivered and injected with defective "low-dose" Fabrazyme from 2009 to 2012.  In 2013 and 2015, she was again delivered and injected with defective Fabrazyme containing Vesivirus.  Plaintiff's clinical status has deteriorated as the Fabry disease has accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria:  immunological sensitization to Fabrazyme, vascular

globotriaosylceramide deposition, hypohidrosis, and debilitating fatigue. The Fabrazyme lots she was injected with contained vesivirus 2117 which injured her by substantially increasing her risk of developing fulminating Vesivirus infection, and Vesivirus induced hematological cancer. Plaintiff's life expectancy has been shortened due to taking "low dose" Fabrazyme because she relied on the expertise of Genzyme which had, and continues to have, a confidential special relationship of ongoing trust and medical care with her. She is young, so she is also at risk for Vesivirus induced reproductive tract complications such difficulty or inability to conceive, still-birth, pre-eclampsia, pre-term birth, and other birth complications assuming she could conceive at all after receiving the vesivirus contaminated Fabrazyme. Plaintiff was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in co-pays to her insurance company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect. The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold. The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold. Sydney Johnson was in privity with Genzyme throughout her treatment with her Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose Fabrazyme], ClinicalTrials.gov Identifier:

NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.  Sydney Johnson was a minor at the time of filing her complaint.

14.     Plaintiff Damon LaForce is an adult individual with Fabry disease who currently resides in San Pedro, California and is a citizen of California. While a resident and citizen of Virginia, Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009. He was delivered and injected with defective "low-dose" Fabrazyme from 2009 to 2012.  In 2013 and 2015, he was again delivered and injected with defective Fabrazyme containing Vesivirus. Plaintiff's clinical status has deteriorated as the Fabry disease has accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria:  immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, debilitating fatigue, neuropathy, anaphylactic infusion reactions, and acroparesthesias.  "Low dose" also caused antibody sensitization to Fabrazyme making it impossible for him to resume full dose treatment with Fabrazyme without requiring steroids as he had before the "low dosing" began. The Fabrazyme lots he was injected with contained vesivirus 2117 which injured him by substantially increasing his risk of developing fulminating Vesivirus infection, and Vesivirus induced hematological cancer.  Plaintiff's life expectancy has been shortened due to taking "low dose" Fabrazyme because he relied on the expertise of Genzyme which had, and continues to have, a confidential special relationship of ongoing trust and medical care with him.  Plaintiff was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in co-pays to his insurance

company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect. The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold. Damon LaForce was in privity with Genzyme throughout his treatment with his Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose Fabrazyme." ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.

15.     Plaintiff Michael Masula is an adult individual with Fabry disease who currently resides in Pittsburgh, Pennsylvania and is a citizen of Pennsylvania. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009. He was delivered and injected with defective "low-dose" Fabrazyme from 2009 to 2012. In 2013 and 2015, he was again delivered and injected with defective Fabrazyme containing Vesivirus. Plaintiff's clinical status has deteriorated as the Fabry disease has accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria: immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, transischemic attacks presenting as stroke, neuropathic pain, acroparesthesias, dental erosion and loss of teeth, and chronic gastrointestinal distress including uncontrollable diarrhea, and viremic lesions. The Fabrazyme lots he was injected with contained vesivirus 2117 which injured him by inducing Vesivirus-induced

vesiculating chronic non-anaphylactic rashes that are not treatable with steroids, and substantially increasing his risk of developing fulminating Vesivirus infection, and Vesivirus induced hematological cancer.  Plaintiff's life expectancy has been shortened due to taking "low dose" Fabrazyme because he relied on the expertise of Genzyme which had, and continues to have, a confidential special relationship of ongoing trust and medical care with him.  Plaintiff was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in co-pays to his insurance company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect. The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold.  Michael Masula was in privity with Genzyme throughout his treatment with his Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose Fabrazyme],." ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.

16.    Plaintiff Erin Masula is an adult individual who currently resides in Pittsburgh, Pennsylvania and is a citizen of Pennsylvania and is the spouse of Michael Masula.

17.    Plaintiff James Matthews is an adult individual with Fabry disease, who currently resides in Indian Trail, North Carolina and is a citizen of North Carolina. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.

Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009. He was delivered and injected with "low-dose" defective Fabrazyme from 2009 to 2012. In 2013 and 2015, he was again delivered and injected with defective Fabrazyme containing Vesivirus.  Plaintiff's clinical status has deteriorated as the Fabry disease has accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria:   immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, end stage renal disease (stage V) requiring dialysis, kidney transplant, complications of the first kidney transplant leading to dialysis and currently requiring a second kidney transplant, heat intolerance; neuropathy, fatigue, anhidrosis.  The Fabrazyme lots he was injected with contained vesivirus 2117 which injured him by substantially increasing his risk of developing fulminating Vesivirus infection, and Vesivirus induced hematological cancer.  Plaintiff's life expectancy has been shortened due to taking "low dose" Fabrazyme because he relied on the expertise of Genzyme which had, and continues to have, a confidential special relationship of ongoing trust and medical care with him.  Plaintiff was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in co-pays to his insurance company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect.  The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold.  James Matthews was in privity with Genzyme throughout his treatment with his Genzyme case

care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose Fabrazyme,]" ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.

18.     Plaintiff Thomas Olszewski is an adult individual with Fabry who currently resides in Grayling, Michigan and is a citizen of Michigan.  He was delivered and injected with defective Fabrazyme from 2009 to 2012.  In 2013 and 2015, he was again delivered and injected with defective Fabrazyme containing Vesivirus.  Plaintiff's clinical status has deteriorated as the Fabry disease has accelerated due to the defective "low-dose" Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria: immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, chronic obstructive pulmonary disease, neuropathic pain, acroparesthesias, and chronic debilitating fatigue.  The Fabrazyme lots he was injected with contained vesivirus 2117 which injured him by substantially increasing his risk of developing fulminating Vesivirus infection, and Vesivirus induced hematological cancer.  Plaintiff's life expectancy has been shortened due to taking "low dose" Fabrazyme because he relied on the expertise of Genzyme which had, and continues to have, a confidential special relationship of ongoing trust and medical care with him.  Plaintiff was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in co-pays to his insurance company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably

expect.  The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold.  Thomas Olszewski was in privity with Genzyme throughout his treatment with his Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose Fabrazyme], ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.

19.    Plaintiff Darlene Cookingham is an adult individual who currently resides in Grayling, Michigan and is a citizen of Michigan and is the spouse of Thomas Olszewski.

20.    Plaintiff Tom Stanziano is an adult individual who currently resides in Oldsmar, Florida and is a citizen of Florida.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009.  He was delivered and injected with defective "low-dose" Fabrazyme from 2009 to 2012.  In 2013 and 2015, he was again delivered and injected with defective Fabrazyme containing Vesivirus. Plaintiff's clinical status has deteriorated as the Fabry disease has accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria: immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, anaphylactic infusion reactions, acroparesthesias, hearing loss, depression, insomnia, and progression of renal disease.  "Low dose" also caused antibody sensitization to Fabrazyme making it impossible for him to resume full dose treatment with Fabrazyme

without steroids as he had before the "low dosing" began.  The Fabrazyme lots he was injected with contained vesivirus 2117 which injured him by substantially increasing his risk of developing fulminating Vesivirus infection, and Vesivirus induced hematological cancer.  Plaintiff's life expectancy has been shortened due to taking "low dose" Fabrazyme because he relied on the expertise of Genzyme which had, and continues to have, a confidential special relationship of ongoing trust and medical care with him. Plaintiff was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in co-pays to his insurance company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect.  The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold.  Tom Stanziano was in privity with Genzyme throughout his treatment with his Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose Fabrazyme], ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.

21.     Plaintiff Wendy Stanziano is an adult individual who currently resides in Oldsmar, Florida and is a citizen of Florida and is the spouse of Tom Stanziano.

22.     Plaintiff Eddie Viers is an adult individual who currently resides in Grundy, Virginia and is a resident of Virginia and was the spouse of Teresa Viers.  Eddie Viers is the Administrator of the Estate of Teresa Viers, who was on treatment with FDA-

approved doses of Fabrazyme prior to June 2009, and died due to the effects of defective "low-dose" Fabrazyme delivered and administered from 2009 to 2012, and in 2013, and in 2015 as evidenced by:   immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, recurrent febrile illness, chronic debilitating fatigue, exercise intolerance, heat intolerance, neuropathic pain, recurrent kidney infections, anaphylactic infusion reaction, increased hemoglobin count, increased creatinine, progression of kidney disease, proteinuria, and enlargement of the heart that all contributed to her death in September of 2019.  Plaintiff's life expectancy was shortened due to taking "low dose" Fabrazyme because she relied on the expertise of Genzyme which had a confidential special relationship of ongoing trust and medical care with her. Plaintiff's estate was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in co-pays to her insurance company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect.  The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold.  Teresa Viers was in privity with Genzyme throughout her treatment with her Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose Fabrazyme]," ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.

23.     Plaintiff William McNew is an adult individual who currently resides in Grundy, Virginia and is a Virginia citizen and is the surviving son of Teresa Viers.

24.     Plaintiff Jeanne Wallace is an adult individual who currently resides in Richmond, Virginia and is a Virginia citizen and was the spouse of Joseph Wallace. Jeanne Wallace is the executor of the Estate of Joseph Wallace, who was on treatment with FDA-approved doses of Fabrazyme prior to June 2009 and died due to the effects of defective "low-dose" Fabrazyme delivered and administered from 2009 to 2012 and in 2013 as evidenced by: immunological sensitization to Fabrazyme, vascular globotriaosylceramide deposition, and acroparesthesias that all contributed to his death. Plaintiff's life expectancy was shortened due to taking "low dose" Fabrazyme because she relied on the expertise of Genzyme which had a confidential special relationship of ongoing trust and medical care with him.  Plaintiff's estate was also damaged by paying over $200,000 for medically worthless Fabrazyme in the aggregate and additional money in co-pays to his insurance company because the product failed to work for its intended purpose and was objectively worth less than what one would reasonably expect.. The "low dose" Fabrazyme was medically worthless because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold. Joseph Wallace was in privity with Genzyme throughout his treatment with his Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry where Genzyme "Monitor[s] factors associated with the efficacy of Fabry disease treatments [including "low dose Fabrazyme],7" ClinicalTrials.gov Identifier: NCT00196742 available at https://clinicaltrials.gov/ct2/show/NCT00196742.

25.     Plaintiff James Wallace is an adult individual that resides in Nashville, Tennessee and is a Tennessee citizen and is a surviving son of Joseph Wallace.

26.     Plaintiff Samuel Wallace is an adult individual who currently resides in Richmond, Virginia, and is a Virginia citizen and is a surviving son of Joseph Wallace.

27.     Defendant Genzyme Corporation is a Massachusetts corporation with a principal place of business located at 50 Binney Street, Cambridge, Massachusetts 02142. Genzyme Corporation does regular business in Indiana and throughout the United States, including the marketing and selling of Fabrazyme and other pharmaceuticals.

<u>JURISDICTION AND VENUE</u>

28.     Jurisdiction is conferred upon diversity jurisdiction and over the Class(as hereinafter defined) pursuant to 28 U.S.C. §§ 1332(d) (2) and (6) of the Class Action Fairness Act of 2005, because one or more members of the Class are citizens of a State different from the Defendant, and the aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

29.     Furthermore, Defendant has sufficient contacts within the state of Indiana and has purposely availed themselves to conduct business within the state, so as to permit the Southern District of Indiana to exercise personal jurisdiction.

30.     The Plaintiffs who are not residents of Indiana join the instant case under Federal Rule of Civil Procedure 20(a)(1)(A) and (B) as all injuries arose from the same occurrences and/or series of occurrences and involve the same questions of law and facts.

## FACTUAL BACKGROUND

31.     Fabry disease is a rare but lethal heritable genetic illness that occurs in approximately 1 in 3,000 births, and, without treatment, results in the premature death of Fabry patients from complications such as renal disease, cardiac disease, and disease of the central nervous system.

32.     In Fabry disease, the gene for an enzyme (alpha-galactosidase) required to metabolize a certain fat (globotriaosylceramide, termed "GL-3) is mutated or missing resulting in the buildup of GL-3 in cells, blood vessels, and organs, which causes inflammation and ultimately leads to death, usually from strokes, kidney failure, and/or heart enlargement.

33.     While no cure for Fabry disease is yet available, one of the greatest breakthroughs in scientific research on Fabry disease has been enzyme replacement therapy where a synthetic version of the enzyme, Fabrazyme (agalsidase beta), can be injected every two weeks to effectively treat Fabry patients.

34.     Fabrazyme infusions temporarily compensate for the absent or mutated agalsidase enzyme by clearing GL-3 buildup from the system.

35.     Fabrazyme does not reverse damage from Fabry disease but can mitigate the effects of toxic GL-3 production.

36.     Fabrazyme is rapidly metabolized so it must be administered every two weeks.

37.      The scientific research for the discovery of Fabrazyme was a direct result of U.S. taxpayer funding.

38.     Specifically, the NIH awarded grant no. DK 34045 to Dr. Robert J. Desnick ("Desnick") at the Mount Sinai School of Medicine to develop Fabrazyme as an enzyme replacement therapy to treat Fabry Disease and conduct clinical trials at the Mount Sinai School of Medicine.

39.     Mount Sinai was granted U.S. Patent No. 5,356,804 to a method of producing agalsidase beta subject to the requirements and obligations of 35 U.S.C. §§ 200-212, commonly known as the Bayh-Dole Act.

40.     Mount Sinai licensed U.S. Patent No. 5,356,804 for the manufacture of agalsidase beta (Fabrazyme) to Genzyme Corporation, which has been the sole FDA approved supplier enzyme replacement therapy to the U.S. marketplace.

41.     In April of 2003, the United State Food and Drug Administration ("FDA") granted rapid orphan drug approval for Genzyme Corporation to exclusively market and sell Fabrazyme for the treatment of Fabry patients throughout the United States. Currently, Fabrazyme treatment generally costs over $600,000 per year per patient.

### Vesivirus 2117 (Allston) (of the Calicivirus family) adulteration

42.     Sometime prior to July 2009, Genzyme Corporation contaminated its bioreactors with Vesivirus 2117 (Allston), a genus of calicivirus.[1]   Qui Y., *et al.* "Identification and quantitation of Vesivirus 2117 particles in bioreactor fluids from infected Chinese hamster ovary cell cultures." *Biotechnol Bioeng.* 2013 May;110(5):13042.

---

[1] Fabrazyme is produced in bioreactors which are similar to fermentation tanks.  Genetically engineered Chinese hamster ovary cells ("CHO cells") secrete the human agalsidase enzyme into the cell growth medium.

43.     Vesiviruses are classified as Category B biodefense pathogens by the National Institute of Allergy and Infectious Diseases.

44.     Category B biodefense pathogens are the second highest priority for national security and public health, and the class includes ricin toxin, zika virus, and *salmonella* pathogens.                    *See*        calicivirus        at https://www.niaid.nih.gov/topics/biodefenserelated/biodefense/pages/cata.aspx. Category A includes more serious pathogens such as Ebola and anthrax, while Category C include less serious pathogens such as influenza, hanta virus, and coronavirus (SARS).

45.     No safe level of exposure to Vesivirus or its viral fragments exists.

46.     Vesivirus has not been approved or recommended for use to treat Fabry disease.

47.     At least as early as July 2009, Genzyme Corporation contaminated "Fabrazyme" with Vesivirus, that it termed Vesivirus 2117 (Allston), for the manufacturing facility where it had been detected (Allston, Massachusetts).

48.     Instead of incinerating or otherwise destroying the Vesivirus 2117 (Allston) infected Fabrazyme, as required by the FDA, or recalling the drug, Genzyme Corporation sold these contaminated lots to all patients, including Plaintiff Wilkins.[2]

49.     In order to sell the virus-contaminated drug to patients, Genzyme Corporation told Fabry patients that Vesivirus 2117 (Allston) was safe to be injected into human beings, which it internally knew was false and misleading.

_____

[2] As defined in Indiana Code § 16-42-3-3: Adulterated drug or device and Indiana Code § 16-42-3-4 Misbranded drug or device.

50.     Vesivirus contaminated Fabrazyme was sold without a warning that the drug was adulterated with a virus and dangerous to humans.

51.     Virus contaminated injectable drugs are always unsafe for human use.[3]

52.     Genzyme Corporation issued a letter to Plaintiff Wilkins, and the other Plaintiffs, encouraging them to be injected with Vesivirus infected Fabrazyme as well as justifying the six-figure costs of the Vesivirus infected Fabrazyme vials.

53.     Specifically, Genzyme Corporation Director of Medical Affairs, Daniel Gruskin, M.D., misrepresented to Plaintiffs in a 2009 letter that: "This virus, Vesivirus 2117, is not known to be harmful in humans, but impairs the viability of CHO [Chinese Hamster Ovary Cells] which are used to produce Cerezyme and Fabrazyme."

54.     None of the Plaintiffs learned Vesivirus infect humans or was harmful to or could connect vesivirus to their injuries until 2016 when they learned the truth about the vesivirus because they relied on the medical expertise of Dr. Gruskin and believed Genzyme had been truthful through it agents regarding their injections of vesivirus in the Fabrazyme lots which they were supplied.

55.     Genzyme Corporation also stated publicly that: "While the virus has the ability to taint the drugs, it is not considered harmful to humans." *See* Ailworth and Weisman, Boston Globe, *Virus shuts GENZYME plant, holds up drugs for 8,000* June 17, 2009

---

[3] It is scientifically well established that virus-infected biologicals have absolutely no valid medical use.  *See* HIV and the Blood Supply: An Analysis of Crisis Decision Making (discussing the issue of whether to give patients HIV-infected blood transfusions).  https://www.ncbi.nlm.nih.gov/books/NBK232419/

(http://www.boston.com/business/healthcare/articles/2009/06/17/genzyme_temporarily_halts_production_on_2_key_drugs/).

56.     More than 20 years ago, researchers demonstrated that Vesivirus can cross species barriers to infect and kill human embryo cell. *See*, Seal, et al., "Isolation of caliciviruses from skunks that are antigenically and genotypically related to San Miguel sea lion virus," Virus Research 37:1-12 (July 1995).

57.     Vesivirus was also known to be dangerous to humans because Vesivirus establishes a persistent infection in primates and the virus easily crosses species barriers. Alvin Smith, et al., "Calicivirus Isolation and Persistence in a Pygmy Chimpanzee (*Pan paniscus*)" *Science* 4605:79-81 (1983); Alvin Smith, et al. "Calicivirus Emergence from Ocean Reservoirs: Zoonotic and Interspecies Movements," *Emerging Infectious Diseases*, 1:13, (1998).

58.     Internally, Genzyme Corporation knew that acute Vesivirus infections cause disease in humans with clinical observations of viremia, vesicular skin lesions, antigenicity, antibody seroconversion, B-cell stimulation, hepatitis, and spontaneous abortions.  Alvin Smith, et al. "*Vesivirus viremia and seroprevalence in humans.*" J Med Virol. 78(5):693-701 (2006); Heetae, et al "*Elevated post-transfusion serum transaminase values associated with a highly significant trend for increasing prevalence of anti-Vesivirus antibody in Korean patients,*" J Med Virol, 84(12): 1943–1952 (Dec. 2012).

59.     Genzyme Corporation interviewed Dr. Alvin Smith, a leading expert on Vesiviruses for a job in assisting remediation efforts in 2009.

60.     Dr. Smith informed Genzyme Corporation that the adulterated Fabrazyme would likely harm humans and delineated the symptoms that Genzyme Corporation should monitor for Fabry patients that were injected with Vesivirus contaminated Fabrazyme, including the observed Vesivirus-induced vesiculating rashes observed in Fabry patients receiving tainted Fabrazyme.

61.     Genzyme Corporation decided not to hire Dr. Smith and decided not to monitor any of the Fabry patients for symptoms of Vesivirus infection or change the warning labels, despite a duty to monitor and warn as part of post-marketing pharmacosurveillance.

62.     In May 2010, the FDA and Department of Justice obtained a consent decree against Genzyme Corporation, which included a $175,000,000.00 fine and oversight of the manufacturing of Fabrazyme for at least seven years.

63.     "Concern also exists for agents that are not obviously productively infectious for humans or for human cells *in vitro*, because they /may have the potential to become latent and may be oncogenic [cancer-causing] in non-host species." Marcus-Sekura, et al. "Evaluation of the Human Host Range of Bovine and Porcine Viruses that may Contaminate Bovine Serum and Porcine Trypsin Used in the Manufacture of Biological Products," *Biologicals*. 6:359-69, FN3 (2011); *Id.* at p.368, para. 4.7 (*emphasis added*).

