# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| TRINA WILKINS; JAMES BISHOP; LISA BISHOP; AMBER BRITTON; TONI CORDOVA; JOHN CORTINA; JILL CORTINA; GEORGE DEMKO; DONOVAN HELTON; MARY HELTON; NATE BROOKS; SYDNEY JOHNSON; PLAINTIFF D.J.; DAMON LAFORCE; MICHAEL MASULA; ERIN MASULA; JAMES MATTHEWS; THOMAS OLSZEWSKI; DARLENE COOKINGHAM; THOMAS STANZIANO; WENDY STANZIANO; EDDIE VIERS, individually as surviving spouse of Teresa Viers, deceased, AND as Personal Representative of the ESTATE OF TERESA VIERS; WILLIAM MCNEW; JEANNE WALLACE, individually as surviving spouse of Joseph Wallace, deceased, AND as Personal Representative of the ESTATE OF JOSEPH WALLACE; JAMES WALLACE; and SAMUEL WALLACE, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:21-cv-10023-DPW<br><br>**Oral Argument Requested**<br><br>Leave to File Memorandum of Law in Excess of Twenty Pages Granted on July 7, 2021 |
|                  Plaintiffs,<br><br>          v.<br><br>GENZYME CORPORATION,<br><br>                  Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) |  |

## DEFENDANT GENZYME CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ...................................................................................................................2

    A.    Defendant ................................................................................................2

    B.    Plaintiffs and Their Prior *Hochendoner* and *Adamo* Actions................................2

    C.    The *Schubert* Action ................................................................................5

    D.    The *Mooney* Action................................................................................5

    E.    The Present Action................................................................................6

        1.    Allegations Regarding the Allston Facility .................................7

        2.    Allegations Regarding the Framingham Facility .................................7

        3.    Plaintiffs' Alleged Injuries................................................................8

ARGUMENT................................................................................................9

I.    THERE IS NOT COMPLETE DIVERSITY BETWEEN THE PARTIES ....................11

II.    THERE IS NO FEDERAL JURISDICTION IN THIS ACTION BECAUSE ALL OF PLAINTIFFS' PUTATIVE CAFA CLASS CLAIMS ARE TIME BARRED ...............12

III.    THERE IS NO FEDERAL JURISDICTION OVER ANY CLAIM ASSERTED IN THE SAC, AND THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING CLAIMS...................19

IV.    ALL CLAIMS IN THE SAC FAIL BECAUSE PLAINTIFFS LACK STANDING.......21

    A.    Plaintiffs Have Not Plausibly Alleged that Any Particular Injuries Are Traceable to Any Particular Defect or Conduct ..................................................24

    B.    Plaintiffs Lack Standing to Bring Claims Regarding Receipt of Fabrazyme Allegedly Contaminated with Vesivirus or Particulate Matter ............................25

    C.    Plaintiffs Lack Standing to Bring Claims Based on Possible Future Injury .........30

    D.    Plaintiffs' Allegations of Spending More than $200,000 for Allegedly Defective Fabrazyme Do Not Give Rise to Standing ...................................32

V.    PLAINTIFFS FAIL TO PLEAD FRAUD WITH PARTICULARITY AS REQUIRED BY THE HEIGHTENED PLEADING STANDARDS OF RULE 9(B) .....33

VI.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER RULES 8 AND 12(B)(6)............38

    A.    Plaintiffs Fail to Plead Claim for Negligence (Count I) ......................................41

    B.    Plaintiffs Fail to Plead Claim for Negligence *Per Se* (Count II) ..........................42

    C.    Plaintiffs' Strict Liability Claims Fail as a Matter of Law (Count III)................43

    D.    Plaintiffs' Claims for Breach of Warranty Fail as a Matter of Law (Count IV)................................................................................................46

    E.    Plaintiffs Fail to Plead Violation of Florida Deceptive and Unfair Trade Practices Act (Count V) ......................................................................48

F.     Plaintiffs Fail to Plead Violation of Indiana Products Liability Act (Count VI) ...................................................................................................49

G.    Plaintiffs Fail to Plead Violations of Product Liability Act of Kentucky and Kentucky Consumer Protection Act (Counts VII and VIII) .........................50

H.    Plaintiffs Fail to Plead Violation of Massachusetts Unfair and Deceptive Trade Practices Act (Count IX) .......................................................................51

I.     Plaintiffs Fail to Plead Violations of Michigan State Product Liability Act and Michigan Consumer Protection Act (Counts X and XI) ..............................52

J.     Plaintiffs Fail to Plead Violation of Nevada Deceptive Trade Practices Act (Count XII) .....................................................................................................53

K.    Plaintiffs Fail to Plead Violation of North Carolina Unfair and Deceptive Trade Practice Act (Count XIII) ....................................................................53

L.     Plaintiffs Fail to Plead Violation of Pennsylvania Unfair Trade Practices Consumer Protection Law (Count XIV) ............................................................54

M.   Plaintiffs Fail to Plead Violations of Virginia Consumer Protection Act, Wrongful Death Statute, or Survival Action Statute (Counts XV, XVI, and XVII) ...........................................................................................................55

N.    Plaintiffs Fail to Plead Violations of Washington Uniform Deceptive Trade Practices Act and Washington Product Liability Act (Counts XVIII and XIX) ...........................................................................................................56

O.    Plaintiffs Fail to State Claims for Fraud and Fraudulent Concealment (Counts XX and XXI) .......................................................................................57

P.     Plaintiffs Fail to State Claim for Breach of Fiduciary Duty (Count XXII) ...........58

Q.    Plaintiffs Fail to State Claim for Unjust Enrichment (Count XXIII) ..................59

R.     Plaintiffs Fail to State Claim for Loss of Consortium (Count XXIV) .................59

CONCLUSION ...........................................................................................................60

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.G. ex rel. Maddox v. Elsevier, Inc.*,
732 F.3d 77 (1st Cir. 2013)........................................................................ 39, 41

*Am. Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974) ................................................................................ 13

*Abla v. Brinker Rest. Corp.*,
279 F.R.D. 51 (D. Mass. 2011) ............................................................... 21

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008) ...................................................................... 60

*AER Advisors, Inc. v. Fid. Brokerage Servs., LLC*,
921 F.3d 282 (1st Cir. 2019) ................................................................ 9, 10, 39

*Ali v. Allergan USA, Inc.*,
No. 12-cv-115, 2012 WL 3692396 (E.D. Va. Aug. 23, 2012) ............................... 55

*Allied Distribs., Inc. v. Latrobe Brewing Co.*,
847 F. Supp. 376 (E.D.N.C. 1993)............................................................ 54

*Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*,
374 F.3d 23 (1st Cir. 2004)................................................................ 33, 35, 37

*Am. Fed'n of State Cnty. & Mun. Emps. v. Ortho-McNeil-Janssen Pharm., Inc.*,
No. 08-cv-5904, 2010 WL 891150 (E.D. Pa. Mar. 11, 2010) ............................... 48

*Ambach v. French*,
216 P.3d 405 (Wash. 2009) ................................................................... 56

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ................................................................................ 21

*Amrhein v. eClinical Works, LLC*,
954 F.3d 328 (1st Cir. 2020)................................................................ 24, 26

*Aponte-Davila v. Mun. of Caguas*,
828 F.3d 40 (1st Cir. 2016)..................................................................... 12

*Arnold v. Liberty Mut. Ins. Co.*,
392 F. Supp. 3d 747 (E.D. Ky. 2019)...................................................... 14, 18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................ 23, 28, 38

*Bailey v. Skipperliner Indus., Inc.*,
   278 F. Supp. 2d 945 (N.D. Ind. 2003) ..................................................... 14

*Baraukas v. Danek Med., Inc.*,
   No. 97-cv-613, 2000 WL 223508 (M.D.N.C. Jan. 13, 2000) ................... 43

*Barnes v. A.H. Robins Co.*,
   476 N.E.2d 84 (Ind. 1985) ...................................................................... 15

*Baumgardner v. Am. Motors Corp.*,
   522 P.2d 829 (Wash. 1974) ..................................................................... 57

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................... 29, 38, 39

*Benedict v. Hankook Tire Co.*,
   286 F. Supp. 3d 785 (E.D. Va. 2018) ...................................................... 42

*Bichler v. Willing*,
   397 N.Y.S.2d 57 (N.Y. App. Div. 1977) .................................................. 47

*Big Rivers Elec. Corp. v. Gen. Elec. Co.*,
   820 F. Supp. 1123 (S.D. Ind. 1992) .................................................. 14, 50

*Blum v. Holder*,
   744 F.3d 790 (1st Cir. 2014) ................................................................... 30

*Blum v. Yaretsky*,
   457 U.S. 991 (1982) ................................................................................ 23

*Bosch v. Bayer Healthcare Pharm., Inc.*,
   13 F. Supp. 3d 730 (W.D. Ky. 2014) ................................................. 14, 18

*Breen v. Ethicon, Inc.*,
   No. C20-5595, 2021 WL 673485 (W.D. Wash. Feb. 22, 2021) ............... 14

*Britton v. Marcus, Errico, Emmer & Brooks, P.C.*,
   No. 18-cv-11288, 2020 WL 7024545 (D. Mass. Nov. 30, 2020) ............. 34

*Burrell v. Bayer Corp.*,
   260 F. Supp. 3d 485 (W.D.N.C. 2017) .................................................... 54

*Campbell v. Harmon*,
   628 S.E.2d 308 (Va. 2006) ...................................................................... 56

*Carrozza v. CVS Pharmacy, Inc.*,
    391 F. Supp. 3d 136 (D. Mass. 2019)...............................................................45

*Cavender v. Medtronic, Inc.*,
    No. 16-cv-232, 2016 WL 6599744 (N.D. Ind. Nov. 8, 2016) ...............................50

*China Agritech, Inc. v. Resh*,
    138 S. Ct. 1800 (2018) .........................................................................................13

*Chongris v. Bd. of Appeals*,
    811 F.2d 36 (1st Cir. 1987)...................................................................................39

*Cin. Life Ins. Co. v. Grottenhuis*,
    No. 10-cv-205, 2011 WL 1107114 (S.D. Ind. Mar. 23, 2011) ............................17

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ......................................................................................29, 30

*Clausnitzer v. Fed. Express Corp.*,
    621 F. Supp. 2d 1266 (S.D. Fla. 2008).................................................................20

*Cont'l 332 Fund, LLC v. Albertelli*,
    No. 17-cv-41, 2018 WL 839318 (M.D. Fla. Feb. 13, 2018)..................................47

*Cruz v. Mylan, Inc.*,
    No. 09-cv-1106, 2010 WL 598688 (M.D. Fla. Feb. 17, 2010)...............................48

*Dalton v. Camp*,
    548 S.E.2d 704 (N.C. 2001)..................................................................................54

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
    958 F.3d 38 (1st Cir. 2020)...................................................................................22

*Dees v. Allstate Ins. Co.*,
    933 F. Supp. 2d 1299 (W.D. Wash. 2013) ..........................................................14

*Delgado v. Pawtucket Police Dep't*,
    668 F.3d 42 (1st Cir. 2012)...................................................................................20

*Deniz v. Mun. of Guaynabo*,
    285 F.3d 142 (1st Cir. 2002)...................................................................................9

*Deutsche Lufthansa AG v. Mass. Port Auth.*,
    No. 17-cv-11702, 2018 WL 3466938 (D. Mass. July 18, 2018) ..........................42

*Diamond v. Charles*,
    476 U.S. 54 (1986) ...............................................................................................29

*Dimieri v. Medicis Pharm. Corp.*,
   No. 14-cv-176, 2014 WL 3417364 (M.D. Fla. July 14, 2014) ........................................ 44, 48

*Dood v. Biomet Orthopedics, L.L.C.*,
   No. 18-cv-1393, 2020 WL 6390201 (W.D. Mich. Nov. 2, 2020) ........................................ 14

*Donahue v. City of Boston*,
   304 F.3d 110 (1st Cir. 2002) ............................................................................................... 25

*Dreamstreet Invs., Inc. v. MidCountry Bank.*,
   842 F.3d 825 (4th Cir. 2016) ............................................................................................... 15

*Dunham v. Covidien LP*,
   No. 19-cv-2851, 2019 WL 6341179 (S.D.N.Y. Nov. 27, 2019) .......................................... 44

*Duronio v. Merck & Co.*,
   No. 267003, 2006 WL 1628516 (Mich. Ct. App. June 13, 2006) ........................................ 52

*Dusoe v. Mobil Oil Corp*,
   167 F. Supp. 2d 155 (D. Mass. 2001) ................................................................................. 41

*Echols v. RJ Reynolds Tobacco Co.*,
   No. 13-cv-14215, 2014 WL 5305633 (S.D. Fla. Oct. 15, 2014) ......................................... 49

*Edlow v. RBW, LLC*,
   No. 09-cv-12133, 2010 WL 2034772 (D. Mass. May 21, 2010) ......................................... 52

*English v. Gen. Elec. Co.*,
   496 U.S. 72 (1990) .............................................................................................................. 44

*Entrialgo v. Twin City Dodge, Inc.*,
   333 N.E.2d 202 (Mass. 1975) ............................................................................................ 51

*Erie R.R. Co. v. Tompkins*,
   304 U.S. 64 (1938) ........................................................................................................ 10, 39

*Estate of Moulton v. Puopolo*,
   467 Mass. 478 (2014) ......................................................................................................... 58

*Farmers Elevator Co. of Oakville, Inc. v. Hamilton*,
   926 N.E.2d 68 (Ind. Ct. App. 2010) ................................................................................... 14

*Fentress Families Tr. v. Virginia Elec. & Power Co.*,
   Nos. CL09-710, CL09-1914, 2010 WL 7765113 (Va. Cir. Ct. July 29, 2010) .................... 47

*Ferens v. John Deere Co.*,
   494 U.S. 516 (1990) ............................................................................................................ 10

*Frey v. Bank One*,
    91 F.3d 45 (7th Cir. 1996) ................................................................................17

*Gearhart v. Express Scripts, Inc.*,
    422 F. Supp. 3d 1217 (E.D. Ky. 2019) ............................................................51

*Georgine v. Amchem Prods., Inc.*,
    83 F.3d 610 (3d Cir. 1996) ..............................................................................31

*Gustavsen v. Alcon Labs., Inc.*,
    272 F. Supp. 3d 241 (D. Mass. 2017) ..............................................................30

*Harris v. T.I. Inc.*,
    413 S.E. 2d 605 (Va. 1992) .............................................................................46

*Hayduk v. Lanna*,
    775 F.2d 441 (1st Cir. 1985) .....................................................................35, 38

*Hendrix v. Daugherty*,
    457 S.E.2d 71 (Va. 1995) ................................................................................56

*Herrington v. Johnson & Johnson Consumer Cos.*,
    No. 09-cv-1597, 2010 WL 3448531 (N.D. Cal. Sept. 1, 2010) ......................31

*Hertz Corp. v. Friend*,
    559 U.S. 77 (2010) ..........................................................................................12

*Hill v. Hoover Co.*,
    899 F. Supp. 2d 1259 (N.D. Fla. 2012) ...........................................................48

*Hochendoner v. Genzyme Corp.*,
    823 F.3d 724 (1st Cir. 2016) ...................................................................*passim*

*Hochendoner v. Genzyme Corp.*,
    95 F. Supp. 3d 15 (D. Mass. 2015) .........................................................*passim*

*Holland v. Select Portfolio Servicing, Inc.*,
    299 F. Supp. 3d 271 (D. Mass. 2018) ..............................................................37

*Home Depot U.S.A., Inc. v. Jackson*,
    139 S. Ct. 1743, 1746 (2019)) .........................................................................10

*Horvath v. Davidson*,
    264 N.E.2d 328 (Ind. App. 1970) ....................................................................14

*Hoyos v. Telecorp Commc'ns, Inc.*,
    488 F.3d 1 (1st Cir. 2007) ................................................................................10

*Hubbard Mfg. Co. v. Greeson*,
   515 N.E.2d 1071 (Ind. 1987) ................................................................... 39, 40

*Hughes v. Chattem, Inc.*,
   818 F. Supp. 2d 1112 (S.D. Ind. 2011) ......................................................... 30

*Iannacchino v. Ford Motor Co.*,
   888 N.E.2d 879 (Mass. 2008) ...................................................................... 47

*In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*,
   915 F.3d 1 (1st Cir. 2019) ............................................................................. 13

*In re Colonial Mortg. Bankers Corp.*,
   324 F.3d 12 (1st Cir. 2003) ........................................................................... 39

*In re Fruit Juice Prods. Mktg. & Sales Pracs. Litig.*,
   831 F. Supp. 2d 507 (D. Mass. 2011) ........................................... 30, 31, 32, 33

*In re Genzyme Corp. Sec. Litig.*,
   754 F.3d 31 (1st Cir. 2014) ............................................................................. 3

*In re Genzyme Corp.*,
   No. 09-cv-11267, 11299, 2012 WL 1076124 (D. Mass. Mar. 30, 2012) ................ 3

*In re Olympic Mills Corp.*,
   477 F.3d 1 (1st Cir. 2007) ............................................................................. 12

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   230 F.R.D. 61 (D. Mass 2005) ...................................................................... 21

*In re TJX Cos. Retail Sec. Breach Litig.*,
   564 F.3d 489, 492 (1st Cir. 2009) ................................................................. 20

*In re Vioxx Prods. Liab. Litig.*,
   MDL No. 1657, 2007 WL 3334339 (E.D. La. Nov. 8, 2007) ............................... 16

*Industria Lechera De P.R., Inc. v. Beiro*,
   989 F.3d 116 (1st Cir. 2021) ......................................................................... 10

*Jackson v. Johnson & Johnson & Janssen Pharms., Inc.*,
   330 F. Supp. 3d 616 (D. Mass. 2018) ............................................................ 46

*Jaffe v. Snow*,
   610 So. 2d 482 (Fla. Dist. Ct. App. 1992) ...................................................... 59

*Johnson v. Int'l Lab'ys, LLC*,
   No. 19-cv-04, 2019 WL 1877289 (E.D. Ky. Apr. 26, 2019) ............................... 51

*Juarez v. Select Portfolio Servicing, Inc.*,
    708 F.3d 269,280 (1st Cir. 2013) ................................................................. 35, 36

*Katz v. Pershing, LLC*,
    672 F.3d 64 (1st Cir. 2012) ........................................................................ 22, 25

*Kemp v. Pfizer, Inc.*,
    835 F. Supp. 1015 (E.D. Mich. 1993) .................................................................53

*Kester v. Zimmer Holdings, Inc.*,
    No. 10-cv-523, 2010 WL 2696467 (W.D. Pa. June 16, 2010) ................................. 47, 48, 54

*Kiah v. Aurora Loan Servs.*,
    LLC, No. 10-cv-40161, 2011 WL 841282 (D. Mass. Mar. 4, 2011) .....................................33

*King v. Collagen Corp.*,
    983 F.2d 1130 (1st Cir. 1993) ..................................................................... 38, 58

*Klein v. Bayer Healthcare Pharm. Inc.*,
    No. 18-cv-1424, 2019 WL 3945652 (D. Nev. Aug. 21, 2019) ......................................... 44, 45

*Klein v. Com. Energy, Inc.*,
    256 F. Supp. 3d 563 (W.D. Pa. 2017) ...................................................................43

*Koronthaly v. L'Oreal USA, Inc.*,
    374 F. App'x 257 (3d Cir. 2010) .......................................................................32

*Koski v. Carrier Corp.*,
    347 F. Supp. 3d 1185 (S.D. Fla. 2017)................................................................ 14, 18

*Lacognata v. Hospira, Inc.*,
    No. 12-cv-822, 2012 WL 6962884 (M.D. Fla. July 2, 2012)..............................................39

*Laura v. DaimlerChrysler Corp.*,
    711 N.W.2d 792 (Mich. Ct. App. 2006)..................................................................14

*Lawless v. Steward Health Care Sys., LLC*,
    894 F.3d 9 (1st Cir. 2018).............................................................................9

*Lawrence v. Sofamor, S.N.C.*,
    No. 95-cv-1507, 1999 WL 592689 (N.D.N.Y. Aug. 2, 1999)...............................................42

*LFM Real Estate Ventures, LLC v. SunTrust Bank*,
    No. 11-cv-135, 2012 WL 6114242 (W.D.N.C. Dec. 7, 2012)...............................................54

*Long v. Chelsea Cmty. Hosp.*,
    557 N.W.2d 157 (Mich. Ct. App. 1996).................................................................59

*Longtin v. Organon USA, Inc.*,
  363 F. Supp. 3d 186 (D. Mass. 2018)................................................................10

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................................................... 22, 29

*Maxwell v. Remington Arms Co.*,
  No. 1:10-cv-918, 2014 WL 5808795 (M.D.N.C. Nov. 7, 2014) ...........................47

*McGee v. Boehringer Ingelheim Pharm., Inc.*,
  No. 16-cv-2082, 2018 WL 1399237 (N.D. Ala. Mar. 20, 2018) ..........................45

*McLiechey v. Bristol W. Ins. Co.*,
  408 F. Supp. 2d 516 (W.D. Mich. 2006) ............................................................52

*Messmer v. KDK Fin. Servs., Inc.*,
  83 N.E.3d 774 (Ind. Ct. App. 2017)............................................................. 17, 18

*Mikesell v. St. Jude Med., Inc.*,
  No. 16-cv-304, 2017 WL 9565366 (N.D. Ind. Feb. 2, 2017) ..............................50

*Miller v. DePuy Spine, Inc.*,
  638 F. Supp. 2d 1226 (D. Nev. 2009) .......................................................... 43, 47

*Morales-Cruz v. Univ. of P.R.*,
  676 F.3d 220 (1st Cir. 2012)..............................................................................41

*Morgan v. Columbus McKinnon Corp.*,
  837 N.E.2d 546 (Ind. Ct. App. 2005) ................................................................15

*Mut. Pharm. Co., v. Bartlett*,
  570 U.S. 472 (2013) ..........................................................................................44