64.     According to a former Genzyme Corporation scientist conducting purity testing in the new Framingham, Massachusetts plant, Vesivirus contamination was again detected by polymerase chain reaction (PCR) tests on at least three occasions in 2013 and

at least once in 2015, as had initially occurred in the former Genzyme Corporation Allston plant in 2008 and 2009, and the Geel plant.

65. These infected lots were shipped to the Plaintiffs, who were injected with them.

66. All of the viral strains are closely related genetically and were derived from the same progenitor virus at the Genzyme facility.

67. When senior management at the Framingham plant was informed about each new positive contamination report, the management dismissed the Vesivirus PCR contamination tests as "false positives."

68. However, Genzyme Corporation's standard operating procedure after obtaining a positive PCR test was supposed to be (a) further checking for viral particles using electron microscopy, (b) attempting to culture and sequence the genome of the potential viral contamination, (c) notifying compliance officers and legal counsel, and (d) notifying the FDA. See, for example, Qui Y., *et al.* "Identification and quantitation of Vesivirus 2117 particles in bioreactor fluids from infected Chinese hamster ovary cell cultures." Biotechnol Bioeng. 2013 May;110(5):1342.

69. None of the internal standard safety procedures were followed by Genzyme Corporation. Its scientists' concerns were ignored. Its compliance and legal advisors were bypassed. The FDA and Department of Justice were not informed of the Framingham test results despite the mandated ongoing oversight from the 2010 consent decree.

70.     The 2013 and 2015 Vesivirus contaminated Fabrazyme was distributed to all U.S. Fabry patients without warnings and without their knowledge.

71.     Genzyme Corporation intentionally sold Vesivirus contaminated Fabrazyme in 2013 and 2015 to Plaintiffs, and the other surviving Plaintiffs, with which they again were injected and injured.

72.     Genzyme Corporation was (and remains) under a legal duty to report these positive test results to the FDA and was (and remains) under a duty to conduct additional post-marketing pharmacovigilance investigations under the supervision of the FDA.

73.     In September of 2016, Genzyme Corporation published its own research disclosing at least one additional danger of Vesivirus 2117 (Allston)—the Vesivirus attaches to human cells for at least two weeks. Plavsic, *et al.*, *Caliciviridae* and *Vesivirus* 2117. *BioProcess. J.* 2011:9, 6.

74.     Virus protein attachment activates cell defense mechanisms that are dangerous to humans, including inflammatory responses and cell death. Mogensen, et al., "Molecular pathways in virus-induced cytokine production." *Microbiol Mol Biol Rev.* 2001;65(1):131–150.                                  Available                                  at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC99022/. *See also* Peñaflor-Téllez *et al.*, Immune Response Modulation by Caliciviruses. *Front Immunol.* 2019:10, 2334. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6779827/.

75.     Viral inactivation/filtration procedures used on contaminated Fabrazyme still rendered it unsafe for human use because inactivation does not remove the small molecular weight viral proteins; therefore, the drug still contains decomposed and filthy

substances manufactured in such a manner that drug "may have been contaminated with filth or made injurious to health."  Indiana Code 16-42-3-3.

76.     In human Vesivirus infection, at least one target cell surface molecule has been identified as a binding ligand: human Junctional Adhesion Molecule-1 (JAM-1). Sosnovtsev SV, *et al.* "Identification of Human Junctional Adhesion Molecule 1 as a Functional Receptor for the Hom-1 Calicivirus on Human Cells," *M. Bio.* 2017; 8 (1): 1-17.

77.     JAM-1 molecule, also known as JAM-A, is expressed in adult bone marrow, embryonic cells, and fetal liver cells.  Sugano, Y., et al., "Junctional adhesion molecule-A, JAM-A, is a novel cell-surface marker for long-term repopulating hematopoietic stem cells," Blood, 2008; 111 (3): 1167-1172.  Mere binding of human JAM-1 to cells activates immunological inflammation.

78.     The Vesivirus family of viruses is particularly dangerous to females.

79.     In pigs, Vesivirus infections (known as vesicular exanthema of swine virus "VESV") can occur with concurrent diarrhea, as well as abortion, stillbirth, cessation of milk production, mortality in the infant pigs and weakness or death in growing pigs. In sea mammals, Vesivirus is associated with abortion, premature births, encephalitis, and pneumonitis. Knowles, N.J. *et al.* "Vesicular Exanthema of Swine Virus," p. 138, Chapter 16, Molecular Detection of Animal Viral Pathogens, ed. Liu, (CRC Press, 2016).   In humans, Vesivirus "caused systemic infections illness including vesicular lesions on all four extremities." *Id.*

80.     Vesivirus 2117 (Allston, Geel, and Framingham) were all grown (albeit unintentionally) exclusively in ovarian cells, thereby creating a viral tropism or preference for infecting ovarian tissue.

81.     Epidemiologically, the incidences of pre-eclampsia, pre-term birth, and other birth complications are increasing in the FDA adverse event reporting database (AERS) for Fabrazyme patients who were exposed in 2009, 2013, and 2015 to batches of Vesivirus contaminated Fabrazyme.

82.     The incidence of hematological cancer in Fabrazyme patients who were exposed in 2009, 2013, and 2015 to batches of Vesivirus contaminated Fabrazyme is also increasing according to the database.

83.     The incidences of dissecting folliculitis of the scalp and non-allergic skin blistering have similarly increased after the contaminations.

84.     Genzyme Corporation has the expertise, specialized reagents, ability, and duty to test and monitor patients for both infection to Vesivirus using PCR and exposure by enzyme-linked immunosorbent assay (ELISA). Qui Y., *et al.* "Identification and quantitation of Vesivirus 2117 particles in bioreactor fluids from infected Chinese hamster ovary cell cultures." *Biotechnol Bioeng*. 2013 May;110(5):1342.

85.     Genzyme Corporation already tests its customers' blood for DNA positive for Fabry disease by PCR, GL-3 buildup by ELISA over time, and anti-Fabrazyme antibodies by ELISA over time.

86.     Genzyme Corporation states in its FDA warning label that it undertakes a special duty to women in particular to monitor the effects of Fabrazyme on their reproductive health and safety.[4]

87.     Genzyme Corporation should test and monitor all of the patients who were exposed to Vesivirus, including the Plaintiffs herein as it already does for GL-3 and anti-Fabrazyme antibodies.

## Improper Fabrazyme Dosage[5]

88.     In 2009, limited stocks of Fabrazyme were available for supply, all of which were contaminated, so Genzyme Corporation recommended a new and untested method of treating Fabrazyme patients with what Genzyme called "low dose" Fabrazyme or "dose skipping".

89.     "Low dosing" Fabrazyme consisted of Genzyme selling a "full dose" in the sense it was the proper mass and number of vials per weight of the patient, but "low dose" in that it was shipped once every 1-6 months instead of bi-weekly as prescribed.

---

[4] Fabrazyme FDA label:  17. PATIENT COUNSELING INFORMATION Patients should be informed that a Registry has been established in order to better understand the variability and progression of Fabry disease in the population as a whole and in women [see Use in Specific Populations (8.6)], and to monitor and evaluate long-term treatment effects of Fabrazyme. *Emphasis added.*

[5] For the purpose of the complaint a "dose" refers to the mass amount of Fabrazyme administered to a patient in one infusion (e.g., 70mg to a 150lb patient), but dosage refers to the amount given the patient over time 1mg/kg every two weeks.  The pharmacology of Fabrazyme dosage changes whether the correct amount is given according to the patient's weight (1mg/kg) as well as according to how often the drug is administered (every two weeks).

90.     Patients were given a choice of taking a reduced dose (0.5-0.2mg/kg) every two weeks or take a full dose (1mg/kg) administered every month or longer by skipping doses.

91.     Either way, the FDA only approved Fabrazyme to be given at 1mg/kg administered every <u>two weeks</u> as described on the label and as prescribed by Plaintiffs' physicians.

92.     Genzyme Corporation "low-dosed" U.S. Fabry patients from July 2009 until sometime between March and July of 2012, despite all patients being prescribed a normal dosage for unadulterated Fabrazyme.

93.     Changing the dose frequency caused injuries to Fabry patients because 'low dosing" is ineffective in treating Fabry disease.

94.     First, as recognized by the Supreme Court when treating terminal diseases such as HIV and cancer, administering ineffective dosages of drugs are unsafe because the disease progresses without effective treatment. [6] [7]

_____

[6] "But, if an individual suffering from a potentially fatal disease rejects conventional therapy in favor of a drug with no demonstrable curative properties, the consequences can be irreversible.(FN)15" *U.S. v Rutherford,* 442 U.S. 544, 556 (1979) [FN13] 42 Fed.Reg. 39768, 39787 (1977) (statement of Dr. Carl Leventhal, Deputy Director of the Bureau of Drugs, FDA, and Assistant Professor of Neurology and Pathology at Georgetown University) ("The safety of a drug for human use depends, in large measure, on the therapeutic effectiveness of the particular drug. . . . In the case of cancer, treatment with an ineffective drug will . . . inexorably lead to the patient's death"); ibid. (statement of Dr. George J. Hill II, Chairman of the Department of Surgery at Marshall University School of Medicine, W.Va.) (Ineffectual treatment can lead to delay in accepted modes of therapy and needless deaths; thus, "[i]n the absence of scientific evidence of effectiveness, no drug intended for use in treating cancer can be regarded as safe").

[7] The last time the Supreme Court allowed an ineffective drug to be marketed under common law in the U.S. was in 1911 for "Dr. Johnson's Mild Combination Treatment for Cancer" because the seller did not mislead about the ingredients but only mislead about the effectiveness of the drug for treating cancer. President Taft subsequently encouraged Congress to tighten the Food, Drugs and Cosmetics Acts to prevent such sales of ineffective drugs from happening again and the law was changed.

95.     Fabry disease is a terminal disease, therefore "low dosing" was unsafe since it was not effective for treating Fabry disease.

96.     Second, "low dosing" was injurious because it caused unique side effects, that are not observed with a proper dosage regimen.

97.     The drug regulatory body for Europe, the European Medicines Agency, was monitoring "low-dosing" for Europeans when Genzyme Corporation experimented with "low dosing."

98.     After three months, adverse event reports in Europe showed that "low dosing" was increasing the incidence of Fabry-related injuries and accelerating the disease process in European Fabry patients as well as immunologically sensitizing patients to the Fabrazyme itself.

99.     Europe banned "low-dosing" entirely and required Genzyme Corporation to change the label to warn patients of possible acceleration of the Fabry-disease process.

100.    Genzyme Corporation did not, and still has not, changed the label in the U.S. to reflect the clinically observed dangers of "low dosing" as required under the Supreme Court ruling in *Wyeth v. Levine*. *Wyeth v. Levine*, 555 U.S. 555 (2009).

101.    Genzyme Corporation had never studied the short term or long-term effects of "low dosing" on U.S. Fabry patients in any clinical FDA trial, although the results of this experiment are documented in the ongoing Fabry registry, which includes the "control group" of Europeans on "full dose" at the same time.

102.    Moreover, Genzyme Corporation's instructions to "low dose" violated a fundamental scientific foundation of drug safety in modern molecular pharmacology and medical posology.

103.    Chemically, Fabrazyme is a protein.  Proteins can inherently induce anaphylaxis but are more likely to induce this reaction at low doses—termed "sensitization."

104.    "Low dosing" a protein like Fabrazyme increases the likelihood that Fabrazyme will induce an immune response against Fabrazyme itself because the immune system is more likely to interpret low-dose protein as a pathogen and become hypersensitive to subsequent injections.

105.    Concomitantly, "low dosing" decreases the effectiveness of the drug because lower doses do not effectively clear the GL-3 from a Fabry patients' system—and, independently, the Fabry disease process itself is accelerated as observed by the European Medicines Agency.

106.    As a result of "low-dosing", Genzyme Corporation had eliminated the therapeutic window for treating Fabry disease with Fabrazyme (lacking therapeutic effect while enhancing the likelihood of known side-effects)—notwithstanding the fact that the Fabrazyme was adulterated with Vesivirus and glass, rubber, and steel particles as well.

107.    Genzyme Corporation intentionally avoided warning patients that the therapeutic window for "low dose" Fabrazyme was effectively non-existent and the risk of sensitization and acceleration of disease was increased.

108.   Genzyme Corporation never changed the label in the U.S. like it did in Europe, despite the greater length of time U.S. patients were "low-dosed" (two and one-half years versus three months) and the far greater diminution of the dose than even those experienced by European patients (20% or less than the recommended dosages for U.S. patients in some months).

109.   Genzyme Corporation, therefore, foresaw and even documented all of the detrimental effects of "low doses" on U.S. patients through private communications through case managers and through the Fabry Registry data collection which is still ongoing.

110.   Genzyme Corporation could and should have mitigated the effects of the virus-contaminated, particulate contaminated, "low dose" Fabrazyme by providing adequate directions for use and adequate warnings against unsafe dosage or methods or duration of administration or application in the manner and form that is necessary for the protection of users.

111.   As a result of Genzyme Corporation's defective "low dosing" over the span of more than two years, Plaintiff Wilkins lost 80% of her hearing--far faster than she would have, if at all, if she had taken no Fabrazyme at all during this low dosing period.

112.   As a result of Genzyme Corporation's defective "low dosing" over the span of more than two years, Plaintiff Wilkins experienced accelerated cardiac swelling and heart arrhythmia.

113.   As a result of Genzyme Corporation's defective "low dosing" over the span of more than two years, Plaintiff Wilkins experienced multiple trans-ischemic attacks (i.e.,

mini-strokes) which she never had prior to "low-dosing," resulting in rapid, significant, and permanent loss of cognitive function including loss of short-term and long-term memory.

114.    As a result of Genzyme Corporation's defective "low dosing" over the span of more than two years, Plaintiff Wilkins had unusually rapid progression of kidney disease from class I to class III in less than two years until the "low-dosing" ceased.

115.    By following Genzyme Corporation's defective "low-dosing" instructions, Plaintiff Wilkins experienced accelerated progression of kidney disease from class I to class III in less than two years and her kidney started shrinking which had never occurred until low-dosing.

116.    By following Genzyme Corporation's defective "low-dosing" instructions, Plaintiff Wilkins will likely require a kidney transplant in the future.

117.    As a result of Genzyme Corporation's defective "low dosing" over the span over the span of more than two years, Plaintiff Wilkins had severe neuropathic paresthesia (burning in hands and feet) that she had had never experienced before she went on "low-dose" Fabrazyme treatment.

118.    As a result of Genzyme Corporation's defective "low dosing" over the span over the span of more than two years, Plaintiff Wilkins' immune system was sensitized to Fabrazyme resulting in severe anaphylactic reactions (antibody mediated shock) when normal dosing resumed—a condition she did not have when being treated with Fabrazyme prior to 2009 and could not have known until she resumed full dosing and experienced the anaphylactic response in 2012 when she was returned to full dosage.

119.     After being sensitized by "low-dose" over the span over the span of more than two years, Plaintiff Wilkins required admission to a hospital intensive care unit for infusion and steroid treatment because every time she was infused with full-dosage Fabrazyme (twice a month) in 2012, her throat swelled shut cutting off her ability to breath, thereby requiring 24 to 48 hours of constant medical monitoring.

120.     Prior to "low-dosing," Plaintiff Wilkins was able to tolerate Fabrazyme and could receive home infusions without medical monitoring or use of steroid pre-medications.

### Combined Injuries from Improperly Dosed Fabrazyme containing Vesivirus, and Glass, Rubber, and Steel Particles

121.     Fabry disease itself is an inflammatory process that causes damage to the vascular system.

122.     Mechanistically, Genzyme Corporation would have expected that the underlying Fabry disease process would be accelerated by any one of the defects to the drug (pro-inflammatory Vesivirus and its fragments and pro-inflammatory, glass, rubber, and steel particles, and pro-inflammatory "low dosing.").

123.     Epidemiologically, Genzyme Corporation actually did observe the Fabry disease accelerated process in European patients in the Fabry Registry, which led to the ban of "low dosing" in Europe within four months of its introduction.  "There is a clear trend of increasing reports of (serious) AEs [Adverse Event] since the start of the shortage. The higher the percentage of patients receiving the lowered dose, the higher the number of AEs reported.  After the recommendations to switch to Replagal or to return to a higher

dose when clinical deterioration appeared, this percentage, as well the absolute number of reports, decreased.   This pattern of adverse events resembles the natural, but accelerated, course of Fabry's disease.   *Assessment report for FABRAZYME agalsidase beta on the shortage of Fabrazyme: Overview of Shortage Period: Spontaneous Reports from June 2009 through 15 September 2010 and [Fabry] Registry Data from June 2009 through 05 August 201*: Available at www.ema.europa.eu/en/documents/other/chmp-public-assessment-report-shortage-fabrazyme_en.pdf

124.   As to the U.S. label for Fabrazyme, nothing was changed despite Genzyme Corporation having direct knowledge that the low-dosing was not only ineffective, but dangerous to the health and safety of the Fabry patients.

125.   As a result of being subjected to multiple defects, all of which cause and/or increase inflammation, all surviving Plaintiffs now have a worse clinical outcome than if they had been given no drug at all because of the merger of the inflammatory disease process created by the triply-inflammatory adulterated Fabrazyme cocktail.

126.   The severity of the Fabry symptoms become worse than pretreatment levels, including Plaintiff Wilkins' inflammatory processes.

127.   The surviving Plaintiffs' life expectancies have been significantly shortened by being administered the inflammatory Fabrazyme cocktail from 2009-2015.

### Specific Allegations of Fraud

128.   On May 31, 2020, the District Court of Utah granted STAT News' request to unseal Plaintiff's (proposed) Fourth Amended Complaint in the case *Schubert v. Genzyme* (Case 2:12-cv-00587-HCN-DAO).

129.    From the detailed discovery in *Schubert* that was revealed and was not otherwise available to Plaintiffs, the *Schubert* case (hereinafter *Schubert*) reveals that all "low dose" Fabrazyme customers were intentionally defrauded.

130.    As background on March 12, 2012, Dr. Schubert's widow sued Genzyme corporation and other entities for wrongful death of her husband, who suffered from Fabry.

131.    March 12, 2012 is also the last purported month where U.S. Fabry patients received "low dose" Fabrazyme.

132.    Dr. Schubert was quickly deteriorating on "low dose" Fabrazyme and begged Genzyme to give him full doses, but Genzyme refused, and Dr. Schubert died of complications from Fabry disease on March 6, 2010.

133.    The current Plaintiffs remained on "low dose" even after the events described in *Schubert infra*, thereby further concealing the information. Genzyme remained in privity with surviving Plaintiffs and relied on Genzyme's candor to report the adverse events that had affected Dr. Schubert.

134.    The evidence of fraud appears both in the unsealed *Schubert* complaint and also as referenced, Bates-numbered documents that were not appended to the recently unsealed complaint, and therefore not subject to STAT News' petition.  The Bates numbered document references are listed in this Second Amended Complaint so that they can be produced to this court as they were produced for the *Schubert* court by the same counsel that represented Genzyme in the *Shubert* case.  Genzyme and its counsel

were in litigation with the Plaintiffs at the time of document production in *Schubert*, so the documents should be preserved in still in Genzyme's possession.

135.    The Supreme Court recognizes that state law regarding safety and purity requirements as well as actions sounding in violation of that law are not pre-empted by the Food, Drug and Cosmetics Act, especially when the use is "off label." *Wyeth v. Levine*, 555 U.S. 555 (2009)

136.    In a series of affirmative, knowing, reckless, and fraudulent acts by Genzyme, it allocated supplies and provided information to consumers during the shortage in a way that manipulated patients into accepting ineffective treatment, and ultimately required patients to take an ineffective and "off label" dose of Fabrazyme during the shortage without adequately warning them of the risks.

137.    At all times relevant hereto, Fabrazyme was marketed under the Orphan Drug Act, 21 U.S.C. § 360aa et seq. "Protection for drugs for rare diseases or conditions", and U.S. patent 5,356,804 giving Genzyme a government-approved monopoly on Fabry Enzyme Replacement Treatment (hereinafter ERT) in the U.S.

138.    Because Orphan Drug manufacturers are granted a government-sanctioned monopoly, so long as a manufacturer continues to supply the drug to customers, federal law imposes an affirmative statutory duty on manufacturers of Orphan Drugs to ensure "the availability of sufficient quantities of the drug to meet the needs of persons with the disease or condition for which the drug was designated." 21 U.S.C. § 360cc(b).

139.     A violation of this requirement enables the FDA to revoke an Orphan Drug's exclusivity and approve another manufacturer to sell similar drugs for use in the U.S.

140.     At all relevant times, at least one alternative drug, Replagal®, existed to treat Fabry Disease in most countries outside the U.S.

141.     However, prior to at least October, 2009, Replagal® was not readily available in the U.S. due to the Orphan Drug monopoly protection given to Genzyme.

142.     In fact, the Orphan Drug Act approval for Fabrazyme came one day prior to the approval of Replagal in the U.S., which prevented the co-pending Replagal new drug application from being approved.