*Myers v. Briggs & Stratton Corp.*,
  No. 09-cv-20, 2010 WL 1579676 (S.D. Ind. Apr. 16, 2010) ..............................49

*N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale*,
  567 F.3d 8 (1st Cir. 2009)..........................................................................*passim*

*Nelson v. Denkins*,
  598 N.E.2d 558 (Ind. Ct. App. 1992) ................................................................59

*Nw. Laborers-Employers Health & Sec. Tr. Fund v. Philip Morris, Inc.*,
  58 F. Supp. 2d 1211 (W.D. Wash. 1999) ...........................................................56

*Ora Catering, Inc. v. Northland Ins. Co.*,
  57 F. Supp. 3d 102 (D. Mass. 2014) ..................................................................14

*OrbusNeich Med. Co., Ltd., BVI v. Bos. Scientific Corp.*,
    694 F. Supp. 2d 106 (D. Mass. 2010) ............................................................ 11, 13

*Padilla-Mangual v. Pavia Hosp.*,
    516 F.3d 29 (1st Cir. 2008) ............................................................................. 12

*Pantages v. Cardinal Health 200, Inc.*,
    No. 08-cv-116, 2009 WL 1244539 (M.D. Fla. July 27, 2009) .......................... 43

*Parkinson v. Guidant Corp.*,
    315 F. Supp. 2d 741 (W.D. Pa. 2004) ........................................................ 45, 48

*Perez-Kudzma v. United States*,
    940 F.3d 142 (1st Cir. 2019) ........................................................................... 23

*Perryman v. Motorist Mut. Ins. Co.*,
    846 N.E.2d 683 (Ind. Ct. App. 2006) ............................................................. 17

*Peter v. Stryker Orthopaedics, Inc.*,
    581 F. Supp. 2d 813 (E.D. Mich. 2008) .......................................................... 53

*Petricca v. Simpson*,
    862 F. Supp. 13 (D. Mass. 1994) .................................................................... 33

*Piltch v. Ford Motor Co.*,
    11 F. Supp. 3d 884 (N.D. Ind. 2014) .............................................................. 49

*Price v. Wyeth Holdings Corp.*,
    505 F.3d 624 (7th Cir. 2007) .......................................................................... 14

*Prohias v. AstraZeneca Pharm., L.P.*,
    958 So. 2d 1054 (Fla. Dist. Ct. App. 2007) ..................................................... 48

*Quintana v. B. Braun Med. Inc.*,
    No. 17-cv-6614, 2018 WL 3559091 (S.D.N.Y. July 24, 2018) ......................... 44

*Ramsey v. Summers*,
    No. 10-cv-829, 2011 WL 811024 (W.D. Pa. Mar. 1, 2011) .............................. 43

*Reich v. Genzyme Corp.*,
    No. 14-cv-1684, 2015 WL 5842418 (D. Colo. Oct. 7, 2015) ............................ 30

*Reicher v. Berkshire Life Ins. Co. of Am.*,
    360 F.3d 1 (1st Cir. 2004) ............................................................................... 10

*Rivera v. Wyeth-Ayerst Lab'ys.*,
    283 F.3d 315 (5th Cir. 2002) .......................................................................... 32

*Rodgers v. Lincoln Benefit Life Co.*,
No. 19-cv-350, 2019 WL 4750193 (W.D. Pa. Sept. 30, 2019) ............................................ 15

*Rodi v. S. New England Sch. of Law*,
389 F.3d 5 (1st Cir. 2004) .................................................................................................... 51

*Rodriguez-Diaz v. Sierra-Martinez*,
853 F.2d 1027 (1st Cir. 1988) .............................................................................................. 12

*Rounds v. Genzyme Corp.*,
No. 10-cv-2479, 2010 WL 5297180 (M.D. Fla. Dec. 20, 2010) ......................................... 43

*Rovinelli v. Trans World Ent. Corp.*,
No. 19-cv-11304, 2021 WL 752822 (D. Mass. Feb. 2, 2021) .......................................*passim*

*Russell v. Cooley Dickinson Hosp., Inc.*,
772 N.E.2d 1054 (Mass. 2002) ............................................................................................ 58

*Sakyi v. Nationstar Mortg., LLC*,
No. 18-cv-265, 2018 WL 11224375 (E.D. Va. June 22, 2018) ..................................... 14, 18

*Sandler v. Commonwealth*,
644 N.E.2d 641 (Mass. 1995) .............................................................................................. 42

*Santos v. SANYO Mfg. Corp.*,
No. 12-cv-11452, 2013 WL 1868268 (D. Mass. May 3, 2013) ........................................... 57

*Schroeder v. Ear, Nose & Throat Assocs., of Lehigh Valley, Inc.*,
557 A.2d 21 (Pa. Super. Ct. 1989) ....................................................................................... 59

*Schubert v. Genzyme Corp.*,
No. 12-cv-587, 2013 WL 4776286 (D. Utah Sept. 4, 2013) ................................................. 5

*Schwartz v. Indep. Appraisals, LLC*,
No. 11-cv-11051, 2011 WL 5593108 (D. Mass. Nov. 17, 2011) ......................................... 51

*Sears v. Russell Road Food & Beverage, LLC*,
460 F. Supp. 3d 1065 (D. Nev. 2020) .................................................................................. 14

*Sena v. Commonwealth*,
629 N.E.2d 986 (Mass. 1994) .............................................................................................. 59

*Shaulis v. Nordstrom, Inc.*,
865 F.3d 1 (1st Cir. 2017) .................................................................................................... 59

*Shearer v. Thor Motor Coach, Inc.*,
470 F. Supp. 3d 874 (N.D. Ind. 2020) ........................................................................... 14, 18

*Sherman v. Pfizer, Inc.*,
    440 P.3d 1016 (Wash. Ct. App. 2019) ............................................................. 57

*Shideler v. Dwyer*,
    417 N.E.2d 281 (Ind. 1981) ............................................................................ 16

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ........................................................................... 22, 23, 29

*Simon v. United States*,
    805 N.E.2d 798 (Ind. 2004) ............................................................................ 39

*Simpson v. Champion Petfoods USA, Inc.*,
    397 F. Supp. 3d 952 (E.D. Ky. 2019) .............................................................. 51

*Soufflas v. Zimmer, Inc.*,
    474 F. Supp. 2d 737 (E.D. Pa. 2007) ............................................................... 48

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ...................................................................... 24, 26, 31

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ......................................................................................... 31

*Stevens v. Hyde Athletic Indus., Inc.*,
    773 P.2d 871 (Wash. Ct. App. 1989) ............................................................... 56

*T.W.M. v. Am. Med. Sys., Inc.*,
    886 F. Supp. 842 (N.D. Fla. 1995) .................................................................. 49

*Tarbrake v. Sharp*,
    894 F. Supp. 270 (E.D. Va. 1995) ................................................................... 56

*Taylor v. SmithKline Beecham Corp.*,
    658 N.W.2d 127 (Mich. 2003) ........................................................................ 52

*Tokio Marine & Fire Ins. Co. v. Giffels Assocs., Inc.*,
    No. 04-cv-13, 2005 WL 2127084 (S.D. Ind. Sept. 1, 2005) .............................. 13

*U.S. Automatic Sprinkler Co. v. Reliable Automatic Sprinkler Co.*,
    719 F. Supp. 2d 1020 (S.D. Ind. 2010) ........................................................... 46

*UBS Fin. Servs., Inc. v. Aliberti*,
    133 N.E.2d 277 (Mass. 2019) .................................................................. 58, 59

*United Mine Workers of Am. v. Gibbs*,
    383 U.S. 715 (1966) ....................................................................................... 20

*United Seniors Ass'n, Inc. v. Philip Morris USA*,
　500 F.3d 19 (1st Cir. 2007) .................................................................................. 9

*Utts v. Bristol-Myers Squibb Co.*,
　251 F. Supp. 3d 644 (S.D.N.Y. 2017) ........................................................... 44, 45

*Van Dusen v. Barrack*,
　376 U.S. 612 (1964) ........................................................................................... 10

*Wajda v. R.J. Reynolds Tobacco Co.*,
　103 F. Supp. 2d 29 (D. Mass. 2000) ................................................................... 38

*White v. SmithKline Beecham Corp.*,
　538 F. Supp. 2d 1023 (W.D. Mich. 2008) .......................................................... 52

*Whitmore v. Arkansas*,
　495 U.S. 149 (1990) ..................................................................................... 22, 30

*Wright v. Eli Lilly & Co.*,
　65 Va. Cir. 483 (Va. Cir. Ct. Sept. 21, 2004) .................................................... 14

*Wyeth v. Levine*,
　555 U.S. 555 (2009) ........................................................................................... 45

*Wynn's Extended Care, Inc. v. Bradley*,
　619 F. App'x 216 (4th Cir. 2015) ...................................................................... 55

*Zafarana v. Pfizer Inc.*,
　724 F. Supp. 2d 545 (E.D. Pa. 2010) ...................................................... 54, 55, 59

**Statutes**

21 U.S.C. § 301 ..................................................................................................... 53

21 U.S.C. § 321 ..................................................................................................... 53

21 U.S.C. § 351-60 ................................................................................................ 53

21 U.S.C. § 355 ..................................................................................................... 43

28 U.S.C § 1332(a)(1) ........................................................................................... 11

28 U.S.C. § 1332(d) ................................................................................................ 2

28 U.S.C. § 1332(d)(2) ......................................................................................... 12

28 U.S.C. § 1332(d)(6) ......................................................................................... 12

28 U.S.C. § 1367(c)(3) ......................................................................................... 20

28 U.S.C. § 1404(a) ................................................................................................ 10, 11

42 U.S.C. § 262 ............................................................................................................ 53

42 Pa. Cons. Stat. § 5527(b) ...................................................................................... 15

Fla. Stat. § 95.11(3)(f) .......................................................................................... 14, 18

Fla. Stat. § 501.212(1) ................................................................................................ 48

Ind. Code § 34-11-2-7 ................................................................................................ 18

Ind. Code § 34-20-1-1 ...................................................................................... 15, 18, 36

Ind. Code § 34-20-3-1(b)(1) .................................................................................. *passim*

Ky. Rev. Stat. § 367.110 ............................................................................................ 51

Ky. Rev. Stat. § 367.220(5) .................................................................................. 14, 18

Ky. Rev. Stat. § 413.140(1)(a) .............................................................................. 14, 18

Mass. Gen. Laws ch. 93A, § 9(3) .............................................................................. 51

Mass. Gen. Laws ch. 260, § 5A ................................................................................ 14

Mich. Comp. Laws § 445.904(1)(a) .......................................................................... 52

Mich. Comp. Laws § 445.911(9) ................................................................................ 14

Mich. Comp. Laws § 600.2946(5) .............................................................................. 52

N.C. Gen. Stat. § 75-16.2 .......................................................................................... 15

N.C. Gen. Stat. § 99B-1.1 .......................................................................................... 45

Nev. Rev. Stat. § 11.190(2)(d) .................................................................................. 14

Nev. Rev. Stat. § 598.0955 ........................................................................................ 53

Va. Code § 8.01-244 .................................................................................................... 14

Va. Code § 59.1-199 .................................................................................................... 55

Va. Code § 59.1-204.1 .......................................................................................... 14, 18

Wash. Rev. Code 7.72.030 .......................................................................................... 57

Wash. Rev. Code 19.86.090 ........................................................................................ 56

Wash. Rev. Code § 7.72.060(3) ........................................................................... 14

Wash. Rev. Code § 19.86.120 ............................................................................. 14

**Rules**

Fed. R. Civ. P. 8 ......................................................................................... *passim*

Fed. R. Civ. P. 9(b) ...................................................................................... *passim*

Fed. R. Civ. P. 12(b)(1) ........................................................................................ 9

Fed. R. Civ. P. 12(b)(6) ................................................................................. *passim*

Fed. R. Civ. P. 23 ....................................................................................... 19, 20

**Regulations**

21 C.F.R. § 314.70(c)(6)(iii) .............................................................................. 44

21 C.F.R § 316 (2011) ...................................................................................... 53

**Other Authorities**

72A C.J.S. Products Liability § 7 (2021) ............................................................. 43

77A C.J.S. Sales § 484 (2020) ........................................................................... 46

## PRELIMINARY STATEMENT

The Second Amended Complaint ("SAC") is plaintiffs' latest attempt to bring actionable state law claims against Genzyme Corporation ("Genzyme" or "the Company") in litigation spanning over a decade concerning two sets of events:  (1) an alleged Vesivirus 2117 ("Vesivirus") contamination at Genzyme's Allston, Massachusetts facility in 2009; and (2) alleged Vesivirus contaminations at Genzyme's Framingham, Massachusetts facility in 2013 and 2015.  Plaintiffs purport to have been impacted by those events because they took a biological product, Fabrazyme, manufactured at those facilities to treat their Fabry disease.  All plaintiffs in this action (or their relatives) previously filed claims concerning the events at the Allston facility.  As in the prior actions, plaintiffs once again fail to plead any actionable claim.

In 2009, Genzyme identified Vesivirus in a bioreactor for a different biologics product (Cerezyme) manufactured at the Allston facility.  Genzyme then closed the facility to sanitize, leading to shortages of all biological products manufactured at the facility, including Fabrazyme.  Until a full supply became available again, patients took reduced dosages.  In 2011 and 2013, plaintiffs filed civil actions against Genzyme alleging harm from receiving "defective" Fabrazyme—including because it was improperly dosed, "contaminated" with Vesivirus, and "contaminated" with particulate steel, glass, and rubber.  *See Hochendoner v. Genzyme Corp.*, No. 11-cv-313 (W.D. Pa. filed Mar. 9, 2011); *Adamo v. Genzyme Corp.*, No. 13-cv-11336 (D. Mass. filed June 3, 2013).  Those actions ultimately were consolidated and then dismissed by this Court for failing to state any claim upon which relief could be granted.  *See Hochendoner v. Genzyme Corp.*, 95 F. Supp. 3d 15, 35 (D. Mass. 2015) (Woodlock, J.).  The U.S. Court of Appeals for the First Circuit affirmed dismissal (except as to a plaintiff not party to the present action) for failing to plead standing.  *See Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 734, 737 (1st Cir. 2016).

Likewise, the present action—which continues to press similar claims regarding the 2009

contamination in Allston as well as purported 2013 and 2015 contaminations in Framingham—should be dismissed. Specifically, the Court lacks subject matter jurisdiction, as there is not complete diversity; all putative class claims that purport to provide federal jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), are untimely; and all remaining claims are strictly state law claims over which the Court should decline to exercise supplemental jurisdiction. Moreover, the claims fail for the independently sufficient reasons that plaintiffs lack standing; all claims based on the safety and efficacy of allegedly Vesivirus-contaminated Fabrazyme or low dose Fabrazyme are grounded in fraud, yet plaintiffs fail to satisfy Federal Rule of Civil Procedure 9(b); and plaintiffs fail to state a claim as required by Federal Rules of Civil Procedure 8 and 12(b)(6). For all of these reasons, the SAC should be dismissed with prejudice.

## BACKGROUND

### A.    Defendant

Defendant Genzyme is a leading biotechnology company that develops products to treat rare diseases and other serious conditions in patients around the world. In 2003, Genzyme received approval from the U.S. Food and Drug Administration ("FDA") to market Fabrazyme to treat Fabry disease. SAC ¶ 41. Fabry disease is a rare genetic disorder that, without treatment, results in complications such as renal disease, cardiac disease, disease of the central nervous system, strokes, kidney failure, heart enlargement, and premature death. *Id.* ¶¶ 31–32. Until recently, Fabrazyme was the only FDA-approved treatment for Fabry disease in the United States. *See Hochendoner*, 95 F. Supp. 3d at 18.

### B.    Plaintiffs and Their Prior *Hochendoner* and *Adamo* Actions

All plaintiffs in this action were either plaintiffs, or relatives of plaintiffs, in the *Hochendoner* and *Adamo* actions filed in 2011 and 2013, respectively. Plaintiffs Amber Britton, George Demko, Michael Masula, Erin Masula, Thomas Olszewski, Darlene Cookingham, Thomas

Stanziano, and Wendy Stanziano were plaintiffs in the *Hochendoner* action originally filed in the U.S. District Court for the Western District of Pennsylvania on March 9, 2011. *See Hochendoner v. Genzyme Corp.*, No. 11-cv-313 (W.D. Pa.), ECF No. 1. On April 29, 2011, *Hochendoner* was transferred to this Court. Plaintiffs Trina Wilkins, James Bishop, Lisa Bishop, Toni Cordova, John Cortina, Jill Cortina, Mary Helton, Donovan Helton, D.J., Sydney Johnson, Damon LaForce, James Matthews, Eddie Viers, and Jeanne Wallace were plaintiffs in the *Adamo* action originally filed in this Court on June 3, 2013, and plaintiffs William McNew, James Wallace, Samuel Wallace, and Nate Brooks are relatives of the *Adamo* plaintiffs. *See* Compl., *Adamo v. Genzyme Corp.*, 13-cv-11336 (D. Mass.), ECF No. 1.

The *Hochendoner* and *Adamo* actions asserted putative class claims on behalf of all Fabry patients in the United States, alleging harm from receiving a reduced dose of Fabrazyme between 2009 and 2012 due to the temporary shutdown of the Allston facility and receiving Fabrazyme contaminated with particulate steel, glass, and rubber.[1] The *Adamo* plaintiffs further alleged a Vesivirus contamination of the Fabrazyme product based on cross-contamination with batches of a different product, known as Cerezyme. In particular, plaintiffs alleged that, sometime prior to July 2009, Genzyme encountered production problems at its Allston facility, where it identified Vesivirus (a rare virus strain) in a Cerezyme bioreactor.[2] In response, Genzyme temporarily interrupted bulk production to sanitize the facility, leading to shortages of all biological products manufactured at the facility (including Fabrazyme). During this time, the Company allegedly sold

---

[1] In addition, shareholders unsuccessfully brought a securities class action against Genzyme. *See In re Genzyme Corp.*, No. 09-cv-11267, 11299, 2012 WL 1076124 (D. Mass. Mar. 30, 2012) (dismissing claims), *aff'd*, *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31 (1st Cir. 2014). Separately, Cerezyme patients brought an action claiming injuries due to the Cerezyme shortage in connection with the same underlying events. *See Reich v. Genzyme Corp.*, No. 14-cv-1684 (D. Colo. filed June 17, 2014). Genzyme's motion to dismiss that action was granted in part and denied in part, and in 2017, the case ultimately was settled and dismissed with prejudice.

[2] Genzyme Co., Annual Report (Form 10-K), at 63 (Feb. 26, 2010) ("In June 2009, we interrupted production of Cerezyme and Fabrazyme at our Allston facility after identifying a virus, Vesivirus 2117, *in a bioreactor used for Cerezyme production*." (emphasis added)); *In re Genzyme Corp. Sec. Litig.*, 754 F.3d at 35, 36, 38.

the limited supply of Fabrazyme to patients in the U.S. and European markets.  In turn, patients took reduced dosages until a full supply became available.  In November 2009, the Company also discovered that a batch of Fabrazyme produced at the Allston facility was adulterated with glass, rubber, and steel particles.[3]  Around March 2012, Fabrazyme patients returned to the full dose.

The *Hochendoner* and *Adamo* actions asserted substantively identical allegations, and on December 5, 2013, this Court consolidated the actions.  After several rounds of motions to dismiss and amended complaints, this Court dismissed all of plaintiffs' claims at the pleading stage, explaining in a 20-page opinion that plaintiffs had failed to state a claim upon which relief may be granted.  *See Hochendoner*, 95 F. Supp. 3d at 35.  On appeal, the First Circuit affirmed dismissal as to all but one of the plaintiffs—James Mooney, who is not a plaintiff in the instant action.  *See Hochendoner*, 823 F.3d at 737.  The First Circuit held that plaintiffs lacked Article III standing to pursue their claims because they did not adequately plead an injury traceable to Genzyme's alleged conduct.  *Id.* at 734.  As a result, on June 28, 2016, both complaints were dismissed, except for certain of Mr. Mooney's claims.[4]  In December 2016, after Genzyme filed a motion to dismiss Mr. Mooney's amended complaint, the Court set a scheduling order on statute of limitations discovery. About two months later, the parties, including some plaintiffs previously dismissed, reached an agreement in principle to resolve the remaining claims.  After two years of plaintiffs' determining the appropriate method for allocating payments, the Court closed the case on March 29, 2019. Plaintiffs in the present action were unable to settle their claims.  *See* Pls.' Mot. for Leave to File

---

[3] In May 2010, Genzyme resolved alleged manufacturing compliance issues, including particulate contamination, in a consent decree with FDA and Department of Justice.  *See United States v. Genzyme Corp.*, No. 10-cv-10865 (D. Mass. May 24, 2010), ECF No. 2; *see also* SAC ¶ 62.

[4] Unlike the other plaintiffs, Mr. Mooney allegedly suffered an anaphylactic reaction upon return to a full dose of Fabrazyme—an injury that for purposes of alleging standing was traceable to the shortage.  *Hochendoner*, 823 F.3d at 735.  His wife's "derivative loss-of-consortium claims" survived for the same reasons. *See id.* at 734 n.5.  For simplicity, as in the First Circuit opinion, this briefing paper describes Mr. Mooney's claims without further reference to those of his wife.  *See id.*

a First Am. Compl. Adding Parties, ECF No. 7, ¶ 8.