143.     Therefore, Replagal® could not be obtained in the U.S. unless a physician obtained a special "compassionate use" exemption from the FDA.

144.     Genzyme was aware that the health of Fabrazyme customers required that Genzyme maintain an adequate reserve inventory of Fabrazyme at all times because (a) Genzyme was the only manufacturer licensed to sell Fabry ERT drugs in the U.S., (b) it takes months to manufacture a 'batch' of Fabrazyme (c) the yields from the reactors used to make Fabrazyme vary significantly, (d) Genzyme only had one facility approved to produce Fabrazyme, (e) Genzyme's facility had very limited manufacturing capacity, (f) it takes years to build a new facility with new bioreactors to thereby increase Fabrazyme production, and (g) Fabry Disease is deadly if left un- or undertreated.

145.     Genzyme also knew that the clinical efficacy of Fabrazyme is highly dose-dependent.

146.     Specifically, Genzyme knew that if Fabrazyme purchasers were deprived of their full 1.0 mg/kg doses of Fabrazyme every two weeks, many purchasers would experience significant clinical deterioration and some would likely suffer premature death. See, e.g. GENZYME013854 (*Schubert*).

147.     Therefore, long before the 2009 shortage, Genzyme knew that reducing dose below levels approved by the FDA in the event of a shortage was neither a safe nor appropriate option.

148.     Moreover, it was not a legally authorized option, because Genzyme had only obtained approval from the FDA to sell Fabrazyme in 1.0 mg/kg doses administered bi-monthly, the FDA had only evaluated the drug at that dosage, and the product labelling for Fabrazyme only lists the approved dose of 1.0 mg/kg administered every two weeks.

149.     In the mid 2000's, Genzyme planned to bring, and then brought, another ERT drug called Myozyme to market. Genzyme decided to manufacture Myozyme at the Allston plant, placing further strain on its limited bioreactors.

150.     Genzyme affirmatively decided to produce Myozyme at the Allston plant without sufficiently increasing its ERT manufacturing capabilities. This decision significantly reduced the quantity of Fabrazyme that Genzyme was able to manufacture.

151.     Thus, by 2008, Genzyme knew that its existing reserves of Fabrazyme inventory and capabilities to produce additional Fabrazyme were inadequate and that supply shortages were foreseeable.

152.    Nevertheless, and despite having no backup supply or manufacturing capacity to produce reserve inventory, between 2007 and 2010, Genzyme affirmatively directed its sales force to aggressively market Fabrazyme, Cerezyme, and Myozyme, to new patients in existing and new geographic markets. These efforts led to further increases in demand for Fabrazyme and other ERT drugs, caused further reductions to inventories of Fabrazyme, and put ERT patients at increased risk in the event that there was any reduction or interruption in production at the Allston plant.

153.    During September and October, 2008, the FDA conducted an inspection of the Allston plant.

154.    On October 10, 2008, the FDA issued a warning letter to Genzyme listing multiple quality control and system failures and other deviations from the current good manufacturing practice ("CGMP"), including failing to demonstrate "critical aseptic connections" in the HVAC system, failing to fill vials in a qualified manner, failing to maintain surfaces of contraptions used in production of Fabrazyme free from "roughing," failing to have a proper cleaning validation assessment of Fabrazyme, and failing to properly document and respond to manufacturing "deviations."

155.    This letter put Genzyme on clear notice that its quality control, quality assurance, and manufacturing systems were inadequate and needed immediate remediation.

156.    Genzyme responded to the FDA on October 31, 2008, assuring the FDA that it would remedy the deficiencies. However, Genzyme then affirmatively chose to not remediate many of the deficient conditions identified by the FDA.

157.    Upon information and belief, as a result of Genzyme's failures to correct problems with its CGMP processes, quality control, quality assurance, and manufacturing systems, Genzyme negligently allowed a virus, Vesivirus 2117, to contaminate Genzyme's Allston plant in the fall of 2008.

158.    Genzyme informed the FDA and the public that Vesivirus 2117 was not believed to be harmful to humans but caused a reduction in the yield of Fabrazyme and other drugs produced in its bioreactors.

159.    On February 27, 2009, the FDA wrote a second warning letter to Genzyme to advise Genzyme that it had not remediated many CGMP deficiencies identified in the FDA's October, 2008 warning letter.  The February 27, 2009 letter also informed Genzyme that the "objectionable conditions" at the Allston plant were caused by "significant" deviations from CGMP.  The FDA stated that additional assurances were needed from Genzyme.              Publicly              available              at http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm148998.htm.

160.    Upon information and belief, Genzyme responded to the letter and assured the FDA that it would remediate the problems the FDA identified.

161.    Genzyme again affirmatively chose not to take all steps necessary to bring its plant into CGMP compliance and rectify the quality control, quality assurance, and manufacturing deficiencies.

162.    In June, 2009, due at least in part to Genzyme's decisions to neither bring its plant into compliance with CGMP nor remediate its quality control and quality

assurance deficiencies, Genzyme again negligently allowed Vesivirus 2117 to contaminate Genzyme's Allston plant.

163.    In mid-June, 2009, Genzyme suspended production of Fabrazyme and several other ERT drugs manufactured at the Allston plant due to the viral contamination in the bioreactors.

164.    Due to Genzyme's announcement that it was halting production at the Allston plant, the Office of Orphan Products Development, a branch of the FDA, issued a letter to Genzyme on July 6, 2009. The July 6 letter stated, in part:

> Based on information provided by Genzyme to the review division, we understand that there is a supply shortage for Fabrazyme for the treatment of Fabry Disease caused by the suspension of production at your Allston Landing production site. Pursuant to 21 CFR 316.36, we ask you to provide a written detailed explanation of the measures being taken to assure the availability of sufficient quantities of drug within a reasonable time to meet the needs of patients with Fabry Disease. Holders of exclusivity for approved orphan drugs are expected to assure the availability of sufficient quantities of their orphan drug to meet the needs of patients. Failure to do so could result in the withdrawal of the drug's exclusive approval [21 CFR 316.36(b)].  GENZYME 626545 (*Schubert*).

165.    On July 9, 2009, Genzyme responded in writing. Genzyme's response misrepresented "assurances" to the FDA that it could continue to supply the market with sufficient quantities of Fabrazyme to meet the needs of the persons affected with Fabry Disease. Genzyme misrepresented that the shortage of Fabrazyme would "last approximately 4 weeks." Genzyme also attached a copy of the guidance document it had created for physicians and patients (discussed below) concerning supply management

which contained the false statement that efforts to conserve supply would "be the same irrespective of geography." GENZYME626538 (*Schubert*).  See also, Doc. 4

166.    At the time Genzyme sent the July 9, 2009 letter, Genzyme did not have a reasonable basis for assuring the FDA that it could continue to supply the market with sufficient quantities of Fabrazyme® to meet the needs of persons affected with Fabry Disease or that it could "assure" the FDA that the shortage would last approximately 4 weeks.

167.    At the time Genzyme sent the July 9, 2009 letter, Genzyme knew that the shortage could persist much longer than 4 weeks for any number of reasons and that its existing inventory would only last a couple of months.

168.    At or about the same time, in various press releases to financial analysts and in letters to patients and physicians, Genzyme represented that the shortage would "occur for a limited period," GENZYME000133 (*Schubert*), would be "a temporary shortage," GENZYME000250 (*Schubert*), and would "last approximately 6-8 weeks," GENZYME000026 (*Schubert*); GENZYME000193 (*Schubert*).

169.    The FDA again inspected the Allston plant during the months of October and November 2009 in connection with its review of Genzyme's CGMP violations.  On November 13, 2009, the FDA issued another warning letter detailing several more deviations from CGMP it had observed during its October 2009 re-inspection of the Allston plant. The letter noted, inter alia, Genzyme had received "many" reports of foreign particles, including glass and rubber particles, in vials; that Genzyme failed to identify the source of the contaminants; that Genzyme failed to perform necessary

calibration of equipment used to manufacture the drugs; that Genzyme had failed to investigate the sources of other contaminations within the plant that had been discovered in past inspections; that there was no documentation showing that the equipment used in the manufacturing process was cleaned prior to use; and that particles were visible inside the aseptic fill rooms of the plant. The FDA concluded and advised Genzyme that the "Quality Assurance oversight of control process is insufficient."

170.    In November 2009, under pressure from the FDA, Genzyme shut down production at the Allston plant for a second time as a result of these ongoing CGMP deficiencies.

171.    On November 11, 2009, Genzyme sent letters, signed by W. Blair Okita, Senior Vice President, Quality and Technical Operations, to physicians to let them know that "Genzyme has detected foreign particles in some products filled at the Allston" plant, including rubber, steel and other "fiber-like material." GENZYME060578 (*Schubert*).

172.    However, Genzyme affirmatively decided to not inform physicians that it had to shut down its fill/finish operations to perform maintenance. Genzyme instructed its employees, if asked, to state that "Genzyme does not currently expect this to affect the availability of new supply of [] Fabrazyme." Id.  It wasn't until December 1, 2009, in different letters, that Genzyme informed physicians and patients that "the temporary interruption of fill/finish operations for maintenance" would significantly impact and increase the duration of the supply shortage for Fabrazyme. GENZYME019560 (*Schubert*).

173.     Genzyme's repeated failures to bring its plant into compliance with CGMP caused the FDA to file a complaint for permanent injunction against Genzyme on May 24, 2010. In its lawsuit, the FDA petitioned the court to enjoin Genzyme from introducing adulterated ERT drugs, including Fabrazyme, into the market, in violation of 21 U.S.C. § 351(a)(2)(B) (prohibiting production of drug in manner not complaint with CGMP) and 21 U.S.C. § 351 (c) (prohibiting production of drug whose "strength differs from, or its purity or quality falls below, that which it purports or is represented to possess"). See Complaint for Permanent Injunction, *U.S.A. v. Genzyme Corp et al*, 1:10-cv-10865, Dkt. No. 1 (D. Mass May 24, 2010).

174.     The FDA's complaint alleged that its inspections "established that the drugs manufactured [are] . . . not in compliance with [CGMP]," *id.* at ¶ 10; that FDA inspectors had "documented forty-nine (49) separate deviations from CGMP," *id.* at ¶ 12, that the FDA inspections "established that the drugs manufactured by [Genzyme] are also adulterated within the meaning of 21 U.S.C. § 351(c), in that their strength differs from, or their purity or quality falls below, that which they purport are represented to possess," *id.* at ¶ 13, and that Genzyme's "noncompliance has continued despite repeated warnings from the FDA regarding their CGMP violations," *id.* at ¶ 18.

175.     On the same day, May 24, 2010, the FDA and Genzyme entered into a consent decree which was approved by the Massachusetts Federal District Court on November 9, 2010.

176.     See Consent Decree of Permanent Injunction, *U.S.A. v. Genzyme Corp*, Dkt. Nos. 2, 12 (Nov. 9, 2010). The consent decree permanently enjoined Genzyme "from

directly or indirectly manufacturing, processing, packing, labelling, holding, or distributing any drugs" at the Allston plant "unless and until [Genzyme's] facilities, methods, processes and controls . . . are established, operated, and administered in conformity with CGMP" and unless and until Genzyme hired "an independent person [] to inspect the Allston Facility" to ensure compliance, *id* at ¶¶ 4(A) and (B), and from distributing an adulterated drug "within the meaning of 21 U.S.C. §§ 315(a)(2)(B) or (c)," *id.* at ¶ 19.

177.    In 2009, in many countries outside the U.S., including Canada, Mexico, and the countries of Europe, a competitor's drug, Replagal, was approved and was available as an ERT therapy to treat individuals suffering from Fabry Disease.  Replagal® is another synthetic biological replacement for the enzyme lacking in those that suffer from Fabry Disease. Unlike Fabrazyme, Replagal® is derived from human cells, whereas Fabrazyme is derived from hamster ovary cells.

178.    Replagal® was manufactured by Shire Pharmaceuticals.  Unlike Fabrazyme, Replagal® was designed to be effective and was approved for sale at a dose of 0.2 mg/kg administered every two weeks.

179.    Genzyme's internal documents show that by 2009, Genzyme believed that Replagal® was, structurally and functionally, a biological equivalent to Fabrazyme. GENZYME003017 (*Schubert*).

180.    In countries where both Fabrazyme and Replagal® were available, both had a significant share of the market and competition was keen.

181.    In 2008 and 2009, Genzyme created documents for its marketing and sales force, instructing them that the drugs were biologically functionally equivalent, but that Fabrazyme® was a better treatment alternative because it was sold in a higher dose. *E.g. id.*

182.    In fact, several of Genzyme's marketing and training documents were built around the talking point "only dose matters."

183.    Genzyme's plan to favor foreign patients where there was market competition in the event of a product shortage.

184.    In 2008 and 2009 Genzyme understood and taught its sales force that providing a full 1.0 mg/kg dose of Fabrazyme® every two weeks was critical to effectively control the life-threatening progression of Fabry Disease conditions. GENZYME003017 (*Schubert*).

185.    As discussed below, Genzyme also knew that many Fabry patients would suffer significant and irreversible medical decline if deprived of full dose Fabrazyme.

186.    By 2008, knowing that supplies of Fabrazyme were tenuous, Genzyme had conducted work on a Fabrazyme Global Contingency Plan and outlined a proposed response to a supply interruption in a document ("Contingency Plan"). GENZYME638592 (Schubert).

187.    In the Contingency Plan, Genzyme acknowledged that Fabrazyme was "very vulnerable" to manufacturing supply interruptions. The Contingency Plan detailed how Genzyme intended to respond to a Fabrazyme supply disruption. *Id.*

188.    The Contingency Plan also recognized that it would be necessary to make appropriate allocation decisions to preserve patient health if a supply shortage occurred.

189.    The Contingency Plan further stated that, in the event of a supply interruption, "strong messaging" would be needed to influence physicians and patients to follow Genzyme's suggested allocation plan during the period of shortage. *Id.*

190.    Genzyme's Contingency Plan states that in the event of a supply interruption, during the initial stages of any interruption**, the "EU markets" would be "protected" with favored treatment** because of what the authors termed the **"business value"** of the European market. *Id.*

191.    Under the Contingency Plan, patients in Europe would not, at the outset, be asked to make the same sacrifices in altering their treatment regimen as would U.S. patients. *Id.*

192.    In other words, Genzyme's 2008 Contingency Plan revealed Genzyme's premeditated intent to give preferential treatment to European patients in the event of a supply interruption.

193.    Genzyme planned to give "protection" to the European Market during the initial stages of a shortage because Genzyme knew that patients in Europe could easily switch to Replagal® while patients in the U.S. could not.

194.    In fact, as detailed below, during the critical first months following the June, 2009 plant shutdown, Genzyme did "favor" the European market by creating more favorable allocation plans for European patients than for U.S. patients and then

permanently switched them to "full doses" thereby further reducing the supply of Fabrazyme being sent to U.S. patients.

195.    Therefore, Genzyme's Contingency Plan for Fabrazyme supply interruptions, and the plan that was followed after the supply interruption was announced, as discussed below, placed concern for preservation of Genzyme's European market share over the health of U.S. patients and evinced a premeditated, knowing, and reckless disregard for the health of Genzyme's U.S. patients, including the named plaintiffs.

196.    By June 2009, Genzyme knew that it had inadequate reserves of Fabrazyme to last more than a few months and that it was uncertain how quickly the Allston plant could be fully remediated. Genzyme also knew that because the quantity of Fabrazyme it could produce in each production cycle and the time each production cycle took were unpredictable, that even when the Allston plant resumed at full capacity, it would take months, at a minimum, to resume full production of Fabrazyme. GENZYME174394 (*Schubert*).

197.    Genzyme also knew that since 2008, it had been unable to remediate CGMP deficiencies noted by the FDA or to alter its internal quality assurance and control protocols in order to avoid future problems.

198.    In fact, as described more fully below, Genzyme employees charged with evaluating the supply situation in the wake of the supply interruption informed upper management that supplies would be tenuous and unstable for several years due to inadequate manufacturing capacity and the lack of inventory. This information was

confirmed in internal emails. *E.g.* GENZYME004750 (*Schubert*). This information was knowingly and fraudulently concealed from physicians, patients, the FDA and the public.

199.    Therefore, in late June and early July 2009, Genzyme knew that it could not reasonably "assure the availability of sufficient quantities of the drug to meet the needs of persons with the disease or condition for which the drug was designated," and that a shortage of Fabrazyme was imminent.

200.    However, Genzyme affirmatively misrepresented in June 2009 press releases that Genzyme was "confident . . . in [their] ability to resolve the issue affecting the [Alston] plaint" and that "[t]he impact will be temporary."   GENZYME000133 (*Schubert*).  Genzyme further misrepresented that "the period of constraint" would only "last approximately 6-8 weeks." GENZYME000136 (*Schubert*).

201.    Genzyme's projections in June – September 2009 that the shortage would be 6 – 8 weeks were completely untenable.

202.    At a minimum, Genzyme lacked sufficient data to make such a "confident" prediction as to the length of the shortage.

203.    Shortly after Genzyme announced the Allston plant's closure, Genzyme learned that financial analysts were predicting that if the shortage was protracted, Genzyme could lose around $100,000,000 in annual sales revenues, over $30,000,000 of which were related to Fabrazyme sales. GENZYME048765.

204.    The financial analyst reports were quickly and widely circulated to many, if not all, of the key Genzyme management decision makers charged with formulating

Genzyme's response to the impending shortage and drafting communications to the FDA, Fabry patients, physicians, advocacy groups, and the media. *E.g. id.*

205.    Genzyme knew that to maintain its Orphan Drug monopoly in the U.S. and avoid losing Fabrazyme patients elsewhere to Replagal®, it would have to assure the FDA and the community of Fabrazyme users that any supply shortage would be very brief. Otherwise, as Genzyme knew, the FDA had authority to revoke Orphan Drug protection for Fabrazyme and would likely work with Shire Pharmaceutical to bring Replagal® to the U.S. Market.

206.    Genzyme also was aware that because Fabrazyme and Replagal® were essentially biologically identical, once a patient switched to treatment with Replagal, Genzyme might lose that patient's business forever.

207.    Genzyme therefore proceeded to provide false, misleading and or groundless assurances in ongoing public announcements throughout the remainder of 2009, that (1) Fabrazyme would only be in short supply for very short period, ranging from 6-8 weeks to a few more months, (2) problems with the Allston plant and bioreactors were being swiftly and effectively remedied, and (3) full production would soon resume. E.g. GENZYME000026 (*Schubert*) (June 19, 2009 supply update website post stating plant closed to "sanitize the Allston facility" that the shortage would "last approximately 6-8 weeks," and that "inventories will stabilize by the end of 2009") (*Schubert*). GENZYME000250 (July 2, 2009 letter to patients and physicians stating production was halted "to allow for sanitization of the entire facility" and that the shortage would be "temporary") (*Schubert*) GENZYME000139 (July 22, 2009 article following Genzyme

announcement that included statement that "Genzyme has now completed the sanitization and is on-track to resume production at Allston this month") (*Schubert*). GENZYME000045 (Sept. 1, 2009 supply update website post stating "both Fabrazyme bioreactors . . . are up and running" and that "new inventory [] is expected to become available during the November/December timeframe") GENZYME046651 (*Schubert*) (September 24 letter to patients and physicians stating production was halted "to allow Genzyme to complete a comprehensive sanitization process" and that newly produced vials of Fabrazyme "are now expected to be available in the first quarter of 2010" to "help allow patients to resume normal dosing.") (*Schubert*)

208.    These communications were made so that Genzyme would not lose its Orphan Drug monopoly in the U.S. and could influence patients and physicians in the U.S. to accept dosages in a manner that allowed Genzyme to favor foreign markets, especially the European market, where Replagal® could be obtained.

209.    In contrast to Genzyme's representations during June - September 2009 that the shortage would last only 6-8 weeks and would be over by December 2009, the Fabrazyme shortage lasted nearly three years. Full "on-label" dosing of Fabrazyme at 1.0 mg/kg administered every two weeks was not restored until March-July of 2012.

210.    Immediately after its June 16, 2009 announcement, Genzyme began creating a plan, consistent with the 2008 Contingency Plan, that favored European patients with a better supply of Fabrazyme than U.S. patients were allocated so that European patients would not be as likely to switch to alternative treatments, especially Replagal®, thereby "protect[ing]" the European market and its "business value."

211.    Pharmaceutical drugs, including Fabrazyme and Replagal®, are regulated in Europe by the European Medicines Agencies ("EMA"), an entity with functions similar to the U.S. FDA.

212.    Within ten days of announcing the plant shutdown, Genzyme affirmatively provided recommendations to the EMA and a European advocacy group ("EU FSWG") concerning how Fabrazyme would be supplied to patients during the shortage. See GENZYME174394; GENZYME055789 (*Schubert*).