###### C.   The *Schubert* Action

In 2012, the wife of a deceased Fabrazyme patient brought an action in Utah state court against Genzyme, asserting nearly identical allegations as in *Hochendoner* and *Adamo*.   *See Schubert v. Genzyme Corp.*, No. 12-cv-00587 (D. Utah), ECF No. 5-1.   Specifically, she alleged: "In June 2009, [Genzyme] negligently allowed a virus contamination in the manufacturing facility where Genzyme makes Fabrazyme which led to a shortage of the drug, and which resulted in Genzyme not meeting demand of Fabrazyme to Fabry Disease Patients."   *Id.* ¶ 12.   Her husband allegedly began treatment with a reduced dose of Fabrazyme in late 2009, allegedly causing his death in March 2010.   *Id.* ¶¶ 13, 14.   Genzyme removed the case to the U.S. District Court for the District of Utah, and in September 2013, the court granted Genzyme's motion for judgment on the pleadings on plaintiff's negligent manufacturing claim.   *Schubert v. Genzyme Corp.*, No. 12-cv-587, 2013 WL 4776286, at *7 (D. Utah Sept. 4, 2013) ("Plaintiff's claim that Genzyme has a duty to meet all market demand for Fabrazyme would assert liability on a theory never before recognized in Utah" and "does not give rise to a duty under Utah or federal law."), *reconsideration denied*, 2013 WL 6809143 (D. Utah Dec. 20, 2013).   Plaintiff took discovery on her remaining state law claims and filed a fourth amended complaint under seal in February 2015.   On June 24, 2015, the case was closed pursuant to a stipulated motion to dismiss.

###### D.   The *Mooney* Action

In 2019, less than six months after this Court closed the *Hochendoner* and *Adamo* litigation, Mr. Mooney brought a new action in the U.S. District Court for the Southern District of Ohio on behalf of himself and his minor daughter, H.M., along with Mercedes Mooney, alleging injury when they took Fabrazyme manufactured at a different facility in Framingham, Massachusetts. *See* Compl., *Mooney v. Genzyme Corp.*, No. 19-cv-791 (S.D. Ohio Sept. 17, 2019), ECF No. 1.

Plaintiffs alleged that their injuries stemmed from alleged Vesivirus contaminations in 2013 and 2015 at the Framingham facility.  Plaintiffs were represented by counsel from both the present action as well as *Hochendoner* and *Adamo*.  After Genzyme moved to dismiss or transfer the complaint, plaintiffs filed an amended complaint in January 2020.  The amended complaint dropped Mr. Mooney's claims in his individual capacity, but the allegations otherwise remained largely the same.  In February 2020, Genzyme filed a motion to dismiss and an alternative motion to transfer venue.  On July 8, 2020, the motion to transfer was granted, and the case was transferred to this Court.  On September 24, 2020, the case was voluntarily dismissed pursuant to a joint stipulation.

### E.      The Present Action

On February 29, 2020, plaintiffs filed the present action against Sanofi Corporation in the U.S. District Court for the Southern District of Indiana.  ECF No. 1.  Plaintiffs' original complaint named only Sanofi Corporation as a defendant, but the allegations focused entirely on the alleged actions of Genzyme.  *See, e.g.*, *id.* ¶ 27 ("SANOFI sells Fabrazyme through its wholly owned subsidiary GENZYME-SANOFI (GENZYME).").  On May 6, 2020, plaintiffs filed an amended complaint that dropped Sanofi Corporation and instead named Genzyme, Sanofi-Aventis SA, and sanofi-aventis U.S., LLC as defendants.  ECF No. 10.  On September 1, 2020, in apparent recognition that Sanofi-Aventis SA and sanofi-aventis U.S., LLC had nothing to do with the allegations in this action, plaintiffs agreed to voluntarily dismiss them by stipulation.  ECF No. 61.  On October 5, 2020, plaintiffs filed the SAC naming only Genzyme as a defendant.  ECF No. 67.  On October 14, 2020, Genzyme moved to transfer venue to this Court, ECF No. 68.  On December 30, 2020, the court granted the motion to transfer, ECF No. 78, and on January 6, 2021, the case was transferred to this Court, ECF No. 80.

In the SAC, plaintiffs bring allegations pertaining to two sets of events:  (1) an alleged

Vesivirus contamination at the Allston facility in 2009 (which mirrors allegations in *Hochendoner*, *Adamo*, and *Schubert*); and (2) alleged Vesivirus contaminations at the Framingham facility in 2013 and 2015 (which mirror allegations in *Mooney*).

### 1.    Allegations Regarding the Allston Facility

As in *Hochendoner* and *Adamo*, plaintiffs allege that "[s]ometime prior to July 2009, Genzyme Corporation contaminated its [unspecified] bioreactors with Vesivirus 2117" at the Allston facility, SAC ¶ 42, resulting in a facility shutdown and a Fabrazyme shortage, *see* SAC ¶ 88.  As a result, plaintiffs allege that they were forced to take "low dose" Fabrazyme (*i.e.*, a reduced dose every two weeks or a full dose once a month rather than biweekly).  *Id.* ¶¶ 88–92.  Plaintiffs further allege that Fabrazyme product was adulterated with glass, rubber, and steel particles.  *Id.* ¶ 106.  The SAC also concludes that Fabrazyme product itself was contaminated by Vesivirus, without offering a single factual allegation in support of this contention.  *See, e.g.*, *id.* ¶ 42 ("Genzyme Corporation contaminated its bioreactors with Vesivirus 2117."); *id.* ¶ 47 ("Genzyme Corporation contaminated 'Fabrazyme' with Vesivirus."); *id.* ¶ 48 ("Genzyme Corporation sold these contaminated lots to all patients.").  Nor could it, as Vesivirus was detected only in a bioreactor used to produce *Cerezyme*, not Fabrazyme.[5]

### 2.    Allegations Regarding the Framingham Facility

More than half of plaintiffs also allege in conclusory terms that there were Vesivirus contaminations at the Framingham facility in 2013 and 2015.  *See, e.g.*, *id.* ¶¶ 2, 4–6, 8, 9, 12–15, 17, 18, 20, 22, 24.  They contend, "[a]ccording to a former Genzyme Corporation scientist conducting purity testing in the new Framingham, Massachusetts plant, Vesivirus contamination was again detected by polymerase chain reaction (PCR) tests on at least three occasions in 2013

---

[5] *See* Genzyme Co., Annual Report (Form 10-K), at 63 (Feb. 26, 2010).

and at least once in 2015." *Id.* ¶ 64. Plaintiffs further allege that "senior management" was informed about the positive PCR tests but did not follow "standard safety procedures" or notify the FDA. *Id.* ¶¶ 67–69. Genzyme then allegedly sold Vesivirus-contaminated Fabrazyme to plaintiffs, *id.* ¶¶ 70–71, allegedly contributing to the same alleged harms (without distinction from the harms allegedly suffered due to the 2009 Allston contamination), *id.* ¶¶ 121–27. Yet, once again, the SAC does not offer any factual allegations to support any of these conclusory theories— much less factual allegations to support their position that Vesivirus actually *entered* any Fabrazyme product. Rather, plaintiffs invite the Court to speculate that their allegations that PCR tests detected a Vesivirus contamination somewhere in the Framingham facility demonstrate that Genzyme sold Fabrazyme product contaminated with Vesivirus to consumers.

### 3. Plaintiffs' Alleged Injuries

The SAC's approach to pleading injury and causation is likewise an exercise in misdirection. Without specifying which alleged conduct by Genzyme contributed to which alleged harm, plaintiffs list various past, present, and possible future harms that they allegedly suffered or may one day suffer. *See, e.g.*, *id.* ¶¶ 1, 2, 4–6, 8, 9, 11–15, 17, 18, 20, 22, 24. Plaintiffs use the phrase "defective Fabrazyme" throughout the SAC to allege "**Combined Injuries from Improperly Dosed Fabrazyme containing Vesivirus, and Glass, Rubber, and Steel Particles**," without distinction.[6] *Id.* ¶¶ 121–27 (vaguely conflating all possible sources of harm as being caused by the administration of an "inflammatory Fabrazyme cocktail from 2009-2015"). Plaintiffs further assert that their "underlying Fabry disease process [was] accelerated by *any one of the defects* to the drug (pro-inflammatory Vesivirus and its fragments and pro-inflammatory, glass, rubber, and steel particles, and pro-inflammatory 'low dosing.')." *See id.* ¶ 122. They also

---

[6] All emphasis is as in the original unless otherwise noted.

allege both "progression" and "exacerbation" of their Fabry disease in unison, making it impossible to determine if their alleged symptoms are due to inactionable return and progression of their Fabry disease symptoms, rather than some separate harm caused by Genzyme's other alleged conduct. *See, e.g.*, *id.* ¶ 1. Crucially, plaintiffs do not plead that any medical professional diagnosed them with Vesivirus or that they tested positive for Vesivirus. Plaintiffs instead cite various scientific studies and invite the Court to conclude that the allegations concerning the studies somehow provide support for their claims that Vesivirus caused their injuries. Notwithstanding plaintiffs' failure to allege diagnosis with or positive tests for Vesivirus, they seek to hold Genzyme accountable for the costs of monitoring potential *future harms* they could allegedly incur. *See id.* at 149 ("Prayer for Relief" requesting "medical monitoring").

## ARGUMENT

When faced with a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "federal courts are required to determine whether Article III jurisdiction exists prior to proceeding to the merits of the case." *United Seniors Ass'n, Inc. v. Philip Morris USA*, 500 F.3d 19, 23 (1st Cir. 2007); *see also Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 16 (1st Cir. 2018) ("A court without jurisdiction is like a king without a kingdom: both are powerless to act."); *Deniz v. Mun. of Guaynabo*, 285 F.3d 142, 149–50 (1st Cir. 2002) ("When a court is confronted with motions to dismiss under both Rules 12(b)(1) and 12(b)(6), it ordinarily ought to decide the former before broaching the latter" because "if the court lacks subject matter jurisdiction, assessment of the merits becomes a matter of purely academic interest.").

The Court should apply First Circuit law in evaluating whether it has subject matter jurisdiction over this action pursuant to Rule 12(b)(1). *See AER Advisors, Inc. v. Fid. Brokerage Servs., LLC*, 921 F.3d 282, 288 (1st Cir. 2019) ("[W]hen one district court transfers a case to

another, the norm is that the transferee court applies its own Circuit's cases on the meaning of federal law."). "Federal courts have jurisdiction 'over two general types of cases: cases that "aris[e] under" federal law' and 'cases in which the amount in controversy exceeds $75,000 and there is diversity of citizenship among the parties.'" *Industria Lechera De P.R., Inc. v. Beiro*, 989 F.3d 116, 120 (1st Cir. 2021) (quoting *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019)). In addition, CAFA provides jurisdiction over certain large civil class actions with "diversity of citizenship between at least one putative plaintiff class representative and one defendant and an aggregate amount 'in controversy exceed[ing] the sum or value of $5,000,000.'" *See Rovinelli v. Trans World Ent. Corp.*, No. 19-cv-11304, 2021 WL 752822, at *5 (D. Mass. Feb. 2, 2021) (Woodlock, J.) (quoting 28 U.S.C § 1332(d)(2), (d)(5)).

As for the sufficiency of allegations under Rules 8, 9(b), or 12(b)(6), "a federal court sitting in diversity or exercising supplemental jurisdiction over state law claims must apply state substantive law, but a federal court applies federal rules of procedure to its proceedings." *Hoyos v. Telecorp Commc'ns, Inc.*, 488 F.3d 1, 5 (1st Cir. 2007). In particular, the Court should apply the same state law that the transferor court would have applied. *See AER Advisors*, 921 F.3d at 289 ("[I]f a federal court transfers a diversity case under § 1404(a), the transferee court applies the *state law* that the transferor court would have applied to any questions of *state law*" and "federalism commands that federal judges apply state substantive law exactly as a state court would" (citing *Van Dusen v. Barrack*, 376 U.S. 612, 627 (1964); *Ferens v. John Deere Co.*, 494 U.S. 516, 524–25 (1990); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). Similarly, because this action was transferred from Indiana, the "choice of law analysis of the [transferor court's] forum state" should apply. *See Longtin v. Organon USA, Inc.*, 363 F. Supp. 3d 186, 191 (D. Mass. 2018) (quoting *Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 4 (1st Cir. 2004)); *AER*

*Advisors*, 921 F.3d at 289.  The Court also should apply Indiana's statute of limitations.  *See OrbusNeich Med. Co., Ltd., BVI v. Bos. Sci. Corp.*, 694 F. Supp. 2d 106, 112–13 (D. Mass. 2010) ("As a general rule, when a case is transferred to a new venue pursuant to 28 U.S.C. § 1404(a) . . . the transferee court is required to apply the statute of limitations of the transferor court's forum state, because that is what the transferor court would have done had the action remained there" (citations and internal quotation marks omitted)).

In this action, the Court lacks subject matter jurisdiction as (I) there is not complete diversity between the parties; (II) all putative class claims that purport to provide federal jurisdiction pursuant to CAFA are untimely; and (III) all remaining claims are state law claims over which the Court should decline to exercise supplemental jurisdiction.  Accordingly, the SAC should be dismissed.  Moreover, all of plaintiffs' claims fail for the independently sufficient reasons that (IV) plaintiffs lack standing as the First Circuit previously held in the *Hochendoner* and *Adamo* actions; (V) all of plaintiffs' claims based on the safety and efficacy of allegedly Vesivirus-contaminated Fabrazyme and low dose Fabrazyme are grounded in fraud, yet plaintiffs fail to plead fraud with particularity under Rule 9(b); and (VI) as this Court previously held in the *Hochendoner* and *Adamo* actions, plaintiffs fail to state a claim under Rules 8 and 12(b)(6).[7]

## I.    THERE IS NOT COMPLETE DIVERSITY BETWEEN THE PARTIES

While plaintiffs aver that this Court has "diversity jurisdiction," SAC ¶ 28, the absence of complete diversity is apparent on the face of the SAC.  Diversity jurisdiction only exists if the parties are "citizens of different States."  28 U.S.C § 1332(a)(1).  "Diversity must be complete—

---

[7] To the extent any of the claims in the SAC survive this motion to dismiss, Genzyme respectfully requests that the Court order limited discovery on the statute of limitations issue.  Indeed, this is how the Court proceeded in the *Adamo* action after the First Circuit held that all plaintiffs, except Mr. Mooney, lacked standing.  After Mr. Mooney filed an amended complaint, Genzyme moved to dismiss, arguing, among other things, that the new allegations were outside of the limitations period.  The Court then set a scheduling order on statute of limitations discovery, and about two months later, the parties reached an agreement in principle to resolve the remaining claims.

'the presence of but one nondiverse party divests the district court of original jurisdiction over the entire action.'" *Aponte-Davila v. Mun. of Caguas*, 828 F.3d 40, 46 (1st Cir. 2016) (quoting *In re Olympic Mills Corp.*, 477 F.3d 1, 6 (1st Cir. 2007)). In other words, diversity jurisdiction requires that no single plaintiff be domiciled in the same state as any defendant. For purposes of diversity, "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business," *Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010) (quoting 28 U.S.C. § 1332(c)(1)), and "a person is a citizen of the state in which he is domiciled," *Aponte-Davila*, 828 F.3d at 46 (quoting *Padilla-Mangual v. Pavia Hosp.*, 516 F.3d 29, 31 (1st Cir. 2008)). "A person's domicile 'is the place where he has his true, fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning.'" *Aponte-Davila*, 828 F.3d at 46 (quoting *Rodriguez-Diaz v. Sierra-Martinez*, 853 F.2d 1027, 1029 (1st Cir. 1988)). Yet, here, plaintiffs James and Lisa Bishop—like defendant Genzyme—are domiciled in Massachusetts. *See* SAC ¶¶ 2–3, 27 (alleging Genzyme is "a Massachusetts corporation with a principal place of business . . . [in] Massachusetts"); *see also* Supp. Jurisdictional Statement, ECF No. 6, ¶¶ 2–3. Thus, there is no diversity jurisdiction in this action.

## II.   THERE IS NO FEDERAL JURISDICTION IN THIS ACTION BECAUSE ALL OF PLAINTIFFS' PUTATIVE CAFA CLASS CLAIMS ARE TIME BARRED

Plaintiffs next contend that this Court has jurisdiction "over the Class(as [*sic*] hereinafter defined) pursuant to 28 U.S.C. §§ 1332(d) (2) and (6) of the Class Action Fairness Act of 2005." SAC ¶ 28. In particular, the SAC purports to define a putative CAFA class that includes patients who "paid" for allegedly "defective" Fabrazyme and suffered "financial losses" following the alleged 2009 contamination in Allston—but not the alleged 2013 and 2015 contaminations in Framingham. *See* SAC ¶ 342 ("bringing this action on behalf of . . . all others similarly situated, which includes any and all individuals residing in the United States of America and who have been

diagnosed with Fabry disease, received Fabrazyme *at any time from July 1, 2009 through March 2012* in a reduced dose amount, and who paid for the reduced dose Fabrazyme, either directly or through an insurance plan, and the spouses of any such person ('the Class')" (emphasis added)); *see also* SAC ¶ 346. Plaintiffs then assert putative CAFA class claims under various state laws concerning receipt of Fabrazyme following the alleged 2009 contamination in Allston.

While CAFA allows plaintiffs to bring a class action based on minimal diversity under certain circumstances, all of plaintiffs' putative CAFA class claims in this action are untimely. As explained below, the limitations period on any CAFA class claims based on receipt of low doses or contaminated product from the Allston facility began to accrue in 2009 and expired years before plaintiffs filed the present action in February 2020. Likewise, any CAFA class claims related to alleged injury in returning to the full dose of Fabrazyme accrued in 2012 and expired years before plaintiffs filed the present action. Significantly, plaintiffs cannot rely on tolling during the pendency of the prior *Hochendoner* and *Adamo* class action lawsuits to save their CAFA class claims. "*American Pipe* tolls the limitation period for *individual* claims" but "does not permit the maintenance of a follow-on *class action* past expiration of the statute of limitations." *See China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1804, 1806 (2018) (emphasis added) (citing *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552–53 (1974)); *see also In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1, 16 (1st Cir. 2019) ("[A] putative class member may not commence a class action anew beyond the time allowed by the untolled statute of limitations."). As such, all putative CAFA class claims were time barred when plaintiffs filed this action.

In particular, the Indiana statute of limitations for products liability claims applies to all of plaintiffs' common law-based product liability claims in the SAC—even if the claim otherwise arises under another state's substantive law—because statutes of limitations are procedural in

Indiana. *See OrbusNeich*, 694 F. Supp. 2d at 112–13; *Tokio Marine & Fire Ins. Co. v. Giffels Assocs., Inc.*, No. 04-cv-13, 2005 WL 2127084, at *2 (S.D. Ind. Sept. 1, 2005) ("Under the *Erie* doctrine, federal courts exercising diversity jurisdiction must apply the procedural law of the forum state to procedural issues."); *Bailey v. Skipperliner Indus., Inc.*, 278 F. Supp. 2d 945, 951–52 (N.D. Ind. 2003) ("Under Indiana law, statutes of limitation are procedural," thus "while this Court may apply Wisconsin substantive law to Plaintiffs' fraud and contract claims, it shall apply Indiana's statute of limitations to all issues in this case."); *Horvath v. Davidson*, 264 N.E.2d 328, 332 (Ind. App. 1970) (applying Indiana statute of limitations because "[w]ithout exception the statute of limitations has been considered procedural in Indiana").

In this products liability action, Indiana law required plaintiffs to commence suit within two years after the cause of action accrued—regardless of legal theory.[8]  Ind. Code § 34-20-3-

---

[8] The two-year limitations period applies to all claims based on common law, including claims for negligence, fraud, breach of fiduciary duty, and loss of consortium. *See Farmers Elevator Co. of Oakville, Inc. v. Hamilton*, 926 N.E.2d 68, 79 (Ind. Ct. App. 2010); *Price v. Wyeth Holdings Corp.*, 505 F.3d 624, 632 (7th Cir. 2007).  It also applies to state statutory claims derived from common law. *See, e.g.*, *Shearer v. Thor Motor Coach, Inc.*, 470 F. Supp. 3d 874, 879 (N.D. Ind. 2020); *Big Rivers Elec. Corp. v. Gen. Elec. Co.*, 820 F. Supp. 1123, 1125–26 (S.D. Ind. 1992) (explaining Products Liability Act of Kentucky "codifies some aspects of a common law products liability cause of action").  Yet, "[t]here is an exception to the rule of the forum state's statute of limitations controlling for causes of action which are created under specific state statutes" and not otherwise based in common law. *Shearer*, 470 F. Supp. 3d at 879.

However, even if the limitations period corresponding with each state's statutory claims applied, plaintiffs' CAFA class claims are still untimely under those statutes of limitations, which range from one to six years. *See* Ky. Rev. Stat. § 413.140(1)(a); *Bosch v. Bayer Healthcare Pharm., Inc.*, 13 F. Supp. 3d 730, 737 (W.D. Ky. 2014) ("Kentucky has a one-year statute of limitations for products liability claims."); Ky. Rev. Stat. § 367.220(5); *Arnold v. Liberty Mut. Ins. Co.*, 392 F. Supp. 3d 747, 767 (E.D. Ky. 2019) (Kentucky Consumer Protection Act claim must be brought within two years); Va. Code § 59.1-204.1; *Sakyi v. Nationstar Mortg., LLC*, No. 18-cv-265, 2018 WL 11224375, at *2 (E.D. Va. June 22, 2018) (Virginia Consumer Protection Act claim must "be brought within two years of when it accrues"); Va. Code § 8.01-244; *Wright v. Eli Lilly & Co.*, 65 Va. Cir. 483, 2004 WL 2157420, at *8 (Va. Cir. Ct. Sept. 21, 2004) (Virginia wrongful death claims must be brought "within two years after the death of the injured person"); *Dood v. Biomet Orthopedics, L.L.C.*, No. 18-cv-1393, 2020 WL 6390201, at *2 (W.D. Mich. Nov. 2, 2020) (Michigan "claim for personal injury must be brought within three years"); Mich. Comp. Laws § 445.911(9); *Laura v. DaimlerChrysler Corp.*, 711 N.W.2d 792, 794 (Mich. Ct. App. 2006) (six-year limitations period applies to claims for failure to "reveal a material fact, the omission of which tends to mislead or deceive the consumer"); Wash. Rev. Code § 7.72.060(3); *Breen v. Ethicon, Inc.*, No. C20-5595, 2021 WL 673485, at *3 (W.D. Wash. Feb. 22, 2021) (Washington Products Liability Act claim "must be brought within 'three years from the time the claimant discovered or in the exercise of due diligence should have discovered the harm and its cause'" (citation omitted)); Wash. Rev. Code § 19.86.120; *Dees v. Allstate Ins. Co.*, 933 F. Supp. 2d 1299, 1309 (W.D. Wash. 2013) (Washington Consumer Protection Act claim has a four-year statute of limitations); Fla. Stat. § 95.11(3)(f); *Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185, 1192 (S.D. Fla. 2017) (Florida Deceptive and Unfair Trade Practices Act limitations period is four years); Mass. Gen. Laws ch. 260, § 5A; *Ora Catering, Inc. v. Northland Ins. Co.*, 57 F. Supp. 3d 102, 108 (D. Mass.