213.    In these late June – early July, 2009 communications, Genzyme indicated that in the European countries, only adult female patients without clinically significant symptoms would receive doses lower than 1.0 mg/kg every two weeks and that adult males should not lower their dose as a result of the announced shortage. Genzyme also gave the EMA specific criteria by which physicians could evaluate whether patients had clinically significant symptoms ("June E.U. guidance"). *See* GENZYME174394; GENZYME055789 (*Schubert*).

214.    Genzyme was aware of medical evidence to support these European recommendations—specifically, that female Fabry patients respond differently to a reduction of the relevant enzyme absent in Fabry patients, making them less likely to become rapidly affected by an interruption in therapy. *E.g.* GENZYME174394 (*Schubert*).

215.    However, Genzyme was concerned for business reasons that if patients in the U.S. received the same recommendations as European patients, supplies of Fabrazyme would quickly be exhausted around the world, including Europe.

216.    This would cause Genzyme to lose market share as predicted by the financial analysts. Many European physicians and patients would switch to the approved dose of Replagal® over an unapproved, reduced dose of Fabrazyme.

217.    This would also cause U.S. physicians and patients to lobby for abolition of Fabrazyme's protected Orphan Drug status so they could more easily acquire Replagal®.

218.    Thus, at the same time Genzyme proposed a medical plan to protect European male patients and European patients with severe clinical symptoms, Genzyme recommended a discriminatory plan for U.S. Fabry patients.

219.    On June 27, 2009, Genzyme proposed an allocation and communications plan for U.S. Fabry patients designed to cause every adult patient in the U.S. to skip doses between July and October 2009, in order to conserve supplies. GENZYME046901 (*Schubert*).

220.    Unlike in Europe, all adults in the U.S., including males and all adults with clinically significant symptoms of Fabry Disease, were to join in skipping doses.

221.    In order to fulfill Genzyme's need of having "strong messaging" to ensure U.S. physicians and patients complied with this plan, on June 27, 2009, Genzyme arranged to meet with a group of physicians and patient advocates, known as the U.S. Fabry Stakeholders Working Group ("US FSWG") to present Genzyme's plan for conserving Fabrazyme in the U.S. and to obtain the group's endorsement. A number of Genzyme employees, including Dr. Daniel Gruskin, attended the meeting and provided information to the US FSWG. *See id.*

222.    Upon information and belief, Genzyme organized, provided logistics to, funded meetings of, and supplied "all" necessary information to, the US FSWG as well Genzyme employees attending the meetings.

223.    Based upon review of the US FSWG's initial recommendation and materials presented to the US FSWG, Genzyme affirmatively and falsely represented to the US FSWG that its guidance and recommendations were and would be "designed to minimize risk for patients" and would "be the same irrespective of geography." *Id.*

224.    However, this was not true since, at the same time, Genzyme presented a different and more favorable plan for European patients to the EMA and the EU FSWG.

225.    In order to convince the US FSWG to go along with its discriminatory "dose skipping" plan, Genzyme also provided unsupported and false "forecasting" that predicted normal supply would resume by fall, 2009. *See id.*

226.    As detailed above, at the time of this "forecasting," Genzyme had insufficient facts to make such predictions credible. No one outside Genzyme knew, or could have known, such was the case.

227.    Genzyme also affirmatively decided to not tell the US FSWG that its plans to clean and repair parts of the Allston plant did not include overhaul of "fill/finish" operations noted by the FDA as being out of compliance at the Allston plant.

228.    In order to convince the US FSWG to approve Genzyme's plan for US patients, Genzyme affirmatively told the US FSWG, and later Fabry patients and physicians, that running completely out of supplies of Fabrazyme could only be avoided by having most U.S. adult patients, including males, skip 2 doses between July and the

end of September, 2009. Genzyme misrepresented in these communications that it was likely that if patients complied with Genzyme's "dose skipping plan," a complete depletion of supplies of Fabrazyme, or a "stock out," would be avoided.

229.    A short time later, Dr. Gruskin, then Genzyme's Global Medical Director who had attended the FSWG, sent an email to another Genzyme employee who attended the meeting, asking "Did we lie to the fswg?" The email response from his colleague, John King, Marketing Director of Fabrazyme, stated "We are the only ones who didn't" lie. GENZYME047527 (*Schubert*).

230.    Due to Genzyme's false representations that alteration in dosing for Fabrazyme would only be necessary for a few months, on June 27, 2009 the US FSWG endorsed Genzyme's allocation and dose skipping plan and endorsed Genzyme's decision not to create criteria to supply full dose Fabrazyme during the shortage to the patients with the greatest medical need for Fabrazyme or simply stop shipping Fabrazyme overseas as the Orphan Drug act and the Bayh-Dole Act mandated.

231.    The US FSWG endorsement influenced all Plaintiffs and other patients to follow the Genzyme's dose skipping plan.  Amber Britton was later told by Genzyme that she could not be put on Fabrazyme at all under the FSWG "guidelines", despite new patients being added in Europe at the same time.

232.    Genzyme then prepared "Dear Dr." and "Dear Patient" letters, issued on or about July 1, 2009 and July 7, 2009, respectively, detailing its dose-skipping plan. Genzyme created these documents and made prominent reference to the "FSWG recommendations" to ensure it had sufficiently "strong messaging" so that U.S. patients

and physicians, including all Plaintiffs (with the exception of Amber Britton), would agree to skip doses from July through September, 2009. These letters included copies of the US FSWG "guidance document." GENZYME001320, GENZYME041153. All Plaintiffs relied on these representations in making their decision to skip doses of Fabrazyme in August and September 2009 and to not seek alternatives.

233.    In order to ensure maximum compliance by patients and physicians with its dose skipping plan, Genzyme then created lists of the 50 physicians with the most Fabrazyme patients and instructed its field employees who worked with the physicians to regularly contact and monitor each prescribing physician to ensure that Genzyme's dose skipping proposals were communicated to clients and were followed. GENZYME021354 (*Schubert*).

234.    In addition to communications explained above, to encourage compliance with its dose skipping plan, throughout July and August, 2009, Genzyme frequently posted "updates" on its supply website portraying a consistent message that everything was on track an in accordance with their initial "projections." On July 14, 2009, Genzyme posted that it the sanitization "process was completed" and that production of Fabrazyme was "expected to resume by the end of this month as planned." GENZYME000034 (Schubert).  On July 22, 2009, through a press release and website post, Genzyme again confirmed it was "on-track." GENZYME000035.   On August 7, 2009, Genzyme posted an update on "dose conservation measures," stating that "we still need this effort to continue with a high level of participation" and that Genzyme "strongly encourage[d]" patients to skip doses. GENZYME000038.  On September 1, 2009, Genzyme posted another update

stating that "it remains critically important for the patients who have not yet done so to miss the equivalent of two infusions" and that "both Fabrazyme® bioreactors . . . are up and running." GENZYME000045.

235.    As explained above, Genzyme used these communications to influence, and in some cases pressure, physicians into compliance with its plan to have all U.S. patients (both adults and children) skip dose regardless of their gender and medical status.

236.    However, even if physicians disagreed and wrote full-dosage prescriptions, Genzyme would ship "low doses" anyway, effectively removing the American physicians and American Fabry patients from making their own treatment decisions, anyway.

237.    For example, in July 2009, Genzyme's Clinical Science Associate, Keith Butler, contacted Dr. Longo (a Fabry Treating Physician) to ensure he was complying with Genzyme's dose-skipping plan to have his all of his 11 Fabry patients, skip 2 doses before the end of September. GENZYME071228.

238.    In July and August, 2009 Genzyme affirmatively chose not to timely inform its U.S. Clinical Science Associates that (a) the Fabrazyme shortage was likely to last much longer than 6-8 weeks and (b) that many European patients were being treated differently than U.S. patients, based on an evaluation of which patients were most likely to be at risk of deterioration if they interrupted or reduced their Fabrazyme therapy.

239.    On September 8, 2009, Genzyme hosted a "town hall" where patients and physicians could call in and listen to updates and questions about the supply of

Fabrazyme. On the call, Genzyme employees explained that a goal in making allocations was that there would be no distinction based on country, that the process from starting a bioreactor to finalized product ready to ship was 3-4 months, and continued to encourage all to follow Genzyme's dose skipping plan. GENZYME042842 (*Schubert*).

240.    Genzyme also created and followed a policy whereby market concerns caused it to mislead U.S. physicians and patients in regard to communications of material facts needed to make good medical decisions during the shortage.

241.    Prior to the shortage, there were only two peer-reviewed and published patient studies studying the effect of Fabrazyme treatment at doses lower than the full FDA-approved dose. One article's principal author was Vedder[8] and the other's was Lubanda[9].

242.    Genzyme knew that the Vedder study, which was published in 2007, was the only study evaluating the clinical outcomes of patients on reduced doses. Genzyme knew that the Vedder study revealed that a lower dose of Fabrazyme® (0.2 mg/kg administered every other week) was not clinically efficacious for a large number of subjects enrolled in the study and that "no reduction in left ventricular mass or other disease parameters" was observed after nearly 2 years of treatment on the reduced dose. The Vedder study also showed that when study subjects who deteriorated on the reduced

---

[8] Vedder AC, Breunig F, Donker-Koopman WE, Mills K, Young E, Winchester B, Ten Berge IJ, Groener JE, Aerts JM, Wanner C, Hollak CE: Treatment of Fabry disease with different dosing regimens of agalsidase: effects on antibody formation and GL-3. Mol Genet Metab. 2008.

[9] Lubanda JC, Anijalg E, Bzdúch V, Thurberg BL, Bénichou B, Tylki-Szymanska A. Evaluation of a low dose, after a standard therapeutic dose, of agalsidase beta during enzyme replacement therapy in patients with Fabry disease. Genet Med. 2009;11(4):256

dose were switched back to the full FDA-approved dose later, the full dose failed to stop "further progression of the disease."

243.    On the other hand, the Lubanda study, published in 2009, only evaluated the effect of a lower dosage of Fabrazyme (0.3 mg/kg every 2 weeks) on measurable biomarkers that can be evaluated by lab testing of subjects. The study found that some patients taking the reduced dose had a change in biomarker levels and some did not.

244.    Of critical import, Genzyme knew that the studied biomarker had not then, and still has not, been proven to be correlated with clinical outcomes. In other words, there is no proof that Fabrazyme in such "low doses" forestalls or delays the progression of cardiac or other diseases caused by the enzyme deficiency in Fabry Disease patients.

245.    Additionally, the authors of the Lubanda study expressly stated in the published study paper that "the small sample size together with the short duration of this exploratory study did not permit analyses of clinical outcomes."

246.    Dr. Gruskin confirmed during his deposition in *Schubert* that Genzyme knows that there is no proven correlation between biomarker readings and clinical results.

Q. *Well, I'm just giving you a proffer of what I believe he said, but the question is whether you agree or disagree that biomarker levels – measured biomarker levels poorly correlate with clinical outcome?*

A. *No. I wouldn't say that. I would say that it has not been proven or demonstrated clinically that there is a correlation between biomarkers in clinical outcomes; not that there's a poor correlation.*

Deposition of Daniel Gruskin at 30:19–31:4 (Oct. 8, 2014).

247.    Nevertheless, when the 2009 supply interruption was announced, in "town hall" meetings and other communications to doctors and patients that were issued by Genzyme, Genzyme directed physicians and patients only to the 2009 study by Lubanda. Genzyme affirmatively chose to not even mention the 2007 Vedder study.

248.    Genzyme also referred only to the Lubanda study in "talking points" Genzyme provided to its clinical representatives for discussion with physicians and patients during the shortage. *E.g.* GENZYME081280; GENZYME048031 (*Schubert*)

249.    During all these communications, Genzyme knew that the Lubanda study could easily be misread, especially by a patient, as suggesting that a 0.3 mg/kg every two weeks dosage of Fabrazyme had been shown to be, or was likely to be, clinically efficacious for many patients.

250.    In fact, Dr. Gruskin also testified that Genzyme is aware of no clinically validated study confirming that Fabrazyme is clinically efficacious to prevent or forestall Fabry Disease symptoms, even at a full dose.

*Q. It's your belief that if Fabrazyme is started before the point of no return it would prevent clinical manifestations of disease?*

*A. Yes, but again, that's a belief that has not yet been verified by clinical trials.*

*Q. So if the question was based upon all the evidence that you are aware of, the medical evidence, has Fabrazyme been proven to have clinical benefit to patients, what's your answer?*

*A. My answer is Fabrazyme has not been definitively proven to prevent clinical events. Id. at 63:19–64:7.*

*Q. Is there a category of patients you can say We have the medical evidence to show that for this category of patients the drug Fabrazyme will, in fact, change clinical outcome?*

*A. No. No. . . .*

Id. at 69:11–16.

251.    Dr. Gruskin also confirmed [in deposition] that in 2009, Genzyme had not studied, and had no validated research evaluating, how quickly, rapidly, or severely skipping doses of Fabrazyme would affect the health of Fabry patients.  This is in contrast, to Dr. Gruskin stated as a signatory to the FSWG that Genzyme would monitor the effect of "low dose" on the health and safety of patients by collecting data on "low-dose" Fabrazyme patients in the Fabry Registry.

252.    Without these material facts, the US FSWG and prescribing physicians were not able to make fully informed and appropriate medical decision with patients about whether to participate in Genzyme's dose skipping plan at the start of the shortage.

253.    All Plaintiffs relied on Genzyme's misleading, inaccurate, and false representations concerning the shortage, in making decisions to skip doses and later take Fabrazyme in the "off label" manner conveyed by Genzyme or foregoing treatment entirely as in the case of Amber Britton.

254.    Genzyme knew of, but chose not to disclose, material facts concerning the medical risks of dose skipping and taking reduced "off label" doses of Fabrazyme.

Genzyme still has not disclosed the data it collected in the Fabry Registry to participants event though it contains the adverse event of Dr. Schubert's acceleration of disease and death as well as all other Americans treated with "low-dose" Fabrazyme.

255. Specifically, Genzyme was aware that male patients, especially patients with advanced clinical conditions, including atrial fibrillation, left ventricular enlargement, and cardiomyopathy, were not appropriate candidates to skip doses.

256. In fact, this information was the basis for Genzyme's June, 2009 recommendations to the EMA and EU FSWG that males and patients with clinically significant symptoms be protected from initial supply disruptions.

257. None of the American Fabry patients or their doctors were not informed of these facts by Genzyme.

258. Genzyme also chose not to disclose that if a patient were to decline after skipping or reducing Fabrazyme doses, the medical decline might be irreversible even if full dosing resumed, as detailed in the 2007 Vedder study.

259. Had Plaintiffs been informed of these facts, they would not have agreed to skip doses or forego treatment.

260. Additionally, if Plaintiffs had been told that the shortage would last longer than 6-8 weeks as Genzyme misrepresented, they would not have agreed to skip doses.

261. Additionally, had Plaintiffs been informed that after skipping several doses, they would still be required to accept a 30% supply of Fabrazyme for years to follow, regardless of their state of health, Plaintiffs would not have agreed to skip doses or delay treatment.

262.     Almost immediately after skipping the doses, all Plaintiffs health began to decline significantly.

263.     By August 2009, Genzyme's management knew that the shortage would not end by October. Genzyme delayed in communicating this to the public.

264.     At this time, Genzyme then began evaluating how to address its Fabrazyme customers once it publicly announced that normal supplies would not then be restored.

265.     During this time, Genzyme was still highly concerned about losing Fabry patients to Shire, manufacturer of Replagal®. *E.g.* GENZYME003150; GENZYME003366 (*Schubert*).

266.     During this time, Genzyme was aware that through a "compassionate use exemption," the FDA could approve the use of non-FDA-approved drugs on emergency, investigational, and/or treatment basis. The emergency access compassionate use exemption, which allows for approval and access to drugs within days of filing an application for an emergency compassionate use exemption, provides for the quickest access to non-approved drugs like Replagal.

267.     During this time Genzyme knew that if a patient experienced clinical decline while on the non-FDA-approved dosage of Fabrazyme, the patient could rapidly obtain Replagal® by making such application.

268.     However, Genzyme knew or should have known that most patients and many physicians, including Plaintiffs, did not know they could rapidly obtain Replagal® during the shortage by applying for an emergency compassionate use exemption with the FDA.

269.    Genzyme affirmatively decided to not tell physicians and patients about the process to obtain or investigate Replagal®. Instead, Genzyme initially instructed its employees to tell physicians and patients who asked about Replagal® that "A single dose substitution for a therapeutic enzyme is not easy to accomplish and the effort for patients and physicians likely exceeds the clinical benefit of the added dose." E.g. GENZYME008669 (*Schubert*). Later instructions were to simply direct patients with questions to Shire's website.

270.    By the start of August 2009, Genzyme knew that restart of the Allston plant was already weeks behind its initial unrealistic schedule. However, in August Genzyme affirmatively decided not to inform doctors or patients that they were behind schedule.

271.    In August 2009 Genzyme had received complaints from its own "field" employees (individual case managers assigned to specific Fabry patients) about Genzyme's misleading and incorrect communications about the likely duration of the shortage.

272.    For example, on August 19, 2009, Ty Donovan, a Genzyme employee, sent an email to Robert Tucker, Dr. Schubert's Case Manager at Genzyme, about matters related to the shortage. Mr. Donovan requested "feedback" about how Genzyme handled communications during the first 8 weeks of the shortage. GENZYME069468 (Schubert).

Tucker replied by email, stating:

> Seems like the information was eeked out incrementally (to staff patients and stakeholders) with the idea of not scaring patients and Genzyme hoping for and trying to will the best possible outcome in terms of shortage… Rather than dashing people's hopes over and over again we could have helped them deal with reality… I think

there is a fine line between containing the message and keeping people in the dark. This was not the time for mushroom management. **(Keep them in the dark and watch them grow!) Without the complete picture, I felt like my communication with patients was inauthentic, stilted, and potentially damaging with some patients**.

273.    Despite Tucker's feedback, it was not until over a month later, September 24 2009, that Genzyme announced it would not be able to produce Fabrazyme quickly enough to meet its false June and July, 2009 projections of restoring normal supplies by the fall of 2009. See GENZYME046651 (*Schubert*).

274.    On or about September 23, 2009 Genzyme announced that while U.S. patients had complied with its dose skipping plan, all U.S. patients would still be required to accept further dose reductions.

275.    At that time, Genzyme misrepresented that full supply would likely be restored by the first quarter of 2010. *See id.*

276.    Upon information and belief, Genzyme again proposed a different and more patient-favorable policy for European patients than the plan it presented for patients in the U.S.

277.    Genzyme affirmatively recommended to and informed the EMA and EU FSWG that, to avoid running out of Fabrazyme, all adult patients would initially be offered reduced doses to the equivalent of 0.3 mg/kg every other week. However, Genzyme affirmatively stated that all "[p]atients who demonstrate a deterioration of disease should reinitiate the original treatment with Fabrazyme." ("September E.U. guidance"). See EMA Press Release (Sept. 25, 2009), currently publicly available at

http://www.ema.europa.eu/docs/en_GB/document_library/Press_release/2009/12/ WC500018408.pdf.

278.    Again, Genzyme's announced plan for patients in the U.S. was significantly different than its plan for patients in Europe.

279.    As it did before, Genzyme affirmatively decided to fulfill its need of "strong messaging" to ensure U.S. physician and patient compliance, by convening the US FSWG.

280.    In September, 2009, Genzyme again provided the US FSWG with incomplete, inadequate, and false data regarding the worldwide allocation plan and current supply situation. This information was provided to obtain the US FSWG's endorsement of Genzyme's modified allocation plan for U.S. patients.

281.    Genzyme officials, including Dr. Gruskin, affirmatively convened a meeting and met with the US FSWG on September 23, 2009.

282.    At this meeting, Genzyme told the US FSWG that supplies would likely allow patients to return to full dosing "in first quarter 2010." Genzyme affirmatively assured the US FSWG that its projections were realistic by telling the US FSWG that its projections and recommendations were likely to not change. GENZYME042931 (*Schubert*). This statement was recklessly made and proved to be disastrously untrue.

283.    Genzyme advised the US FSWG that in order to avoid running out of Fabrazyme, all patients would need to reduce their doses to the equivalent of 0.3 mg/kg every other week through the end of 2009. *Id.*

284.    However, unlike in Europe, Genzyme did not propose exceptions or a plan whereby U.S. Fabrazyme patients declining on the reduced dose could be quickly

returned to a full dose of Fabrazyme before the effects of the decline became irreversible. *Id.*

285. Genzyme again affirmatively told the US FSWG that its guidance would "be designed to minimize risk for patients," and that "all countries and regions" would participate equally. *Id.*

286. Such statements were false. Genzyme did not provide a means whereby U.S. patients showing clinical decline could receive an increased dose of Fabrazyme. This was significantly different from Genzyme's recommendations for European patients, who wondered the same thing.

287. Additionally, Genzyme's supply projections to the US FSWG in September, 2009 were again not supported by a reasonable basis.