1(b)(1); *see also* Ind. Code § 34-20-1-1 ("This article governs all actions that are: (1) brought by

a user or consumer; (2) against a manufacturer or seller; and (3) for physical harm caused by a

product; *regardless of the substantive legal theory or theories upon which the action is brought*"

(emphasis added)).  Under Indiana's "discovery rule," the limitations period "commences to run

from the date the plaintiff knew or should have discovered that she suffered an injury or

impingement, and that it was caused by the product or act of another."  *Barnes v. A.H. Robins Co.*,

476 N.E.2d 84, 87–88 (Ind. 1985); *Morgan v. Columbus McKinnon Corp.*, 837 N.E.2d 546, 551

(Ind. Ct. App. 2005).

Here, according to plaintiffs' own allegations in the SAC, plaintiffs learned (or could have

discovered) that they had been injected with contaminated Fabrazyme from the Allston facility in

2009, by which point Genzyme allegedly had publicly announced that it discovered a Vesivirus

contamination, suspended production of Fabrazyme, delayed production of Fabrazyme, began

offering low doses, and discovered foreign particles in products at the Allston facility.  *See, e.g.*,

SAC ¶ 55 (citing June 17, 2009 Boston.com article describing Genzyme's public statement about

the temporary shutdown of the Allston facility due to detection of virus); *id.* ¶ 207 (alleging

Genzyme posted a supply update on its website on June 19, 2009 stating the Allston facility was

closed for sanitization); *id.* ¶ 239 ("On September 8, 2009, Genzyme hosted a 'town hall' where

patients and physicians could call in and listen to updates and questions about the supply of

Fabrazyme."); *id.*  ¶ 273 (alleging Genzyme announced on September 24, 2009 that it could not

---

2014) ("[F]our-year statute of limitations for consumer protection acts brought for, *inter alia*, violations of Chapter[] 93A."); Nev. Rev. Stat. § 11.190(2)(d); *Sears v. Russell Road Food & Beverage, LLC*, 460 F. Supp. 3d 1065, 1070 (D. Nev. 2020) (Nevada Deceptive Trade Practices Act has a four-year limitation period); N.C. Gen. Stat. § 75-16.2; *Dreamstreet Invs., Inc. v. MidCountry Bank.*, 842 F.3d 825, 830 (4th Cir. 2016) ("Under North Carolina law, [Unfair and Deceptive Trade Practices Act] claims are governed by a four-year statute of limitations."); 42 Pa. Cons. Stat. § 5527(b); *Rodgers v. Lincoln Benefit Life Co.*, No. 19-cv-350, 2019 WL 4750193, at *2 (W.D. Pa. Sept. 30, 2019) ("A[n] [Unfair Trade Practices and Consumer Protection Law] claim is subject to a 6-year statute of limitations."). As explained herein, all of plaintiffs' CAFA claims accrued by 2009, and thus, even applying a six-year limitations period, those claims expired by 2015.  Accordingly, all CAFA class claims were untimely when filed.

produce Fabrazyme quickly enough to meet its June and July projections of restoring normal supplies by Fall 2009); *id.* ¶ 171 ("On November 11, 2009, Genzyme sent letters . . . to physicians to let them know that 'Genzyme has detected foreign particles in some products filled at the Allston' plant, including rubber, steel and other 'fiber-like material.'").  Plaintiffs further allege that they suffered injuries when they first began taking the low dose of Fabrazyme in 2009.[9]  *See id.* ¶¶ 1, 2, 6, 8, 9, 11–15, 17, 18, 20, 22, 24 (alleging "treatment with FDA-approved doses of Fabrazyme prior to June 2009," and "deliver[y] and inject[ion] with defective Fabrazyme from 2009 to 2012").  As such, all of plaintiffs' putative CAFA class claims related to receipt of low dose or contaminated Fabrazyme from the Allston facility accrued in 2009 and expired in 2011.[10]

Likewise, the fraud claims at Counts XX and XXI are based *only* on the 2009 Allston contamination, SAC ¶¶ 128–340, 441–71 (alleging "series of affirmative, knowing, reckless, and fraudulent acts by Genzyme" concerning low dose Fabrazyme), and therefore began to run in 2009, when plaintiffs were aware of or could have discovered their injury.  Because plaintiffs' fraud claims are grounded in the same core theory as the rest of their product liability claims, the fraud claims are governed by the same two-year statute of limitations and expired in 2011.  *See In re Vioxx Prods. Liab. Litig.,* MDL No. 1657, 2007 WL 3334339, at *6 (E.D. La. Nov. 8, 2007) (holding Indiana's two-year statute of limitations applied to fraud and constructive fraud claims in

---

[9] Plaintiffs Toni Cordova and Amber Britton allege that they began taking low dose Fabrazyme in 2010 and 2011, respectively. SAC ¶¶ 4, 5.  Thus, at the latest, their claims expired two years later in 2012 and 2013, respectively.

[10] At the latest, plaintiffs surely knew that they were injured by receipt of low dose Fabrazyme and alleged contaminants in 2011 and 2013 when they brought putative class claims purporting to describe those injuries in *Hochendoner* and *Adamo*.  In fact, in 2013, plaintiffs' counsel conceded on his website that "[i]t is possible that jurisdictions will require a lawsuit to be filed by June 1, 2011 ([two years from] the beginning of the shortage) to avoid the statute of limitation which may bar any later filed cases." C. Allen Black, *Fabrazyme Lawsuit*, http://www.patentlawyersite.com/Fabrazymelawsuit.html (last visited Sept. 26, 2013)).  The actual website was last available on February 19, 2015, but remains archived with the Wayback Machine. *See* https://web.archive.org/web/20150219021650/http://www.patentlawyersite.com/Fabrazymelawsuit.html.  Thus, even assuming for the sake of argument that the *Hochendoner* plaintiffs could not have discovered their claims until the very dates that they filed *Hochendoner* and *Adamo*, all of those claims expired by 2013 and 2015, respectively.

cause of action for personal injury related to a medication); *see also Shideler v. Dwyer*, 417 N.E.2d 281, 286, 288 (Ind. 1981) (applying two-year limitations period to all malpractice claims, including fraud, as "[t]he number and variety of Plaintiff[s'] technical pleading labels and theories of recovery cannot disguise the obvious fact apparent even to a layman that this is a malpractice case, and hence is governed by the statute of limitations applicable to such actions").

While *Schubert* purportedly provided further details about the alleged fraud "not otherwise available" to plaintiffs, SAC ¶ 129, those details were not necessary for the fraud claims to accrue. *See Messmer v. KDK Fin. Servs., Inc.*, 83 N.E.3d 774, 780 (Ind. Ct. App. 2017) ("For a cause of action to accrue, it is not necessary that the full extent of the damage be known or even ascertainable but only that some ascertainable damage has occurred."). Rather, like the rest of plaintiffs' products liability claims, plaintiffs' fraud claims began to accrue in 2009, when they knew (or could have discovered) "that some ascertainable damage ha[d] occurred." *Id.* Nothing more was required. *See Cin. Life Ins. Co. v. Grottenhuis*, No. 10-cv-205, 2011 WL 1107114, at *10 (S.D. Ind. Mar. 23, 2011) ("Indiana does not require that a plaintiff uncover the legal theory for holding a defendant liable for the action to accrue. Rather, the plaintiff must only be aware that the defendant caused him injury" (quoting *Frey v. Bank One*, 91 F.3d 45, 47 (7th Cir. 1996))); *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 689 (Ind. Ct. App. 2006) ("[A]pplication of the discovery rule does not mandate that plaintiffs know with precision the legal injury that has been suffered, but merely anticipates that a plaintiff be possessed of sufficient information to cause him to inquire further in order to determine whether a legal wrong has occurred."). However, at the absolute latest, plaintiffs' fraud claims must have accrued by March 2011, when the *Hochendoner* plaintiffs filed a complaint alleging that Genzyme "*expressly or impliedly misrepresent[ed]* that the reduced dose of Fabrazyme® was in accordance with statutory mandates

and efficacious for use," and "instructed and/or through knowledge and consent reduced the dose of Fabrazyme® to dangerous, sub-efficacious and unapproved levels."  Compl. ¶¶ 71(f), 83(k), *Hochendoner v. Genzyme Corp.*, No. 11-cv-313 (W.D. Pa. Mar. 9, 2011), ECF No. 1 (emphasis added).  At that point, plaintiffs were aware of (or could have discovered) their fraud claims, and thus their fraud claims expired no later than March 2013.[11]

The only other possible putative CAFA class claims relate to alleged injuries to plaintiffs Trina Wilkins, Tom Stanziano, and Damon LaForce upon return to a full dose of Fabrazyme in 2012.  *See, e.g.*, SAC ¶ 1 (alleging "'[l]ow dose' also caused antibody sensitization to Fabrazyme making it impossible for [Ms. Wilkins] to resume full dose treatment in the spring of 2012 with Fabrazyme as she had before the 'low dosing' began" and requiring that she "be administered Fabrazyme in the cardiac intensive care unit for 24-48 hour observation instead of the normal infusion center because a return to full dose caused severe life threatening reactions every time she received it, unlike her infusion prior to the shortage"); *see also id.* ¶¶ 14, 20, 118–19.  As plaintiffs allege that they suffered harm upon their return to the full dose in 2012, all of those putative class claims expired by 2014.  *See* Ind. Code §§ 34-20-3-1(b)(1), 34-20-1-1.[12]

---

[11] Furthermore, even if a six-year limitations period applies to plaintiffs' fraud claims (it does not), they would have expired in 2015 (based on a 2009 accrual date) and no later than March 2017 (based on a March 2011 accrual date). *See Messmer*, 83 N.E.3d at 780 (citing Ind. Code § 34-11-2-7).  Accordingly, even assuming the latest possible accrual date of March 2011 and even applying the extended (and inapplicable) six-year statute of limitations, all of plaintiffs' fraud claims expired in March 2017—before the parties signed a tolling agreement in May 2017. *See* Pls.' Mot. for Leave to File a First Am. Compl. Adding Parties, ECF No. 7, ¶ 6 ("[O]n May 19, 2017, Plaintiffs and Genzyme Corporation . . . entered into a Tolling Agreement regarding the statute of limitations.").

[12] Even assuming the allegations based on return to a full dose were all CAFA class claims (despite Mr. LaForce failing to allege that he is a class representative, *id.* ¶ 342) and even assuming the longest possible limitations period applied to the "specific state statut[ory]" claims, *see Shearer*, 470 F. Supp. at 879, those CAFA class claims nonetheless were time-barred well before the May 2017 tolling agreement. *First*, Ms. Wilkins' putative CAFA class claims pursuant to the Product Liability Act of Kentucky would have expired in 2013, one year after returning to the full dose, and her claim pursuant to the Kentucky Consumer Protection Act would have expired in 2014, two years after returning to the full dose. *See* Ky. Rev. Stat. § 413.140(1)(a); *Bosch*, 13 F. Supp. 3d at 737; Ky. Rev. Stat. § 367.220(5); *Arnold*, 392 F. Supp. 3d at 767. *Second*, Mr. LaForce's putative CAFA class claims pursuant to the Virginia Consumer Protection Act would have expired in 2014, two years after returning to the full dose. *See* Va. Code § 59.1-204.1; *Sakyi*, 2018 WL 11224375, at *2. *Third*, Mr. Stanziano's putative CAFA class claim pursuant to

Accordingly, all CAFA class claims based on the alleged contamination at the Allston facility were untimely when plaintiffs filed this action in February 2020 and should be dismissed.[13]

## III.   THERE IS NO FEDERAL JURISDICTION OVER ANY CLAIM ASSERTED IN THE SAC, AND THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING CLAIMS

As explained in Part II *supra*, all of plaintiffs' CAFA class claims were untimely when filed, and therefore the Court does not have (and never had) federal jurisdiction over any claim in this action. Aside from the time-barred CAFA class claims addressed in Part II *supra*, the only other claims in this action are state law claims brought by individual plaintiffs concerning the alleged 2009 contamination at the Allston facility and the alleged 2013 and 2015 Vesivirus contaminations at the Framingham facility. As there is no federal jurisdiction over any claim in the SAC, the Court should decline to exercise supplemental jurisdiction over all remaining claims.

Indeed, this Court recently declined to exercise supplemental jurisdiction over "purely state law claims" in an action where plaintiffs' putative CAFA class action allegations could not satisfy the predominance and commonality requirements of Federal Rule of Civil Procedure 23. *See Rovinelli v. Trans World Ent. Corp.*, No. 19-cv-11304, 2021 WL 752822, at *1, 7–13, 16–18 (D. Mass. Feb. 2, 2021) (Woodlock, J.) (explaining that because the "action is not—and cannot ever

---

the Florida Deceptive and Unfair Trade Practices Act would have expired in 2016, four years after returning to the full dose. *See* Fla. Stat. § 95.11(3)(f); *Koski*, 347 F. Supp. 3d at 1192.

[13] While they are not CAFA class claims, many of plaintiffs' individual claims also are time barred under the two-year limitations period. *First*, all claims involving the sale of allegedly Vesivirus-contaminated Fabrazyme from the Allston facility are untimely. As explained above, those claims accrued in 2009, but plaintiffs did not bring them before they expired in 2011. Yet, the *Hochendoner* plaintiffs did not allege the sale of Vesivirus-contaminated Fabrazyme in any of their prior complaints, and the *Adamo* plaintiffs did not file a complaint alleging sale of Vesivirus-contaminated Fabrazyme until 2013. *Second*, all claims brought by the *Adamo* plaintiffs are untimely because, as explained above, they began to accrue in 2009 and had to be filed by 2011. Yet, the *Adamo* plaintiffs did not file their initial complaint until June 2013, despite being represented by the same counsel as the *Hochendoner* plaintiffs who had filed their complaint years earlier. *Third*, all claims concerning the alleged 2013 and 2015 Vesivirus contaminations at the Framingham facility (which are brought only as individual—not class—claims) also are time barred under the two-year limitations period. Even assuming those claims accrued on the last day of 2015, plaintiffs needed to file their claims by the last day of 2017. *See* Ind. Code § 34-20-3-1(b)(1). Instead, plaintiffs brought those claims for the very first time in 2020. Importantly, the May 2017 tolling agreement has no bearing on plaintiffs' claims concerning the alleged 2013 and 2015 contaminations, which were not asserted in *Hochendoner* or *Adamo*.

become—a federal class action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2), I lack subject matter jurisdiction over the matter"), *appeal dismissed*, No. 21-1160 (1st Cir. May 12, 2021); *see also* 28 U.S.C. § 1367(c)(3) (providing discretion if "the district court has dismissed all claims over which it has original jurisdiction"). Likewise, "[t]he First Circuit, for its part, has expressed doubt concerning the wisdom of continued jurisdiction after CAFA allegations have been dismissed." *Rovinelli*, 2021 WL 752822, at \*13 (citing *In re TJX Cos. Retail Sec. Breach Litig.*, 564 F.3d 489, 492 (1st Cir. 2009)); *see also Clausnitzer v. Fed. Express Corp.*, 621 F. Supp. 2d 1266, 1271 (S.D. Fla. 2008) (declining to exercise supplemental jurisdiction over state law claims as court lacked CAFA jurisdiction). "A district court's determination of whether to exercise supplemental jurisdiction takes into account 'judicial economy, convenience, fairness to the litigants, and comity.'" *Rovinelli*, 2021 WL 752822, at \*17 (quoting *Delgado v. Pawtucket Police Dep't*, 668 F.3d 42, 48 (1st Cir. 2012)). A key factor is "how far the proceedings have progressed. If the case remains in its nascent stages when all federal law claims are dismissed, dismissal of the pendent state law claims, rather than exercise of supplemental jurisdiction, may be more appropriate." *Id.* Moreover, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties." *Id.* (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).

As in *Rovinelli*, plaintiffs here cannot rely on CAFA to support jurisdiction as "there is no reasonably foreseeable possibility that the plaintiffs could propose a satisfactory class in the future, there is not and never was CAFA jurisdiction." *Rovinelli*, 2021 WL 752822, at \*16; *see also id.* at \*13 ("[T]o hold that federal jurisdiction remains . . . threatens to elevate CAFA's statutory jurisdiction above core principles of Article III."). Not only are all of plaintiffs' CAFA class claims untimely as explained in Part II *supra*, but the SAC contains no allegations that could satisfy the

commonality and superiority requirements of Rule 23.  Instead, each plaintiff alleges distinct injuries arising under nearly a dozen state laws and thus needs to establish individualized facts under laws that differ by each plaintiff's state.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 82 (D. Mass 2005) ("[I]n a multi-state class action, variations in state law may swamp any common issues and defeat predominance" (citation omitted)); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624–25 (1997) (holding predominance requirement not satisfied in action where "[d]ifferences in state law" undermine "class cohesion").  In addition, while plaintiffs purport to name five class representatives, those five plaintiffs do not even bring claims covering all of the class allegations.[14]  SAC ¶ 342.  Plaintiffs' failure to name an adequate representative is unsurprising, as there are no typical injuries or class claims that an individual (or group of individuals) could purport to bring.  *See Abla v. Brinker Rest. Corp.*, 279 F.R.D. 51, 55 (D. Mass. 2011) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–49 (2011)).

Moreover, the principles of comity and fairness to the parties would be best served by dismissal of the state law claims because the "remaining state law claims prominently" involve "area[s] of law most appropriately adjudicated and managed by the state courts." *Rovinelli*, 2021 WL 752822, at *18.  Plus, this case has only been pending in this Court since January 2021, and "there has not been such an investment of judicial resources by this court as to merit exercising supplemental jurisdiction over purely state law claims." *Id.*  Because plaintiffs' CAFA class claims are untimely and fail to provide any basis for jurisdiction, the SAC should be dismissed.

## IV.   ALL CLAIMS IN THE SAC FAIL BECAUSE PLAINTIFFS LACK STANDING

This Court lacks jurisdiction for another independent reason—plaintiffs do not have Article

---

[14] Despite naming multiple class representatives, plaintiffs appear to allege that only a single "Plaintiff will fairly and adequately represent and protect the interests of the members of the Class because *her* interests do not conflict with the interests of the individual members of the Class" and "Plaintiff will retain competent and experienced counsel to represent *herself* and the members of the Class if the Class is certified."  SAC ¶ 348 (emphasis added).

III standing to assert their claims concerning the alleged Allston contamination in 2009 or their claims concerning the alleged Framingham contaminations in 2013 and 2015.  The same pleading infirmity led the First Circuit to affirm dismissal of nearly identical claims concerning the alleged 2009 contamination at the Allston facility in *Hochendoner*.  *See Hochendoner*, 823 F.3d at 730–34 ("[S]tanding is a prerequisite to a federal court's subject matter jurisdiction," and "at the pleading stage, the plaintiff bears the burden of establishing sufficient factual matter to plausibly demonstrate his standing to bring the action.").  In meeting their burden to establish standing, plaintiffs must plead sufficient factual allegations to demonstrate:  (1) "injury in fact" for each plaintiff that is both "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical'"; (2) the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) it is "likely," not "merely 'speculative,'" that the injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 41–43 (1976)). Importantly, "[t]he standing inquiry is claim-specific: a plaintiff must have standing to bring each and every claim that she asserts."  *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012). Accordingly, even if plaintiffs could plead standing on some, but not all, of their claims (which they do not), the Court must dismiss any claims for which plaintiffs lack standing.

As relevant here, for each claim, plaintiffs must allege that they suffered an injury-in-fact and that it is traceable to Genzyme's conduct.  *See Hochendoner*, 823 F.3d at 733 ("[T]he plaintiff-by-plaintiff and claim-by-claim analysis required by standing doctrine demands allegations *linking* each plaintiff to each of these injuries" and "[s]uffering one species of injury does not confer standing on a plaintiff to press claims based on another species of injury, even if the injuries share a common genus" (emphasis added)); *Dantzler, Inc. v. Empresas Berrios Inventory & Operations,*

*Inc.*, 958 F.3d 38, 50 (1st Cir. 2020) ("[A] federal court [can] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from [an] independent" source (quoting *Simon*, 426 U.S. at 41–42)); *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject.").  Legal conclusions, "naked assertion[s] devoid of further factual enhancement," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted); *see also Hochendoner*, 823 F.3d at 731 ("Neither conclusory assertions nor unfounded speculation can supply the necessary heft."); *Perez-Kudzma v. United States*, 940 F.3d 142, 146 (1st Cir. 2019) (holding plaintiffs lacked standing as the complaint "sets forth only a diffuse description of the asserted injuries" and "omits any facts that explain how those injuries could be identified as resulting from" defendants' alleged conduct).