288. In September 2009, Genzyme knew, or should have known, that its Allston plant was still not in compliance with CGMP and that severe deficiencies at the Allston plant remained, thus making Genzyme's projections unsupportable.

289. At the September 2009 US FSWG meeting, Genzyme made reference to the findings of the 2009 Lubanda study, presenting it as providing some support for a dose of 0.3 mg/kg every other week as an effective dose. GENZYME042931 (*Schubert*).

290. Upon information and belief, Genzyme did not similarly propose the 2007 Vedder study for discussion at this meeting, and the differences between what each study measured and the study results were not addressed.

291. Following the September, 2009 US FSWG meeting, Genzyme again prepared "Dear Doctor" and "Dear Patient" letters, detailing its dose reduction plan, citing

the US FSWG support for this plan. GENZYME046651. Genzyme created these documents to ensure it had sufficiently "strong messaging" that U.S. patients and physicians, including Plaintiffs, would follow Genzyme's plan and drastically reduce doses. Plaintiffs relied on these representations in making their decision to continue treatment on the reduced dose of Fabrazyme and to not seek alternatives or seek to enforce Fabrazyme from being sent overseas in contravention to the Orphan Drug Act.

292.   In those documents, Genzyme affirmatively cited to the Lubanda study, thereby providing false and misleading reassurance to patients, that the dose of 0.3 mg/kg every two weeks would be efficacious and safe. *Id.*

293.   Genzyme again affirmatively decided to not disclose the relevant data on the lack of clinical efficacy or the results of the 2007 Vedder study.

294.   Shortly after this supply interruption was announced, Genzyme's upper management was advised that, in fact, the shortage would not likely be "temporary." A decision was made to conceal this from physicians, patients, regulatory authorities and the FSWG's.

295.   On September 30, 2009, in an email chain discussing Fabrazyme supply, Andre Richer, the liaison between the manufacturing and business units of Genzyme, confirmed this to John King, the Director of Marketing for Fabrazyme, and Dr. Gruskin, Global Medical Affairs Director. Mr. Richer stated "I think it is critical to realize that we will live from reactor to reactor for much of 2010. We only really get comfortable from an inventory standpoint in 2011 with the start of the new 2000Ls (either June 2011 or Dec 2011 approval)." GENZYME004750 (*Schubert*).

296.    The above email shows that at the time Genzyme decided to supply patients with "low-dose" Fabrazyme, Genzyme knew that shortages in Fabrazyme supply would likely persist for at last another two years.

297.    Had this true information about the supply situation been provided to the FDA, the information would have been material to the FDA's decision on whether it would revoke Fabrazyme's Orphan Drug status.

298.    Had the true information about the supply situation been provided to the US FSWG, it would have been material to the US FSWG's recommendations to patients.

299.    Had the true information about the supply situation been provided to Plaintiffs and their doctors, they would have acted with great urgency in September, 2009 to seek alternative treatment, such as Replagal®, through a compassionate use exemption or additional Fabrazyme through private arrangements with other patients and doctors.

300.    Had this more realistic information about the supply of Fabrazyme been provided to the Fabry community as a whole, there would have been an outcry to create a more appropriate plan, greater efforts to provide access to Replagal® for patients, and an emergency access program would have been created for patients showing clinical decline.

301.    Genzyme also affirmatively chose to conceal from these sources what Genzyme knew could happen to patients on reduced doses.

302.    During the very next month, October, 2009, and while Genzyme was implementing and communicating its plan to supply all U.S. patients with "low dose" Fabrazyme without disclosing any medical risks for patients taking the reduced dose,

Genzyme was actively marketing against Australian governmental approval of a similarly reduced dose of Fabrazyme, and warning the Australian medical authority of grave dangers to patients if the reduced dose was approved.

303.    Genzyme knew that a dose of 0.3 mg/kg dose every two weeks was off-label, meaning that it had not been approved by the FDA or any other country's medical agency.

304.    In September or October, 2009, when it unveiled its plan to supply Fabrazyme to all patients in 0.3 mg/kg doses every two weeks, Genzyme could have, but affirmatively decided not to, petition the FDA or any other medical agency, to approve Fabrazyme at a dose of 0.3 mg/kg every two weeks. Doing so would have exposed Genzyme to governmental regulatory scrutiny of the medical efficacy and medical risks of 0.3 mg/kg doses of Fabrazyme.   Therefore, it created the FSWG as an alternative regulatory body to the FDA through which it could obtain medical approval to "low dose" American Fabry patients.

305.    During July – October, 2009, the Australian medical regulatory authority was evaluating whether it could reduce the approved dose of Fabrazyme to 0.2 mg/kg every two weeks as the FSWG regulatory body had done in an effort to save its citizens 80% of the enormous cost of treatment of Fabrazyme.

306.    The Australian medical authority asked Genzyme to respond as to whether it was medically safe for patients to order Fabrazyme in a reduced dose.

307.    In responding to Australia's recommendation that Fabrazyme be approved at a dose of 0.2 mg/kg administered every two weeks, Genzyme's senior management,

including many of the same Genzyme management involved in reviewing, approving, and communicating the "low-dose" plan for U.S. Fabry patients to accept a reduced dose, reviewed and approved Genzyme 's response to the Australian medical authority.

308.    Genzyme's response to Australian medical authorities warned that reducing dose "to 0.2 mg/kg . . . across the board would have significant clinical consequences for patients, with the expectation that many would suffer irreversible harm as a result of insufficient dosing," and that "treatment at a higher dose is necessary and may be life-saving." In the same communication, Genzyme stated that the suggestion to "reduce the dose of Fabrazyme® to 0.2 mg/kg in all patients ignores the cumulative evidence in the extant literature" and that to believe such a reduction could occur "with little or no loss of efficacy is conjectural." GENZYME013854; GENZYME013847 (*Schubert*).

309.    In the same response letter, Genzyme officials cited to the Vedder study and its conclusion that a dose of 0.2 mg/kg of Fabrazyme® was "suboptimal" and would not "elicit[] a clinically relevant response to treatment." *Id.*

310.    In a related email, Genzyme senior management stated that such a "**blanket dose adjustment would be insane**." GENZYME013840.

311.    Genzyme's internal drafts, comments, and final responses to the Australian medical authority demonstrates that Genzyme knew that its September, 2009 plan for dose reduction in the U.S. without an option for access to additional Fabrazyme upon early signs of decline was against "the cumulative evidence in the extant literature" and exposed U.S. Fabry patients to unwarranted medical risks.

312.     All Plaintiffs who received "low doses" were led to believe that "something was better than nothing."  Sarah Kulke, M.D., Medical Director, Genzyme, stated at such the Baystate Genetics and Genzyme supply update meeting on Monday, November 2nd, 2009, responding to Cheryl Sacks' question about the effectiveness of low dose, that "at least you're getting something."

313.     Genzyme knew that receiving a full dose was especially critical for patients who showed symptoms of medical deterioration after dose skipping in August and September 2009.

314.     However, Genzyme made no effort to warn Plaintiffs that patients with clinically significant symptoms or early signs of deterioration were at significant medical risk if they took "low dose" Fabrazyme.

315.     Such information was critical to Plaintiffs and would have caused them to take different actions after the September 2009 announcement of Genzyme's dose-reduction plan in the U.S.

316.     Because Plaintiffs did not receive such information in September 2009, they did not understand the extreme urgency to obtain access to other treatments, including Replagal®.

317.     Had Genzyme truly wanted to create guidance that was meant to "be designed to minimize risk for patients," "be the same, irrespective of geography," and "be based on best available evidence and experience," and "protect the most vulnerable patients" instead of a plan based on Genzyme's desire to preserve its market share, Genzyme would have created a plan allowing for patients such as the Plaintiffs to access

additional Fabrazyme, through an emergency access program or by facilitating knowledge of how to access Replagal®, or simply withdrawing Fabrazyme from the European market entirely.

318.    Replagal® would have been a better alternative than low-dose Fabrazyme, since it had been clinically evaluated and approved for use by many government medical regulatory agencies while "low-dose" Fabrazyme had not.

319.    Alternatively, Plaintiffs could have located Replagal® to take in addition to the reduced Fabrazyme dose in order to receive a greater quantity of ERT treatments.

320.    Plaintiffs relied on the information provided in support of Genzyme's September dose-reduction plan. They were not warned of the true risks of dose skipping and dose reduction and were not told the true facts relating to the likely duration of shortage.

321.    Therefore, Plaintiffs accepted a dosing regimen equal to 0.3 mg/kg (or less) every two weeks for  two and one half years until the shortage ended in the spring of 2012 as  their sole treatment and did not obtain Replagal®, with the exception of Cheryl Sacks who applied for (and was granted) compassionate use of Replagal® after her exchange with Dr. Kulke detailed above.

322.    As detailed above, an October and November, 2009 inspection by the FDA resulted in findings that Genzyme had still failed to remedy CGMP deviations that the FDA had identified over a year earlier and ordered Genzyme to remediate.

323.    Following this event, Genzyme supplied another written announcement to patients and physicians on December 1, 2009. GENZYME019560 (*Schubert*).

324.     On November 29, 2009, in discussing issues related to supply, Geoffrey McDonough, a top Genzyme officer, explained to Dr. Gruskin, John King, and Ralph Kern, "…In the worst case, Genzyme anticipates resuming full supply of Fabrazyme® by the end of 2010." GENZYME073484 (*Schubert*).

325.     However, Genzyme affirmatively chose to not communicate this scenario in its direct mailings to Fabrazyme customers and physicians.

326.     Instead, in Genzyme's December 1, 2009 "Dear Dr." and "Dear Patient" letters, Genzyme stated that patients would continue to receive Fabrazyme at 0.3 mg/kg administered every two weeks "through March of 2010," but that "Genzyme plan[ned] to resume shipping Fabrazyme® at 70 – 100% of full dose . . . beginning in the second quarter of 2010." GENZYME019560 (*Schubert*).

327.     In the December 1, 2009 letters, Genzyme again decided to not include information about the treatment of patients in Europe, or about the existing medical literature which did not support the clinical efficacy and safety of "low dose" Fabrazyme therapy. *See id.*

328.     Revealing that Genzyme was still not being truthful in communications with its prescribing physicians and patients, on January 14, 2010, Dr. Gruskin forwarded an email stating "Enjoy! With the most recent ~~lie~~ (sic) update, I did not produce another guidance document - we just sent out letters to doctors/patients/payors saying the guidance will be continued." GENZYME035638.

329.    The "~~lie~~ update" Dr. Gruskin was referring to was Genzyme's most recent false communication, projecting that full dosing would likely be restored within a few months.

330.    At the same time Genzyme released a statement to investors that "Fabrazyme has earned its market-leading position based on the product's approved dosing and demonstrated clinical outcomes. To better serve patients, Genzyme is also conducting a post-marketing study of Fabrazyme exploring lower dosing options for patients earlier in the course of their disease.   PRESS RELEASE: January 12 2010, Genzyme      Reports      Fourth-Quarter      Revenue.      *Available*      at https://www.sanofigenzyme.com/en/about-us/newsroom/archive/2010/2010-01-12-12-03-00

331.    Genzyme did not inform patients and physicians that its "prediction" was again incorrect until February 17, 2010 nor did it report the results of the "post marketing study" of lowered dosing, which it was conducting.

332.    These decisions led to inconsistent, medically arbitrary, and inequitable results; some patients in need were denied additional Fabrazyme while others received it. *E.g.* GENZYME019806.

333.    By December 2009, American physicians and Fabry patients had communicated to Genzyme that it was important and necessary to have an emergency access program for patients in medical need to access full dose Fabrazyme.

334.    Despite these requests, and Genzyme's own research data collected in the Fabry Registry, Genzyme declined to establish an emergency access program for U.S. Fabry patients.

335.    Additionally, Genzyme declined to establish a uniform procedure/process to quickly evaluate and respond to requests for additional Fabrazyme.

336.    These decisions led to inconsistent and inequitable results; some patients in need were denied additional Fabrazyme® while others received it. E.g. GENZYME019806 (*Schubert*).

337.    However, during late 2009 and the beginning of 2010, Genzyme granted several requests by other patients for additional Fabrazyme®, including a request from a patient with advanced cardiac involvement.

338.    Dr. Gruskin continued to be involved in regard to Genzyme's response and communications concerning the ongoing shortage.

339.    On January 18, 2011 in an email to his colleague, Andre Richer, Dr. Gruskin stated "We totally screwed the pooch and PV is to blame, although we let them do it. We sent the EMA bullshit data and then are surprised when they come up with recommendations to switch to Replagal®." GENZYME511440 (*Schubert*).

340.    On February 27, 2012, Dr. Gruskin commented in a company email to a colleague in anticipation of his annual review by Genzyme management:

> They don't like it when peons like me say the truth. They tell me I have a "bad attitude" and negatively affect other people.  Rogerio was really pissed at me at an offsite….I said that altho individually people are still very patient focused, the company isn't, as shown by how we managed /communicated during the shortage….." GENZYME549334 (*Schubert*).

## CLASS ALLEGATIONS AS TO PAYMENTS
## FOR DEFECTIVE AND/OR INEFFECTIVE FABRAZYME

341.    The preceding paragraphs are incorporated by reference as though set forth here in their entirety as is are all prior facts and claims averred in *Adamo, et al. v. Genzyme Corp.*, No. 13-11336 (D. Mass) and *Hochendoner, et al. v. Genzyme Corp.*, No. 11-10739 (D. Mass).

342.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Wilkins along with co-representative plaintiffs, George Demko, Michael Masula, Thomas Olszewski, and Tom Stanziano are bringing this action on behalf of themselves, Plaintiffs herein, and all others similarly situated, which includes any and all individuals residing in the United States of America and who have been diagnosed with Fabry disease, received Fabrazyme at any time from July 1, 2009 through March 2012 in a reduced dose amount, and who paid for the reduced dose Fabrazyme, either directly or through an insurance plan, and the spouses of any such person ("the Class").

343.    The requirements of Rule 23(a)(1) are satisfied.  With respect to payment for defective and/or ineffective Fabrazyme and the required medical monitoring, the proposed Class is so numerous that joinder of all members of the Class is impractical and the administration of the claims as set forth herein on behalf of the Class is more efficient and will benefit the parties and the Court.

344.    The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant's records, including but not limited to, the

sales and transaction records that Defendant possesses and the Fabry patient registry created and maintained by Defendant.

345.    The requirements of Rule 23(a)(2) are satisfied,  With respect to payment for defective and/or ineffective Fabrazyme and the required medical monitoring, the questions of law and fact common to the Class predominate over the questions affecting only individual members of the Class, including the following:

   a.    Whether reduced dose Fabrazyme is ineffective to treat Fabry disease;

   b.    Whether Genzyme knew, or should have known, that reduced dose Fabrazyme was ineffective to treat Fabry disease;

   c.    Whether the reduced dose and/or contaminated Fabrazyme can cause an increased risk of future medical conditions, which require medical monitoring;

   d.    Whether Genzyme received payment for the defective and/or ineffective Fabrazyme from the Class or the Class' insurers and how much money was received; and

   e.    Whether the Class is entitled to damages as a result of Defendant's conduct, including reimbursement for the costs of contaminated and/or ineffective doses of Fabrazyme, the costs of medical monitoring, punitive damages, and/or attorneys' fees and costs.

346.    The requirements of Rule 23(a)(3) are satisfied.  Plaintiff's claims as set forth herein are typical of the claims of the Class as they have all suffered similar harms, namely, financial losses and the need for future medical monitoring, and are based on the same legal theories related to the allegations of Defendant's actions and omissions.

347.    Plaintiff and members of the Class were all customers of Defendant, receiving "low-dose" Fabrazyme during the relevant time period.

348.     The requirements of Rule 23(a)(4) are satisfied.  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class because her interests do not conflict with the interests of the individual members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no antagonistic interest to the members of the Class.  Plaintiff will retain competent and experienced counsel to represent herself and the members of the Class if the Class is certified.

349.     The claims of Plaintiff and the Class are substantially identical as explained above.  The aggregate damages that may be awarded to members of the Class are likely to be substantial, whereas the expense and burden of prosecuting such claims on an individual basis would be burdensome, economically infeasible, and procedurally impracticable.  Certifying the Class will centralize these substantially identical claims in a single proceeding, which is the most manageable litigation method available to Plaintiff and the Class.

WHEREFORE, Plaintiffs demand judgment against Defendant, jointly and severally, in an amount in excess of $5,000,000.00, together with costs of suit and punitive damages as applicable.  JURY TRIAL DEMANDED.

## INDIVIDUAL COUNTS

### COUNT I: NEGLIGENCE
JAMES BISHOP; TONI CORDOVA; JOHN CORTINA; GEORGE DEMKO; PLAINTIFF D.J.; SYDNEY JOHNSON; DAMON LAFORCE; MICHAEL MASULA; JAMES MATTHEWS; THOMAS STANZIANO; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. GENZYME CORPORATION

350.     The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

351.     The injuries sustained by Plaintiffs were due to and were the direct and proximate result of the negligence, carelessness, and recklessness of Defendant generally, and under the following particulars:

    a.    in that Defendant failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston and Framingham, MA plant;

    b.    in that Defendant failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

    c.    in that Defendant failed to take reasonable steps to avoid and prevent contamination of Fabrazyme vials with particulate steel, glass, and rubber;

    d.    in that the Defendant unilaterally devised, implemented, and approved with knowledge and consent the Genzyme Rationing Plan, and otherwise reduced or consented to reducing the dose of Fabrazyme or denied it entirely for treatment of Fabry patients;

    e.    in that Defendant marketed and sold Fabrazyme vials contaminated with dangerous infectious and immunogenic virus, glass, rubber and steel particles United States with actual and constructive knowledge that the drug is too harmful to be used by anyone;

    f.    in that the Defendant hid the danger of Vesivirus infected Fabrazyme;

    g.    in that the Defendant instructed and through knowledge and consent reduced the dose of Fabrazyme to dangerous, sub-efficacious and unapproved levels to Americans based invidiously and irrationally discriminatory bases.

h.   in that the Defendant barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme in accordance with the indications of the product insert and substituting an illegal, "low dose", untested, adulterated and contaminated product that is of no known therapeutic benefit, nor as an approved equivalent for substitution of effective and pure prescription Fabrazyme;

i.   in affirmatively representing that the drug given at full dosage would be sold to citizens at various dates, but breached such promises repeatedly since June 2009;

j.   in that the Defendant failed to test or require the testing of the effects of reducing the dosage of Fabrazyme to unapproved levels to treat Fabry disease or report such effects;

k.   in that the Defendant failed to provide adequate warnings, cautions,  and directions concerning the dangers and limitations of the "low dose" of Fabrazyme that they observed or foresaw and expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements regarding medical safety of Vesivirus injection as false;

l.   in negligently marketing Fabrazyme known to be untested, contaminated, adulterated, ineffective and "low dose" for treatment of Fabry disease; and

m.   in that the Defendant failed to provide or require proper and adequate reserves of unadulterated Fabrazyme in order to prevent or mitigate manufacturing errors;

n.   in that the Defendant failed to provide or license a second source of manufacture for Fabrazyme in order to prevent or mitigate life-threatening supply chain disruptions;

o.   in that Defendant negligently monitored the effects of "low dose" on the named Plaintiffs and affirmatively hid the

dangers of "low dose" Fabrazyme when there was a duty to speak;

p.    in that Defendant never were informed of the danger of the low dose such that they could make an informed treatment decision;

q.    in otherwise failing to exercise the care and caution that a reasonable, careful, and prudent entity would have or should have exercised under the circumstances; and

r.    in that Defendant violated the following statutes, giving rise to negligence per se;

s.    and that the sale of the drug was in contravention to the individual state statutes protecting Plaintiffs from adulterated or misbranded drugs in that the dosages being shipped were not in compliance (or even intended to be in compliance) with the required labeling at the time the drug left the control of the manufacturer or seller[10];

352.    As a direct and proximate result of Defendant's negligent, willful, and wanton conduct, as set forth above, and reckless indifference to Plaintiffs' health and interests, Plaintiffs have sustained, or are at imminent risk of sustaining, the following serious injuries consistent with deterioration of disease, some or all which may be of a permanent nature:

a.    renal injury;

b.    cardiac injury;

c.    neurological injury;

d.    peripheral pain;

e.    chronic abdominal pain and diarrhea;

---

[10] MA (M.G.L. 94 §186 et seq.); NC (G.S. § 14-34.4 et seq.); NV (N.R.S. § 585.010 et seq.); NY, PA, FL, and VA (Va. Code § 54.1-3461 et seq.).

f.  impairment of vision;

g.  impairment of hearing;

h.  increased severity and likelihood of infusion reactions;

i.  Vesivirus infection, Vesivirus-induced hematological cancer, hepatitis, inoculation, seroconversion, and sensitization; and

j.  premature death and other serious and permanent injuries.