In *Hochendoner*, the First Circuit dismissed for lack of standing plaintiffs' claims concerning the alleged 2009 contamination at the Allston facility that plaintiffs (1) experienced "an *accelerated* course of deterioration on the lowered dose [of Fabrazyme]," and (2) faced harm "attributable to the receipt of Fabrazyme tainted with particulate matter," specifically steel, glass, and rubber.  *Hochendoner*, 823 F.3d at 728–29, 730–34.  The Court noted that plaintiffs failed to provide "specific information . . . regarding the harm, if any, that has befallen each individual plaintiff" and "offer only scattered descriptions of generalized harms."  *Id.* at 732.  With regard to the claims of disease acceleration, "there [was] no allegation that any named plaintiff has suffered accelerated disease progression (as opposed to the natural progression of the disease) as a result of taking a reduced dose of Fabrazyme."  *Id.* at 732–33.  As for the claims of particulate

contamination, "[t]here [was] simply no assertion at any point in the complaints that any specific plaintiff took or received a dose contaminated with particulate matter." *Id.* at 732. The Court also dismissed with prejudice all claims based on "progression" of disease symptoms. *Id.* at 736–37.

Here, plaintiffs once again have not met their burden to plead standing. *First*, plaintiffs claim that they received "defective Fabrazyme" following the 2009 Allston contamination and the alleged 2013 and 2015 Framingham contaminations, but they have not alleged any connection between a particular injury and any particular defect in Fabrazyme or conduct by Genzyme. *Second*, plaintiffs' claims based on alleged contaminations at the Allston and Framingham facilities fail because plaintiffs have not alleged facts sufficient, for standing purposes, to establish that they received any contaminated Fabrazyme in the first place. *Third*, plaintiffs do not have standing to pursue their allegations of possible future injury. *Fourth*, plaintiffs' allegations that they paid $200,000 for Fabrazyme do not confer standing because they are not supported by any plausible factual allegations that Fabrazyme provided no medical benefit.

### A.    Plaintiffs Have Not Plausibly Alleged that Any Particular Injuries Are Traceable to Any Particular Defect or Conduct

The Court should dismiss all of plaintiffs' claims because the SAC fails to plead any connection between a particular injury and any alleged defect in Fabrazyme or conduct by Genzyme. *See Amrhein v. eClinical Works, LLC*, 954 F.3d 328, 330 (1st Cir. 2020) (requiring plaintiffs "clearly . . . allege facts demonstrating" that their purported injuries are fairly traceable to the defendant's alleged actions (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016))). While the SAC lists harms that allegedly occurred or will occur to each plaintiff (or their family member), the SAC continues to bundle all of Genzyme's alleged conduct and generally attribute it to all of plaintiffs' alleged injuries. For instance, plaintiffs aver that they were "delivered and injected with" so-called "defective" Fabrazyme from 2009 to 2012 and again in 2013 and 2015,

resulting in their "clinical status [] deteriorat[ing] as the Fabry disease [has] accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation" of various "physical injuries, symptoms, and diagnostic criteria." SAC ¶¶ 2, 6, 8, 9, 12–15, 17, 18, 20. But plaintiffs use "defective Fabrazyme" to refer en masse to all of the alleged misconduct by Genzyme, including allegedly providing low dose Fabrazyme, Fabrazyme contaminated with particulates, and Fabrazyme contaminated with Vesivirus. Plaintiffs thereby fail to allege that any particular alleged injury is attributable to any particular alleged conduct by Genzyme—rather than "the natural progression of the disease." *See Hochendoner*, 823 F.3d at 732–33; *Katz*, 672 F.3d at 71–72 (explaining plaintiffs do not have Article III standing if they fail "to show a sufficiently direct causal connection" between each identified harm and the opposing party's action; "overly attenuated" connections where the injury may stem from a different source do not suffice (quoting *Donahue v. City of Boston*, 304 F.3d 110, 115 (1st Cir. 2002))). Plaintiffs also have not pointed to any factual allegations—such as a diagnosis from a physician—supporting their conclusory and speculative claims that "defective" Fabrazyme caused the acceleration of their disease. Thus, plaintiffs yet again fail to plead the requisite "plaintiff-by-plaintiff and claim-by-claim analysis required by standing doctrine." *Hochendoner*, 823 F.3d at 733. Plaintiffs' "conclusory assertions" and "unfounded speculation" do not "supply the necessary heft" to plead standing. *Id.* at 731.

### B.     Plaintiffs Lack Standing to Bring Claims Regarding Receipt of Fabrazyme Allegedly Contaminated with Vesivirus or Particulate Matter

This Court also should dismiss all claims regarding receipt of Fabrazyme allegedly contaminated with Vesivirus or particulate matter from either the Allston or Framingham facilities because the allegations in the SAC do not give rise to standing. For standing purposes, to bring claims based on contamination at either facility, plaintiffs needed to do more than merely conclude that a batch of Fabrazyme was contaminated with Vesivirus or particulate matter and then

"distributed to all U.S. Fabry patients."  SAC ¶ 70.  Plaintiffs were required to "clearly . . . allege facts demonstrating" that their purported injuries are fairly traceable to Genzyme's alleged actions. *See Amrhein*, 954 F.3d at 330 (quoting *Spokeo*, 136 S. Ct. at 1547). Yet, as in *Hochendoner*, the SAC contains no plausible, non-conclusory factual allegations "that any specific plaintiff took or received a dose contaminated with particulate matter."  *See Hochendoner*, 823 F.3d at 732–33.

*First*, the SAC does not plausibly allege that Fabrazyme actually was contaminated with Vesivirus at the Allston facility.  Instead, it simply asserts that there was a Vesivirus contamination at the Allston facility and then concludes that some Fabrazyme product must have been contaminated.  *See* SAC ¶ 42 ("Genzyme Corporation contaminated its [unspecified] bioreactors with Vesivirus 2117."); *id.* ¶ 47 ("At least as early as July 2009, Genzyme Corporation contaminated 'Fabrazyme' with Vesivirus, that it termed Vesivirus 2117 (Allston), for the manufacturing facility where it had been detected (Allston, Massachusetts).").  While plaintiffs selectively quote from an article stating that Genzyme "halted production of" Cerezyme and Fabrazyme after "detect[ing] the virus strain, Vesivirus 2117, in one [bio]reactor," the article does not suggest that any Fabrazyme actually was contaminated with Vesivirus—notwithstanding plaintiffs' conclusory insinuations to the contrary.  *See* Erin Ailworth & Robert Weisman, *Virus Shuts Genzyme Plant, Holds up Drugs for 8,000*, Boston.com (June 17, 2009), http://archive.boston.com/business/healthcare/articles/2009/06/17/genzyme_temporarily_halts_production_on_2_key_drugs/ (hereinafter "Ailworth & Weisman, Boston.com"); SAC ¶ 55.  The article makes clear that "Genzyme officials believe the inventory was not affected" and its "manufacturing plant will remain shut . . . while it is decontaminated as a precaution."  *See* Ailworth & Weisman, Boston.com.

Moreover, the SAC does not contain any factual allegations that contaminated doses

manufactured at the Allston facility were actually "shipped or administered to any named Fabry patients" or "that any named plaintiff has suffered accelerated disease progression (as opposed to the natural progression of the disease) as a result of taking a reduced dose of Fabrazyme." *Hochendoner*, 823 F.3d at 732–33.  Nonetheless, the SAC leaps to the conclusion that certain plaintiffs were "injected with defective Fabrazyme containing Vesivirus."  *See* SAC ¶¶ 2, 4–6, 8, 9, 12–15, 17, 18, 20.  But the SAC stops short of pleading any facts to support this conclusion. Instead, the SAC quotes from a letter signed by Genzyme's Senior Director of Medical Affairs stating, "[t]his virus, Vesivirus 2117, is not known to be harmful in humans, but impairs the viability of CHO [Chinese Hamster Ovary Cells] which are used to produce Cerezyme and Fabrazyme." *Id.* ¶ 53; *see also* Declaration of Robert G. Jones ("Jones Decl."), Exhibit A (Letter from Senior Director of Medical Affairs for Genzyme, Executive Director of the Fabry Support and Information Groups, and Founder and President of the National Fabry Disease Foundation (2009) (stating "no evidence of the virus has been detected in any of the material or equipment used to produced Fabrazyme")).  However, this letter does not contain any factual statements to support plaintiffs' speculative theory that Fabrazyme was contaminated with Vesivirus.  Nor does the SAC's repeated incantation of the phrase "Vesivirus contaminated Fabrazyme" demonstrate any traceable link between the allegedly contaminated product and any alleged injury.  *See* SAC ¶¶ 50, 60, 70, 71, 81, 82.  Plaintiffs also contend that a "leading expert on Vesiviruses" "informed Genzyme Corporation that the adulterated Fabrazyme would likely harm humans."  *See id.* ¶¶ 59– 60.  However, plaintiffs do not allege that the so-called expert ever informed Genzyme that there actually was Vesivirus in any Fabrazyme product shipped to patients.  Moreover, while the SAC references Genzyme's 2010 consent decree with the FDA and Department of Justice, *id.* ¶ 62, those references cannot support plaintiffs' speculative theory because the FDA and Department of

Justice never alleged that Fabrazyme was contaminated with Vesivirus.  *See United States v. Genzyme Corp.*, No. 10-cv-10865 (D. Mass. May 24, 2010), ECF No. 1.

*Second,* the SAC does not plausibly allege that any Fabrazyme actually was contaminated with Vesivirus at the Framingham facility or that any contaminated Fabrazyme product actually was "shipped or administered to any named Fabry patients."  *See Hochendoner*, 823 F.3d at 732– 33.  In apparent concession that their theory of Vesivirus-contaminated Fabrazyme at the Framingham facility is entirely speculative, plaintiffs rely only on allegations that do not actually advance their theory.  For instance, plaintiffs cite an anonymous source in alleging that Vesivirus was detected at the Framingham facility.  SAC ¶ 64 ("According to a former Genzyme Corporation scientist conducting purity testing in the new Framingham, Massachusetts plant, Vesivirus contamination was again detected by polymerase chain reaction (PCR) tests on at least three occasions in 2013 and at least once in 2015.").  But the SAC does not allege that there was any positive PCR test result for Vesivirus in *Fabrazyme product*, rather than in some unidentified location in the Framingham facility.  *Cf. Hochendoner*, 823 F.3d at 732 (dismissing claims for lack of standing and explaining that "the allegation is only that Genzyme produced a batch of Fabrazyme contaminated with particulate matter—not that contaminated doses were ever shipped or administered to any named Fabry patients").  The SAC instead leaves it to the Court to draw the conclusion that Fabrazyme product shipped from Framingham must have been contaminated with the virus, that the contaminated product was shipped to plaintiffs, and that, as a result, plaintiffs have either had Vesivirus-related symptoms or may suffer future harm.  But plaintiffs cannot merely allege the existence of a "test" and invite the Court to conclude that the test related in some way to Fabrazyme.  Plaintiffs' "'naked assertion[s]' devoid of 'further factual enhancement'" are insufficient to state a claim and cannot support Article III standing.  *See Iqbal*,

- 28 -

556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *Diamond v. Charles*, 476 U.S. 54, 66 (1986) ("[U]nadorned speculation will not suffice to invoke the federal judicial power" (quoting *Simon*, 426 U.S. at 44)).  Plaintiffs' failure to satisfy the threshold standing requirement warrants dismissal of all claims regarding receipt of Fabrazyme allegedly contaminated with Vesivirus or particulate matter from the Framingham facility.

*Third*, the SAC does not allege that any plaintiff suffered any injury-in-fact due to alleged injection with contaminated Fabrazyme from either facility.  Among the plaintiffs who allege injection with Vesivirus-contaminated Fabrazyme, none even claims to have been diagnosed with or to have tested positive for Vesivirus.  *See* SAC ¶¶ 1, 2, 4–6, 8, 9, 11–15 17, 18, 20.  Some plaintiffs do not even allege any particular present or past injury from alleged injection with allegedly Vesivirus-contaminated Fabrazyme at all, instead alleging only an increased risk of developing future conditions.  *See id.* ¶¶ 4, 6, 11–14, 17–18, 20, 22, 24.  Other plaintiffs allege "Vesivirus-induced vesiculating chronic non-anaphylactic rashes," but those allegations fare no better.  *See id.*  ¶¶ 1, 2, 5, 8, 9, 15.  Aside from calling the rashes "Vesivirus-induced," plaintiffs provide no factual allegations that could plausibly support their conclusory assertions that their alleged rashes are traceable to alleged exposure to Vesivirus-contaminated Fabrazyme.  In fact, given that rashes are a known and disclosed side effect of using Fabrazyme, the bare assertions that plaintiffs' rashes were "Vesivirus-induced" are insufficient to plausibly allege traceability to any Vesivirus exposure.[15]  *See Lujan*, 504 U.S. at 560; *cf. Clapper v. Amnesty Int'l USA*, 568 U.S.

---

[15] The FDA-approved Fabrazyme label states that rashes are a "[s]erious and/or frequently occurring (≥ 5% incidence) related adverse reaction[]," and during the relevant time period, Fabrazyme labels informed patients that rashes were found to occur in 20% of clinical trials.  *See* Jones Decl., Exhibit B (Fabrazyme, Highlights of Prescribing Information at 1, 4, 6, https://www.accessdata.fda.gov/drugsatfda_docs/label/2008/103979s5107lbl.pdf (2008)); Jones Decl., Exhibit C (Fabrazyme, Highlights of Prescribing Information at 1, 4, 6, https://www.accessdata.fda.gov/drugsatfda_docs/label/2010/103979s5135lbl.pdf (2010)).  Plaintiffs were aware of the potential side effects listed in the FDA-approved Fabrazyme label, as illustrated by their reliance on the FDA-approved label in the SAC.  *See, e.g.*, SAC ¶ 86 n.4 (quoting "PATIENT COUNSELING INFORMATION" section of FDA-approved Fabrazyme label); *id.* ¶ 91 (referring to FDA-approved dosing instructions in FDA-approved

398, 410–11 (2013) (explaining respondents fail to establish a "fairly traceable" injury-in-fact if they cannot show whether the alleged harm was based on the challenged action or "some other" possibility).  As such, plaintiffs have not pled an injury-in-fact or that any purported injury is traceable to conduct by Genzyme (as opposed to the natural effects of their Fabry disease), and the allegations in the SAC do not give rise to standing.[16]  *See Hochendoner*, 823 F.3d at 732–33.

## C.     Plaintiffs Lack Standing to Bring Claims Based on Possible Future Injury

Plaintiffs' speculative allegations of possible future harm, including the risks of "developing fulminating Vesivirus infection, and Vesivirus induced hematological cancer" as well as potential future reproductive complications, similarly cannot give rise to standing.  *See* SAC ¶¶ 1, 2, 4–6, 8, 9, 11–15, 17, 18, 20.  It is well established that "'[a]llegations of *possible* future injury' are not sufficient" to establish Article III standing.  *Blum v. Holder*, 744 F.3d 790, 796 (1st Cir. 2014) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (explaining that for standing based on future harm, the harm must be "certainly impending" and not "hypothetical" *id.* at 797–98 (quoting *Clapper*, 568 U.S. at 416)).  Courts recognize that "[t]he claim of potential future injury is simply too hypothetical or conjectural to establish Article III standing."  *In re Fruit Juice Prods. Mktg. & Sales Pracs. Litig.*, 831 F. Supp. 2d 507, 511 (D. Mass. 2011); *see also Hughes v. Chattem, Inc.*, 818 F. Supp. 2d 1112, 1119 (S.D. Ind. 2011) ("[F]ear and apprehension about a possible future physical medical consequence of exposure . . . is not enough to establish an injury

---

Fabrazyme label).  This Court may take judicial notice of the FDA-approved Fabrazyme labels.  *Gustavsen v. Alcon Labs., Inc.*, 272 F. Supp. 3d 241, 252 (D. Mass. 2017)  ("Courts in the District of Massachusetts have considered information on the FDA's website subject to judicial notice and consideration on a motion to dismiss."), *aff'd*, 903 F.3d 1 (1st Cir. 2018); *Hochendoner*, 95 F. Supp. 3d at 32 (considering FDA-approved Fabrazyme package insert).

[16] In *Reich v. Genzyme Corp.*, plaintiffs alleged that Vesivirus entered the Cerezyme product following the 2008 and 2009 Vesivirus contamination at the Allston facility.  No. 14-cv-1684, 2015 WL 5842418, at *8 (D. Colo. Oct. 7, 2015).  On a motion to dismiss, the court held that plaintiffs "pled a causal connection between vesivirus and Reich's injuries," namely skin lesions, but those Vesivirus-related claims failed to comply with Federal Rule of Civil Procedure 8.  *Id.* at *9.  However, that case concerned Cerezyme (not Fabrazyme), and Genzyme had not challenged standing.  Accordingly, the holding in *Reich* is not applicable here; nor is it binding on this Court.

in fact" (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 636 (3d Cir. 1996) (Wellford, J., concurring))); *Herrington v. Johnson & Johnson Consumer Cos.*, No. 09-cv-1597, 2010 WL 3448531, at *3 (N.D. Cal. Sept. 1, 2010) ("[T]o the extent that an increased risk of harm could constitute an injury-in-fact in a product liability case . . . , Plaintiffs must plead a *credible* or *substantial* threat to their health . . . to establish their standing to bring suit" (emphasis added)). Without any present or past injury, plaintiffs have not alleged an injury-in-fact—"the '[f]irst and foremost' of standing's three elements." *Spokeo*, 136 S. Ct. at 1547 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)).

A recent decision dismissing a complaint for failure to plead standing is instructive. *See Fruit Juice*, 831 F. Supp. 2d at 509–13. There, the Court dismissed allegations that defendants' products placed them "at risk of future harm from lead poisoning." *Id.* at 510. In holding that plaintiffs failed to plead standing, the Court explained that allegations of risk of future harm were insufficient to satisfy the "credible or substantial threat" standard, *id.* (quoting *Herrington*, 2010 WL 3448531, at *3), because, among other things, the "products have not been recalled," the "FDA has found that . . . these products do not pose an unacceptable risk to human health," and "Plaintiffs have made no allegations as to the amount of lead actually in Defendants' products, have not claimed that any particular amount in the products is dangerous, and have not alleged that any specific amount has caused actual injuries to any plaintiff," *id.* at 511. Likewise, here, plaintiffs have not plausibly alleged that Fabrazyme was contaminated with Vesivirus, let alone that plaintiffs were exposed to it. Moreover, plaintiffs do not plausibly allege a "credible or substantial threat," *id.* at 510, of developing future symptoms, such as infection or hematological cancer.[17]

---

[17] The SAC contends that the FAERS database—which consists of adverse event reports submitted to the FDA by drug manufacturers, consumers, and health care professionals—supports their allegations that Vesivirus exposure may cause hematological cancer. SAC ¶ 82. However, the FAERS database explicitly cautions that mere inclusion of an adverse event report in the database does not establish causation. *See* Questions and Answers on FDA's Adverse

*See id.* ¶¶ 1, 2, 4–6, 8, 9, 11–15, 17, 18, 20.  Plaintiffs' "claim[s] of potential future injury [are] simply too hypothetical or conjectural to establish Article III standing."  *Fruit Juice*, 831 F. Supp. 2d at 511.  As such, plaintiffs' claims based on future harm should be dismissed.

> ### D.     Plaintiffs' Allegations of Spending More than $200,000 for Allegedly Defective Fabrazyme Do Not Give Rise to Standing

For all of the same reasons, plaintiffs also lack standing to bring claims based on allegedly paying "$200,000 for medically worthless Fabrazyme" and "additional money in co-pays."  SAC ¶¶ 1, 2, 5, 6, 8, 9, 11–15, 17, 18, 20, 22, 24; *see also id.* ¶ 4 (plaintiff Britton claiming "$80,000 for medically worthless Fabrazyme").  Without more, allegations of "economic injury" do not give rise to standing.  *See Fruit Juice*, 831 F. Supp. 2d at 512; *Rivera v. Wyeth-Ayerst Lab'ys.*, 283 F.3d 315, 319 (5th Cir. 2002) ("Merely asking for money does not establish an injury in fact.").  In particular, "[a]bsent any allegation that [plaintiffs] received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably expect, [plaintiffs] ha[ve] not demonstrated a concrete injury-in-fact."  *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010).  As explained above, plaintiffs have not plausibly alleged that "defective" Fabrazyme caused them any specific and cognizable injury or that Fabrazyme actually was

---

Event Reporting System (FAERS), https://www.fda.gov/drugs/surveillance/questions-and-answers-fdas-adverse-event-reporting-system-faers ("FDA does not require that a causal relationship between a product and event be proven, and reports do not always contain enough detail to properly evaluate an event.").  FAERS states: (1) "[s]ubmission of a safety report does not constitute an admission that . . . [a] manufacturer or product caused or contributed to the event"; (2) "this surveillance system has limitations, including the potential submission of incomplete, inaccurate, untimely, unverified information"; and (3) "FAERS data alone cannot be used to establish rates of events, [or] evaluate a change in event rates over time . . . [t]he number of reports cannot be interpreted or used in isolation to reach conclusions about the existence, severity, or frequency of problems associated with drug products."  FDA Adverse Events Reporting System (FAERS) Public Dashboard https://fis.fda.gov/sense/app/d10be6bb-494e-4cd2-82e4-0135608ddc13/sheet/7a47a261-d58b-4203-a8aa-6d3021737452/state/analysis.  Likewise, an "Assessment report on the shortage of Fabrazyme" cannot establish causation, as the report itself notes that "[a] subgroup of patients seems to be doing well on the lower Fabrazyme dose," "not all changes in dosage have been reported to the Fabry Registry and changes in the average reported dose may not accurately reflect patients' actual treatment regimens," and the data may reflect "reporting biases, the limitations of spontaneous reporting and the small number of reports."  *See* SAC ¶ 123 (citing Assessment Report on the Shortage of Fabrazyme, https://www.ema.europa.eu/en/documents/other/chmp-public-assessment-report-shortage-fabrazyme_en.pdf).

contaminated with Vesivirus. Moreover, Fabrazyme "ha[s] not been recalled, ha[s] not caused any reported injuries, and do[es] not fail to comply with any federal standards." *See Fruit Juice*, 831 F. Supp. 2d at 512. Thus, plaintiffs "are unable to show that *any* actual harm resulted from consumption of" Fabrazyme, and accordingly, "their allegation of 'economic' injury lacks substance." *Id.* Plaintiffs cannot rely on allegedly "paying over $200,000 for medically worthless Fabrazyme" to establish standing. *See* SAC ¶¶ 1, 2, 5, 6, 8, 9, 11–15, 17, 18, 20, 22, 24.