353.  As a direct and proximate result of the aforesaid injuries, Plaintiffs have been damaged as follows:

a.  Plaintiffs have been and will be required to expend large sums of money for medical and surgical attention, medical and surgical supplies, medical and surgical appliances, and medicines;

b.  Plaintiffs have suffered and will continue to suffer great pain, suffering, inconvenience, impairment of bodily function, and mental anguish;

c.  Plaintiffs have been and will be deprived of earnings and earning capacity;

d.  Plaintiffs have suffered loss of enjoyment of life;

e.  Plaintiffs have suffered a reduced life expectancy;

f.  Plaintiffs' general health, strength, and vitality have been impaired;

g.  Plaintiffs and/or their subrogators have expended large sums of money for a contaminated, adulterated, dangerous, and worthless medical treatment of Fabry disease.

WHEREFORE, Plaintiffs named in Count I demand judgment against Defendant in an amount in excess of $75,000.00, together with costs of suit and punitive damages as applicable.  JURY TRIAL DEMANDED.

## COUNT II: NEGLIGENCE *per se*

**JAMES BISHOP; TONI CORDOVA; JOHN CORTINA; GEORGE DEMKO; PLAINTIFF D.J.; SYDNEY JOHNSON; DAMON LAFORCE; MASULA; JAMES MATTHEWS; THOMAS STANZIANO; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT**

354.     The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

355.     By virtue of the negligence per se including substitution of a contaminated, adulterated, "low dose", untested, mislabeled product in lieu of the medically prescribed, FDA-approved, pure and non-"low dose" Fabrazyme, Defendant is liable for the severe injuries and conditions of named Plaintiffs.

356.     As a direct and proximate result of the aforesaid injuries, named Plaintiffs, their subrogators, and all others similarly situated have suffered damages as set forth herein in Count II.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, demand judgment against Defendant in an amount in excess of $75,000.00, together with costs of suit.  JURY TRIAL DEMANDED.

## COUNT III: STRICT LIABILITY
**JAMES BISHOP; TONI CORDOVA; JOHN CORTINA; GEORGE DEMKO; PLAINTIFF D.J.; SYDNEY JOHNSON; DAMON LAFORCE; MICHAEL MASULA; JAMES MATTHEWS; THOMAS STANZIANO; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT**

357.     The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

358.     Defendant is strictly liable to Plaintiffs as follows:

a.    for failing to adequately and safely label the "low dose" of Fabrazyme;

b.    for selling and licensing the use of Fabrazyme at a defective dosage;

c.    for selling Fabrazyme in a defective dosage and condition being adulterated with Vesivirus pathogen, glass, rubber, and steel particles;

d.    for selling and licensing the use of Fabrazyme at a "low dose" when the dose is untested and unreasonably dangerous for its intended use;

e.    for failure to give adequate and complete warnings of the known or knowable dangers involved in the use Fabrazyme at a "low dose"; and

f.    for causing patients to be injected with Vesisivirus-containing Fabrazyme without prior testing or obtaining informed consent or disclosure of infection, risk of virus-associated hepatitis and cancer, immunogenicity and risk of seroconversion and sensitization post-inoculation as well as concealing these medical facts found in prior medical literature.

359.    By virtue of the strict liability of Defendant, Defendant is liable for the severe injuries and conditions, as set forth herein for named plaintiffs, individually and on behalf of all others similarly situated as set forth herein in Count III.

360.    As a direct and proximate result of the aforesaid injuries, the named Plaintiffs, their subrogators, individually and on behalf of all others similarly situated have suffered damages as set forth herein in Count III.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, demand judgment against Defendant in an amount in excess of $75,000.00, together with costs of suit.  JURY TRIAL DEMANDED.

<u>COUNT IV: BREACH OF WARRANTY</u>
JAMES BISHOP; TONI CORDOVA; JOHN CORTINA; GEORGE DEMKO; PLAINTIFF
D.J.; SYDNEY JOHNSON; DAMON LAFORCE; MICHAEL MASULA; JAMES
MATTHEWS; THOMAS STANZIANO; INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED v. DEFENDANT

361.    The preceding paragraphs are incorporated by reference as though set forth

here in their entirety.

362.    All of the resultant losses, damages, and injuries sustained by Plaintiffs

resulted directly and proximately from Defendant's breach of express and implied

warranties of merchantability or fitness for the use of Fabrazyme, in the following

particulars:

    a.    Defendant expressly warranted in the Fabrazyme product insert that Fabrazyme reduces globotriaosylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product and inconsistent dosing reduces such deposition and having observed the contrary for the "low dose";

    b.    Defendant expressly warranted in the Fabrazyme product insert that Fabrazyme is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using "low dose" for such an indication;

    c.    Defendant failed to adequately, properly, and timely test the "low dose" prior to use;

    d.    Fabrazyme, given at "low dose" and being adulterated with glass, steel, and rubber particles, is not fit for the ordinary purpose for which it is customarily or foreseeably used;

    e.    Defendant knew or should have known that the adulterated drug and "low dose" of Fabrazyme is dangerous and likely to cause damage to users;

    f.    Fabrazyme, given at "low dose" and being adulterated, was not of merchantable quality and was not in conformity,

insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

g.      Defendant knew or should have known that in order to make Fabrazyme effective for its intended use, they should have provided the drug at the recommended dose;

h.      Defendant knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, they should have provided warnings on the product to protect users;

i.      Defendant did not keep abreast of the state of the art in the science and knew of adverse events involving "low dose" and failed to warn users;

j.      Defendant did not disclose to the users of the "low dose" of Fabrazyme that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

k.      Defendant included an incorrect and unapproved product insert because Defendant did not allow physicians to treat patients with the recommended dose for which the insert was intended;

l.      Defendant knew or should have known that users were relying upon the expertise of the Defendant in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme;

m.      in affirmatively representing that the drug given at full dosage would be sold to citizens at various dates, but breached such promises repeatedly since June 2009;

n.      in expressly and impliedly warranting that a "low dose" of Fabrazyme was approved for use by the FDA and efficacious for use in the treatment of Fabry disease;

o.      in expressly and impliedly misrepresenting that a "low dose" of Fabrazyme was approved for by the FDA and efficacious for use in the treatment of Fabry disease;

p.      in expressly and impliedly misrepresenting that a "low dose" of Fabrazyme was approved for by the FDA and efficacious for use in the treatment of Fabry disease; and

q.   in expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements regarding medical safety of Vesivirus injection as false.

363.   By virtue of the of the breach of these expressed or implied warranties of Defendant, Defendant is liable for the severe injuries and conditions to the Plaintiffs individually and on behalf of all others similarly situated as set forth herein in Count IV.

364.   As a direct and proximate cause, Plaintiffs, their subrogators, and others similarly situated, suffered severe injuries and conditions as set forth herein in Count IV.

WHEREFORE, Plaintiffs, and all others similarly situated suffered severe injuries and conditions as set forth herein in Count IV, demand judgment against Defendant in an amount in excess of $75,000.00, together with costs of suit.  JURY TRIAL DEMANDED.

## COUNT V: FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT VIOLATION (F.S. § 501.201 *et seq.*)
### TOM STANZIANO, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT

365.   The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

366.   All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant's deceptive acts or practices regarding the sale and use of the drug, Fabrazyme, generally, and in the following particulars:

a.   in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

b.   in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will treat Fabry disease and Fabry disease patients will benefit from use of a "low dose" when it had overwhelming evidence to the contrary;

c.   in willfully placing a misleading and incorrect label with the product since Genzyme Corporation substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

d.   in affirmatively representing that the drug given at full dosage every two weeks would be sold to Florida citizens at various dates, but breached such promises repeatedly since June 2009;

e.   in barring Florida physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring Florida Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert;

f.   in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary; and

g.   in expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical

testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of Vesivirus injection as false.

367.   By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of Plaintiff Tom Stanziano individually and on behalf of all others similarly situated, as set forth herein in Count V.

368.   As a direct and proximate result of the aforesaid injuries, Tom Stanziano, his subrogators, and others similarly situated have suffered damages as set forth herein in Count V.

WHEREFORE, Plaintiff Tom Stanziano demands judgment individually and on behalf of all others similarly situated, against Defendant in an amount in excess of $75,000.00, together with costs of suit.  JURY TRIAL DEMANDED.

### COUNT VI: INDIANA PRODUCTS LIABILITY ACT VIOLATION (I.C. § 34-20-1-1 et seq.)
### MARY HELTON; DONOVAN HELTON; TRINA WILKINS AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT

369.   The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

370.   All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendant's practices regarding the manufacture, sale and use of the drug, Fabrazyme, generally, and in the following particulars:

a.    in that the Defendant failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston and Framingham, MA plant;

b.    in that the Defendant failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

c.    in that the Defendant failed to take reasonable steps to avoid and prevent contamination of Fabrazyme vials with particulate steel, glass and rubber;

d.    in that the Defendant manufactured and sold defective Fabrazyme vials contaminated with virus, glass, rubber and steel particles;

e.    in that the Defendant unilaterally devised, and willfully implemented a treatment plan for Fabry patients that was contrary to what their physicians recommended;

f.    in that the Defendant designed and implemented a plan to distribute a dose of Fabrazyme that was known to be injurious;

g.    in that the Defendant instructed physicians and patients to use a "low dose" of Fabrazyme that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller;

h.    in that the Defendant barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme in accordance with the indications of the product insert;

i.    in that the Defendant failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme to unapproved levels to treat Fabry disease;

j.    in that the Defendant failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the "low dose" of Fabrazyme;

k.    in that the Defendant failed to provide or require proper and adequate reserves of unadulterated Fabrazyme in order to prevent or mitigate manufacturing errors;

l.  in that the Defendant failed to provide or license a second source of manufacture for Fabrazyme in order to prevent or mitigate life-threatening supply chain disruptions;

m.  in that the Defendant failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;

n.  in that the Defendant affirmatively represented that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o.  in that the Defendant expressly or impliedly misrepresented that the "low dose" and adulterated Fabrazyme was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p.  in affirmatively representing that the drug given at full dosage would be sold to Indiana citizens at various dates, but breached such promises repeatedly since June 2009 after delivery of the products to the Plaintiffs at various time points between June 2009 to spring of 2012;

q.  in that the Defendant expressly warranted in the Fabrazyme product insert that Fabrazyme reduces globotriaosylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r.  in that the Defendant expressly warranted in the Fabrazyme product insert that Fabrazyme is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using "low dose" for such an indication;

s.  in that the Defendant failed to adequately, properly, and timely test the "low dose" prior to use;

t.  in that the Defendant marketed and sold Fabrazyme, given at "low dose" and further being contaminated with Vesivirus and adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which

it is customarily or foreseeably used and in contravention to IN anti-adulteration law (I.C. § 16-42-2-1 et seq.);

u.    in that the Defendant knew or should have known that the adulterated drug and "low dose" of Fabrazyme is dangerous and likely to cause damage to users;

v.    in that the Defendant manufactured and sold Fabrazyme, given at "low dose" and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w.    in that the Defendant knew or should have known that in order to make Fabrazyme effective for its intended use, it should have provided the drug at the recommended dose;

x.    in that the Defendant knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y.    in that the Defendant did not keep abreast of the state of the art in the science and knew of adverse events involving "low dose" and failed to warn physicians and users of known or knowable dangers;

z.    in that the Defendant did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

aa.    in that the Defendant willfully included an incorrect and unapproved product insert that does not apply to a "low dose";

bb.    in that the Defendant knew or should have known that physicians and users were relying upon the expertise of the Defendant in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme;

cc.    in that the Defendant expressly and impliedly warranted that a "low dose" of Fabrazyme was approved for use by the FDA and efficacious for use in the treatment of Fabry disease;

dd.    in expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of Vesivirus injection as false;

ee.    in negligently marketing Fabrazyme known to be untested, contaminated, adulterated, ineffective and "low dose" for treatment of Fabry disease;

ff.    in that Defendant negligently monitored the effects of "low dose" on the named Plaintiffs and affirmatively hid the dangers of "low dose" Fabrazyme when there was a duty to speak;

gg.    in that Defendant never were informed of the danger of the low dose such that they could make an informed treatment decision;

hh.    in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

371.    As a direct and proximate result of Defendant's negligent, willful, and wanton conduct, as set forth above, and reckless indifference to Plaintiffs' health and interests, Plaintiffs have sustained, or are at imminent risk of sustaining, the following serious injuries consistent with deterioration of disease, some or all which may be of a permanent nature:

a.    renal injury;

b.    cardiac injury;

c.    neurological injury;

d.    peripheral pain;

e.    chronic abdominal pain and diarrhea;

      f.       impairment of vision;

      g.      impairment of hearing;

      h.      increased severity and likelihood of infusion reactions;

      i.       Vesivirus infection, Vesivirus-induced hematological cancer, hepatitis, inoculation, seroconversion, and sensitization; and

      j.       premature death and other serious and permanent injuries.

372.    As a direct and proximate result of the aforesaid injuries, Plaintiffs have been damaged as follows:

      a.     Plaintiffs have been and will be required to expend large sums of money for medical and surgical attention, medical and surgical supplies, medical and surgical appliances, and medicines;

      b.     Plaintiffs have suffered and will continue to suffer great pain, suffering, inconvenience, impairment of bodily function, and mental anguish;

      c.     Plaintiffs have been and will be deprived of earnings and earning capacity;

      d.     Plaintiffs have suffered loss of enjoyment of life;

      e.     Plaintiffs have suffered a reduced life expectancy;

      f.      Plaintiffs' general health, strength, and vitality have been impaired;

      g.     Plaintiffs and/or their subrogators have expended large sums of money for a contaminated, adulterated, dangerous, and worthless medical treatment of Fabry disease.

373.    By its actions, Defendant is liable for the severe injuries and conditions of the Plaintiffs and on behalf of all others similarly situated, as set forth herein in Count VI.

374.    As a direct and proximate result of the aforesaid injuries, Plaintiffs and their subrogators, and all others similarly situated, have suffered damages as set forth herein in Count VI.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, demand judgment against Defendant in an amount in excess of $75,000.00, together with costs of suit.   JURY TRIAL DEMANDED.

### COUNT VII: PRODUCT LIABILITY ACT OF KENTUCKY VIOLATION (KY. REV. STAT. §411.300 et seq.) TRINA WILKINS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT

375.    The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

376.    All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant's practices regarding the manufacture, sale and use of the drug, Fabrazyme, generally, and in the following particulars:

377.    All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant's practices regarding the manufacture, sale and use of the drug, Fabrazyme, generally, and in the following particulars:

> a.    in that the Defendant failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston and Framingham, MA plant;

b.      in that the Defendant failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

c.      in that the Defendant failed to take reasonable steps to avoid and prevent contamination of Fabrazyme vials with particulate steel, glass and rubber;

d.      in that the Defendant manufactured and sold defective Fabrazyme vials contaminated with virus, glass, rubber and steel particles;

e.      in that the Defendant unilaterally devised, and willfully implemented a treatment plan for Fabry patients that was contrary to what their physicians recommended;

f.      in that the Defendant designed and implemented a plan to distribute a dose of Fabrazyme that was known to be injurious;

g.      in that the Defendant instructed physicians and patients to use a "low dose" of Fabrazyme that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller;

h.      in that the Defendant barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme in accordance with the indications of the product insert;

i.      in that the Defendant failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme to unapproved levels to treat Fabry disease;

j.      in that the Defendant failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the "low dose" of Fabrazyme;

k.      in that the Defendant failed to provide or require proper and adequate reserves of unadulterated Fabrazyme in order to prevent or mitigate manufacturing errors;

l.      in that the Defendant failed to provide or license a second source of manufacture for Fabrazyme in order to prevent or mitigate life-threatening supply chain disruptions;

m.      in that the Defendant failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;

n.      in that the Defendant affirmatively represented that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o.      in that the Defendant expressly or impliedly misrepresented that the "low dose" and adulterated Fabrazyme was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p.      in affirmatively representing that the drug given at full dosage would be sold to Kentucky citizens at various dates, but breached such promises repeatedly since June 2009 after delivery of the products to the Plaintiffs at various time points between June 2009 to spring of 2012;

q.      in that the Defendant expressly warranted in the Fabrazyme product insert that Fabrazyme reduces globotriaosylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r.      in that the Defendant expressly warranted in the Fabrazyme product insert that Fabrazyme is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using "low dose" for such an indication;

s.      in that the Defendant failed to adequately, properly, and timely test the "low dose" prior to use;

t.      in that the Defendant marketed and sold Fabrazyme, given at "low dose" and further being contaminated with Vesivirus and adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used  and in contravention to KY anti-adulteration law  (K.R.S. chapter 217 et seq.);

u.      in that the Defendant knew or should have known that the adulterated drug and "low dose" of Fabrazyme is dangerous and likely to cause damage to users;

v.      in that the Defendant manufactured and sold Fabrazyme, given at "low dose" and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w.      in that the Defendant knew or should have known that in order to make Fabrazyme effective for its intended use, it should have provided the drug at the recommended dose;

x.      in that the Defendant knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y.      in that the Defendant did not keep abreast of the state of the art in the science and knew of adverse events involving "low dose" and failed to warn physicians and users of known or knowable dangers;

z.      in that the Defendant did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

aa.     in that the Defendant willfully included an incorrect and unapproved product insert that does not apply to a "low dose";

bb.     in that the Defendant knew or should have known that physicians and users were relying upon the expertise of the Defendant in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme;

cc.     in that the Defendant expressly and impliedly warranted that a "low dose" of Fabrazyme was approved for use by the FDA and efficacious for use in the treatment of Fabry disease;

dd.     in expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical

testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of Vesivirus injection as false;

ee.   in negligently marketing Fabrazyme known to be untested, contaminated, adulterated, ineffective and "low dose" for treatment of Fabry disease;

ff.   in that Defendant negligently monitored the effects of "low dose" on the named Plaintiffs and affirmatively hid the dangers of "low dose" Fabrazyme when there was a duty to speak;

gg.   in that Defendant never were informed of the danger of the low dose such that they could make an informed treatment decision; and

hh.   in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

378.   As a direct and proximate result of Defendant's negligent, willful, and wanton conduct, as set forth above, and reckless indifference to Plaintiff's health and interests, Plaintiff has sustained, or is at imminent risk of sustaining, the following serious injuries consistent with deterioration of disease, some or all which may be of a permanent nature:

a.   renal injury;

b.   cardiac injury;

c.   neurological injury;

d.   peripheral pain;

e.   chronic abdominal pain and diarrhea;

f.   impairment of vision;

g.   impairment of hearing;

h.  increased severity and likelihood of infusion reactions;

i.  Vesivirus infection, Vesivirus-induced hematological cancer, hepatitis, inoculation, seroconversion, and sensitization; and

j.  premature death and other serious and permanent injuries.

379.  As a direct and proximate result of the aforesaid injuries, Plaintiff has been damaged as follows:

a.  Plaintiff has been and will be required to expend large sums of money for medical and surgical attention, medical and surgical supplies, medical and surgical appliances, and medicines;

b.  Plaintiff has suffered and will continue to suffer great pain, suffering, inconvenience, impairment of bodily function, and mental anguish;

c.  Plaintiff has been and will be deprived of earnings and earning capacity;

d.  Plaintiff has suffered loss of enjoyment of life;

e.  Plaintiff has suffered a reduced life expectancy;

f.  Plaintiff's general health, strength, and vitality have been impaired;

g.  Plaintiff and/or her subrogators have expended large sums of money for a contaminated, adulterated, dangerous, and worthless medical treatment of Fabry disease.

380.  By its actions, Defendant is liable for the severe injuries and conditions of Trina Wilkins, individually and on behalf of all others similarly situated, as set forth herein in Count VII.

381.  As a direct and proximate result of the aforesaid injuries, Trina Wilkins, her subrogators, and all others similarly situated, have suffered damages, individually and on behalf of all others similarly situated, as set forth herein in Count VII.

WHEREFORE, Plaintiff Trina Wilkins demands judgment individually and on behalf of all others similarly situated, against Defendant in an amount in excess of $75,000.00, together with punitive damages where appropriate, and costs of suit. JURY TRIAL DEMANDED.

## COUNT VIII: KENTUCKY CONSUMER PROTECTION ACT VIOLATION
### (KRS § 367.110 et seq)
### TRINA WILKINS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT

382.    The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

383.    All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant's deceptive acts or practices regarding the sale and use of Fabrazyme, generally, and in the following particulars:

a.    in intentionally failing to inform the Plaintiff that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

b.    in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low dose";

c.    in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

d.    in affirmatively representing that the drug given at full dosage every two weeks would be sold to Kentucky citizens at various dates, but breached such promises repeatedly since June 2009;

e.   in barring Kentucky physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring Kentucky Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert;

f.   in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary; and

g.   in expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of Vesivirus injection as false.

384.   By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of Trina Wilkins, individually, and on behalf of all others similarly situated, as set forth herein in Count VIII.