## V. PLAINTIFFS FAIL TO PLEAD FRAUD WITH PARTICULARITY AS REQUIRED BY THE HEIGHTENED PLEADING STANDARDS OF RULE 9(B)

All claims in the SAC concerning the safety and efficacy of Fabrazyme purportedly "contaminated" with Vesivirus from either the Allston or Framingham facilities, *see, e.g.*, *id.* ¶¶ 49, 70–71, 351, as well as all claims concerning "low dose" Fabrazyme from the Allston facility, *see, e.g.*, *id.* ¶¶ 351, 362, are grounded in allegations of fraudulent, misleading, or deceptive conduct by Genzyme. Those claims therefore must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13, 15 (1st Cir. 2009) ("Rule 9(b)'s heightened pleading standard applies to state law fraud claims asserted in federal court," and the First Circuit "reads Rule 9(b) expansively to cover associated claims where the core allegations effectively charge fraud."). To satisfy Rule 9(b), plaintiffs were required to "state with particularity the circumstances constituting fraud or mistake," *see* Fed. R. Civ. P. 9(b), including by setting out "the who, what, where, and when of the allegedly false or fraudulent representation," *see Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004); *Kiah v. Aurora Loan Servs.*, LLC, No. 10-cv-40161, 2011 WL 841282, at *5 (D. Mass. Mar. 4, 2011) (explaining plaintiffs must "[a]t a minimum . . . allege the time, place and contents of the alleged misrepresentation, as well as the identity of the person making them" (quoting *Petricca v. Simpson*, 862 F. Supp. 13, 15–16 (D.

Mass. 1994))).  In addition, "Rule 9(b) requires not only specifying the false statements and by whom they were made but also identifying the basis for inferring scienter."  *See Cardinale,* 567 F.3d at 13.  To plead scienter, plaintiffs must allege "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading."  *Id.*  "'[A] general averment of the defendant's 'knowledge' of material falsity' [is] insufficient."  *Britton v. Marcus, Errico, Emmer & Brooks, P.C.*, No. 18-cv-11288, 2020 WL 7024545, at *3 (D. Mass. Nov. 30, 2020) (quoting *Cardinale*, 567 F.3d at 13).

*First*, plaintiffs' allegations that they received Fabrazyme purportedly "contaminated" with Vesivirus from both the Allston and Framingham facilities are grounded in fraud but fail to meet the heightened pleading standards of Rule 9(b).  *See, e.g.*, SAC ¶ 351 (alleging Genzyme "hid the danger of Vesivirus infected Fabrazyme," "expressly and impliedly misrepresent[ed] that injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, . . . and further conceal[ed] previously published medical literature rendering such statements regarding medical safety of Vesivirus injection as false").  With respect to each set of claims, Plaintiffs allege that Genzyme "intentionally sold Vesivirus contaminated Fabrazyme . . . without warning and without [plaintiffs'] knowledge," all the while concealing the risks, *id.* ¶¶ 70–71, told patients that allegedly "contaminated" Fabrazyme "was safe to be injected into human beings, which it *internally knew was false and misleading*," *id.* ¶ 49 (emphasis added), and "expressly and impliedly misrepresent[ed]" that "Vesivirus-containing Fabrazyme" was "harmless, non-immunogenic, [and] without impact on the efficacious treatment of Fabry disease."  *See id.* ¶¶ 351, 362, 366, 370, 377, 383, 387, 391, 397, 401, 405, 409, 413, 417, 434, 438.

However, plaintiffs do not allege any actual factual support for these conclusions and are

silent as to when, where, and how the purported fraud occurred. *See Synopsys*, 374 F.3d at 29; *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985) ("[M]ere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated."). In fact, as explained in Part IV.B *supra*, plaintiffs do not even plausibly allege that Fabrazyme product was actually contaminated with Vesivirus. Instead, in connection with the allegations concerning the Allston facility, plaintiffs simply assert that there was a Vesivirus contamination somewhere at the facility, SAC ¶¶ 42, 47, and rely on a Boston.com article that cannot be plausibly read to suggest any Fabrazyme actually was contaminated with Vesivirus. *See* SAC ¶ 55; Ailworth & Weisman, Boston.com. Likewise, as for the allegations concerning the Framingham facility, plaintiffs refer to "positive [PCR] test results" in unspecified locations at the facility from an unnamed "former Genzyme Corporation scientist" but do not allege that those tests detected Vesivirus in Fabrazyme product. SAC ¶ 64. Plaintiffs thereby accuse Genzyme of fraudulent concealment of the alleged Vesivirus contamination of the Fabrazyme product and intentionally misleading behavior without elaboration. *See, e.g.*, *id.* ¶¶ 70–71 (alleging Genzyme "intentionally sold Vesivirus contaminated Fabrazyme"); *id.* ¶ 49 (alleging Genzyme "internally knew" its statements about the safety of Fabrazyme were "false and misleading").

At times, plaintiffs even selectively use the passive voice—leaving the Court to guess who committed the alleged acts. *See, e.g.*, *id.* ¶ 69 ("The FDA and Department of Justice *were not informed* of the Framingham test results."); *id.* ¶ 70 ("The 2013 and 2015 Vesivirus contaminated Fabrazyme *was distributed* to all U.S. Fabry patients without warnings and without their knowledge."). In this regard, plaintiffs' pleading failures are comparable to those in *Juarez v. Select Portfolio Servicing, Inc.*, wherein the First Circuit held that plaintiff failed to meet the

heightened pleading requirements of Rule 9(b) because her complaint was "devoid of th[e] specifics." *See* 708 F.3d 269, 280 (1st Cir. 2013). The Court explained that "establishing that something *possibly* happened is far distant from the threshold particularity requirements that must be pled under Fed. R. Civ. P. 9(b)." *Id.* ("Much more would be required, for example, in the way of allegations regarding [plaintiff's] reliance on defendants' allegedly false statements," and "[m]ore could also be alleged concerning who she was in contact with, when and what was said to her in the alleged misrepresentations."). The same reasoning applies here. Plaintiffs provide nothing more than conclusory allegations regarding the *possibility* of Fabrazyme contamination and subsequent concealment, but their allegations are entirely "devoid of th[e] specifics" required by Rule 9(b). *See id.*

*Second*, every claim concerning the safety and efficacy of "low dose" Fabrazyme treatment (not just Counts XX and XXI[18]) is grounded in alleged fraudulent and deceptive conduct by Genzyme. *See, e.g.*, SAC ¶ 107 ("Genzyme Corporation intentionally avoided warning patients that the therapeutic window for 'low dose' Fabrazyme was effectively non-existent and the risk of sensitization and acceleration of disease was increased"); *id.* ¶ 351 (alleging Genzyme "affirmatively hid the dangers of 'low dose' Fabrazyme when there was a duty to speak"); *id.* ¶ 362 (alleging Genzyme "expressly and impliedly misrepresent[ed]" the dangers of taking a "'low dose' of Fabrazyme"). Yet, plaintiffs offer only conclusory, irrelevant, and wholly unsupported allegations in contending that Genzyme misrepresented the safety and efficacy of low dose Fabrazyme, thereby failing to meet the pleading requirements of Rule 9(b). *See id.* ¶¶ 145–47,

---

[18] For the very first time in the history of this and all related litigation, the SAC brings claims entitled "Fraud" and "Fraudulent Concealment" at Counts XX and XXI. SAC ¶¶ 441–57, 458–71; *see also id.* ¶¶ 128–340. Counts XX and XXI purport to assert claims based on the receipt of low doses of Fabrazyme following the 2009 Allston contamination. As explained above in Part II *supra*, those fraud claims have a two-year limitations period, began to accrue at least by 2009 (when plaintiffs were aware of or could have discovered their injury), and expired by 2011. *See* Ind. Code §§ 34-20-3-1(b)(1), 34-20-1-1. Accordingly, Counts XX and XXI should be dismissed as untimely.

185 (concluding, without any supporting factual allegations, that Genzyme "knew" low dose Fabrazyme was unsafe and ineffective); *see also Cardinale*, 567 F.3d at 13; *Synopsys*, 374 F.3d at 29–30 (affirming dismissal under Rule 9(b) where, "[d]espite the fervor with which [plaintiff] denounced [defendant's] treachery, it did not provide any details as to who allegedly uttered the misleading statements, to whom they were made, where they were made, when they occurred, and what actions they engendered"); *Holland v. Select Portfolio Servicing, Inc.*, 299 F. Supp. 3d 271, 275 (D. Mass. 2018) (holding plaintiff failed to state fraud claim because, among other things, she failed to "allege any facts from which the court can conclude that [defendants] made knowingly false statements").  For example, plaintiffs allege that, in an update to physicians, Genzyme improperly relied on a study that did not provide evidence of the safety of lower doses of Fabrazyme. *See, e.g.*, SAC ¶¶ 207, 243–49, 292.  But, in referencing the study, Genzyme's update plainly cautions, "[t]here is limited evidence in the literature on the use of Fabrazyme at doses lower than the recommended 1mg/kg biweekly."  *See* Jones Decl., Exhibit D (Revised Guidance to the U.S. Fabry Community:  Management of Fabrazyme® (agalsidase beta for injection) Supply (Sept. 2009)).  Plaintiffs' vague and unsupported allegations are insufficient to plead fraud with particularity under Rule 9(b).

In sum, plaintiffs offer no factual allegations whatsoever to support their allegations that Genzyme knew Fabrazyme product was contaminated with Vesivirus, knew that low dose Fabrazyme was ineffective or unsafe, or intentionally hid that information from plaintiffs or anyone else.  Accordingly, each of plaintiffs' claims concerning the safety and efficacy of allegedly contaminated Fabrazyme from the Allston facility, the safety and efficacy of allegedly contaminated Fabrazyme from the Framingham facility, and the safety and efficacy of low dose Fabrazyme from the Allston facility must be dismissed for failure to plead fraud with sufficient

particularity.[19]  *See, e.g.*, *Wajda v. R.J. Reynolds Tobacco Co.*, 103 F. Supp. 2d 29, 33 (D. Mass. 2000) (dismissing because "complaint provides no details as to whether, or how, the plaintiff came to rely detrimentally on material misstatements or omissions," "especially as it may pertain to the plaintiff's own use of" the allegedly harmful product); *Hayduk*, 775 F.2d at 444 (affirming dismissal as "allegations of fraud" and "conditions of mind" were "too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated").[20]

## VI.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER RULES 8 AND 12(B)(6)

Plaintiffs' allegations fail for the independently sufficient reason that they do not state a claim as required by Federal Rules of Civil Procedure 8 and 12(b)(6).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The allegations must be more than speculative, and "conclusory statements[] do not suffice."  *Id.*  Courts will not credit "'bald assertions, unsupportable conclusions, and opprobrious epithets' woven into the

---

[19] The SAC adds a "Specific Allegations of Fraud" section that merely copies and pastes more than 200 paragraphs regarding the 2009 contamination at the Allston facility from the fourth amended complaint in *Schubert* without offering facts to support their fraud allegations or "identifying the basis for scienter."  *See Cardinale*, 567 F.3d at 13; SAC ¶¶ 128–340.  While plaintiffs devote most of those new paragraphs to averring that Genzyme intentionally extended the length of the Fabrazyme shortage, those allegations have no bearing on plaintiffs' claims regarding the safety and efficacy of (1) the allegedly Vesivirus-contaminated Fabrazyme or (2) Fabrazyme at low dosages. Moreover, those allegations are irrelevant as Genzyme had no "duty to supply the market with Fabrazyme," and any failure to disclose could not have been the proximate cause of plaintiffs' injuries.  *Hochendoner*, 95 F. Supp. 3d at 25. Likewise, allegations that Genzyme sold Fabrazyme in other markets, competed with other drugs, or manufactured other products have no bearing on plaintiffs' allegations of misrepresentations concerning safety and efficacy of low dose Fabrazyme.  Besides, to the extent that plaintiffs seek to insinuate that Genzyme could have predicted the Vesivirus contamination at its Allston facility and resulting shortages of Fabrazyme, this argument is a bridge too far. Plaintiffs cannot allege fraud with the benefit of hindsight by contending that Genzyme should have predicted future events.  *See, e.g., Cardinale*, 567 F.3d at 14.  Finally, plaintiffs' "Specific Allegations of Fraud" do not include any allegations regarding the alleged particulate contamination at either the Framingham or Allston facilities or the alleged Vesivirus contaminations at the Framingham facility.

[20] Moreover, plaintiffs' "fraud claim is, at bottom, a failure to warn claim," and as explained in Part VI.O *infra*, "is preempted expressly by" federal law.  *King v. Collagen Corp.*, 983 F.2d 1130, 1136 (1st Cir. 1993).

fabric of the complaint." *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003) (quoting *Chongris v. Bd. of Appeals*, 811 F.2d 36, 37 (1st Cir. 1987)).

Plaintiffs fail to state a claim as they have not plausibly alleged that specific conduct by Genzyme—rather than the natural progression of their Fabry disease—caused any of their injuries. *See A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 82 (1st Cir. 2013) ("The superficiality of the causation allegation, coupled with the speculative nature of the claim as a whole, makes manifest that the plaintiffs have failed to plead a plausible cause of action."). If a complaint's allegations give rise to an "obvious alternative explanation," then the complaint "stops short of the line between possibility and plausibility of 'entitle[ment] to relief.'" *Twombly*, 550 U.S. at 557, 567 (citation omitted). Because Genzyme has no duty to supply the market with Fabrazyme, the natural progression of plaintiffs' disease during low dose treatment cannot give rise to a claim. *See Hochendoner*, 823 F.3d at 730 (explaining that many of plaintiffs' claims "were ineffective due to reliance on the notion, debunked by the district court, that Genzyme had a duty to supply the market with Fabrazyme"); *Lacognata v. Hospira, Inc.*, No. 12-cv-822, 2012 WL 6962884, at *2 (M.D. Fla. July 2, 2012) ("There is no authority that supports Plaintiff's argument that a drug manufacturer . . . has a duty to continue supplying a patient with a drug that it knows the patient relies upon for his or her medical health."), *aff'd*, 521 F. App'x 866 (11th Cir. 2013).

As in *Hochendoner*, plaintiffs have not plausibly alleged that their injuries were due to Genzyme's conduct—rather than mere return of Fabry disease symptoms during low dose treatment.[21] Thus, they have not pled a "direct harm" due to Genzyme's conduct. *Hochendoner*,

---

[21] In assessing the sufficiency of plaintiffs' state law claims, the Court should apply Indiana choice of law analysis, and as a result, Massachusetts law governs the state law claims. *See AER Advisors*, 921 F.3d at 289 (citing *Erie*, 304 U.S. at 78). "[I]n tort cases Indiana choice-of-law analysis . . . involves multiple inquiries. As a preliminary matter, the court must determine whether the differences between the laws of the states are 'important enough to affect the outcome of the litigation.'" *Simon v. United States*, 805 N.E.2d 798, 804–05 (Ind. 2004) (quoting *Hubbard Mfg. Co. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind. 1987)). Where, as here, "such a conflict exists, the presumption is that the traditional *lex loci delicti* rule (the place of the wrong) will apply." *See id.* at 805. "Under this rule, the court applies

95 F. Supp. 3d at 24–25 (dismissing claims that "symptoms of their disease returned due to lack of sufficient medication" as plaintiffs failed to "indicate that the acceleration was something more than the return of the life threatening symptoms that occur when Fabry disease goes untreated"); *id.* at 25–26 (dismissing claims concerning alleged particulate contaminants because "Plaintiffs have identified neither an injury that resulted from the particulates nor those who allegedly suffered from it" as they did not "allege that any particular Plaintiff or Plaintiffs were injected with the contents of contaminated vials of Fabrazyme® or were otherwise harmed by those contaminants" and "they do not allege that any direct harm to patients flowed from the contaminants").

Plaintiffs instead use the phrase "defective Fabrazyme" throughout the SAC to allege "*combined* injuries from improperly dosed Fabrazyme containing Vesivirus, and glass, rubber, and steel particles," without distinction.   SAC ¶¶ 121–27 (emphasis added).   They also allege "progression" and "exacerbation" of their Fabry disease in unison, making it impossible to discern whether their alleged symptoms are due to inactionable progression of their Fabry disease symptoms during the low dose treatment or due to some separate harm made worse by any of Genzyme's alleged conduct.   *See, e.g., id.* ¶ 1 (alleging "Plaintiff's clinical status has deteriorated as the Fabry disease has accelerated due to the defective Fabrazyme treatment *as evidenced by the occurrence, progression, and exacerbation* of at least the following injuries, symptoms, and diagnostic criteria . . ." and "Plaintiff's life expectancy has been shortened due to taking 'low dose' Fabrazyme" (emphasis added)); *id.* ¶ 4 (alleging harm "[d]ue to the progression of untreated

---

the substantive laws of the 'state where the last event necessary to make an actor liable for the alleged wrong takes place.'"  *Id.* (quoting *Hubbard*, 515 N.E.2d at 1073).  Here, Massachusetts is the place of the purported wrong because it is "the state where the last event necessary to make an actor liable for the alleged wrong" supposedly occurred.  *See id.* (quoting *Hubbard*, 515 N.E.2d at 1073–74); *Hubbard*, 515 N.E.2d at 1073 (explaining if the location of the wrong is "insignificant to the action," courts should also consider other factors, including "1) the place where the conduct causing the injury occurred; 2) the residence or place of business of the parties; and 3) the place where the relationship is centered").  Accordingly, Massachusetts law applies to the substantive state law claims.  Yet, for Counts I through IV, Genzyme also completes the analysis of plaintiffs' claims as to plaintiffs' state of alleged citizenship, to the extent the laws of those states apply to these counts.

Fabry" and Genzyme's alleged "refus[al] to sell Fabrazyme to her at any dose until 2011"); *id.* ¶¶ 352, 359–60, 363–64, 367–68, 371, 378, 384–85, 392, 398–99, 402–03, 406–07, 410–11, 414–15, 418–19, 423, 435–36, 439–40 (grouping together Genzyme's alleged conduct and contending, "[a]s a direct and proximate result . . . Plaintiffs have sustained, or are at imminent risk of sustaining" in the future or "have suffered damages"). By plaintiffs' own admission, their alleged "acceleration" injuries are bound up with (*i.e.*, "evidenced by") the mere occurrence and progression of their underlying Fabry disease. Plaintiffs' claims therefore fail for the very same reasons provided by this Court in *Hochendoner*. *See Hochendoner,* 95 F. Supp. 3d. at 29–34. All claims should be dismissed for these reasons as well as the pleading deficiencies described below.

## A.   Plaintiffs Fail to Plead Claim for Negligence (Count I)

All of plaintiffs' negligence claims should be dismissed because, as discussed above, plaintiffs have not plausibly alleged that any particular purported Fabrazyme "defect" was the proximate cause of their injuries.[22] *See Dusoe v. Mobil Oil Corp*, 167 F. Supp. 2d 155, 163 (D. Mass. 2001) (dismissing plaintiffs' claims of negligence for failing to establish causation).

Plaintiffs also incorrectly conflate negligence with allegations of "recklessness" and "willful, and wanton conduct." SAC ¶¶ 351–52. The Supreme Judicial Court of Massachusetts has explained: "Our recent practice has been simply to refer to reckless conduct as constituting the conduct that produces liability for what the court has traditionally called wilful, wanton, or reckless conduct," and "reckless conduct involves a degree of risk and a voluntary taking of that

---

[22] Plaintiffs further contend that Fabrazyme was "in contravention to the individual state statutes protecting Plaintiffs from adulterated or misbranded drugs" because "the dosages being shipped were not in compliance . . . with the required labeling at the time the drug left the control of the manufacturer or seller." SAC ¶ 351(s); *see also id.* ¶ 377(t). *First*, these allegations fail because, as described above, plaintiffs have not pled proximate causation. *Second*, plaintiffs' allegations are implausible and "conclusory legal allegations (which need not be credited)" given that the Fabrazyme product shipped by Genzyme included the FDA-approved label with FDA-approved dosage instructions. *See* SAC ¶ 91 (referring to FDA-approved dosing instructions in FDA-approved Fabrazyme label on product received by plaintiffs); *A.G. ex rel. Maddox*, 732 F.3d at 80 (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)).

risk so marked that, compared to negligence, there is not just a difference in degree but also a difference in kind." *See Sandler v. Commonwealth*, 644 N.E.2d 641, 643–44 (Mass. 1995) (stating recklessness is more difficult to establish than negligence because "reckless conduct must be based on a high degree of risk that death or serious bodily injury will result from a defendant's action or inaction *when under a duty to act*" (emphasis added) (citations omitted)).  Because plaintiffs failed to plausibly allege that any purported Fabrazyme "defect" was the proximate cause of their injuries or that Genzyme had a duty to supply the market with Fabrazyme, their allegations of "recklessness" and "willful, and wanton conduct" must be dismissed.[23]

### B.   Plaintiffs Fail to Plead Claim for Negligence *Per Se* (Count II)

Plaintiffs' claims for negligence *per se* fail for the same reason that plaintiffs' negligence claims fail—plaintiffs have not alleged that any regulatory or statutory violation by Genzyme was the proximate cause of their injuries.  *See Benedict v. Hankook Tire Co.*, 286 F. Supp. 3d 785, 799 (E.D. Va. 2018) (dismissing negligence *per se* claim for failing to explain how the alleged regulatory violation was a proximate cause of the accident); *Lawrence v. Sofamor, S.N.C.*, No. 95-cv-1507, 1999 WL 592689, at *6 (N.D.N.Y. Aug. 2, 1999) (dismissing claim for failing to allege defendants' negligence *per se* proximately caused plaintiff's injury).[24]

In addition, plaintiffs' negligence *per se* claims fail for the following reasons.  *First*, Massachusetts does not recognize plaintiff James Bishop's negligence *per se* claim independent from a general negligence claim.  *See Deutsche Lufthansa AG v. Mass. Port Auth.*, No. 17-cv-11702, 2018 WL 3466938, at *2 (D. Mass. July 18, 2018) ("The Supreme Judicial Court has

---

[23] Likewise, all of plaintiffs' other Counts based on negligence fail for the same reasons.  In fact, this Court previously dismissed plaintiffs' similar claims of negligence, concluding that Genzyme did not have a duty to manufacture Fabrazyme to meet market demand.  *See Hochendoner*, 95 F. Supp. 3d at 30–31.