385.   As a direct and proximate result of the aforesaid injuries of Trina Wilkins, her subrogators, and all others similarly situated, as set forth herein in Count VIII.

WHEREFORE, Plaintiff Trina Wilkins, individually and on behalf of all others similarly situated, demand judgment against Defendant in an amount in excess of $75,000.00, together with punitive damages where appropriate, and costs of suit.  JURY TRIAL DEMANDED.

### COUNT IX:  MASSACHUSETTS UNFAIR AND DECEPTIVE TRADE PRACTICES ACT VIOLATION (Mass. Gen. Laws Ch. 93A § 1 et seq.)
JAMES BISHOP; AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT

386.    The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

387.    All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant's deceptive acts or egregious practices regarding the sale and use of Fabrazyme, generally, and in the following particulars:

      a.    in intentionally failing to inform the Plaintiff that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

      b.    in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low dose";

      c.    in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

      d.    in affirmatively representing that the drug given at full dosage every two weeks would be sold to Massachusetts citizens at various dates, but breached such promises repeatedly since June 2009;

      e.    in barring Massachusetts physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring Massachusetts Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert;

      f.    in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary; and

g.   in expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of Vesivirus injection as false.

388.   By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of James Bishop, individually and on behalf of all others similarly situated, as set forth herein in Count IX.

389.   As a direct and proximate result of the aforesaid injuries, James Bishop, and all others similarly situated, have suffered damages, as set forth herein in Count IX.

WHEREFORE, Plaintiffs James Bishop, his subrogators, individually and on behalf of all others similarly situated, demand judgment against Defendant in an amount in excess of $75,000.00, together with treble damages and costs of suit.   JURY TRIAL DEMANDED.

## COUNT X:  MICHIGAN STATE PRODUCT LIABILITY ACT VIOLATION (M.C.L. 600.2946 et seq.)
### THOMAS OLSZEWSKI; AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. ALL DEFENDANT

390.   The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

391.   All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendant' practices regarding the manufacture, sale and use of the drug, Fabrazyme, generally, and in the following particulars:

a.      in that the Defendant failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston and Framingham, MA plant;

b.      in that the Defendant failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

c.      in that the Defendant failed to take reasonable steps to avoid and prevent contamination of Fabrazyme vials with particulate steel, glass and rubber;

d.      in that the Defendant manufactured and sold defective Fabrazyme vials contaminated with virus, glass, rubber and steel particles;

e.      in that the Defendant unilaterally devised, and willfully implemented a treatment plan for Fabry patients that was contrary to what their physicians recommended;

f.      in that the Defendant designed and implemented a plan to distribute a dose of Fabrazyme that was known to be injurious;

g.      in that the Defendant instructed physicians and patients to use a "low dose" of Fabrazyme that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller;

h.      in that the Defendant barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme in accordance with the indications of the product insert;

i.      in that the Defendant failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme to unapproved levels to treat Fabry disease;

j.      in that the Defendant failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the "low dose" of Fabrazyme;

k.      in that the Defendant failed to provide or require proper and adequate reserves of unadulterated Fabrazyme in order to prevent or mitigate manufacturing errors;

l.    in that the Defendant failed to provide or license a second source of manufacture for Fabrazyme in order to prevent or mitigate life-threatening supply chain disruptions;

m.    in that the Defendant failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;

n.    in that the Defendant affirmatively represented that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o.    in that the Defendant expressly or impliedly misrepresented that the "low dose" and adulterated Fabrazyme was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p.    in affirmatively representing that the drug given at full dosage would be sold to Kentucky citizens at various dates, but breached such promises repeatedly since June 2009 after delivery of the products to the Plaintiffs at various time points between June 2009 to spring of 2012;

q.    in that the Defendant expressly warranted in the Fabrazyme product insert that Fabrazyme reduces globotriaosylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r.    in that the Defendant expressly warranted in the Fabrazyme product insert that Fabrazyme is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using "low dose" for such an indication;

s.    in that the Defendant failed to adequately, properly, and timely test the "low dose" prior to use;

t.    in that the Defendant marketed and sold Fabrazyme, given at "low dose" and further being contaminated with Vesivirus and adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which

116

it is customarily or foreseeably used  and in contravention to MI anti-adulteration law  (MI ST 333.17764.);

u.    in that the Defendant knew or should have known that the adulterated drug and "low dose" of Fabrazyme is dangerous and likely to cause damage to users;

v.    in that the Defendant manufactured and sold Fabrazyme, given at "low dose" and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w.    in that the Defendant knew or should have known that in order to make Fabrazyme effective for its intended use, it should have provided the drug at the recommended dose;

x.    in that the Defendant knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y.    in that the Defendant did not keep abreast of the state of the art in the science and knew of adverse events involving "low dose" and failed to warn physicians and users of known or knowable dangers;

z.    in that the Defendant did not disclose to the physicians and users that the dosing was defectively and unreasonably designed,  thereby making the product dangerous to use;

aa.    in that the Defendant willfully included an incorrect and unapproved  product insert  that does not apply to a "low dose";

bb.    in that the Defendant knew or should have known that physicians and users were relying upon the expertise of the Defendant in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme;

cc.    in that the Defendant expressly and impliedly warranted that a "low dose" of Fabrazyme was approved for use by the FDA and efficacious for use in the treatment of Fabry disease;

dd.   in expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of Vesivirus injection as false;

ee.   in negligently marketing Fabrazyme known to be untested, contaminated, adulterated, ineffective and "low dose" for treatment of Fabry disease;

ff.   in that Defendant negligently monitored the effects of "low dose" on the named Plaintiffs and affirmatively hid the dangers of "low dose" Fabrazyme when there was a duty to speak;

gg.   in that Defendant never were informed of the danger of the low dose such that they could make an informed treatment decision;

hh.   in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

392.   As a direct and proximate result of Defendant's negligent, willful, and wanton conduct, as set forth above, and reckless indifference to Plaintiff's health and interests, Plaintiff has sustained, or is at imminent risk of sustaining, the following serious injuries consistent with deterioration of disease, some or all which may be of a permanent nature:

a.   renal injury;

b.   cardiac injury;

c.   neurological injury;

d.   peripheral pain;

e.   chronic abdominal pain and diarrhea;

f.     impairment of vision;

g.     impairment of hearing;

h.     increased severity and likelihood of infusion reactions;

i.     Vesivirus infection, Vesivirus-induced hematological cancer, hepatitis, inoculation, seroconversion, and sensitization; and

j.     premature death and other serious and permanent injuries.

393. As a direct and proximate result of the aforesaid injuries, Plaintiff has been damaged as follows:

a.     Plaintiff has been and will be required to expend large sums of money for medical and surgical attention, medical and surgical supplies, medical and surgical appliances, and medicines;

b.     Plaintiff has suffered and will continue to suffer great pain, suffering, inconvenience, impairment of bodily function, and mental anguish;

c.     Plaintiff has been and will be deprived of earnings and earning capacity;

d.     Plaintiff has suffered loss of enjoyment of life;

e.     Plaintiff has suffered a reduced life expectancy;

f.     Plaintiff's general health, strength, and vitality have been impaired; and

g.     Plaintiff and/or his subrogators have expended large sums of money for a contaminated, adulterated, dangerous, and worthless medical treatment of Fabry disease.

394. By its actions, Defendant is liable for the severe injuries and conditions of Thomas Olszewski, individually and on behalf of all others similarly situated, as set forth herein in Count X.

395.     As a direct and proximate result of the aforesaid injuries, Thomas Olszewski, his subrogators, and all others similarly situated, have suffered damages, as set forth herein in Count X.

WHEREFORE, Thomas Olszewski, individually and on behalf of all others similarly situated, demand judgment against Defendant in an amount in excess of $75,000.00, together with costs of suit.   JURY TRIAL DEMANDED.

## COUNT XI: MICHIGAN STATE LAW DECEPTIVE TRADE PRACTICE VIOLATION (MICHIGAN COMPILED LAWS § 445.903 et seq.) THOMAS OLSZEWSKI; AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT

396.     The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

397.     All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant' deceptive acts or practices regarding the sale and use of the drug, Fabrazyme, generally, and in the following particulars:

   a.     in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

   b.     in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low dose";

   c.     in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

d. in affirmatively representing that the drug given at full dosage every two weeks would be sold to Michigan citizens at various dates, but breached such promises repeatedly since June 2009;

e. in barring Michigan physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring Michigan Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

f. in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary; and

g. in expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of Vesivirus injection as false.

398. By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of Thomas Olszewski and on behalf of all others similarly situated, as set forth herein in Count XI.

399. As a direct and proximate result of the aforesaid injuries, Thomas Olszewski, his subrogators, and all others similarly situated, have suffered damages, as set forth herein in Count XI.

WHEREFORE, Plaintiff Thomas Olszewski individually and on behalf of all others similarly situated, demand judgment against Defendant in an amount in excess of $75,000.00, together with costs of suit.  <u>JURY TRIAL DEMANDED</u>.

## COUNT XII:  NEVADA STATE LAW DECEPTIVE TRADE PRACTICE VIOLATION
### (N. R. S. §§ 598.0903-0990)
## TONI CORDOVA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT

400.    The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

401.    All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant's deceptive acts or practices regarding the sale and use of the drug, Fabrazyme, generally, and in the following particulars:

a.    in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

b.    in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low dose";

c.    in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

d.    in affirmatively representing that the drug given at full dosage every two weeks would be sold to Nevada citizens at various dates, but breached such promises repeatedly since June 2009;

e.    in barring Nevada physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring Nevada Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert;

      f.     in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary; and

      g.     in expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of Vesivirus injection as false.

402.    By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of Toni Cordova, individually and on behalf of all others similarly situated, as set forth herein in Count XII.

403.    As a direct and proximate result of the aforesaid injuries, Toni Cordova, her subrogators, and all others similarly situated, have suffered damages, as set forth herein in Count XII.

WHEREFORE, Toni Cordova demand judgment individually and on behalf of all others similarly situated, against Defendant in an amount in excess of $75,000.00, together with costs of suit. <u>JURY TRIAL DEMANDED</u>.

## <u>COUNT XIII: NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT VIOLATION (N.C.G.S. § 75-1.1 et seq.)</u><br>JAMES MATTHEWS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT

404.    The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

405.    All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant's deceptive acts or egregious practices:

    a.    in intentionally failing to inform the Plaintiff that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

    b.    in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low dose";

    c.    in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

    d.    in affirmatively representing that the drug given at full dosage every two weeks would be sold to North Carolina citizens at various dates, but breached such promises repeatedly since June 2009;

    e.    in barring North Carolina physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring North Carolina Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert;

    f.    in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary; and

    g.    in expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective

truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of Vesivirus injection as false.

406.    By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of James Matthews, individually and on behalf of all others similarly situated, as set forth herein in Count XIII.

407.    As a direct and proximate result of the aforesaid injuries James Matthews and his subrogators, have suffered damages, and all others similarly situated, as set forth herein in Count XIII.

WHEREFORE, James Matthews, individually and on behalf of all others similarly situated, demands judgment against Defendant in an amount in excess of $75,000.00, together with treble damages and costs of suit.   JURY TRIAL DEMANDED.

### COUNT XIV:   PENNSYLVANIA UNFAIR TRADE PRACTICES CONSUMER PROTECTION LAW VIOLATION (73 P.S. §§201-1 - 201-9.2) GEORGE DEMKO AND MICHAEL MASULA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT

408.    The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

409.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendant's deceptive acts or practices regarding the sale and use of Fabrazyme, generally, and in the following particulars:

a.    in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

b.   in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low dose";

c.   in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

d.   in affirmatively representing that the drug given at full dosage every two weeks would be sold to Pennsylvania citizens at various dates, but breached such promises repeatedly since June 2009;

e.   in barring Pennsylvania physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring Pennsylvania Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert;

f.   in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary; and

g.   in expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of Vesivirus injection as false.

410.   By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of George Demko and Michael Masula, individually and on behalf of all others similarly situated, as set forth herein in Count XIV.

411.    As a direct and proximate result of the aforesaid injuries, Plaintiffs George Demko, and Michael Masula, their subrogators, and all others similarly situated, have suffered damages, as set forth herein in Count XIV.

WHEREFORE, Plaintiffs George Demko and Michael Masula, individually and on behalf of all others similarly situated, demand judgment against Defendant in an amount in excess of $75,000.00, together with treble damages and costs of suit.  JURY TRIAL DEMANDED.

## COUNT XV:  VIRGINIA CONSUMER PROTECTION ACT VIOLATION
### (VA. CODE § 59.1 et seq.)
### SYDNEY JOHNSON, PLAINTIFF D.J., DAMON LAFORCE;  INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. ALL DEFENDANT

412.    The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

413.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendant's deceptive acts or practices regarding the sale and use of Fabrazyme, generally, and in the following particulars:

      a.    in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

      b.    in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low dose";

      c.    in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in

the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

d.    in affirmatively representing that the drug given at full dosage every two weeks would be sold to Virginia citizens at various dates, but breached such promises repeatedly since June 2009;

e.    in barring Virginia physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring Virginia Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert;

f.    in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary; and

g.    in expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of Vesivirus injection as false.

414.    By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of the named plaintiffs, individually and on behalf of all others similarly situated, as set forth herein in Count XV.

415.    As a direct and proximate result of the aforesaid injuries of Plaintiffs, and all others similarly situated, have suffered damages as set forth herein in Count XV.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, demand judgment against Defendant in an amount in excess of $75,000.00, together with treble damages and costs of suit.  <u>JURY TRIAL DEMANDED</u>.

## COUNT XVI:  VIRGINIA PROHIBITION OF FALSE ADVERTISING VIOLATION (VA. CODE § 59.1 et seq.)
### SYDNEY JOHNSON, PLAINTIFF D.J.; PLAINTIFF S.J.; DAMON LAFORCE; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT

416.    The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

417.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendant's acts or practices regarding the sale and use of Fabrazyme, generally, and in the following particulars:

   a.    in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

   b.    in affirmatively representing that the drug given at "low dose" and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a "low dose";

   c.    in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

   d.    in affirmatively representing that the drug given at full dosage every two weeks would be sold to Virginia citizens at various dates, but breached such promises repeatedly since June 2009;

   e.    in barring Virginia physicians from administering the prescribed and lawful recommended dose of Fabrazyme and barring Virginia Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert;

f.    in expressly or impliedly misrepresenting that the "low dose" and further that the adulterated Fabrazyme was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary; and

g.    in expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of Vesivirus injection as false.

418.    By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of the named Plaintiffs, individually and on behalf of all others similarly situated, as set forth herein in Count XVI.

419.    As a direct and proximate result of the aforesaid injuries of the named Plaintiffs, individually and on behalf of all others similarly situated, as set forth herein in Count XVI.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, demand judgment against Defendant in an amount in excess of $75,000.00, together with treble damages and costs of suit.  <u>JURY TRIAL DEMANDED</u>.

**<u>COUNT XVII:  VIRGINIA WRONGFUL DEATH (Code of Virginia §8.01-50) or in the alternative SURVIVAL ACTION CLAIMS (Code of Virginia §8.01-25)</u>**
**EDDIE VIERS, individually and as administrator of THE ESTATE OF TERESA VIER as substituted for Teresa Viers; WITH WILLIAM MCNEW; JEANNE WALLACE, individually and as administrator of THE ESTATE OF JOSEPH WALLACE as substituted for Joseph Wallace; WITH JAMES WALLACE; AND WITH SAMUEL WALLACE; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. ALL DEFENDANT**

420.    The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

421.    Eddie Viers, individually and as Administrator of the Estate of Teresa Viers brings this action on behalf of the beneficiaries under and by virtue of the Wrongful Death Act, Code of Virginia §8.01-50, and the applicable rules of civil procedure and decisional law.

422.    Jeanne Wallace, individually and as Administrator of the Estate of Joseph Wallace brings this action on behalf of the beneficiaries under and by virtue of the Wrongful Death Act Code of Virginia §8.01-50, and the applicable rules of civil procedure and decisional law.

423.    As a result of the negligent acts and omissions of Defendant, Teresa Viers and Joseph Wallace were caused grave injuries and death resulting in the entitlement to damages to those individuals defined as beneficiaries under the Wrongful Death Act.

424.    The named administrators claim all administrator's expenses recoverable under the Wrongful Death Act, including, but not limited to damages for hospital, medical, funeral and burial expenses and all expenses of administration made necessary because of Teresa Viers' and Joseph Wallace's deaths.

425.    The Wrongful Death Act beneficiaries of the Estate of Teresa Viers are:

   a.    Eddie Viers, spouse; and

   b.    William McNew, son.

426.    The Wrongful Death Act beneficiaries of the Estate of Joseph Wallace are:

   a.    Jeanne Wallace, spouse;

    b.  James Wallace, son and

    c.  Samuel Wallace, son.

427. On behalf of wrongful death beneficiaries, the Administrators claims damage for monetary support that decedents would have provided to the beneficiaries during their lifetime, including, but not limited to the support provided or which could have been expected to have been provided to the beneficiaries.

428. On behalf of the Wrongful Death Act beneficiaries, the Administrators claim damages for loss of companionship, comfort, society, guidance, solace, and protection by the decedents.

429. On behalf of the wrongful death beneficiaries, the Administrator claims damages for the full damages allowed under the Wrongful Death Act of Virginia and decisional law interpreting the Act.

WHEREFORE, Plaintiffs demand damages against Defendant in an amount in excess of $50,000.00, exclusive of pre-judgment interest, post-judgment interest and costs.

## AND IN THE ALTERNATIVE--SURVIVAL ACTION

430. On behalf of the Survival Action beneficiaries under Code of Virginia § 8.01-25, the Administrators claim all loss of income, retirement, and social security income as a result of the deaths of Teresa Viers and Joseph Wallace.

431. On behalf of the Survival Act beneficiaries, the Administrator claims damages for the pain, suffering and inconvenience endured by Teresa Viers and Joseph

Wallace, including, but not limited to their physical pain and suffering and mental pain and suffering.

432.    Plaintiffs claim the full measure of damages under the Survival Act and decisional law interpreting the Act.

WHEREFORE, Plaintiffs demand damages against Defendant in an amount in excess of $50,000.00 under the Survival Act, exclusive of prejudgment interest, post-judgment interest and costs.

### COUNT XVIII:  WASHINGTON UNIFORM DECEPTIVE TRADE PRACTICES ACT VIOLATION (RCW § 19.86.010 et seq.) AMBER BRITTON; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT

433.    The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

434.    All of the resultant losses, damages, and injuries sustained by Plaintiff resulted directly and proximately from Defendant's deceptive acts or practices regarding the sale and use of Fabrazyme, generally, and in the following particulars:

    a.    in intentionally failing to inform the Plaintiff that the Fabrazyme she was administered contained Vesivirus and Vesivirus fragments, and

    b.    in expressly and impliedly misrepresenting that injection with Vesivirus containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of Vesivirus injection as false.

435.     By the use of deceptive trade practices, Defendant is liable for the severe injuries and conditions of Plaintiffs Amber Britton, individually and on behalf of all others similarly situated, as set forth herein in Count XVIII.

436.     As a direct and proximate result of the aforesaid injuries of Plaintiff Amber Britton, and, and all others similarly situated, have suffered damages, as set forth herein in Count XVIII.

WHEREFORE, Plaintiff Amber Britton, demands judgment individually and on behalf of all others similarly situated, against Defendant in an amount in excess of $75,000.00, together with treble damages and costs of suit.  JURY TRIAL DEMANDED.