[24] This Court previously dismissed plaintiffs' similar negligence *per se* claims, concluding that Genzyme did not have a duty to manufacture Fabrazyme to meet market demand.  *See Hochendoner*, 95 F. Supp. 3d at 30–31.

repeatedly affirmed the principle that negligence per se does not exist as a cause of action independent from a general negligence action because violation of [a] statute can only be some evidence of the defendant's negligence" (citation omitted)). *Second*, Pennsylvania does not recognize the claims of plaintiffs George Demko and Michael Masula for negligence *per se* independent of negligence. *See Klein v. Com. Energy, Inc.*, 256 F. Supp. 3d 563, 596 (W.D. Pa. 2017); *Ramsey v. Summers*, No. 10-cv-829, 2011 WL 811024, at *2 (W.D. Pa. Mar. 1, 2011). *Third*, Florida, Nevada, and North Carolina law prohibit plaintiffs Thomas Stanziano, Toni Cordova, John Cortina, and James Matthews from pursuing their negligence *per se* claims predicated on the federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 355. *Compare* Am. Compl. ¶ 135(p) (alleging violation of FDCA), *with* SAC ¶ 351(r) (alleging "Defendant violated the following statutes, giving rise to negligence per se" without explicit reference to any statutes because plaintiffs had the opportunity to preview Genzyme's correct interpretation of Florida, Nevada, and North Carolina law in the prior round of motion to dismiss briefing). *See also Rounds v. Genzyme Corp.*, No. 10-cv-2479, 2010 WL 5297180, at *3 (M.D. Fla. Dec. 20, 2010); *Pantages v. Cardinal Health 200, Inc.*, No. 08-cv-116, 2009 WL 2244539, at *2 (M.D. Fla. July 27, 2009); *Miller v. DePuy Spine, Inc.*, 638 F. Supp. 2d 1226, 1231 (D. Nev. 2009); *Baraukas v. Danek Med., Inc.*, No. 97-cv-613, 2000 WL 223508, at *4 (M.D.N.C. Jan. 13, 2000).

### C.     Plaintiffs' Strict Liability Claims Fail as a Matter of Law (Count III)

Plaintiffs' claims for strict liability also should be dismissed because, as discussed above, plaintiffs have failed to adequately plead that any purported Fabrazyme "defect," or that Genzyme's alleged failure to warn about such defects, was the proximate cause of their injuries. *See* SAC ¶ 358(a)–(f). To establish a prima facie case of strict tort liability, the plaintiff must allege "that the product was in a defective condition unreasonably dangerous to the consumer [and] that the defect caused an injury for which compensation was sought." 72A C.J.S. Products

Liability § 7 (2021); *see also Dunham v. Covidien LP*, No. 19-cv-2851, 2019 WL 6341179, at *2 (S.D.N.Y. Nov. 27, 2019) (dismissing strict liability defective manufacture claim for failing to plausibly allege either a manufacturing defect or the exclusion of other possible causes of plaintiff's injuries); *Quintana v. B. Braun Med. Inc.*, No. 17-cv-6614, 2018 WL 3559091, at *6 (S.D.N.Y. July 24, 2018) (holding that plaintiff failed to state a claim as she did not plausibly allege that defendant's failure to warn caused her injuries); *Dimieri v. Medicis Pharm. Corp.*, No. 14-cv-176, 2014 WL 3417364, at *4–5 (M.D. Fla. July 14, 2014) (dismissing plaintiff's claim of strict liability for failing to make a sufficient causal connection between the allegedly defective product and his injury).  Count III should be dismissed on this basis alone.

Separately, plaintiffs' strict liability claims based on Genzyme's alleged failure to warn are preempted by federal law.  *See* SAC ¶ 358(a), (e).  Impossibility preemption arises when it is "impossible for a private party to comply with both state and federal requirements."  *Mut. Pharm. Co., v. Bartlett*, 570 U.S. 472, 480 (2013) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)).  The federal FDCA governs warnings on pharmaceutical products, and federal law generally preempts brand drug manufacturers from issuing warnings outside of what is on a product's label after approval by the FDA.  *See Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 660 (S.D.N.Y. 2017).  Under the federal Changes Being Effected ("CBE") regulation, unilateral changes can be made to a medication's label to add or strengthen a contraindication, warning, precaution, or adverse reaction *only* when the changes are based on "newly acquired information."  21 C.F.R. § 314.70(c)(6)(iii).  Such "newly acquired information must provide 'reasonable evidence of a causal association' of a 'clinically significant adverse reaction[]' to a drug." *Klein v. Bayer Healthcare Pharm. Inc.*, No. 18-cv-1424, 2019 WL 3945652, at *5 (D. Nev. Aug. 21, 2019) (quoting 21 C.F.R. § 201.57(c)(6)(i)).

Accordingly, under federal law, Genzyme could not have issued any additional warnings beyond those already on the product label. Any allegation of "newly acquired information" would be based on plaintiffs' same conclusory allegations that fail to connect any particular Fabrazyme "defect" to any particular harm.[25] *See McGee v. Boehringer Ingelheim Pharm., Inc.*, No. 16-cv-2082, 2018 WL 1399237, at *5 (N.D. Ala. Mar. 20, 2018) (dismissing state law failure-to-warn claim where "the complaint at best contains ambiguity about the newly-available data that [manufacturer] had or should have had after [medication's] approval and before [plaintiff's] injury"); *see also Utts*, 251 F. Supp. 3d at 673; *Klein*, 2019 WL 3945652, at *5. Plaintiffs' failure-to-warn claims are thus preempted under federal law and should be dismissed.[26]

In addition, plaintiffs' strict liability claims fail for the following reasons. *First*, Massachusetts law does not recognize the strict tort liability claim of plaintiff James Bishop separate from liability for breach of warranty under the Uniform Commercial Code. *See Carrozza v. CVS Pharmacy, Inc.*, 391 F. Supp. 3d 136, 147 (D. Mass. 2019). *Second*, Pennsylvania precludes the claims of plaintiffs George Demko and Michael Masula for strict liability involving prescription medications. *See Parkinson v. Guidant Corp.*, 315 F. Supp. 2d 741, 747–48 (W.D. Pa. 2004) (citing *Hahn v. Richter*, 673 A.2d 888, 890–91 (Pa. 1996)). *Third*, North Carolina and Virginia do not recognize the strict product liability claims of plaintiffs James Matthews, D.J.,

---

[25] Plaintiffs cite *Wyeth v. Levine,* 555 U.S. 555 (2009), for the proposition that "Genzyme Corporation did not, and still has not, changed the label in the U.S. to reflect the clinically observed dangers of 'low dosing' as required under the Supreme Court ruling in *Wyeth v. Levine*." SAC ¶¶ 100, 135. But *Wyeth's* holding is inapposite. In *Wyeth*, plaintiff brought state law claims for defective Phenergan labeling after suffering gangrene and an amputation. 555 U.S. at 559. Plaintiff also presented evidence of at least 20 other adverse events prior to her injury in which a Phenergan injection caused gangrene and amputation. *Id.* at 569. Thus, the Court held that plaintiff's state law claims were not preempted because Wyeth could have strengthened its warnings in Phenergan's FDA-approved label pursuant to the CBE regulation without violating the FDCA. *Id.* at 569-73. *Wyeth's* holding does not apply here because plaintiffs do not plausibly allege that Genzyme had any "newly acquired information" regarding the safety and efficacy of low dose Fabrazyme. *See id.* at 569 (quoting 73 Fed. Reg. 49604).

[26] Likewise, plaintiffs' other Counts based on strict liability fail for the same reasons. In fact, this Court previously dismissed plaintiffs' similar claims of strict liability, concluding that Genzyme did not have a duty to manufacture Fabrazyme to meet market demand. *See Hochendoner*, 95 F. Supp. 3d at 30–31.

Sydney Johnson, and Damon LaForce. *See e.g.*, N.C. Gen. Stat. § 99B-1.1; *Harris v. T.I. Inc.*, 413 S.E. 2d 605, 609-10 (Va. 1992).

### D.      Plaintiffs' Claims for Breach of Warranty Fail as a Matter of Law (Count IV)

Plaintiffs' claims for breach of express and implied warranties also fail as a matter of law. As discussed above, plaintiffs have not alleged that any breach of warranty caused their injuries. *See* 77A C.J.S. Sales § 484 (2020) (explaining breach of warranty claim requires "allegations of fact stating in what respect any warranty was breached and that any breach was a proximate cause of the injury"); *see also Jackson v. Johnson & Johnson & Janssen Pharms., Inc.*, 330 F. Supp. 3d 616, 627 (D. Mass. 2018) (explaining "plaintiff must demonstrate that the defendant promised a specific result and that defendant failed to deliver on his promise and, therefore, breached the express warranty" (citation omitted)); *U.S. Automatic Sprinkler Co. v. Reliable Automatic Sprinkler Co.*, 719 F. Supp. 2d 1020, 1027 (S.D. Ind. 2010) ("The plaintiff may not recover for breach of an implied warranty where the evidence shows that there are several possible causes of the plaintiff's injury, and for at least one of these possible causes the defendant is not responsible, and it is just as reasonable and probable that the injury was the result of one cause or the other" (citation omitted)). Count IV should be dismissed on this basis alone.

Further, plaintiffs failed to allege any express or implied warranty was made in the first place. Plaintiffs contend that, through the Fabrazyme product label, Genzyme expressly warranted that "Fabrazyme reduces globotriaosylceramide deposition" and is "indicated for use to treat Fabry disease"—even though such claims were not tested or approved for the "low dose." SAC ¶ 362(a)–(b). But the Fabrazyme label never made such claims for lower or reduced dose Fabrazyme, nor does the label state that Fabrazyme would be as effective at lower or less frequent doses. Indeed, as this Court explained in *Hochendoner* in dismissing similar claims, "Plaintiffs ignore that immediately following these lines in the package insert are dosing directions, indicating the dosage

at which the FDA has approved Fabrazyme® and in the context of which the 'Indications and Usage' statement must be read." *Hochendoner*, 95 F. Supp. 3d at 32. "The mere existence of the first two lines on the FDA package insert does not create a plausible claim that Genzyme made any express warranty regarding the efficacy of Fabrazyme® at a lower dosage." *Id.*

Plaintiffs' other claims of express and implied warranty similarly fail because they are either implausible or entirely conclusory. Plaintiffs allege that Genzyme "expressly and impliedly warrant[ed]" and "misrepresent[ed]" that "a 'low dose' of Fabrazyme was approved for use by the FDA and efficacious for use in the treatment of Fabry disease" and that "injection with Vesivirus-containing Fabrazyme is harmless, non-immunogenic, [and] without impact on the efficacious treatment of Fabry disease with Fabrazyme." SAC ¶ 362(n)–(q). However, plaintiffs do not allege how Genzyme expressly or impliedly made those warranties, and such conclusory allegations cannot support breach of warranty claims under the laws of any relevant state.[27] As in *Hochendoner*, these allegations "too fail[] to pass the plausibility test." *Hochendoner*, 95 F. Supp. 3d at 32. "Plaintiffs do not allege that Genzyme ever intimated that the lower dosage would be as efficacious in treating Fabry disease as the recommended one" nor do they "allege that any Plaintiff believed that the lower dose would work as well." *Id.* "Instead, Plaintiffs depend on the mere fact that the amount available was limited and that patients could not access the doses and amounts recommended and approved by the FDA." *Id.* The Court similarly should reject such allegations.[28]

---

[27] *See Cont'l 332 Fund, LLC v. Albertelli*, No. 17-cv-41, 2018 WL 839318, at *7 (M.D. Fla. Feb. 13, 2018); *Maxwell v. Remington Arms Co.*, No. 1:10-cv-918, 2014 WL 5808795, at *3–4 (M.D.N.C. Nov. 7, 2014); *Kester v. Zimmer Holdings, Inc.*, No. 10-cv-523, 2010 WL 2696467, at *10 (W.D. Pa. June 16, 2010); *Fentress Families Tr. v. Va. Elec. & Power Co.*, Nos. CL09-710, CL09-1914, 2010 WL 7765113, at *7 (Va. Cir. Ct. July 29, 2010); *Miller*, 638 F. Supp. 2d at 1229–30; *Bichler v. Willing*, 397 N.Y.S.2d 57, 58 (N.Y. App. Div. 1977); *accord Iannacchino v. Ford Motor Co.*, 888 N.E.2d 879, 888-89 (Mass. 2008).

[28] Likewise, plaintiffs' other Counts based on breach of warranty fail for the same reasons.

In addition, plaintiffs' breach of warranty claims fail for the following reasons. *First*, Pennsylvania bars the claims of plaintiffs George Demko and Michael Masula for breach of implied warranty regarding prescription medications. *See Kester*, 2010 WL 2696467, at *11; *Soufflas v. Zimmer, Inc.*, 474 F. Supp. 2d 737, 751–52 (E.D. Pa. 2007) (finding implied warranties of merchantability and fitness do not apply to prescription drugs); *Parkinson*, 315 F. Supp. 2d at 752–53. Further, plaintiffs did not provide the notice required under Pennsylvania law to Genzyme of their alleged breach of warranties before filing suit. *See, e.g.*, *Am. Fed'n of State Cnty. & Mun. Emps. v. Ortho-McNeil-Janssen Pharm., Inc.*, No. 08-cv-5904, 2010 WL 891150, at *6 (E.D. Pa. Mar. 11, 2010) (a buyer must "within a reasonable time after he discovers or should have discovered any breach notify the seller of [the] breach or be barred from any remedy" (citation omitted)). *Second*, the claims of plaintiff Thomas Stanziano should be dismissed because there is no privity between the parties as required by Florida law. *See Dimieri*, 2014 WL 3417364, at *5 (explaining that for a plaintiff "to recover in an action for breach of an express warranty, the parties must be in privity" (quoting *Cruz v. Mylan, Inc.*, No. 09-cv-1106, 2010 WL 598688, at *2 (M.D. Fla. Feb. 17, 2010))); *Hill v. Hoover Co.*, 899 F. Supp. 2d 1259, 1267 (N.D. Fla. 2012) ("A plaintiff who purchases a product, but does not buy it directly from the defendant, is not considered to be in privity with that defendant" (citation omitted)). Here, plaintiff does not (and cannot) allege that he purchased Fabrazyme directly from Genzyme.

### E. Plaintiffs Fail to Plead Violation of Florida Deceptive and Unfair Trade Practices Act (Count V)

Count V fails because the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") does not apply to "[a]n act or practice required or specifically permitted by federal or state law." Fla. Stat. § 501.212(1); *Prohias v. AstraZeneca Pharm.*, *L.P.*, 958 So. 2d 1054, 1056 (Fla. Dist. Ct. App. 2007) (finding failure to state a FDUTPA claim because drug labeling complied with

FDA requirements).  Here, Fabrazyme is a prescription product with an FDA-approved label, and the manufacture, sale, and use of Fabrazyme are regulated under federal law.  Separately, FDUTPA does not apply to claims "for personal injury or death."  *See Echols v. RJ Reynolds Tobacco Co.*, No. 13-cv-14215, 2014 WL 5305633, at *5 (S.D. Fla. Oct. 15, 2014) (dismissing plaintiff's FDUTPA claim because he sought damages for personal injury); *T.W.M. v. Am. Med. Sys., Inc.*, 886 F. Supp. 842, 844 (N.D. Fla. 1995) (same).[29]

### F.    Plaintiffs Fail to Plead Violation of Indiana Products Liability Act (Count VI)

Count VI, which alleges a violation of the Indiana Products Liability Act ("IPLA"), fails because plaintiffs have not plausibly alleged that any specific conduct by Genzyme or any purported Fabrazyme "defect" caused their injuries.  Under the IPLA, a strict liability standard applies to manufacturing defect claims, whereas a negligence standard applies to design defects and failure to warn claims.  *See Myers v. Briggs & Stratton Corp.*, No. 09-cv-20, 2010 WL 1579676, at *3 (S.D. Ind. Apr. 16, 2010).  To plead a claim of negligence under the IPLA, plaintiffs are required to allege:  (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach.  *Piltch v. Ford Motor Co.*, 11 F. Supp. 3d 884, 888 (N.D. Ind. 2014), *aff'd*, 778 F.3d 628 (7th Cir. 2015).  Similarly, with respect to IPLA strict liability actions, plaintiffs must prove: (1) the product was defective and unreasonably dangerous; (2) the defective condition existed at the time the product left the defendant's control; and (3) the defective condition was the proximate cause of the plaintiff's injuries.  *Id.*  Under both the negligence and strict liability theories, plaintiffs must prove

---

[29] This Court previously dismissed plaintiffs' similar FDUTPA claims, concluding that the package insert did not represent that a lower dose would be as efficacious in treating Fabry disease as the dose recommended on the packaging or that a lower dose was approved by the FDA.  *See Hochendoner*, 95 F. Supp. 3d at 31–32.  The Court also explained that plaintiffs provided no legal support for their claim that it was an unfair trade practice for a patentholder to produce insufficient medication.  *See id.*

proximate cause.  *Myers*, 2010 WL 1579676, at *4.

As discussed above, plaintiffs have not plausibly alleged that Genzyme owed a duty to plaintiffs, that any Fabrazyme they received was actually contaminated with Vesivirus (much less caused them any specific injuries), or which (if any) of their injuries were caused by these supposed contaminations.  *See Mikesell v. St. Jude Med., Inc.*, No. 16-cv-304, 2017 WL 9565366, at *6 (N.D. Ind. Feb. 2, 2017) (dismissing manufacturing defect claims for failing to allege that the device was defective and failing to allege a causal nexus between the alleged manufacturing defect and plaintiff's injuries*); see also Cavender v. Medtronic, Inc.*, No. 16-cv-232, 2016 WL 6599744, at *6 (N.D. Ind. Nov. 8, 2016) (dismissing plaintiff's complaint where plaintiff failed to allege facts such as when the device malfunctioned and how the alleged malfunction injured her).[30]

### G.    Plaintiffs Fail to Plead Violations of Product Liability Act of Kentucky and Kentucky Consumer Protection Act (Counts VII and VIII)

Count VII, which alleges a violation of the Product Liability Act of Kentucky, fails because "the Product Liability Act of Kentucky . . . does not, and was not intended to, create a cause of action for product liability actions."  *Big Rivers Elec. Corp. v. Gen. Elec. Co.*, 820 F. Supp. 1123, 1125 (S.D. Ind. 1992).  "Rather it codifies some aspects of a common law products liability cause of action."  *Id.* at 1126.  As discussed above, plaintiffs have failed to state a common law claim, and Count VII must be dismissed.[31]

Count VIII, which alleges a violation of the Kentucky Consumer Protection Act ("KCPA"),

---

[30] This Court previously dismissed plaintiffs' similar claims under the IPLA, holding that Genzyme did not expressly or impliedly represent that low dose Fabrazyme would be as efficacious as a full dose and plaintiffs could not maintain a product liability claim based on a failure to manufacture sufficient quantity of a non-defective product.  *See Hochendoner*, 95 F. Supp. 3d at 33–34.

[31] This Court previously dismissed plaintiffs' similar claims under the Product Liability Act of Kentucky, holding that Genzyme did not expressly or impliedly represent that low dose Fabrazyme would be as efficacious as a full dose and plaintiffs could not maintain a product liability claim based on a failure to manufacture sufficient quantity of a non-defective product.  *See Hochendoner*, 95 F. Supp. 3d at 33–34.

fails as a matter of law because plaintiff Trina Wilkins has not sufficiently alleged that she purchased Fabrazyme directly from Genzyme such that she was in privity with Genzyme—as required to state a KCPA claim.  *See* Ky. Rev. Stat. § 367.110; *Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952, 962 (E.D. Ky. 2019) ("The language of the [KCPA] plainly contemplates an action by a purchaser against his immediate seller" (citation omitted)); *Gearhart v. Express Scripts, Inc.*, 422 F. Supp. 3d 1217, 1224 (E.D. Ky. 2019) (dismissing claim for failing to allege privity of contract, which is the "crux of a KCPA claim").  Plaintiff Wilkins has not pled privity as she has not alleged (and cannot allege) that she purchased Fabrazyme directly from Genzyme.  Moreover, even if she could allege privity with Genzyme (which she cannot), her KCPA claim still fails because, as explained in Part V *supra*, her KCPA claims are based in fraud and she has not pled fraud with particularity.  *See Johnson v. Int'l Lab'ys, LLC*, No. 19-cv-04, 2019 WL 1877289, at *3 (E.D. Ky. Apr. 26, 2019) (dismissing KCPA claim, in part, for failing to sufficiently allege fraudulent intent).