## COUNT XIX:  WASHINGTON PRODUCT LIABILITY ACT VIOLATION
### (R.C.W. § 7.72 et seq.)
### AMBER BRITTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT

437.     The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

438.     All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendant's practices regarding the manufacture, sale, contract for sale, and use of the drug, Fabrazyme, generally, and in the following particulars:

a.     in that the Defendant failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Framingham, MA plant;

b.     in that the Defendant failed to take reasonable steps to avoid and prevent contamination of Fabrazyme vials with Vesivirus;

c.      in that the Defendant manufactured and sold defective Fabrazyme vials contaminated with virus;

d.      in that the Defendant failed to report the effects of Vesivirus on Fabry patients;

e.      in that the Defendant failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of contaminated Fabrazyme;

f.      in that the Defendant affirmatively represented that the drug contaminated with virus will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

g.      in that the Defendant expressly or impliedly misrepresented that the adulterated Fabrazyme was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

h.      in that the Defendant marketed and sold Fabrazyme being contaminated with Vesivirus, which is not fit for the ordinary purpose for which it is customarily or foreseeably used  and in contravention to WA anti-adulteration law (RCW § 69.04.410-440);

i.      in that the Defendant knew or should have known that the adulterated drug is dangerous and likely to cause damage to users;

j.      in that the Defendant manufactured and sold Fabrazyme being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

k.      in that the Defendant knew or should have known, that due to the inherently dangerous nature of the design of virally infected Fabrazyme, it should have provided warnings on the product to protect users;

l.      in that the Defendant did not keep abreast of the state of the art in the science and knew of adverse events involving Vesivirus and failed to warn physicians and users of known or knowable dangers;

m.   in that the Defendant did not disclose to the physicians and users that the Fabrazyme was defectively and unreasonably designed, thereby making the product dangerous to use;

n.   in that the Defendant willfully included an incorrect and unapproved product insert that does not apply to adulterated Fabrazyme;

o.   in that the Defendant knew or should have known that physicians and users were relying upon the expertise of the Defendant in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme;

p.   in that the Defendant expressly and impliedly warranted that virus tainted Fabrazyme was approved for use by the FDA and efficacious for use in the treatment of Fabry disease;

q.   in expressly and impliedly misrepresenting that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements as to medical safety of Vesivirus injection as false;

r.   in negligently marketing Fabrazyme known to be untested, contaminated, adulterated for treatment of Fabry disease;

s.   in inequitably denying Plaintiff access to Fabrazyme when it knew she was diagnosed with Fabry, entered into the Fabry Registry clinical trial for medical monitoring, but not granted standard of care that she had been prescribed and subsequently required as her condition deteriorated and

t.   in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

439.   By its actions, Defendant is liable for the severe injuries and conditions of Amber Britton, individually and on behalf of all others similarly situated, as set forth herein in Count XIX.

440.     As a direct and proximate result of the aforesaid injuries, Amber Britton and all others similarly situated, have suffered damages, as set forth herein in Count XIX.

WHEREFORE, Plaintiff Amber Britton, individually and on behalf of all others similarly situated, demands judgment against Defendant in an amount in excess of $75,000.00, together with punitive damages, and costs of suit.     JURY TRIAL DEMANDED.

### COUNT XX:  FRAUD

**TRINA WILKINS; JAMES BISHOP; AMBER BRITTON; TONI CORDOVA; JOHN CORTINA; GEORGE DEMKO; DONOVAN HELTON; MARY HELTON; PLAINTIFF D.J.; SYDNEY JOHNSON; DAMON LAFORCE; MICHAEL MASULA; JAMES MATTHEWS; THOMAS OLSZEWSKI; THOMAS STANZIANO; THE ESTATE OF TERESA VIER; THE ESTATE OF JAMES WALLACE; THE INDIVIDUALLY AND ON BEHALF OF ALL OTHERS  SIMILARLY SITUATED v. DEFENDANT**

441.     Plaintiffs incorporate all preceding paragraphs and further alleges as follows:

442.     Defendant sold Fabrazyme and had a pecuniary interest in selling Fabrazyme.

443.     Defendant affirmatively decided to sell to patients, including Plaintiffs, Fabrazyme at doses lower than were approved by the FDA.

444.     Defendant owed a duty to provide truthful, accurate, and non-misleading information to physicians and patients regarding the doses of Fabrazyme, medical risks of skipping infusions and later taking reduced doses of Fabrazyme, the likely duration of the shortage, the treatment alternatives available during the shortage, the meaning of the

relevant medical studies in regard to the risks assumed by "off label" treatment with Fabrazyme, and other relevant facts as detailed in herein.

445.   Defendant's duties included, but were not limited to, a duty to warn that

(a) the "low dose" of 0.5 mg/kg of Fabrazyme, or less, administered bi-weekly would be insufficient to prevent accelerated and, in some cases, potentially catastrophic clinical deterioration in many patients, (b) male patients with significant cardiac disease, were particularly likely to suffer accelerated medical decline if they skipped doses or took reduced doses, (c) if such a patient showed signs of medical decline on the reduced dose, that such decline would, in many cases, be irreversible even if full dose was eventually restored, (d) the Vedder study was not reassuring as to the clinical efficacy of a 0.3 mg/kg dose every two weeks of Fabrazyme, and (e) the Lubanda study was neither assuring nor clinically relevant on this issue.

446.   Defendant negligently, recklessly, and/or knowingly made false representations as to the efficacy of reduced doses and the lack of danger of taking reduced doses, all while knowing that said representations were false or that there was not a sufficient basis to make such representations.

447.   These misrepresentations caused Plaintiffs to agree to skip doses of Fabrazyme, take reduce doses of Fabrazyme, continue to purchase Fabrazyme, and forego other treatment options that Plaintiffs could have more urgently sought. The misrepresentations include, but are not limited to, all affirmative communications detailed in this Complaint and discovered in *Schubert v. Genzyme*.

448.    Defendant alleged that Fabrazyme was effective at doses lower than the FDA-approved 1.0 mg/kg dose without scientifically significant knowledge to support their claims. Defendant did so through many actions including, but not limited to, supporting the use of Fabrazyme at doses lower than was approved by the FDA and by referring patients and physicians to only the Lubanda study, knowing that the Lubanda study could be improperly interpreted as clinical support for a dose of 0.3 mg/kg Fabrazyme®.

449.    Defendant informed, inter alia, Plaintiffs that it projected the shortage to be significantly shorter than it actually was when Defendant knew that the shortage would last much longer, or at least knew they lacked sufficient knowledge to state otherwise. Defendant did so with knowing and reckless disregard for the truth.

450.    Defendant made these false representations with knowledge that they were false and/or reckless, knowing that they had insufficient knowledge on which to base such representation.

451.    But for these false representations, Plaintiffs would not have agreed to skip doses and would have been more aggressive in obtaining alternative treatments.  Instead, Plaintiffs relied on those representations and believed, inter alia, that Fabrazyme would be effective in the reduced dose and that the shortage would be only temporary and confined to a few months at most. Plaintiffs did so to their detriment.

452.    In addition to the actions described in the preceding paragraphs, Defendant acted fraudulently in the following particulars:

a.   Dr. Gruskin was supplied with knowingly false information to convey to the US FSWG in June and September 2009 about the length of the shortage;

b.   Dr. Gruskin was supplied with knowingly false information to convey to the US FSWG in June and September 2009 that the guidelines to be developed by the US FSWG were to be adopted in all regions of the world;

c.   Dr. Gruskin affirmatively conveyed this information to the US FSWG, as more fully described above, in June and September 2009;

d.   Dr. Gruskin affirmatively conveyed that Vesivirus is not harmful to humans;

e.   Dr. Gruskin and other officials of Defendant prepared and distributed letters, with Dr. Gruskin's and/or other employee's signatures, to patients and physicians on or about July 2, 2009, September 24, 2009, December 2, 2009, and February 17, 2010, explaining the length of the shortage, which repeatedly was found to be false, and the US FSWG's endorsement of Defendant' plan, as more fully described above;

f.   Defendant supplied false information to the FDA in its responses to the FDA letter dated July 6, 2009, which response was dated July 9, 2009 and signed by Alex Kuta, concerning Defendant' ability to assure adequate supplies and to provide a geographically equitable allocation of Fabrazyme;

g.   In town hall communications and supply update meetings wherein various Defendant employees presented false information and responded to questions while patients and physicians could call in and listen to learn more about the shortage. In giving forms with frequently asked questions and Defendant' prepared responses that provided false information regarding the length of the shortage and the efficacy of Fabrazyme® at doses lower than the FDA-approved dose, that "it was better to have something instead of nothing", as detailed in this Complaint.

453.    Defendant used the US FSWG as a vehicle whereby to perpetrate fraudulent misrepresentations on Plaintiffs and other patients and physicians.

454.    Defendant knowingly or recklessly recommended "low-dose" Fabrazyme to patients and doctors, while knowing they lacked sufficient knowledge upon which to base such a representation, made such fraudulent misrepresentations with the goal of inducing Plaintiffs, and U.S. physicians to  continue to use Fabrazyme on the reduced dose during the shortage.

455.    Defendant's fraudulent representations as to the safeness of low dosing, the efficacy of low dosing, the anticipated duration of the shortage, the status of getting the plant up and running, and other such misrepresentations were done solely for the economic benefit of Defendant, including to retain Plaintiffs as customers, to protect Defendant's valuation, and to protect against competitors entering the market.

456.    Plaintiffs reasonably relied on Defendant fraudulent misrepresentations, as set forth in this Complaint and elsewhere in this Complaint, which reliance was a direct and proximate cause of the harms alleged herein.

457.    Plaintiffs are entitled to compensatory and punitive damages as set forth herein, including the costs of the low doses of Fabrazyme paid for by Plaintiffs.

WHEREFORE, Plaintiffs demand judgment, individually and on behalf of all others similarly situated, against Defendant in an amount in excess of $75,000.00, together with punitive damages and costs of suit.  JURY TRIAL DEMANDED.

<u>COUNT XXI:  FRAUDULENT CONCEALMENT</u>

**TRINA WILKINS; JAMES BISHOP; AMBER BRITTON; TONI CORDOVA; JOHN CORTINA; GEORGE DEMKO; DONOVAN HELTON; MARY HELTON; PLAINTIFF D.J.; SYDNEY JOHNSON; DAMON LAFORCE; MICHAEL MASULA; JAMES MATTHEWS; THOMAS OLSZEWSKI; THOMAS STANZIANO; THE ESTATE OF TERESA VIER; THE ESTATE OF JAMES WALLACE; THE INDIVIDUALLY AND ON BEHALF OF ALL OTHERS  SIMILARLY SITUATED v. DEFENDANT**

458.    Plaintiffs incorporate all preceding paragraphs and further allege as follows.

459.    Defendant thus owed a duty to inform physicians and patients, including Plaintiffs, of any and all information related to Fabrazyme where, without such knowledge, harm could be suffered by the end user of Fabrazyme.

460.    Additionally, because Defendant continued to manufacture and distributed Fabrazyme at doses lower than was approved by the FDA, Defendant owed a duty to inform those they communicated with Plaintiffs, of all information necessary to make informed treatment decisions.

461.    As detailed herein, such information includes, but is not limited to: the lack of efficacy of treatment with Fabrazyme at dosages Defendant required, recommended, encouraged, or otherwise recklessly caused to be administered, where such dosages were significantly lower or different than the FDA-approved dosage; the increasing lack of efficacy of Fabrazyme at reduced dosages over increased periods of time; the fact that patients who remained stable while they received Fabrazyme at a full dose could deteriorate on lower doses to a point where recovery was impossible; and all facts related

to the length of time Defendant required, or recklessly caused, patients to be administered doses lower than the dose approved by the FDA.

462.    The facts in the preceding paragraph were material to decisions regarding treatment with Fabrazyme in that, had they been properly communicated, physicians and patients using Fabrazyme, including Plaintiffs, would have been more active and aggressive in seeking alternative treatments, including, but not limited to, accessing Replagal.

463.    Because Defendant affirmatively decided to sell patients, including Plaintiffs, Fabrazyme at a dose 70% lower than was approved by the FDA, Defendant assumed a duty to provide reasonably complete, truthful, accurate and non-misleading information to physicians and patients regarding the dose, its risks, and the duration with which such dose would be provided, and also a duty to provide a drug which was safe and efficacious.

464.    Defendant's duties included, but were not limited to, a duty to warn that

(a) the "low-dose" Fabrazyme would be insufficient to prevent accelerated and, in some cases, potentially catastrophic clinical deterioration in many patients, (b) male patients with significant cardiac disease, were particularly likely to suffer accelerated medical decline if they skipped doses or took reduced doses, (c) if such a patient showed signs of medical decline on the reduced dose, that such decline would, in many cases, be irreversible even if full dose was eventually restored, (d) the Vedder study was not reassuring as to the clinical efficacy of a 0.3 mg/kg dose of Fabrazyme, and (e) the Lubanda study was neither assuring nor clinically relevant on this issue.

465.    As detailed herein, Defendant fraudulently concealed their knowledge, as shown by their response to the Australian government's effort to approve Fabrazyme for use at 0.2 mg/kg, that reducing the dose of Fabrazyme® to significantly lower than the FDA-approved dose of 1.0 mg/kg every-other-week "across the board," as Defendant did in the U.S., "would have significant clinical consequences for patients, **with the expectation that many would suffer irreversible harm as a result of insufficient dosing,**" that "**treatment at a higher dose is necessary and may be life-saving**," that the suggestion to reduce the dose of Fabrazyme® to 0.2 mg/kg in all patients "ignores the cumulative evidence in the extant literature," that such a reduction could occur "with little or no loss of efficacy is conjectural," that the medical conclusion from the Vedder study was that a dose of 0.2 mg/kg of Fabrazyme® would not "elicit[] a clinically relevant response to treatment in many Fabry patients," and that a "**blanket dose adjustment would be insane**." GENZYME013854; GENZYME013847; GENZYME013840 (*Schubert*).

466.    As detailed herein, Defendant intentionally fraudulently concealed such information from physicians and patients, including Plaintiffs, by not communicating critical life-saving information to the US FSWG or to patients and physicians.

467.    Additionally, Defendant fraudulently concealed Defendant's knowledge that, as stated in the deposition of Dr. Gruskin, Defendant' Vice President of U.S. Medical Affairs, that Fabrazyme has not been proven to change clinical outcomes of patients, including, but not limited to, those with advanced stage disease.

468.    Defendant did not inform Plaintiffs of these material facts, including those listed above.

469.     Because Plaintiffs did not receive such facts, they skipped doses of Fabrazyme in August and September 2009, and continued to purchase Fabrazyme at a dose 70% lower than was approved by the FDA thereafter, and they did not actively pursue alternative treatments in a timely manner.

470.     Thus, as a direct and proximate result of the Defendant's fraudulent concealment of these material facts, Plaintiffs suffered the harms alleged herein.

471.     Plaintiffs are entitled to relief as fully set forth in this Complaint.

WHEREFORE, Plaintiffs demand judgment, individually and on behalf of all others similarly situated, against Defendant in an amount in excess of $75,000.00, together with punitive damages and costs of suit.  JURY TRIAL DEMANDED.

## COUNT XXII:  BREACH OF FIDUCIARY

**TRINA WILKINS; JAMES BISHOP; AMBER BRITTON; TONI CORDOVA; JOHN CORTINA; GEORGE DEMKO; DONOVAN HELTON; MARY HELTON; PLAINTIFF D.J.; SYDNEY JOHNSON; DAMON LAFORCE; MICHAEL MASULA; JAMES MATTHEWS; THOMAS OLSZEWSKI; THOMAS STANZIANO; THE ESTATE OF TERESA VIER; THE ESTATE OF JAMES WALLACE; THE INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED v. DEFENDANT**

472.     Plaintiffs incorporate all preceding paragraphs and further allege as follows:

473.     Defendant manufactured and sold Fabrazyme but did not limit their actions to manufacturing and selling Fabrazyme.

474.     Defendant maintained and still maintains a close personal relationship with Plaintiffs, including monitoring their health both through individual case managers and through the Fabry registry clinical trial.

475. When a shortage of Fabrazyme was imminent, Genzyme undertook to create a body of experts for reviewing the effectiveness and safety of "low-dose" Fabrazyme which included doctors and employees of Genzyme.

476. Genzyme created a position of fiduciary with all Fabry patients, which required full and honest disclosure of information when Genzyme bypassed the normal regulatory body of the FDA to create a governing entity (FSWG) that would approve and recommend the use of "low-dose" Fabrazyme in the United States.

477. It created further fiduciary duties by affirmatively undertaking to "protect the most vulnerable patients" who were the American Fabry patients and then telling each individual plaintiff that it would protect them even though Genzyme knew that Americans did not have free-market access to Replagal.

478. These fiduciary duties were breached when Genzyme failed to disclose the risks of taking "low-dose" Fabrazyme, failed to allocate Fabrazyme first to the American patients who were the most vulnerable of all Fabry patients under the mandate of the Orphan Drug Act, and when Genzyme failed to disclose (and still fails to disclose) information that was adverse to the FSWG recommendations for treatment, as well as when it refused or reduced doses to Americans instead of to the markets where it had competition.

479. Genzyme's fiduciary duty has not ended because it still maintains the close personal relationship with each of the plaintiffs and monitors their health and premature deaths through the Fabry registry.

480.     Thus, as a direct and proximate result of the Defendant's conduct alleged herein, Plaintiffs suffered the harms alleged and are entitled to such relief.

WHEREFORE, Plaintiffs demand judgment, individually and on behalf of all others similarly situated, against Defendant in an amount in excess of $75,000.00, together with costs of suit.  JURY TRIAL DEMANDED.

<u>COUNT XXIII:  UNJUST ENRICHMENT</u>

**TRINA WILKINS; JAMES BISHOP; AMBER BRITTON; TONI CORDOVA; JOHN CORTINA; GEORGE DEMKO; DONOVAN HELTON; MARY HELTON; PLAINTIFF D.J.; SYDNEY JOHNSON; DAMON LAFORCE; MICHAEL MASULA; JAMES MATTHEWS; THOMAS OLSZEWSKI; THOMAS STANZIANO; THE ESTATE OF TERESA VIER; THE ESTATE OF JAMES WALLACE; THE INDIVIDUALLY AND ON BEHALF OF ALL OTHERS  SIMILARLY SITUATED v. ALL DEFENDANT**

481.     Plaintiffs incorporate all preceding paragraphs and further allege as follows:

482.     All Plaintiffs except for Amber Britton paid for "low-dose" Fabrazyme.

483.     All Plaintiffs including Amber Britton paid for Vesivirus contaminated Fabrazyme.

484.     Given the fact Genzyme knew "low-dose" Fabrazyme was ineffective and dangerous as well as the fact that Vesivirus contaminated Fabrazyme is dangerous even at a normal dosage, it would be unjust to allow Genzyme to retain the monies it charged to the Plaintiffs and the other American Fabry patients.

485.     The scale and level of deception is so unconscionable that restitution to the individual Plaintiffs and disgorgement of the entire monies derived from the sale of "low-dose" and Vesivirus contaminated Fabrazyme is required in equity.

486.     Thus, as a direct and proximate result of the Defendant's conduct alleged herein, Plaintiffs suffered the harms alleged and are entitled to such relief.

WHEREFORE, Plaintiffs demand judgment, individually and on behalf of all others similarly situated, against Defendant in an amount in excess of $75,000.00, together with costs of suit.  JURY TRIAL DEMANDED.

<u>COUNT XXIII:  LOSS OF CONSORTIUM</u>
LISA BISHOP; DARLENE COOKINGHAM; JILL CORTINA; NATE BROOKS; ERIN MASULA; WENDY STANZIANO; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, v. DEFENDANT

487.     The preceding paragraphs are incorporated by reference as though set forth here in their entirety.

488.     As a direct and proximate result of the injuries sustained by their spouses, Plaintiffs have been damaged as follows:

    a.     Plaintiffs have been and will continue to be compelled to expend large sums of money for medical care, supplies, appliances, and medicine;

    b.     Plaintiffs have been and may be compelled to expend large sums of money for hiring help to perform household duties previously performed by their spouses; and

    c.     Plaintiffs have been and will be deprived of their spouse's aid, comfort, assistance, companionship, and consortium.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, demand judgment against Defendant in an amount in excess of $75,000.00, together with treble damages and costs of suit.

## JURY TRIAL DEMANDED ON ALL ISSUES SO TRIABLE

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

a.   Certification of this action or common issues herein as a class action;

b.   A determination of common issues and claims in a unitary, consolidated or class- wide trial pursuant to Fed. R. Civ. P. 23 and/or Fed. R. Civ. P 42;

c.   An award of compensatory damages to each injured class member in an amount deemed appropriate by the trier of fact;

d.   An award of punitive damages for acts and omissions of Defendant found to be willful and wanton, outrageous, and made with wickedness and reckless indifference to Plaintiffs' lives, health and interests;

e.   An award of compensatory, equitable and/or restitution damages according to proof and for all applicable damages, remedies, and relief under applicable federal and state statutes including medical monitoring;

f.   Unrestricted publication of the de-identified full clinical results that have been obtained by Genzyme from "low-dosing" Americans with Fabrazyme versus full doses for Europeans as collected in the Fabry Registry in accordance with the National Institutes of Health requirements under ClinicalTrials.gov Identifier: NCT00196742 for the benefit of the Americans that were treated with "low-dose" Fabrazyme and the advancement of medical science on Fabry disease;

g.   An award of costs of suit; and

h.   Any other and further legal and/or equitable relief to which Plaintiffs might be entitled at law or which this Court deems proper.

**JURY TRIAL DEMANDED**

For the Plaintiffs,


/s/ C. Allen Black, Jr.
C. Allen Black
PA I.D. No. 202501
LAW OFFICE OF C. ALLEN BLACK
1579 Montgomery Rd.
Allison Park, PA 15101
Telephone: 412.908.3268
Email: drallenblack@gmail.com


/s/ Jonathan M. Gesk
Jonathan M. Gesk, Esquire
PA I.D. No. 205678
Gesk Moritz, LLC
14 East Main Street
Carnegie, PA 15106
Telephone: (412) 429 – 9100
Email: jgesk@gesklaw.com