### H.   Plaintiffs Fail to Plead Violation of Massachusetts Unfair and Deceptive Trade Practices Act (Count IX)

Count IX, which alleges a violation of Chapter 93A of the Massachusetts Unfair and Deceptive Trade Practices Act, fails because plaintiff Bishop has not alleged that he provided the required pre-suit demand letter to Genzyme.  *See* Mass. Gen. Laws ch. 93A, § 9(3); *Entrialgo v. Twin City Dodge, Inc.*, 333 N.E.2d 202, 812 (Mass. 1975); *Schwartz v. Indep. Appraisals, LLC*, No. 11-cv-11051, 2011 WL 5593108, at *6 n.14 (D. Mass. Nov. 17, 2011) ("[Plaintiff] admits that no demand letter was ever served . . . and for that reason . . . [defendant's] motion to dismiss the (remaining) Chapter 93A claim . . . must be allowed.").  "That is sufficient ground to justify dismissal of the Ch. 93A claim." *Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 19–20 (1st Cir. 2004) (dismissing Chapter 93A claim for failing to allege compliance with pre-suit notice

requirement).  Plaintiff's Chapter 93A claim is also derivative of his negligence and breach of

warranty claims, and so it fails for the same reasons.  *See Edlow v. RBW, LLC*, No. 09-cv-12133,

2010 WL 2034772, at *8 (D. Mass. May 21, 2010) (applying Massachusetts law).[32]

##### I.   Plaintiffs Fail to Plead Violations of Michigan State Product Liability Act and Michigan Consumer Protection Act (Counts X and XI)

Count X, which alleges a violation of the Michigan State Product Liability Act, fails

because the statute provides absolute immunity when a drug and its labeling have been approved

by the FDA and such approval was not fraudulently obtained.  Mich. Comp. Laws § 600.2946(5);

*see also Taylor v. SmithKline Beecham Corp.*, 658 N.W.2d 127, 131 (Mich. 2003) (explaining

that, absent fraud, "a manufacturer or seller of a drug that has been approved by the FDA has an

absolute defense to a products liability claim if the drug and its labeling were in compliance with

the FDA's approval"); *White v. SmithKline Beecham Corp.,* 538 F. Supp. 2d 1023, 1026–31 (W.D.

Mich. 2008).   Here, plaintiffs affirmatively pled that the FDA approved Fabrazyme and its

labeling, and plaintiffs do not allege that FDA approval was obtained fraudulently.  SAC ¶¶ 41,

91.  Count X is thus foreclosed as a matter of law.[33]

Count XI, which alleges a violation of the Michigan Consumer Protection Act, should be

dismissed because the Michigan Consumer Protection Act does not apply to conduct regulated by

state or federal law.  *See* Mich. Comp. Laws § 445.904(1)(a); *see also McLiechey v. Bristol W.*

*Ins. Co.*, 408 F. Supp. 2d 516, 523 (W.D. Mich. 2006) (citing *Smith v. Globe Life Ins. Co.*, 597

---

[32] This Court previously dismissed plaintiffs' similar Massachusetts Unfair and Deceptive Trade Practices Act claims, concluding that the package insert did not represent that a lower dose would be as efficacious in treating Fabry disease as the dose recommended on the packaging or that a lower dose was as approved by the FDA.  *See Hochendoner*, 95 F. Supp. 3d at 31–32.  The Court also explained that plaintiffs provided no legal support for their claim that it was an unfair trade practice for a patentholder to produce insufficient medication.  *See id.*

[33] This Court previously dismissed plaintiffs' similar claims under the Michigan State Product Liability Act, holding that Genzyme did not expressly or impliedly represent that low dose Fabrazyme would be as efficacious as a full dose and plaintiffs could not maintain a product liability claim based on a failure to manufacture sufficient quantity of a non-defective product.  *See Hochendoner*, 95 F. Supp. 3d at 33–34.

N.W.2d 28, 38 (Mich. 1999)); *Duronio v. Merck & Co.*, No. 267003, 2006 WL 1628516, at *7

(Mich. Ct. App. June 13, 2006); *Peter v. Stryker Orthopaedics, Inc.*, 581 F. Supp. 2d 813, 816

(E.D. Mich. 2008); *Kemp v. Pfizer*, *Inc.*, 835 F. Supp. 1015, 1021 (E.D. Mich. 1993).  The

manufacture, sale, and use of Fabrazyme are regulated under federal law.  *See, e.g.*, 42 U.S.C.

§ 262 (2010); 21 U.S.C. §§ 301, 321, 351–60 (2010); 21 C.F.R § 316 (2011).  The claims under

the Michigan Consumer Protection Act are therefore foreclosed as a matter of law.[34]

**J.**      **Plaintiffs Fail to Plead Violation of Nevada Deceptive Trade Practices Act (Count XII)**

Count XII, which alleges a violation of the Nevada Deceptive Trade Practices Act, should

be dismissed because the statute does not apply to conduct regulated by state or federal law.  *See*

Nev. Rev. Stat. § 598.0955 ("The provisions of NRS 598.0903 to 598.0999, inclusive, do not apply

to: (a) Conduct in compliance with the orders or rules of, or a statute administered by, a federal,

state or local governmental agency.").  The manufacture, sale, and use of Fabrazyme, as a biologics

product, are regulated by federal law.  *See* Part VI.C, I *supra*.  Thus, the claims under the Nevada

Deceptive Trade Practices Act are foreclosed as a matter of law.[35]

**K.**      **Plaintiffs Fail to Plead Violation of North Carolina Unfair and Deceptive Trade Practice Act (Count XIII)**

Count XIII, which alleges a violation of the North Carolina Unfair and Deceptive Trade

Practices Act ("NCUDTPA"), is preempted because the FDA approved Fabrazyme and its

---

[34] This Court previously dismissed plaintiffs' similar claims under the Michigan Consumer Protection Act, concluding that the package insert did not represent that a lower dose would be as efficacious in the treatment of Fabry disease as the dose recommended on the packaging or that a lower dose was approved by the FDA.  *See Hochendoner*, 95 F. Supp. 3d at 31–32.  The Court also explained that plaintiffs provided no legal support for their claim that it was an unfair trade practice for a patentholder to produce insufficient medication.  *See id.*

[35] This Court previously dismissed plaintiffs' similar claims under the Nevada Deceptive Trade Practices Act, concluding that the package insert did not represent that a lower dose would be as efficacious in the treatment of Fabry disease as the dose recommended on the packaging or that a lower dose was approved by the FDA.  *See Hochendoner*, 95 F. Supp. 3d at 31–32.  The Court also explained that plaintiffs provided no legal support for their claim that it was an unfair trade practice for a patentholder to produce insufficient medication.  *See id.*

labeling.    NCUDTPA claims are preempted when "the alleged misrepresentations are indistinguishable from FDA-approved labeling statements."  *See Burrell v. Bayer Corp.*, 260 F. Supp. 3d 485, 495 (W.D.N.C. 2017).  Moreover, to state a viable NCUDTPA claim, plaintiffs must allege "*egregious* or *aggravating* circumstances."  *See Dalton v. Camp,* 548 S.E.2d 704, 711 (N.C. 2001) (quoting *Allied Distribs., Inc. v. Latrobe Brewing Co.*, 847 F. Supp. 376, 379 (E.D.N.C. 1993)).  Egregious and aggravating circumstances involve "intentional misrepresentation for the purpose of deceiving or injuring another or actions that rise to the level of fraud."  *LFM Real Est. Ventures, LLC v. SunTrust Bank*, No. 11-cv-135, 2012 WL 6114242, at *9–10 (W.D.N.C. Dec. 7, 2012) ("When a [NC]UDTPA claim is based upon a theory of misrepresentation or fraud, 'a plaintiff must show that a defendant's words or conduct possessed the tendency or capacity to mislead or create the likelihood of deception'" (citation omitted)).  Plaintiffs have not pled an intentional misrepresentation with sufficient particularity to satisfy the heightened pleading requirements of Rule 9(b), *see* Part V *supra*, and thus they have not alleged the egregious or aggravating circumstances to support a NCUDTPA claim.  *See Dalton,* 548 S.E.2d at 711.  For both of these reasons, the claims under the NCUDTPA are foreclosed as a matter of law.[36]

### L.    Plaintiffs Fail to Plead Violation of Pennsylvania Unfair Trade Practices Consumer Protection Law (Count XIV)

Count XIV, which alleges a violation of the Pennsylvania Unfair Trade Practices Consumer Protection Law ("UTPCPL"), fails as a matter of law because "a plaintiff does not have a viable UTPCPL cause of action against a manufacturer of prescription drugs."  *See Kester*, No. 2010 WL 2696467, at *14; *Zafarana v. Pfizer Inc.*, 724 F. Supp. 2d 545, 558 (E.D. Pa. 2010).  Specifically,

---

[36] This Court previously dismissed plaintiffs' similar claims under the NCUDTPA, concluding that the package insert did not represent that a lower dose would be as efficacious in treating Fabry disease as the dose recommended on the packaging or that a lower dose was approved by the FDA.  *See Hochendoner*, 95 F. Supp. 3d at 31–32.  The Court also explained that plaintiffs provided no legal support for their claim that it was an unfair trade practice for a patentholder to produce insufficient medication.  *See id.*

a prescribing physician breaks the required chain of justifiable reliance and causation.  *Kester*, 2010 WL 2696467, at \*14; *Zafarana*, 724 F. Supp. 2d at 558.  Therefore, plaintiffs' claims under the UTPCPL should be dismissed. [37]

### M.   Plaintiffs Fail to Plead Violations of Virginia Consumer Protection Act, Wrongful Death Statute, or Survival Action Statute (Counts XV, XVI, and XVII)

Counts XV and XVI, which allege violations of the Virginia Consumer Protection Act ("VCPA"), fail because the statute does not apply to "[a]ny aspect of a consumer transaction which aspect is authorized under laws or regulations of this Commonwealth or the United States, or the formal advisory opinions of any regulatory body or official of this Commonwealth or the United States."  Va. Code § 59.1-199; *see also Ali v. Allergan USA, Inc.*, No. 12-cv-115, 2012 WL 3692396, at \*19 (E.D. Va. Aug. 23, 2012).  The manufacture, sale, and use of Fabrazyme are regulated under federal law, *see* Part VI.C, I, J *supra*, and plaintiffs' claims under the VCPA are thus foreclosed as a matter of law.  Counts XV and XVI also fail because VCPA claims are "governed by the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure," *see Wynn's Extended Care, Inc. v. Bradley*, 619 F. App'x 216, 220 (4th Cir. 2015), and as explained in Part V *supra*, plaintiffs failed to plead fraud with sufficient particularity. [38]

Count XVI, which alleges violations of Virginia false advertising law, also should be dismissed because, as in *Hochendoner*, plaintiffs did not plausibly allege that "Genzyme made any

---

[37] This Court previously dismissed plaintiffs' similar claims under the UTPCPL, concluding that the package insert did not represent that a lower dose would be as efficacious in treating Fabry disease as the dose recommended on the packaging or that a lower dose was approved by the FDA.  *See Hochendoner*, 95 F. Supp. 3d at 31–32.  The Court also explained that plaintiffs provided no legal support for their claim that it was an unfair trade practice for a patentholder to produce insufficient medication.  *See id.*

[38] This Court previously dismissed plaintiffs' similar VCPA claims, concluding that the package insert did not represent that a lower dose would be as efficacious in treating Fabry disease as the dose recommended on the packaging or that a lower dose was approved by the FDA.  *See Hochendoner*, 95 F. Supp. 3d at 31–32.  The Court also explained that plaintiffs provided no legal support for their claim that it was an unfair trade practice for a patentholder to produce insufficient medication.  *See id.*

untrue or deceptive statements regarding the efficacy of Fabrazyme® at a lower dosage." *See Hochendoner*, 95 F. Supp. 3d at 33 n.13.

Count XVII, which alleges violations of the Virginia wrongful death statute, fails because the statute "does not create a new cause of action, but only a right of action in a personal representative to enforce a decedent's claim for any personal injury that caused death." *Tarbrake v. Sharp*, 894 F. Supp. 270, 271 (E.D. Va. 1995). Plaintiffs cannot recover on their underlying claims because they failed to plead proximate cause or meet the heightened pleading standard of Rule 9(b). Thus, their claims under the Virginia wrongful death statute also fail as a matter of law.

In the alternative, Count XVII seeks damages under Virginia's survival action statute. However, the survival action statute "only applies to causes of action 'exist[ing]' prior to the decedent's death and provides that a 'cause of action asserted by the decedent in his lifetime' for personal injury does not 'survive,' but rather can be amended as a wrongful death action under Code § 8.01-56." *Campbell v. Harmon*, 628 S.E.2d 308, 312 (Va. 2006) (quoting *Hendrix v. Daugherty*, 457 S.E.2d 71, 73 (Va. 1995)). The decedents, Teresa Viers and Joseph Wallace, were both plaintiffs in *Adamo*, wherein they already asserted claims based on the same alleged injury against Genzyme during their lifetimes. As such, their personal injury claims do not "survive." *See id.* Plaintiffs' only option was to file a wrongful death claim, which fails for the reasons explained above. Accordingly, Count XVII fails as a matter of law.

### N.    Plaintiffs Fail to Plead Violations of Washington Uniform Deceptive Trade Practices Act and Washington Product Liability Act (Counts XVIII and XIX)

Count XVIII alleging violations of the Washington Uniform Deceptive Trade Practices Act fails because the statute permits suit *only* by "[a]ny person who is injured in his or her *business or property*." Wash. Rev. Code 19.86.090. Plaintiffs may not recover damages for alleged physical injuries. *See Ambach v. French*, 216 P.3d 405, 409 (Wash. 2009); *Stevens v. Hyde Athletic Indus.*,

*Inc.*, 773 P.2d 871, 873 (Wash. Ct. App. 1989); *Nw. Laborers-Employers Health & Sec. Tr. Fund v. Philip Morris, Inc.*, 58 F. Supp. 2d 1211, 1215 (W.D. Wash. 1999).

Count XIX, which alleges violations of the Washington Product Liability Act, fails because plaintiffs have not stated claims for breach of warranty, design defects, manufacturing defects, or failure to warn.  *See* Wash. Rev. Code 7.72.030 (defining causes of action against product manufacturers under the Washington Product Liability Act).  The breach of warranty claims are not cognizable for the reasons discussed in Part VI.D *supra*.  Further, plaintiffs cannot plead a design defect or manufacturing defect because, as discussed above, plaintiffs have not alleged that any purportedly defective Fabrazyme proximately caused them any particular harm.  *See Baumgardner v. Am. Motors Corp.*, 522 P.2d 829, 833 (Wash. 1974) (stating "manufacturer can be held liable . . . for design or manufacture defects *which proximately cause enhanced injuries due to such defects*" (emphasis added)).  Further, plaintiffs cannot plead a failure to warn claim because, under Washington's learned intermediary doctrine, "any failure to warn by [a] drug manufacturer c[an] not be the proximate cause of the plaintiff's harm."  *Sherman v. Pfizer, Inc.*, 440 P.3d 1016, 1022 (Wash. Ct. App. 2019).  Here, plaintiffs have not alleged that their prescribing physicians relied on any alleged misrepresentations made by Genzyme.[39]

### O. Plaintiffs Fail to State Claims for Fraud and Fraudulent Concealment (Counts XX and XXI)

As explained in Part V *supra*, plaintiffs' fraud and fraudulent concealment claims fail because plaintiffs have not plausibly alleged that Genzyme made knowingly false representations regarding the safety or efficacy of allegedly "contaminated" or "low dose" Fabrazyme.  *See Santos*

---

[39] This Court previously dismissed plaintiffs' similar Washington Uniform Deceptive Trade Practices Act and Washington Product Liability Act claims, concluding that the package insert did not represent that a lower dose would be as efficacious in treating Fabry disease as the dose recommended on the packaging or that a lower dose was approved by the FDA.  *Hochendoner*, 95 F. Supp. 3d at 31–32.  The Court also explained that plaintiffs provided no legal support for their claim that it was an unfair trade practice for a patentholder to produce insufficient medication. *See id.*

*v. SANYO Mfg. Corp.*, No. 12-cv-11452, 2013 WL 1868268, at *5 (D. Mass. May 3, 2013) ("[U]nder Massachusetts law, a plaintiff must show that 'the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage.'" (*quoting Russell v. Cooley Dickinson Hosp., Inc.*, 772 N.E.2d 1054, 1066 (Mass. 2002))); *Cardinale*, 567 F.3d at 13 (plaintiffs must set forth "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading"). Plaintiffs also have not plausibly alleged that their injuries were proximately caused by any particular purported Fabrazyme "defect." Moreover, when considering fraud claims in an analogous federally regulated medical device action, the First Circuit explained: "[T]he fraud claim is, at bottom, a failure to warn claim. It seeks to show that [Genzyme] had a duty to provide different information in [Fabrazyme's] packaging and labeling than that which was approved by the FDA. As such, the claim is preempted expressly by" federal law. *King*, 983 F.2d at 1136. For the foregoing reasons, plaintiffs' fraud and fraudulent concealment claims should be dismissed.

### P.  Plaintiffs Fail to State Claim for Breach of Fiduciary Duty (Count XXII)

Plaintiffs' breach of fiduciary duty claim fails because Genzyme did not owe plaintiffs a fiduciary duty, and, even if there was such a duty, plaintiffs' injuries were not proximately caused by Genzyme. *See Est. of Moulton v. Puopolo*, 467 Mass. 478, 492 (2014) ("To establish a breach of fiduciary duty, there must be a duty owed to the plaintiff by the defendant and injury to the plaintiff proximately caused by the breach" (citation omitted)). Fiduciary duties can arise in two ways: (1) "as a matter of law, where parties to the subject relationship are cast in archetypal roles, 'such as trustee and [beneficiary], guardian and ward, attorney and client,'" or (2) by articulating facts that otherwise support the creation of a fiduciary duty, such as where "one person is in fact dependent on another's judgment in business affairs or property matters." *UBS Fin. Servs., Inc. v.*

*Aliberti*, 133 N.E.2d 277, 288 (Mass. 2019) (citations omitted).   The relationship between a biologics manufacturer and consumers of its product is not one of "the archetypal roles" in fiduciary law.   *See id.; cf. Zafarana*, 724 F. Supp. 2d at 560 (holding drug manufacturers did not owe a fiduciary duty to patients).   Plaintiffs' allegations of a "close personal relationship" with Genzyme, communication with "individual case managers," and use by Genzyme of a "body of experts" or patient registry also do not support the creation of a fiduciary duty.   SAC ¶¶ 474–75; *see Aliberti*, 133 N.E.2d at 290 (explaining "power imbalance is not uncommon in our modern consumer marketplace" and finding no fiduciary duty for "a retail consumer relationship governed by contract").

## Q.   Plaintiffs Fail to State Claim for Unjust Enrichment (Count XXIII)

Plaintiffs' unjust enrichment claims fail because parties with "an adequate remedy at law cannot claim unjust enrichment," *see Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017). Plaintiffs' unjust enrichment claim fails even if the Court dismisses the rest of plaintiffs' claims. *Id.* ("It is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment.").

## R.   Plaintiffs Fail to State Claim for Loss of Consortium (Count XXIV)[40]

Plaintiffs' loss of consortium claims fail because they "cannot survive without the underlying counts to support it."   *Hochendoner*, 95 F. Supp. 3d at 34; *see also Schroeder v. Ear, Nose & Throat Assocs., of Lehigh Valley, Inc.*, 557 A.2d 21, 22 (Pa. Super. Ct. 1989) ("Any action for loss of consortium is derivative, depending for its viability upon the substantive merit of the injured party's claims."); *Long v. Chelsea Cmty. Hosp.*, 557 N.W.2d 157, 162 (Mich. Ct. App. 1996), *abrogated on other grounds Feyz v. Mercy Mem. Hosp.*, 719 N.W.2d 1 (Mich. 2006); *Sena*

---

[40] The SAC includes two "Count XXIII" claims.  This briefing paper refers to the second "Count XXIII" as "Count XIV" for ease of reference.

*v. Commonwealth*, 629 N.E.2d 986, 994 (Mass. 1994); *Nelson v. Denkins*, 598 N.E.2d 558, 563

(Ind. Ct. App. 1992); *Jaffe v. Snow*, 610 So. 2d 482, 488 (Fla. Dist. Ct. App. 1992).

## **CONCLUSION**

For the foregoing reasons, Genzyme respectfully requests that the Court dismiss plaintiffs'

claims with prejudice.[41]

Dated: July 9, 2021                         Respectfully submitted,

                                            /s/ *Robert G. Jones*
                                            Robert G. Jones (BBO #630767)
                                            Jessica M. Bergin (BBO #693683)
                                            Gregory F. Malloy (BBO #703661)
                                            ROPES & GRAY LLP
                                            Prudential Tower
                                            800 Boylston Street
                                            Boston, MA 02199-3600
                                            Telephone: (617) 951-7000
                                            Facsimile: (617) 951-7050
                                            Robert.Jones@ropesgray.com
                                            Jessica.Bergin@ropesgray.com
                                            Gregory.Malloy@ropesgray.com

                                            Renee T. Whyte (admitted *pro hac vice*)
                                            ROPES & GRAY LLP
                                            1211 Avenue of the Americas
                                            New York, NY 10036-8704
                                            Telephone: (212) 596-9000
                                            Facsimile: (212) 596-9090
                                            Renee.Whyte@ropesgray.com

                                            *Counsel for Defendant Genzyme Corporation*

---

[41] As in *Rovinelli*, plaintiffs should be denied leave to amend their pleadings. *Rovinelli*, 2021 WL 752822, at *2, 19 (denying leave to amend as "the Complaint is functionally Plaintiffs' third opportunity over the span of three years to present an adequate pleading" and "in light of Plaintiffs' repeated failure to cure deficiencies in their pleadings, even with [the Court's] guidance, and the futility of any further amendment"). Over more than a decade, plaintiffs have unsuccessfully tried numerous times to state a claim regarding the same underlying events, "impos[ing] unnecessary costs and inefficiencies on both the courts and party opponents." *Id.* at *19; *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008).

## <u>CERTIFICATE OF SERVICE</u>

I, Robert G. Jones, hereby certify that on July 9, 2021, I filed the foregoing electronically with the U.S. District Court for the District of Massachusetts using the CM/ECF system, and caused it to be served on all registered participants via the Notice of Electronic Filing.

Dated: July 9, 2021

/s/ *Robert G. Jones*
Robert G. Jones (BBO #630767)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
Robert.Jones@ropesgray.com