# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TRINA WILKINS; JAMES BISHOP; LISA BISHOP; AMBER BRITTON; TONI CORDOVA; JOHN CORTINA; JILL CORTINA; GEORGE DEMKO; DOVAN HELTON; MARY HELTON; NATE BROOKS; SYDNEY JOHNSON; PLAINTIFF D.J.; DAMON LAFORCE; MICHAEL MASULA; ERIN MASULA; JAMES MATTHEWS; THOMAS OLSZEWSKI; DARLENE COOKINGHAM; THOMAS STANZIANO; WENDY STANZIANO; EDDIE VIERS, individually as surviving spouse of Teresa Viers, deceased, AND as Personal Representative of the ESTATE OF TERESA VIERS; WILLIAM MCNEW; JEANNE WALLACE individually as surviving spouse of Joseph Wallace, deceased, AND as Personal Representative of the ESTATE OF JOSEPH WALLACE; JAMES WALLACE; and SAMUEL WALLACE; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No: 1:21 – cv – 10023 – DPW<br><br>Class Action<br><br><br>*Electronically Filed* |
|     Plaintiffs, | ) ) | |
|     v. | ) ) | |
| GENZYME CORPORATION; | ) ) | |
|     Defendant. | ) | |

<u>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**</u>
<u>**GENZYME CORPORATION'S MOTION TO DISMISS**</u>
<u>**SECOND AMENDED COMPLAINT**</u>

AND NOW come the Plaintiffs, by and through their counsel, C. Allen Black, Esquire and Jonathan M. Gesk, Esquire, and hereby file this Memorandum of Law in Opposition to Genzyme Corporation's Motion to Dismiss Second Amended Complaint as follows:

## I. INTRODUCTION

This case is well known in this court from *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 734 (1st Cir. 2016).   However, Genzyme Corporation's internal communications about the information it was sending to Plaintiffs, most that Genzyme Corporation knew that the information was inaccurate, were concealed by Genzyme Corporation until *Schubert v. Genzyme's* Fourth Amended Complaint was unsealed last year.  SAC ¶ 129 citing *Schubert v. Genzyme Corp.* (2:12-cv-00587-HCN-DAO)).   The Fourth Amended Complaint, detailed with citations to bates-stamped documents, unveiled a systematic fraud against these specific Plaintiffs, even while their own cases were pending in this court.   Two of the Plaintiffs have since died without ever knowing what Genzyme had done to them.

In *Schubert's* Fourth Amended Complaint, Genzyme's own employee, Dr. Daniel Gruskin, Director of Medical Affairs stated that Genzyme sent "bullshit data" on "low dose" Fabrazyme to the European Medical Authority and felt Genzyme should not have been surprised when the data was rejected for "low dose" treatment for Europeans. *See* Complaint SAC ¶ 339.  Genzyme had better luck convincing American doctors and patients to believe this "bullshit data."[1]  In making

---

[1] The data is from the Lubanda study on low dosing patients, which was equivocal for low dose due the small sample size.  However, the Lubanda study was not.  Low dose was ineffective.  Genzyme used

representations to the U.S. advisory authority for the shortage, the U.S. FSWG,  Dr. Gruskin stated "did we lie to the FSWG?" to which Genzyme Corporation's marketing director, John King, said "we are the only ones who didn't".  SAC ¶ 229.  Dr. Daniel Gruskin further sent letters to the Plaintiffs which he later described in an internal e-mail as a "~~lie~~ (sic) update" about the length of the shortage and that Genzyme was doing all it could to "help the most vulnerable patients, while knowing that the statement "little is known in the literature" about "low dose" was dangerously misleading.[2]  SAC ¶ 329. His deposition testimony revealed there was no evidence to support giving "low dose" Fabrazyme to patients.  SAC ¶ 246.  In further documents, Genzyme authorities told the Australian regulatory authorities <u>not</u> to purchase "low dose" Fabrazyme because blanket dose adjustments "**would be insane**."  SAC ¶ 465.

There is a difference between legitimately not knowing the effects of "low dose" Fabrazyme versus telling some customers, but not others, that a blanket dose adjustment for Fabrazyme **would be insane**.  *Id.*  The Plaintiffs' belief that "low dose" Fabrazyme would have some positive effect on their Fabry disease was cultivated by Genzyme, which it termed "strong messaging" to U.S. patients in its "Contingency Plan" for a shortage. SAC ¶ 189; ¶ 232.   In light of this information, Genzyme attempts to argue that the current pleading does not make a judiciable case for a variety of reasons.  Genzyme does not attempt to address the facts now being pled and ignores the *Schubert* discovery documents entirely.  *Schubert v. Genzyme Corp.* (Case 2:12-cv-00587-HCN-DAO) District Court for the District of Utah and *Schubert v. Genzyme Corp.*, No.

---

Lubanda to convince the Australian regulatory authorities that low dosing would be "insane ".  SAC ¶ 242, ¶ 465

[2] Stating that "little is known in the literature" is a decidedly ambiguous statement versus "low dose" being **insane**.  Daniel Gruskin was proffering an interpretation of the literature that he described himself as "bullshit." SAC ¶ 399. See also, The Restatement (Second) of Torts "A representation that the maker knows is capable of two interpretations of which one is false and the other true is fraudulent if it is made with intention that be in understood in the sense which it is false... or made with reckless indifference.

2:12CV587DAK, 2013 WL 6809143 (D. Utah Dec. 20, 2013) ("The court's prior ruling… specifically stated that Plaintiff had a claim for the distribution of Fabrazyme in reduced, allegedly unsafe, dosages.")

While the courts have resoundingly found no duty to supply the market, the law still requires a duty of manufacturers to be truthful with the purchasers, including the Plaintiffs, especially for off-label marketed pharmaceuticals. *Id.* ("The [*Schubert*] court recognized that the shortage of a product was an unactionable act of omission whereas supplying the market with medication in an unsafe dosage was actionable like any other products liability case."). *See also In re Neurontin Mktg. & Sales Pracs. Litig.,* 677 F. Supp. 2d 479, 499 (D. Mass. 2010)*, judgment rev'd in part, vacated in part,* 712 F.3d 51 (1st Cir. 2013). ("Plaintiffs have submitted abundant evidence outlined above that Defendants engaged in off-label marketing of Neurontin for multiple indications, all while they were in possession of studies showing that Neurontin was not more effective than a placebo in treating these indications… Such evidence raises a genuine issue of material fact with respect to scienter.").

Massachusetts has specifically recognized that a misrepresentation is intentionally deceitful when a drug is marketed off-label without full disclosure of whether it is effective or not, and the tort of misrepresentation sounds in fraud (RICO). *Id.* Massachusetts recognized "that a manufacturer of a pharmaceutical has a duty to disclose to physicians and patients material facts about the risks of the drug, particularly when it is engaged in off-label marketing for uses not approved by the FDA, if it knows that the plaintiff and/or his prescriber does not know or cannot reasonably discover the undisclosed facts." *In re Neurontin Marketing, Sales Practices, and Prods. Liability Litig.*, 618 F. Supp. 2d 96, 110 (D. Mass. 2009). During appeal, the First Circuit recognized at least three classes of fraudulent marketing: "This fraudulent marketing included, but

was not limited to, three strategies, each of which included subcomponents: (1) direct marketing (or "detailing") to doctors, which misrepresented Neurontin's effectiveness for off-label indications; (2) sponsoring misleading informational supplements … ; and (3) suppressing negative information about Neurontin while publishing articles in medical journals that reported positive information about Neurontin's off-label effectiveness." *In re Neurontin Mktg. and Sales Practices Litig.*, 712 F.3d 21, 34 (1st Cir.2013).  The current case mirrors the *In re Neurontin* case reviewed by the First Circuit because it alleges that Genzyme directly marketed doctors and patients about the effectiveness of "low dose" Fabrazyme with "strong messaging"; sponsored misleading informational seminars to the U.S. FSWG (did we just lie to the FSWG?—we are the only one who didn't); and suppressed negative information about "low dose" Fabrazyme, which included the fact that a patient would be **insane** to take it. SAC ¶ 232, SAC ¶ 239, SAC ¶ 310.  Even worse than the Neurontin marketing, is that when a doctor did not prescribe "low dosing" in response to "strong messaging," Genzyme simply refused to ship full doses, thereby preventing doctors and patients even the barest ability to act in the patients' interest.   SAC ¶ 92, SAC ¶ 236.  Every single Plaintiff in this case alleges receiving "low dose" Fabrazyme, apart from Plaintiff Amber Britton, who received nothing despite others being given full dose during the shortage.  SAC ¶¶ 1, 2, 4, 5, 6, 8, 9, 11, 12, 13, 14, 15, 17, 18, 20, 22, and 24.   In other words, Genzyme breached its duty to consumers, including the Plaintiffs, by engaging in off-label marketing without providing full disclosure on the dangers and lack of effectiveness of Fabrazyme.[3]

---

[3] The defense argues that limited pre-answer discover would be useful as opposed to full discovery. However, no efficiency would be gained.  First, Plaintiff D.J. would be prejudiced as he is a protected minor.  Second, discovery of the fraud occurred after the unsealing of *Schubert*.  The discovery rule for fraudulent concealment is the discovery of the fraud. Finally, the anaphylactic injuries of Trina Wilkins, Damon LaForce, and Thomas Stanziano all occurred when the shortage ended, not when it started so the accrual date is within the statute of limitations, notwithstanding the tolling that occurred during the serial sales of "low doses" without correcting the misperception that it would not be **insane** to take it.

The instant case benefits from the direction of the First Circuit in *Hochendoner* and repleads the case considering its pronouncements.  First, the Plaintiffs are discussed individually and not in the aggregate (as will be done in this brief except when necessary).  Second, the Plaintiffs who received "low doses" plead "acceleration" of their disease, which is vetted pleading language as a cause of action.  Finally, where appropriate, the Plaintiffs plead anaphylactic reactions to "low dose" Fabrazyme, which was also vetted language by the First Circuit.

The previous opposition in *Hochendoner* focused on a lack of facts creating standing and proximate causation between the "low dose" Fabrazyme and the specific Plaintiffs' injuries.  That connection is now stated explicitly for each Plaintiff.  Moreover, Genzyme presented to the court that it was ignorant of any information regarding "low dose" Fabrazyme, except that "not much was known in the literature."  See Defense Motion For Dismissal Brief Exhibit D (Document 104-4 filed 07/09/21) signed by Daniel Gruskin, who was also sending "~~lie~~ (sic) updates" to doctors, patients, and payors.  The current pleading leaves no doubt as to the "who, what, where, when and how" Genzyme caused the particular injuries to the Plaintiffs.  An actual dispute exists regarding the material facts.[4]  There is a legally cognizable difference between a natural progression of a disease and progression due to delay in seeking proper treatment based on negligent or fraudulent information being supplied to a patient.  Indeed, the Restatement states that causation/injury includes the "increase of disease in a patient."  Restatement (Second) of Torts § 539, cmt. b.  The Massachusetts courts recognize injuries from increase in disease due to delay of treatment based

---

[4] Exhibit D was not available to Plaintiffs until the defense attached it to its brief.  Notably, it is an internal draft of a letter sent to the Plaintiffs, not the letter that Plaintiffs received.  While it indeed says that "not much is known in the literature," it is also stamped "not for promotional purposes."  The letter was then used to promote "low doses."  Thus, it operates as yet another source of evidence that Genzyme knew its off-label marketing of "low dose" Fabrazyme was both illegal and in willful contravention to the law. This Bates numbered document was not in the unsealed *Schubert* complaint, although it appears to be from the *Schubert* discovery.

on misleading, ambiguous, and one-sided, cherry picked "bullshit" data that Genzyme used to influence doctors and patients to choose a "low dose."

## II.     CONCISE FACTUAL AND PRODCEDURAL HISTORY

The heart of Genzyme Corporation's Motion to Dismiss is the argument that Plaintiffs' class action claim is untimely, and thus, with no viable federal claim remaining, this Honorable Court should decline to exercise supplemental jurisdiction.  In making this argument, however, Genzyme Corporation fails to provide the full and accurate procedural background and also relies heavily on factual assertions that not only require further discovery, but would be contrary to the facts alleged by Plaintiffs and thus violative of the standard governing motions to dismiss.

The misleading summation of this case's procedural history makes gray what is otherwise very simple, well-established, black and white rules with respect to class tolling, savings statutes, and tolling agreements.  Plaintiffs provide this concise factual and procedural history to provide the necessary background that supports Plaintiffs' opposition to Genzyme Corporation's Motion to Dismiss.

Genzyme Corporation experienced a Fabrazyme shortage as a result of a contamination at one of its manufacturing plants.  Faced with less supply than it needed to accommodate its patients-clients, Genzyme Corporation decided to instruct its United States patients, including Plaintiffs, to take lower doses of Fabrazyme while it attempted to resolve the contamination issue and restart the manufacturing of Fabrazyme.  On July 1, 2009, Genzyme Corporation advised Plaintiffs that they would be receiving less Fabrazyme than the prescribed dosage and that they should begin skipping or taking lower doses of the drug.  Of note, as this case has not yet reached the discovery stage, it is not clear when Plaintiffs actually received and took lower doses of the drug, but it would be no earlier than July 1, 2009.  In that regard, the record does not even

establish when these Plaintiffs began receiving low doses.  More importantly, the record does not

yet establish when Plaintiffs incurred a harm or injury as a result of Genzyme Corporation's

actions.  Thus, from the outset, Genzyme Corporation's fact-based statute of limitations

argument is premature.

The effect of low doses of Fabrazyme is essential to this case.  It can actually accelerate

Fabry disease instead of mitigate it, and as Genzyme Corporation admitted behind closed-doors,

at best low doses have no positive effect on Fabry disease.  (See e.g., Plaintiffs' Second

Amended Complaint, ¶¶ 310 ("a blanket dose adjustment would be insane"; 328 ("Enjoy! With

the most recent ~~lie~~ update…); and 339 ("We sent the EMA bullshit data and then are surprised

when they come up with recommendations to switch to Replagal.")).  Again, without the benefit

of discovery, neither party can say with any certainty when Plaintiffs would have incurred harm

from the low doses, when they would have realized the source of that harm, and when they could

have learned that Genzyme Corporation actually knew that the low doses were either not helping

or hurting Plaintiffs but yet concealed that information from Plaintiffs, their doctors, the FDA,

and the medical community as a whole.  All that being said, just for the sake of argument, the

earliest the statute of limitations could have commenced was July 1, 2009.

On March 9, 2011, Plaintiffs filed a Complaint, which included a putative class claim.

(*Hochendoner et al. v. Genzyme Corporaton*, No. 11-cv-313 (W.D. Pa. 2011)).  Genzyme

Corporation does not contest that this was a timely filed class action lawsuit.  As this Honorable

Court is well aware, the *Hochendoner* action, and a subsequent action (*Adamo*), ultimately were

consolidated and reached the District Court of Massachusetts.  The consolidated cases were

dismissed and then appealed to the U.S. Court of Appeals for the First Circuit.  On May 23,

2016, the First Circuit affirmed the dismissal, however, on the basis that the Plaintiffs'

allegations failed to establish standing as the allegations failed to specifically tie the injuries and harms occasioned to each individual Plaintiff.  In that regard, Plaintiffs were given an opportunity to amend and refile their complaint.  At no time did any court certify or deny the putative class.

Pursuant to Massachusetts' savings clause, Plaintiffs had one year from the date of the First Circuit's decision to refile their complaint.  (MASS.GEN.LAWS ch. 260, § 32).  Pursuant to Indiana's Journey's Account statute, Plaintiffs had three years to file a new action.  (Ind. Code § 34-11-8-1).  Indiana's Journey's Account statute applies even though the original action was filed in Pennsylvania and dismissed in Massachusetts.  See, *Abele v. A. L. Dougherty Overseas, Inc.*, 192 F. Supp. 955 (N.D. Ind. 1961); *Ullom v. Midland Indus., Inc.*, 663 F. Supp. 491 (S.D. Ind. 1987); and *Basham v. Penick*, 849 N.E.2d 706 (Ind. Ct. App. 2006).  "Many states, of which Indiana is one, have enacted what are quaintly called journeys account statutes, permitting plaintiffs to refile dismissed suits within some period, provided the original suit was timely. In Indiana the plaintiff has three years to refile, unless the dismissal was attributable to negligence in its prosecution, abatement, or an adverse decision on the merits. I.C. § 34-11-8-1 (formerly I.C. § 34-1-2-8). The refiled action is treated as a 'continuation of the original action'.  So if plaintiffs themselves had been among the named parties in *Kelce*, they could have refiled the action in Indiana as a 'continuation,' using *Kelce's* 1990 filing date for limitations purposes." *Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998).

After the First Circuit's ruling, Plaintiffs prepared an amended complaint that would cure the deficiencies highlighted by this Honorable Court and the First Circuit.  Before the lapse of Massachusetts' and Indiana's savings clauses, the parties agreed to enter into a tolling agreement so that they could explore settlement discussions instead of further litigation.  (Exhibit 1).  This

was a worthwhile exercise as a great number of the original plaintiffs were able to settle their claims.  However, those that did not reach a settlement ultimately filed this subject action.

Plaintiffs then timely re-filed their action in the Federal District Court for the Southern District of Indiana.  The case was then transferred to this Honorable Court upon motion by Genzyme Corporation.  For the reasons stated herein, the subject action is timely and this Honorable Court has jurisdiction over the class claims and all individual claims.

III.   **LEGAL STANDARD**

To establish Article III standing, Plaintiffs must demonstrate that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo*, 136 S.Ct. at 1547; *see Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).  "Although the same pleading standards apply both to standing determinations and Rule 12(b)(6) determinations, the two inquiries remain fundamentally distinct: 'standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.' *citations omitted*. An individual's plausible allegations of a personal injury will generally suffice to plead an injury in fact, even if the claim is ultimately lacking on the merits. *citations omitted.*  It follows that, in conducting our inquiry into standing, we have not considered the validity of any of the plaintiffs' claims as a matter of law or the adequacy of their pleading to state a claim under Rule 12(b)(6)."  *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 734 (1st Cir. 2016).   A "plaintiff-by-plaintiff and claim-by-claim analysis required by standing doctrine demands allegations linking each plaintiff to each of these injuries." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 733 (1st Cir. 2016).  "We make explicit today what our cases have implied and what the near-uniform precedent in other circuits has established: at the pleading stage, the plaintiff bears the burden of establishing sufficient factual matter to

plausibly demonstrate his standing to bring the action. Neither conclusory assertions nor unfounded speculation can supply the necessary heft. *See Iqbal*, 556 U.S. at 678–79, 129 S.Ct. 1937; Blum v. Holder, 744 F.3d 790, 795 (1st Cir.), cert. denied, ⸺ U.S. ⸺, 135 S.Ct. 477, 190 L.Ed.2d 358 (2014)." *Hochendoner v. Genzyme Corp*., 823 F.3d 724, 731 (1st Cir. 2016).

"To state a claim upon which relief may be granted, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). At a minimum, the complaint must 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Calvi v. Knox County*, 470 F.3d 422, 430 (1st Cir. 2006) (quoting *Educadores Puertorriqueños en Acción v. Hernández*, 367 F.3d 61, 66 (1st Cir. 2004)).

At this stage, a case may be dismissed "only if taking all of the complaint's well-pled allegations as true and viewing the other facts in the light most favorable to the plaintiff, the complaint does not allege enough facts to state a claim to relief that is plausible on its face." *In re Fresenius Granuflo/Naturalyte Dialysate Prods. Liab. Litig.*, 76 F. Supp. 3d 294, 299 (D. Mass. 2015).

"While, ordinarily, a district court's review under Rule 12(b)(6) is limited to consideration of the facts set forth in the complaint and the documents attached thereto, an exception exists for 'documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" *Town of Acton v. W.R. Grace & Co. -- Conn. Techs., Inc.*, No. 13-12376-DPW, 2014 U.S. Dist. LEXIS 132684, at *14 (D. Mass. Sep. 22, 2014), citing to *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

"A statute of limitations defense is an affirmative defense that can be addressed by either a 12(b)(6) or a 12(c) motion.  Dismissal may only be granted if the complaint and any documents

11

that properly may be read in conjunction with it show beyond doubt that the claim asserted is out of time." *In re Fresenius Granuflo/Naturalyte Dialysate Prods. Liab. Litig.* 76 F. Supp. 3d at 299-300.

"In evaluating a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, we construe plaintiffs' complaint liberally and ordinarily "may consider whatever evidence has been submitted, such as . . . depositions and exhibits." *Carroll v. United States*, 661 F.3d 87, 94 (1st Cir. 2011).

"Generally, a civil complaint must contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Fed. R. Civ. P. 8(a)(2); *see Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567-68, 570, (2007). Complaints alleging fraud, though, are subject to a heightened pleading standard, which is embodied in Federal Rule of Civil Procedure 9(b). That rule demands that the 'circumstances constituting fraud' be pleaded 'with particularity.' Fed. R. Civ. P. 9(b); *see Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 15 (1st Cir. 2004). We have explained that when Rule 9(b) applies, the pleader ordinarily must 'specify the who, what, where, and when' regarding the alleged fraud. *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004). Other facets of fraud, such as intent, may be pleaded in general terms. See Fed. R. Civ. P. 9(b); *Rodi*, 389 F.3d at 15." *Id.*

"Under our jurisprudence, Rule 9(b)'s heightened pleading requirements apply not only to claims of fraud simpliciter but also to related claims as long as the central allegations of those claims 'effectively charge fraud.' *Mulder v. Kohl's Dep't Stores, Inc.*, 865 F.3d 17, 21-22 (1st Cir. 2017) (*quoting N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 15 (1st Cir. 2009))." *Foisie v. /Worcester Polytechnic Inst.*, 967 F.3d 27, 49 (1st Cir. 2020).

But Rule 9(b) does not demand a blow-by-blow account; as long as a plaintiff has adequately pleaded the who, what, where, and when of the alleged fraudulent conduct, the rule does not obligate her to allege every conceivable detail incident to the fraud. See *Dumont v. Reily Foods Co.*, 934 F.3d 35, 38-39 (1st Cir. 2019) ….  And this is all the more true when — as in this case — the missing details are 'either irrelevant or the potential subjects of discovery.'" Dumont, 934 F.3d at 39."  *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 50–51 (1st Cir. 2020).

## IV.    LEGAL ARGUMENT

### a.   The class action filed on March 9, 2011 is within any potentially applicable statute of limitations period and thus tolled all claims for all putative class members

"A federal class action is no longer 'an invitation to joinder' but a truly representative suit designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 550 (1974).  "Thus, the commencement of the action satisfied the purpose of the limitation provision as to all those who might subsequently participate in the suit as well as for the named plaintiffs.  To hold to the contrary would frustrate the principal function of a class suit, because then the sole means by which members of the class could assure their participation in the judgment if notice of the class suit did not reach them until after the running of the limitation period would be to file earlier individual motions to join or intervene as parties -- precisely the multiplicity of activity which Rule 23 was designed to avoid in those cases where a class action is found 'superior to other available methods for the fair and efficient adjudication of the controversy.'"  *Id*. at 551.

It is crystal clear law that the statute of limitations is tolled once a putative class is asserted and before a court has certified or denied the putative class.  In fact, the Supreme Court,

in making its case for broad protection of potential class members, specifically noted that those parties to a putative class have tolled the statute. "Rule 23 is not designed to afford class action representation only to those who are active participants in or even aware of the proceedings in the suit prior to the order that the suit shall or shall not proceed as a class action. During the pendency of the District Court's determination in this regard, which is to be made 'as soon as practicable after the commencement of an action,' potential class members are mere passive beneficiaries of the action brought in their behalf." *Id*. at 552.

The putative class in this case has never been approved or denied. Genzyme Corporation, however, seeks to not only deprive potential class members of their rights to either join in the class if it is certified or pursue individual claims if the class is denied, but to take it a step further and have this Honorable Court hold that Plaintiffs, who timely filed their actions, lose the protection of Indiana's savings clause and the parties' tolling agreement without any legal justification.

Genyzme Corporation has long been aware of the putative class, the identities of the specific Plaintiffs, and the substance of their claims. "The policies of ensuring essential fairness to defendants and of barring a plaintiff who 'has slept on his rights,' are satisfied when, as here, a named plaintiff who is found to be representative of a class commences a suit and thereby notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment. Within the period set by the statute of limitations, the defendants have the essential information necessary to determine both the subject matter and size of the prospective litigation, whether the actual trial is conducted in the form of a class action, as a joint suit, or as a principal suit with additional intervenors." *Am. Pipe & Constr. Co.*, 414 U.S. at 554-55.

Genzyme Corporation argues that *American Pipe* tolling does not apply to this case and that this case is more akin to *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800 (2018). This argument fails as *China Agritech* clearly addresses an entirely different question: "The question presented in the case now before us: [1] **<u>Upon denial of class certification</u>**, may a putative class member, in lieu of promptly joining an existing suit or promptly filing an individual action, commence a class action anew beyond the time allowed by the applicable statute of limitations? Our answer is no. *American Pipe* tolls the statute of limitations during the pendency of a putative class action, allowing unnamed class members to join the action individually or file individual claims if the class fails." *Id*. at 1804 (bold and underline emphasis added). Genzyme Corporation is well aware that the putative class has neither been certified or denied, and instead the parties have been engaged in settlement discussions under the protection of a tolling agreement. This is quite simply not a follow-on class action lawsuit. This is the same class action filed in 2011 and well within the statute of limitations.

Genzyme Corporation does not even attempt to argue that a particular event triggered the end of the *American Pipe* tolling and that these Plaintiffs, who are protected by the Indiana and/or Massachusetts savings statutes and a tolling agreement, should have commenced individual actions. For example, a putative class member in this case was well within his or her rights to await a decision on whether the *Hochendoner* class was certified or denied. In fact, that is what the courts encourage. At no point did the tolling of putative class members end. The class is still awaiting a decision on whether it will be certified.

      **b.**         **Plaintiffs' individual claims should all survive as set forth below**

         i.   <u>Trina Wilkins (Indiana Resident and party to the original *Adamo* Action)</u>

   1)      Genzyme Corporation does not oppose Trina Wilkins' case moving forward for

acceleration of her disease due to "low dose" Fabrazyme, so the case should move forward on at least this theory of liability.  SAC ¶ 1, ¶¶ 118-120.  Similarly, Genzyme does not oppose Trina Wilkins' injury claims from anaphylactic reactions from first being sensitized to Fabrazyme from the "low doses" and then going into anaphylactic shock when normal dosing resumed in 2012, so her case should move forward on this theory of liability as well.  *Id.*  Notably, the anaphylactic injury occurred after the shortage, not during the shortage.  As such, her claim for anaphylactic shock could not accrue until she had the reaction in 2012.   Trina Wilkins' type of anaphylaxis claim was previously approved by the First Circuit for Plaintiff James Mooney who was previously in Hochendoner/Adamo.  *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016).

2)      The choice of law for Trina Wilkins is procedural and substantive Indiana and Kentucky law.  As discussed herein, Indiana uses a borrowing statute for out of state residents suing out of state defendants.  "A product may be defective under the IPLA [Indiana Product Liability Act] if it is defectively designed, if it has a manufacturing flaw, or if it lacks adequate warnings about dangers associated with its use."   Kaiser v. Johnson & Johnson, 947 F.3d 996, 1007 (7th Cir. 2020), and Ind. Code Ann. § 34-20-4-1.  For Kentucky, see  KRS 411.300(1) discussed in Monsanto Co. v. Reed, 950 S.W.2d 811 (Ky. 1997).  The defense argues in a footnote that a conflict of law arises, but it does not.  Indiana applies the state law of the forum where the injury occurred for purposes of lex loci delecti (the place of the wrong).   "Indiana applies a two-step conflicts analysis. Hubbard Mfg. v. Greeson, 515 N.E.2d 1071, 1073 (Ind.1987). First, the court must determine if the place where the last event necessary to make the defendant liable—that is, the place of the injury—is insignificant. Id. If it is not, the law of that state applies. *Id.* Only if the court finds that the place of injury is insignificant does it move to step two which requires the court to consider "other factors such as: 1) the place where the conduct causing the injury occurred;

16

2) the residence or place of business of the parties; and 3) the place where the relationship is centered." *Id*. at 1073–74. In the instant case, we, like the district court, arrive at the inevitable conclusion that the place of the injury—Indiana—is not insignificant.  Therefore, we apply Indiana law and need not address the second prong in Indiana's choice-of-law analysis. *See Judge v. Pilot Oil Corp.*, 205 F.3d 335 (7th Cir.2000)." *Land v. Yamaha Motor Corp.*, 272 F.3d 514, 516–17 (7th Cir. 2001).  "The Lands [motioning party] propose an approach whereby the law of the place of the tortious conduct is controlling in product liability cases. The state of Indiana has given us no indication that it intends to change its choice-of-law policy to reach such a result, and we decline to make that policy decision for it." *Id.*  "Although *Hubbard* does note some discomfort with the rigid place of injury, or lex loci delicti, approach, it still adheres to an analysis that uses the place of injury as a baseline. 515 N.E.2d at 1073–74. If the place of injury is not insignificant, we must apply its law regardless of the greater interest another state may have."  *Id.* at 517.  "[I]t was not mere fortuity that the injury occurred in Indiana, as the Lands suggested by comparing this choice-of-law determination with those involving pass-through automobile or airplane accidents in which the place of the injury is given little weight, and the argument that Indiana's contacts have little or no relevance to the legal action simply cannot withstand scrutiny." *Id.*   The defense argues like the Lands did that the place of the injury does not control, but that approach is not adopted by the Indiana courts.[5]

   3)   Genzyme Corporation opposes Ms. Wilkins' "progression of disease" claim.  Ms. Wilkins, however, is not relying on a theory that low doses caused the "natural progression." *Hochendoner v. Genzyme Corp.,* 823 F.3d 724, 732–33 (1st Cir. 2016).  Instead, Ms. Wilkins properly pleads negligent and fraudulent inducement to take "low dose" Fabrazyme (as opposed

---

[5] The district court, as a transferee court sitting in diversity, is obligated to apply the choice-of-law rules followed by the transferor court.  *Van Dusen v. Barrack*, 376 U.S. 612 (1964).

to another drug) because the material information of the ineffectiveness of Fabrazyme for treating Fabry disease was hidden from her, and she properly relied on Genzyme Corporation to inform her that "low dose" Fabrazyme would be ineffective in treating the disease.[6] SAC ¶ 1.  The reliance causing her injury is recognized in the Restatement (Second) of Torts under negligence theories § 310 (Conscious Misrepresentation Involving Risk of Physical Harm), § 311 (Negligent Misrepresentation Involving Risk of Physical Harm), § 324A (Negligent Undertaking), § 402B (Misrepresentation of Material Fact),   and fraud theories § 525 (Liability For Fraudulent Misrepresentation), § 550 (Liability for Fraudulent Concealment), § 551 (Liability for Fraudulent Non-disclosure), § 552 (Information Negligently Supplied for the Guidance of Others), § 536 (Fraudulent Misrepresentation Where Statute Requires Disclosure to Protect a Class), and § 557A (Fraudulent Misrepresentations Causing Physical Harm) and subsumed into the Indiana Product Liability Act as a theory for a products liability case.[7]

   4)     Scienter and the fraudulent scheme are properly plead for the fraud claims because Dr. Gruskin knew that the low dosing data was false when he sent Ms. Wilkins letters (*e.g.*

---

[6] "Massachusetts views the Restatement favorably."  *Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 14 (1st Cir. 2004).

[7] "In 1995, the Indiana Legislature amended the IPLA to apply to all products-liability actions, regardless of the substantive legal theory, Ind.Code § 34–20–1–1, and provided that defective-design and inadequate-warnings claims are to be governed by negligence principles rather than strict liability." "The adequacy of a warning (i.e., whether the defendant breached its duty to warn) is generally a question of fact, but it can be decided as a matter of law when the facts are undisputed and only one inference can be drawn from those facts." *Weigle*, 729 F.3d at 731 (*citing Cook v. Ford Motor Co.*, 913 N.E.2d 311, 327 (Ind. Ct. App. 2009)).  A product may be "defective" under the Indiana Products Liability Act (IPLA) if: (1) it is defectively designed; (2) it has a manufacturing flaw; or (3) it lacks adequate warnings about dangers associated with its use. Ind. Code Ann. § 34-20-4-1.  Similarly, The "unreasonably dangerous" standard incorporates the "consumer expectations" test set forth in the Restatement (Second) of Torts: A product is unreasonably dangerous when it "exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers." Ind. Code § 34-6-2-146; accord Restatemtn (second) of Tort § 402A cmt. i (AM. LAW INST. 1965).  *See Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1008 (7th Cir. 2020).

"bullshit" and the Vedder study found "low dose" ineffective, while the Lubanda study was not reassuring that "low dose" was effective).  SAC ¶ 464.  A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies. Restatement (Second) of Torts § 526.  It is also fatally ambiguous to say "not much is known in the literature" Restatement (Second) of Torts § 527, as well as being misleading because of its incompleteness. Restatement (Second) of Torts § 529.   Fraud is considered a separate tort from product liability theory in Indiana.  The details of "who, what, where, and when" are laid out in the pleading with precision as are the Bates numbered documents that Genzyme Corporation already possesses showing its scheme to defraud.[8]

5)      Genzyme Corporation argues that the injuries are not "titrated" with the defect in the Fabrazyme matched to the injury as was done in *Hochendoner*.  This is not true for acceleration

---

[8]      "Under Indiana's discovery rule, a cause of action accrues, and the limitations period begins to run, when a claimant knows or in the exercise of ordinary diligence should have known of the injury." *Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009*). Robertson v. State*, 141 N.E.3d 1224, 1227 (Ind. 2020) The statute of limitations is 2 years for negligence and six years for fraud.
      As the Indiana courts recognize, the date upon which a plaintiff "discovered facts which, in the exercise of ordinary diligence, should lead to the discovery of [causation] and resulting injury, is often a question of fact." *Van Dusen v. Stotts*, 712 N.E.2d 491, 499 (Ind.1999). Generally, though, the plaintiff's suspicion, standing alone, about the source of her injury is insufficient to trigger the onset of the limitations period. See Evenson, 899 F.2d at 705; *Van Dusen*, 712 N.E.2d at 499. In contrast, the limitations period will begin to run when a physician suggests there is a "reasonable possibility, if not a probability" that a specific product caused the plaintiff's injury. *Degussa Corp.*, 744 N.E.2d at 411; *Van Dusen*, 712 N.E.2d at 499. In this latter case, a reasonable individual, exercising ordinary diligence, *967 would pursue the lead and procure "additional medical or legal advice needed to resolve any remaining uncertainty or confusion regarding the cause of his or her injuries." *Degussa Corp.*, 744 N.E.2d at 411. The Indiana courts have cautioned that " 'events short of a doctor's diagnosis can provide a plaintiff with evidence of a reasonable possibility' that another's product caused his or her injuries." *Id.* at 411 (quoting Evenson, 899 F.2d at 705). And FN 6 In general terms, the discovery rule states that a cause of action accrues for purposes of the statute of limitations only when the plaintiff knew or reasonably should have known of his injury and its cause. *Nelson v. Sandoz Pharms. Corp.*, 288 F.3d 954, 966–67 (7th Cir. 2002). *Cf.* If a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at any time within the period of limitation after the discovery of the cause of action." Ind.Code § 34–11–5–1,  *Alldredge v. Good Samaritan Home, Inc.*, 9 N.E.3d 1257, 1258 (Ind. 2014).

claims and vesivirus claims and particulate claims.  However, Genzyme attempt to place a level of granularity "triply defective" Fabrazyme that is not physically possible due to human biology. Quite simply, if any one of the defects listed is a substantial cause of the injury (inflammation), then liability attaches independent of other causes.  "If the defendant's negligence is a substantial factor in producing plaintiff's injury, and if the particular injury suffered is one of a class that was reasonably foreseeable at the time of the defendant's wrongful act, then there is causal relation in fact as well as legal cause." citing *Tabor v. Continental Baking Company* (1941), 110 Ind.App. 633.  *Johnson v. Bender*, 174 Ind. App. 638, 643 (1977).  For inflammation, it is impossible to identify whether any particular cell in a patient's body is responding due to exposure to vesivirus, particulates, or "lose dose" sensitization because immune cells have the same reaction to each physical insult.  On the other hand, it is possible to show that a patient who received triply defective Fabrazyme has increased inflammation relative to those who took uncontaminated full doses, of which one or all were substantial factors in causing the inflammation. SAC ¶¶ 125-126. In any event, the notice function of a pleading is satisfied, especially in that the molecular biology of each injury is laid out with citations to the appropriate medical literature.  It is now time for the fact-finder to weigh in on causation since the issue is the proper subject of expert testimony and opinion.

6)      Genzyme Corporation argues that money is not an injury, as if the "low dose" Fabrazyme failed to deliver an economic expectation under a mercantile contract instead of being purchased under the false belief that "low dose" Fabrazyme would be of some use in arresting Plaintiffs' Fabry disease.  When consumers purchase a drug, the primary reason is to effectively treat their disease, not how it tastes or what color it is.  As stated in the Restatement (Second) of Torts, a fraudulent misrepresentation creates liability for the actor for the "pecuniary loss caused." § 525 (4).  Since tort law recognizes pecuniary loss, the claim is properly pled.

Moreover, the law has long recognized a fraud can be accomplished both in factum (the vial contained Fabrazyme) and in the inducement ("low dose" is effective to some degree at least in the treatment of Fabry disease).  The inducement was cultivating the false belief that "low dose" Fabrazyme would be useful.  The defense only argues that the vials were not falsely labeled as to the contents of the vial and ignore that the inducement to buy the "low dose" was due to responding to the "strong messaging" of Genzyme to promote "low dose" Fabrazyme. Failure to tell the Plaintiffs that they would be **insane** to take "low dose" Fabrazyme and that the data on "low dose" for treating Fabry was "bullshit" constitutes material and outrageously deceitful omissions.   See also Restatement (Second) of Torts § 551 (Fraudulent non-disclosure) "One who fails to disclose a fact that he knows may justifiably induce another to act or refrain from acting in a business transaction is subject to the same liability."    In similar cases, the First Circuit has found that "this is a classic benefit-of-the-bargain injury, for which the measure of damages is "the monetary difference between the actual value of the product at the time of purchase and what its value would have been if the representations had been true." *Aspinall v. Philip Morris Cos.*, 442 Mass. 381, 813 N.E.2d 476, 487 (2004).  *Lee v. Conagra Brands, Inc.*, 958 F.3d 70, 76 (1st Cir. 2020). "No more need be alleged at this stage of litigation."  *Lee v. Conagra Brands, Inc.*, 958 F.3d 70, 80–81 (1st Cir. 2020)."

7)     Genzyme Corporation argues that the fraud was subject to the "storm warning doctrine" in that Plaintiffs were already suspicious of Genzyme Corporation's promotion of "low dose" Fabrazyme.   Suspicion does not start accrual of any of the Plaintiffs' states fraud laws. "Storm warning" doctrine has only been applied to securities cases and has not been adopted by Indiana for fraud and fraudulent concealment of dangers or ineffectiveness associated with pharmaceutical drugs.  *See also, Young v. Lepone*, 305 F.3d 1 (1st Cir. 2002).   In determining

whether "storm warnings" put investors on notice of possible securities fraud, for limitations purposes under Rule 10b-5, the reviewing court must first ascertain whether, when, and to what extent such warnings actually existed, and second whether, once warnings were apparent, investor probed matter in reasonably diligent manner. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5." As such, it is up to the fact finder to determine when a plaintiff knew of their injury and the fraud respectively.

      8)     For the Kentucky claims, "product liability actions are governed by the Kentucky Product Liability Act ("KPLA"). See KRS § 411.300–.350.4 A plaintiff may advance three different causes of actions against a manufacturer: (1) strict liability, (2) negligence, and (3) breach of warranty. *Williams v. Fulmer*, 695 S.W.2d 411, 413 (Ky.1985). Additionally, Kentucky law recognizes three theories of product liability: (1) defective design, (2) defective manufacture, and (3) failure to warn. *Clark v. Hauck Mfg. Co.,* 910 S.W.2d 247, 251 (Ky.1995), overruled on other grounds by *Martin v. Ohio Cnty. Hosp. Cor*p., 295 S.W.3d 104 (Ky.2009). To recover under any product liability claim, the plaintiff must prove the existence of a 'defect,' *McCoy v. Gen. Motors Corp.*, 47 F.Supp.2d 838, 839 (E.D.Ky.1998), and legal causation. *Morales v. Am. Honda Motor Co., Inc.*, 71 F.3d 531, 537 (6th Cir.1995) (citing *Huffman v. SS. Mary & Elizabeth Hosp.*, 475 S.W.2d 631, 633 (Ky.1972))." *Prather v. Abbott Lab'ys*, 960 F. Supp. 2d 700, 705–06 (W.D. Ky. 2013). Plaintiff has alleged defective design in that the Fabrazyme is a pharmaceutical and therefore Genzyme is strictly liable for the effects of vesivirus and particulates on Trina Wilkin's vesivirus infection and her inflammation and her accelerated disease process. The product was defectively designed in that it was administered at "low" dose which makes it impossible to treat Fabry disease. Genzyme further failed to warn Trina Wilkins that the data it had collected for requiring "low dose" during the shortage was "bullshit." The defense only argues that the causes

of action should be labeled differently in the complaint, not that the causes of action have not been properly pled by Trina Wilkins under Kentucky law.

9)      For the Kentucky Consumer Protection Act, Genzyme Corporation argues that it and Trina Wilkins were not in privity.  However, the Second Amended Complaint pleads privity. In fact, Genzyme Corporation tracks the health of its customers and communicates through "care representatives" throughout the course of treatment.  This is not the hands-free distance that is consistent with normal distribution in a chain of sale.  The federal district court held that, "while Kentucky law normally requires buyer–seller privity to maintain a cause of action for breach of warranty, the Kentucky Supreme Court would give the consumer standing in the case because the 'express limited warranty was intended to benefit the residential homeowners and not the distributors who sold [the] product.' In the second case, *Naiser v. Unilever U.S., Inc.,* 975 F.Supp.2d 727 (W.D. Ky. 2013), the same court expanded this rationale to include scenarios where the 'express warranties were clearly intended for the product's consumers,' even if the warranties did not 'expressly state that they run directly to the intended consumers.' *Id.* at 739–40.  *Yonts v. Easton Tech. Prod., Inc.*, 676 F. App'x 413, 420 (6th Cir. 2017).  In *Levin* and *Naiser*, the consumer purchased the defective product directly from a retailer; there was only one middleman." *Id.*  In any event, the claims should not fail for naming the wrong party.  Discovery would be needed to identify the unwitting pharmacy supplying "low dose" Fabrazyme.

10)     Genzyme Corporation argues impossibility pre-emption under the Food Drug and Cosmetics Acts ("FDCA") by citing *PLIVLA v. Mensing,* but impossibility only applies to generic, not branded medications. *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011).  Fabrazyme is a "branded" medication because it was the first to market.

> As the Seventh Circuit explains:  "A brand-name manufacturer can strengthen a warning label without waiting for FDA approval. *See* 21 C.F.R. §

23

314.70(c)(6)(iii). The FDA requires brand-name manufacturers to file a supplement explaining a change in warnings and reserves the right to reject a labeling change after it is made. *Id*. § 314.70(c)(7).  *In Wyeth v. Levine*, 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009), the Supreme Court considered whether it was impossible for a brand-name drug manufacturer to comply with this federal labeling regime and its duties under state tort law. The Court rejected the manufacturer's claim of impossibility preemption, noting that the FDA permitted a manufacturer "to unilaterally strengthen its warning" to comply with state law. *Id*. at 573, 129 S.Ct. 1187. The Court recognized that the FDA could veto such a change, but "absent clear evidence that the FDA would not have approved a [warning] change," no direct conflict between federal and state duties could be said to exist. *Id*. at 571, 129 S.Ct. 1187."
*Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1005, 1010 (7th Cir. 2020).

Moreover, Genzyme was marketing the drug "off-label" which, under the First Circuit's case law from *In re Neurontin*, <u>especially</u> requires a manufacturer to disclose such additional information.  *In re Neurontin Marketing, Sales Practices, and Prods. Liability Litig*., 618 F. Supp. 2d 96, 110  (D. Mass. 2009).  Genzyme Corporation acknowledges in its brief that the statute specifically accommodates and expects new data to be submitted.  Similarly, the Supreme Court held that "[w]hen the risks of a particular drug become apparent, the manufacturer has a duty to provide a warning that adequately describe[s] that risk.  *Merck Sharp & Dohme Corp. v. Albrecht,* 139 S. Ct. 1668, 1677 (2019) (internal citations and quotations omitted) (emphasis added); *Wyeth v. Levine*, 555 U.S. 555, 571 (2009).  It is clear why Genzyme did not update the label.  It did not want anyone (except for the Australians) to know that taking "low dose" Fabrazyme would be **insane**. [9]  Finding impossibility pre-emption in the current case would simply overturn *Wyeth v. Levine*, 555 U.S. 555, (2009).

---

[9] Genzyme insinuates that the FDA would have enforced the statute if there had been anything wrong with "low dose" Fabrazyme, but the more credible explanation for non-enforcement was that Genzyme simply did not submit any data to the U.S. authorities fearing the same rejection it had received in Europe.  It also insinuates that acknowledging in a website that statutes of limitations exist is an admission that the statute of limitations has passed.  The proposition is false.  Statutes of limitations issues are fact-specific, which is why a lawyer should be consulted.  Thus, nothing is "conceded."

11)     Genzyme Corporation also argues that the statute of limitations has lapsed on all of Ms. Wilkins' causes of action.  Genzyme Corporation is vague as to which arguments apply to which Plaintiffs, but it implies that Ms. Wilkins' case was "filed too late" in Indiana in 2020.  First, she was protected by a tolling agreement that was signed by counsel for both parties in this case. The agreement shows that the cause of action is not late by means of *American Pipe* tolling, the tolling agreement, and estoppel if it was filed by February 29, 2021.  The case was filed on February 29, 2021.  Thus, the case is timely filed and relates back to the original *Adamo* complaint.

As to the original *Adamo* action, it was filed within two years of the end of the shortage. Genzyme Corporation argues that this is too late, but it could not have been.  Ms. Wilkin's reaction to full dose occurred when the shortage ended and she was supplied full dose. SAC ¶ 118.  In other words, the injury accrued when the normal dosing resumed in 2012, not the first "low dose."

As to the other theories of liability, the repeated and continued misrepresentations causes the accrual date to extend to any subsequent sale of Fabrazyme after receiving the first low dose. "One who deals with another in a business transaction… knowing that the other is relying upon the maker's misrepresentation previously made… in another and earlier transaction is subject to the same liability as though the maker had repeated the representation for the purpose of influencing the recipient's conduct in the later transaction." Restatement (Second) Torts § 535 Continuing Misrepresentations. As such, the penultimate sale of "low dose" Fabrazyme at the end of the shortage in 2012 is the accrual date for any statute of limitations based on misrepresentation, not the first sale of "low dose" Fabrazyme in 2009.

Moreover, the Indiana Supreme Court has stated that "For centuries, our justice system has operated under the principle that a person who commits fraud should not be permitted to gain

thereby. *See, e.g., Talbot v. Jansen*, 3 U.S. 133, 158, 3 Dall. 133, 1 L.Ed. 540 (1795) (Paterson, J.) ("Hence the efficacy of the legal principle, that no man shall set up his own fraud or iniquity, as a ground of action or defence."); *Bd. of Comm'rs of Clinton Cnty. v. Davis*, 162 Ind. 60, 69 N.E. 680, 683 (1904) ("It is a maxim of the law that no man shall be permitted to profit by, or take advantage of, his own wrong, or to found any claim upon his own iniquity."). As applied to statutes of limitation, this principle means "the statute in good conscience can not run until the party has a right to commence his suit, and that right can not accrue in the case of fraud, until the injured party is informed of the injury done or fraud committed." Raymond, 4 Blackf. at 84–85. Thus, a tortfeasor's fraudulent concealment of his wrong ordinarily will operate to toll the statute of limitation until the plaintiff discovers the wrong. *Doe v. Shults–Lewis Child & Family Servs., Inc.,* 718 N.E.2d 738, 744–45 (Ind.1999) (*citing Fager v. Hundt*, 610 N.E.2d 246, 251 (Ind.1993)). At that point, the plaintiff has 'a reasonable amount of time' to bring his claim. *Id*. at 745.  And that language has survived to the present day without substantive amendment.  The Fraudulent Concealment Act now provides: "If a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at any time within the period of limitation after the discovery of the cause of action." Ind.Code § 34–11–5. *Alldredge v. Good Samaritan Home, Inc*., 9 N.E.3d 1257, 1262 (Ind. 2014).  "[I]f the parties are in a fiduciary relationship such that the defendant had a duty to disclose the existence of the claim to the plaintiff, the concealment need not be active; the defendant's failure to fulfil that duty may be sufficient to invoke the protection of the statute. *Malachowski*, 590 N.E.2d at 563." *Id.*  "The question… is not, are there allegations of fraudulent concealment in the complaint, but rather, is a party entitled to plead and prove such a defense (if the facts exist) against the statute of limitations? *Fraud vitiates anything*. Courts will not uphold fraud, or presume the Legislature

intended to do so by allowing one in a confidential relationship to conceal an injury done another until the statute of limitations has run. …. *Id.* at 111, 138 N.E.2d at 896–97 (emphasis added)." *Alldredge v. Good Samaritan Home, Inc.*, 9 N.E.3d 1257, 1263 (Ind. 2014). As such, the accrual date for the fraud/misrepresentations related claims is the unsealing of the *Schubert* complaint that occurred while this case was already pending in Indiana. Therefore, since the Plaintiff facially pled facts that are within the statute of limitations, dismissal at the pleading stage is inappropriate. To the extent Genzyme argues that the case was not filed within one year of the dismissal of *Adamo*, the Massachusetts' and/or Indiana savings statutes apply.[10]

Similarly, the original class action in *Hochendoner* is tolled under *American Pipe* until certification is granted or denied. Because there has never been a certification decision, the *Adamo* case was timely filed in 2013 as was this case in 2020.

12)     The Fraud and Fraudulent Inducement claims are valid. Genzyme Corporation argues in a single paragraph that there is failure to plausibly allege that Genzyme Corporation made knowing misrepresentations. However, Genzyme Corporation ignores the information gleaned from *Schubert's* Fourth Amended Complaint. Genzyme Corporation's own employee, Dr. Daniel Gruskin, Director of Medical Affairs, stated that Genzyme sent "bullshit data" on "low dose" Fabrazyme to the European Medical Authority and felt that Genzyme should not have been surprised when the data was rejected as well as "low dose" treatment for Europeans. See Complaint SAC ¶ 339. In making representations to the U.S. advisory authority for the shortage, U.S. FSWG.

---

[10] The impending one-year date for the savings statute was the inducement for the Plaintiffs to enter into the tolling agreement. Under Massachusetts law, if an action is duly commenced within the limitations period and then dismissed for "any matter of form," the plaintiff is entitled to "commence a new action for the same cause within one year after the dismissal." Mass. Gen. Laws ch. 260, § 32. The savings statute applies, inter alia, to an action originally filed and dismissed in a court of another state or in a federal district court." *Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 12 (1st Cir. 2004) *See Boutiette v. Dickinson*, 54 Mass.App.Ct. 817, 768 N.E.2d 562, 563–64 (2002); *Liberace v. Conway*, 31 Mass.App.Ct. 40, 574 N.E.2d 1010, 1012 (1991).

Dr. Gruskin stated "did we lie to the FSWG?" to which Genzyme Corporation's marketing director, John King, said "we are the only ones who didn't".  Dr. Daniel Gruskin, further sent letters to the Plaintiffs which he described in an internal e-mail as "~~lie~~ (sic) update" about the length of the shortage and that Genzyme was doing all it could to "help the most vulnerable patients, while knowing that the statement "little is known in the literature" about "low dose" is dangerously misleading.   SAC ¶ 329. His deposition testimony revealed there was no evidence to support giving "low dose" Fabrazyme to patients. SAC ¶ 246.  In further documents, Genzyme authorities told the Australian regulatory authorities not to purchase "low dose" Fabrazyme because blanket dose adjustments "**would be insane.**"  SAC ¶ 465.   The actions and statements of Genzyme's agent, Daniel Gruskin M.D. are properly pled with particularly.   Genzyme Corporation again argues impossibility pre-emption, which does not exist for branded drug manufacturers as described above.

13)   Genzyme Corporation does not seriously challenge the claim for breach of fiduciary duty.  First, it refers to the wrong law.  As described above, the lex loci delicti doctrine used by Indiana is the place of the injury, not a balancing test used in Massachusetts.   Secondly, the allegation of a close relationship is properly pled.  SAC ¶ 1.  This pleading is not conclusory.  "A confidential or fiduciary relationship exists when confidence is reposed by one party in another with resulting superiority and influence exercised by the other." *Kalwitz v. Estate of Kalwitz*, 822 N.E.2d 274, 281 (Ind. Ct. App. 2005), trans. denied." *Butler v. Symmergy Clinic*, PC, 158 N.E.3d 407, 414 (Ind. Ct. App. 2020).  Dr. Gruskin is an archetypal fiduciary and he sent the "~~lie~~ (sic) update" to Ms. Wilkins.  The close contact by physicians and personal case managers who knew her communicated with her directly (not at arm's length) was intended to convey a "strong messaging" to Ms. Wilkins and the other Plaintiffs and their physicians to accept "low doses."

SAC  ¶ 221.  The pleading even cites to case managers within Genzyme who questioned the way information was being dispensed to patients. While Genzyme Corporation is indeed a biologics manufacturer, it also employs case managers such as nurses and social workers to communicate directly with customers in archetypal fiduciary roles.  "[T]here is a fine line between containing the message and keeping people in the dark. This was not the time for mushroom management. (Keep them in the dark and watch them grow!) Without the complete picture, I felt like my communication with *patients* was inauthentic, stilted, and potentially damaging with some *patients*."  SAC ¶ 272, emphasis added (not distributors but actual patients).  While Genzyme Corporation is indeed a manufacturer, it stepped into a fiduciary role by directly influencing the doctor-patient relationship and circumventing the independent judgment of prescribing physicians, thereby stepping into a physician's role.  SAC ¶ 221.  This is not a routine power-imbalance.  The substance of this relationship is an issue for the fact-finder.

14)     In Indiana, "[a] 'person who has been unjustly enriched at the expense of another is required to make restitution to the other.'(quoting Restatement (First) of Restitution § 1 (1937)). To prevail on a claim of unjust enrichment, a plaintiff must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Zoeller,* 904 N.E.2d at 220; *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind.1991), reh'g denied.  Ms. Wilkins properly pled a claim for unjust enrichment because Genzyme knew that "low dose" Fabrazyme would be ineffective for treating her Fabry disease.  SAC ¶ 1; *see also, Kohl's Indiana, L.P. v. Owens*, 979 N.E.2d 159, 167 (Ind. Ct. App. 2012).  Therefore, the claim for unjust enrichment is properly pled by Ms. Wilkins as an alternative cause of action in equity if her claims at law are dismissed.

ii.     James Bishop (Massachusetts resident and party to the original *Adamo*

Action)[11]

1)      Genzyme does not oppose James Bishop's claim based on acceleration of his disease due to "low dose" Fabrazyme, so the case should move forward on at least that theory of liability.  Mr. Bishop does not plead an anaphylactic response to full dose as Ms. Wilkins did.

2)      For purposes of *lex loci delecti* in an Indiana forum law, Massachusetts law applies as discussed *supra*.  Indiana applies its borrowing statute to foreign cases where the Plaintiff and Defendant have no connection with the state, so the statute of limitations is applied based on citizenship of the injured party.[12]

3)      Genzyme opposes "progression" of disease, but as previously explained, this is not a claim of "natural progression."  Mr. Bishop properly pleads negligent and fraudulent inducement to take "low dose" Fabrazyme because the material information of the ineffectiveness of "low dose" Fabrazyme for treating Fabry disease was hidden from him, and he properly relied on Genzyme to inform him that "low dose" Fabrazyme would be ineffective in treating the disease.  SAC ¶ 2.  The reliance causing him injury is recognized in the Restatement (Second) of Torts under Negligence Theories § 310 (Conscious Misrepresentation Involving Risk of Physical Harm), § 311 (Negligent Misrepresentation Involving Risk of Physical Harm), § 324A (Negligent Undertaking), § 402B (Misrepresentation of Material Fact), and Fraud Theories § 525 (Liability For Fraudulent Misrepresentation), § 324A(b) (Negligent Undertaking);  § 550

---

[11] While the claims and the plaintiffs are required to be matched for analysis under *Hochendoner*, the rebuttals to the defense opposition are shortened herein but not to the exclusion of arguments presented for other Plaintiffs.

[12] A conflict of law only arises in an Indiana court between an Indiana resident and a foreign resident, not two foreign residents.  See *In re E. Livestock Co., LLC*, 547 B.R. 277 (Bankr. S.D. Ind. 2016).  (IN 34-11-4-2 Bar of cause of action as defense Sec. 2. When: (1) a cause of action arose outside of Indiana against a nonresident defendant; (2) the defendant does not maintain an agent in Indiana for service of process or other person who, under the laws of Indiana, could be served with process as agent for the defendant; and (3) the cause is fully barred by the laws both of the place where the defendant resides and of the place where the cause of action arose; the bar of the cause of action under subdivision (3) is a defense.

(Liability for Fraudulent Concealment), § 551 (Liability for Fraudulent Non-disclosure), § 552 (Information Negligently Supplied for the Guidance of Others), § 536 (Misrepresentation While Under Statutory Duty to Disclose), and § 557A (Fraudulent Misrepresentations Causing Physical Harm).  The details of "who, what, where, and when" are laid out in the pleading with precision as are the Bates numbered documents that Genzyme already possesses showing its own scienter.

4)      The facts are properly plead for the fraud claims because Dr. Gruskin knew that the data on low dose was false when he sent Mr. Bishop letters (e.g. "bullshit" and the Vedder study found "low dose" ineffective, while the Lubanda study was not reassuring that "low dose" was effective).  A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies. Restatement (Second) of Torts § 526.  The details of "who, what, where, and when" are laid out in the pleading with precision as are the Bates numbered documents that Genzyme already possesses showing its own scienter.[13]

5)      Genzyme argues that the injuries are not "titrated" with the defect in the Fabrazyme matched to the injury as was done in *Hochendoner*.  This is not true for acceleration claims and vesivirus and particulate claims.  SAC ¶ 2.  As to triply-inflammatory Fabrazyme, the same reasoning used for Ms. Wilkins' claims apply.  To the extent any one of the defects are a substantial factor in the injury, the claim is properly pled.

6)      Genzyme also argues that loss of money is not an injury; however, "[o]ne who fails to disclose a fact that he knows may justifiably induce another to act or refrain from acting

---

[13] As to the accrual date, Massachusetts law states that "A claim for fraudulent misrepresentation does not begin to accrue until "a plaintiff learns or reasonably should have learned of the misrepresentation." *Kent v. Dupree*, 13 Mass.App.Ct. 44, 429 N.E.2d 1041, 1043 (1982).

in a business transaction is subject to the same liability."   Similarly, Massachusetts courts have found in comparable cases that "this is a classic benefit-of-the-bargain injury, for which the measure of damages is "the monetary difference between the actual value of the product at the time of purchase and what its value would have been if the representations had been true." *Aspinall v. Philip Morris Cos.*, 442 Mass. 381, 813 N.E.2d 476, 487 (2004).  *Lee v. Conagra Brands, Inc.*, 958 F.3d 70, 76 (1st Cir. 2020). "No more need be alleged at this stage of litigation."  *Lee v. Conagra Brands, Inc.*, 958 F.3d 70, 80–81 (1st Cir. 2020)."

7)      The "Storm warning" doctrine has not been adopted by Massachusetts for fraud and fraudulent concealment of dangers or ineffectiveness associated with pharmaceutical drugs. *See also, Young v. Lepone*, 305 F.3d 1 (1st Cir. 2002).

8)      As to negligence, Plaintiff has properly alleged (1) defective design, (2) defective manufacture, and (3) failure to warn.  The contamination claims for vesivirus and particulates sound in negligence as well as implied warranty of merchantability.  The fact that pure Fabrazyme is approved by the FDA at an approved dose does not create a defense for distributing contaminated drugs, and Genzyme does not point to any case law where such a defense has even been considered by a court. The FDA warning label only shields a company to the extent that the drug was tested.  Obviously, the clinical trials for Fabrazyme did not include a study for "Fabrazyme with particulates" or "Fabrazyme with vesivirus" because such a clinical study would never have been approved in the first place.

    The "low dose" claims are ones of defective warning.  As held by the First Circuit, if a drug is marketed off-label, then a duty to warn about all the observed side-effects and lack of effectiveness applies with even more force.  While Massachusetts does not recognize negligence per se, it does allow breach of regulatory laws as evidence.  Moreover, the nexus between a

vesivirus contamination and a vesivirus infection is plead with particularity.  The regulatory laws being breached are the state (not the federal) Pure Food and Drug Acts, which co-exist peacefully as described in *Wyeth v. Levine*.[14]

9)      The defense is correct that a 93A letter was not sent to Genzyme.  The Massachusetts deceptive trade practices claim has been eliminated from the proposed Third Amended Complaint.

10)     Impossibility preemption does not apply since Fabrazyme is a branded drug, as discussed above.

11)     Genzyme opposes James Bishop's case moving forward arguing that the statute of limitations has expired.  As discussed previously, the current action was filed under a savings statute and a tolling agreement.  To the extent, Genzyme is arguing that the *Adamo* action was filed late, it was protected under the *American Pipe* tolling from the *Hochendoner* filing.    To the extent that Genzyme is arguing that the *Wilkins* case was not filed within one year of dismissal, the approaching one year Massachusetts Saving Statute was the inducement to enter into the tolling agreement in the first place.  To the extent Genzyme is arguing that the fraud claims should have been filed sooner, there would be no possibility of such a claim accruing until the Plaintiffs learned of the fraud.  Moreover, the serial sale of "low dose" Fabrazyme without full disclosure extended the tort under the Restatement (Second) Torts § 535 Continuing

---

[14] "In keeping with Congress' decision not to pre-empt common-law tort suits, it appears that the FDA traditionally regarded state law as a complementary form of drug regulation. The FDA has limited resources to monitor the 11,000 drugs on the market, and manufacturers have superior access to information about their drugs, especially in the postmarketing phase as new risks emerge. State tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve a distinct compensatory function that may motivate injured persons to come forward with information. Failure-to-warn actions, in particular, lend force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times. Thus, the FDA long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation." *Wyeth v. Levine*, 555 U.S. 555, 578–79 (2009).

Misrepresentations until 2012 and were not even discoverable until 2020.  "One who deals with another in a business transaction… knowing that the other is relying upon the maker's misrepresentation previously made… in another and earlier transaction is subject to the same liability as though the maker had repeated the representation for the purpose of influencing the recipient's conduct in the later transaction." Misrepresentations would include, but not be limited to, not disclosing that U.S. patients would be **insane** to take low doses and that the Vedder study on low dose was "bullshit data."

12)     The Fraud and Fraudulent Inducement claims are valid.  The actions and statements of Genzyme's agent, Daniel Gruskin M.D., confirm that Genzyme was selling an ineffective drug, while it gaslighted patients into believing the company was trying to protect them.  Mr. Bishop received letters from Dr. Gruskin as well.

13)     Breach of fiduciary duty is not seriously challenged.  Dr. Gruskin and the case managers used their positions as a health care professional to induce professional reliance and trust in Genzyme.

14)     Unjust enrichment is properly plead.  Plaintiff Bishop conferred a pecuniary benefit to Genzyme due to its deceit, which is unjust.

### iii.     Amber Britton (Washington state resident and party to the original *Hochendoner* Action)[15]

1)     Amber Britton's claims are only mentioned once by the defense in a footnote arguing that her claims expired in 2013, which is impossible.  She had a case pending in 2013 and was covered under the tolling agreement in 2017, so the expansive arguments regarding the statute of limitations do not apply.  Moreover, the Washington Supreme Court has stated that when the

---

[15] While the claims and the plaintiffs are required to be matched for analysis under *Hochendoner*, the rebuttals to the defense opposition are shortened herein but not to the exclusion of the arguments presented for previous Plaintiffs.

statute of limitations is disputed, as here, the issue is for the fact finder. "For reasons discussed hereafter we hold that the claimant must know or should with due diligence know that the cause in fact was an alleged defect. Whether the claimant knew or should have known will ordinarily be a question of fact. That the causal connection usually is a question of fact is recognized." *N. Coast Air Servs., Ltd. v. Grumman Corp.,* 111 Wash. 2d 315, 319, (1988).  "This statute is intended to give the plaintiff a fair chance to ascertain the harm and its cause. Protection to the defendant is afforded by the provision that plaintiff may be barred if plaintiff did not exercise due diligence in discovering the harm and its cause."  *Id.* at 328.  "Our interpretation is consistent with the legislative declaration of purpose to treat all parties in a balanced fashion and without unduly impairing the rights of one injured as a result of an unsafe product."  *Id.*  "Subsection (c) extends the limitation period beyond the time of harm in situations where the claimant would have no reason to know about the harm or the causal connection to a defective product (e.g., the case of long-term pharmaceutical harms)."  *N. Coast Air Servs., Ltd. v. Grumman Corp.*, 111 Wash. 2d 315, 327, (1988).

2)       The choice of law for the statute of limitations is controlled by the Indiana borrowing statute where the Plaintiff and Defendant are both foreign to Indiana, which means that Washington state law is applied, as discussed *supra*.   Substantively, Plaintiff and defense agree that Washington state law is applied.

3)       As a reminder, Amber Britton did not receive "low doses" because Genzyme told her it could not provide her any doses, but it also did not tell her she could seek the alternative Replagal.  Genzyme rejected her prescription despite the fact that Genzyme was waiving its allocation rules for some but not others. SAC ¶ 4,  SAC ¶ 231.  She forewent treatment as a result. As such, her claims are not for the defective Fabrazyme during the shortage, but negligent

35

undertaking under the Genzyme's capricious allocation system for treatment that favored some but not others (see the Genzyme Contingency Plan), fraudulent concealment and misrepresentation, and breach of fiduciary duty in communicating with her and her doctor about the end of the shortage and affirmatively deciding not to tell her about the source an alternative treatment through the Compassionate Use Program.

More specifically, her reliance on Genzyme's information caused her injuries recognized in the Restatement (Second) of Torts under Negligence Theories § 310 (Conscious Misrepresentation Involving Risk of Physical Harm), § 311 (Negligent Misrepresentation Involving Risk of Physical Harm), § 324A (Negligent Undertaking) and Fraud Theories § 525 (Liability For Fraudulent Misrepresentation), § 324A(b) (Negligent Undertaking);   § 550 (Liability for Fraudulent Concealment), § 551 (Liability for Fraudulent Non-disclosure), § 552 (Information Negligently Supplied for the Guidance of Others), § 536, and § 557A (Fraudulent Misrepresentations Causing Physical Harm).  *cf.* "A 'product liability claim' under the WPLA preempts any claim or action that previously would have been based on any "substantive legal theory except fraud, intentionally caused harm or a claim or action brought under the consumer protection act, chapter 19.86 RCW." RCW 7.72.010(4); see *Graybar*, 112 Wash.2d at 860; *Wash. State Physicians Exch. & Ass'n v. Fisons Corp.*, 122 *Wash.2d 299*, 323 (1993); *La.-Pac. Corp. v. ASARCO Inc.,* 24 F.3d 1565, 1584 (9th Cir.1994).  *Bylsma v. Burger King Corp.*, 176 Wash. 2d 555, 559 (2013). The fraud is pled with particularity by referencing the Genzyme "Contingency Plan", the communications to doctors through the FSWG, and Dr. Daniel Gruskin's representations to Fabry patients as discussed previously.

4)     The defective product claims are limited to receiving vesivirus contaminated Fabrazyme in 2013 and 2015, which is not mentioned in the Motion to Dismiss.  Her vesivirus

injuries are properly pled under the Washington Product Liability Act and Deceptive Trade Practices Act as is the need to medically monitor her since she is a female. *See* Fabrazyme FDA label: "17. PATIENT COUNSELING INFORMATION Patients should be informed that a Registry has been established in order to better understand the variability and progression of Fabry disease in the population as a whole and in women [see Use in Specific Populations (8.6)], and to monitor and evaluate long-term treatment effects of Fabrazyme." SAC Fn. 4.  Notably, these vesivirus claims have been removed in the proposed Third Amended Complaint to focus the issues on what Genzyme told her and what was hidden from her.

5)      Regarding the Washington Product Liability Act and Deceptive Trade Practices Act, Genzyme collapses both claims and only argues that the vesivirus contaminated vials did not cause her to be exposed to vesivirus.  In other words, it argues the adequacy of proof presented, not the sufficiency of the pleading.   The learned intermediary doctrine does not apply because Genzyme offered ambiguous statements that the Fabrazyme contained vesivirus or that the virus was dangerous.  SAC ¶ 53, ¶ 67.   No physician ever prescribed any Category B biodefense pathogen for injection into humans.  The breach of warranty is pled under the Washington Product Liability act as a theory subsumed by the Act not in contravention to the Act.  The deceptive trade practice is simply that Genzyme did not tell Ms. Britton about the contamination or that vesivirus was dangerous to humans. SAC ¶ 158.

6)      The "Storm Warning" doctrine does not apply as discussed supra.

7)      Impossibility Preemption does not apply for vesivirus claims.  Contaminations are to be reported immediately to the FDA and patients under the internal corporate standard at Genzyme and the FDCA as a deviation.  SAC ¶P 68-69.

8)      Economic expectations do not apply to Ms. Britton's claim for contamination as it

is a defect that caused a physical harm.

9)    A cause of action for unjust enrichment is properly pled.  "Unlike the law of conversion, which requires that the transferee have wrongfully received the property of another, the law of restitution requires only that the transferee have received the property of another under circumstances that result in the transferee's "unjust enrichment." The Washington Supreme Court embraced or re-embraced these general principles in *Nelson v. Appleway Chevrolet, Inc.*." *Davenport v. Washington Educ. Ass'n*, 147 Wash. App. 704, 726 (2008).

### iv.    Toni Cordova (Nevada state resident and party to the original *Adamo* Action)

1)    Toni Cordova's claims are only mentioned once in the Motion to Dismiss, in a footnote arguing that her claims expired in 2013 which is impossible.  She had a case pending in 2013 and was covered under the tolling agreement in 2017, so the expansive argument of the statute of limitations does not apply.  "The statute of limitations begins to run when a plaintiff discovers facts suggesting a potentially negligent cause of harm and not when the injury itself is discovered." *Crabb v. Harmon Enterprises, Inc*., 130 Nev. 1167 (2014).[16]

2)    Choice of law for the statute of limitations is Nevada law under the Indiana borrowing statute and substantive Nevada law for the reasons previously described.

3)    Factually, Ms. Cordova's case is also unique in that she was granted access to Fabrazyme during the shortage, unlike Plaintiff Amber Britton.   However, her condition accelerated under the "low dosing."  SAC ¶ 5.  "Under Nevada law, a product may contain a defect that renders it unreasonably dangerous if it lacks adequate safety features or if a safer design is feasible. *Ford Motor Co. v. Trejo*, 133 Nev. 520, 525 (2017)(identifying design defects as a theory

---

[16] *Bemis v. Estate of Bemis*, 114 Nev. 1021, 1025, 967 P.2d 437, 440 (1998) ("Whether plaintiffs exercised reasonable diligence in discovering their causes of action is a question of fact to be determined by the jury or trial court after a full hearing.")

of strict products liability recognized in Nevada*); Fyssakis v. Knight Equip. Corp.,* 108 Nev. 212, 214 (1992)(explaining that a plaintiff may establish that a product is defective by showing that it "lacked adequate safety features or that a safer alternative design was feasible at the time of manufacture"). The same is true of a product that does not "include a warning that adequately communicates the dangers that may result from its use or foreseeable misuse."[17] A safer design was clearly possible in which full doses would be available if patients deteriorated or, at a minimum, Genzyme was duty-bound to warn about the possibility of accelerated Fabry disease as discussed previously.

4)      Ms. Cordova also has valid claims sounding in both negligence and fraud for the concealment of the dangers of low doses like the other Plaintiffs who did not know that taking low doses would be "**insane.**" SAC ¶ 310.   The reliance causing her injuries is recognized in the Restatement (Second) of Torts under Negligence Theories § 310 (Conscious Misrepresentation Involving Risk of Physical Harm), § 311 (Negligent Misrepresentation Involving Risk of Physical Harm), § 324A (Negligent Undertaking) § 402B (Misrepresentation of Material Fact) and Fraud Theories § 525 (Liability For Fraudulent Misrepresentation), § 324A(b) (Negligent Undertaking); § 550 (Liability for Fraudulent Concealment), § 551 (Liability for Fraudulent Non-disclosure), § 552 (Information Negligently Supplied for the Guidance of Others), § 536 (Misrepresentations Under a Statutory Duty to Inform), and § 557A (Fraudulent Misrepresentations Causing Physical Harm).

5)      Fraud and Breach of Fiduciary Duty are also properly pled for the same reasons that the claims of Trina Wilkins and the remaining Plaintiffs that they received low doses are properly

---

[17] "Since it is not clear that the soap's warning adequately communicated that the soap could cause blindness, we conclude that Fyssakis has raised a genuine issue of fact as to whether the soap was defective." *Fyssakis v. Knight Equip. Corp.*, 108 Nev. 212, 214 (1992)

pled. The communications from Genzyme led Ms. Cordova to believe "low dose" would be at of least some benefit in treating her disease despite Genzyme knowing otherwise.

6) Genzyme does not seriously challenge the pleading of the Nevada Unfair Trade Practices Claim. Indeed, Genzyme even cites that the regulatory approval only applies when the conduct was in compliance with the law. Off-label marketing is not in compliance with the FDCA. Indeed, some of the largest awards in civil enforcement actions by the FDA are where the manufacturer engaged in off-label marketing as discussed by the First Circuit *in In re Neurotin* RICO case. The argument that the label did not say that a low dose was not "as efficacious" as a full dose, makes no sense in light of the specific allegations of fraud, where Genzyme knew that low doses did not work at all for treating Fabry disease. Similarly, the "failure to supply" the market is different that supplying the market with doses of drug the manufacturer knows to be **insane** to administer to patients. SAC ¶ 465.

7) Breach of fiduciary duty is not seriously challenged. Dr. Gruskin and the case managers used their positions as a health care professional to induce reliance and trust in Genzyme.

8) Unjust enrichment is properly pled. "Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is "'acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.'" *Unionamerica Mtg. v. McDonald,* 97 Nev. 210, 212, 626 P.2d 1272, 1273 (1981) (quoting *Dass v. Epplen*, 162 Colo. 60, 424 P.2d 779, 780 (1967)). *Certified Fire Prot. Inc. v. Precision Constr.,* 128 Nev. 371, 381, 283 P.3d 250, 257 (2012). It is unconscionable that a company would force Americans to take a "low dose," while knowing such a dosing was **insane** for treating the disease. Retention of the money for forcing patients to buy a useless drug to treat their disease shocks the conscious.

40

v.   John Cortina (New York state resident and party to the original *Adamo* Action)

1)   John Cortina's claims are only mentioned once in Genzyme's motion.  Genzyme objects to John Cortina pleading negligence per se under the FDCA.  However, John Cortina is not alleging a violation of federal law but the state Pure Food and Drug act, so the claims are valid.  Genzyme did not oppose his particular case proceeding under any other theory or set of laws. As such his claims for Negligence, Strict Liability, Breach of Implied or Express Warranty must survive.[18]  Mr. Cortina's claims are not challenged on the statute of limitations, which is three years for product liability claims. [19]  Mr. Cortina was covered under the tolling agreement as well.

2)   The choice of law for the statute of limitations is New York law under Indiana's borrowing statute and substantive New York law.

3)   Genzyme's general objections to acceleration theory, particulate theory, vesivirus theory, or combination theory rebutted *supra* and apply with equal force to John Cortina's claims. SAC ¶ 6.   Impossibility pre-emptions similarly does not apply.

4)   Genzyme references a few New York cases, but they do not match the fact pattern currently being alleged.

First, "a seller of drugs is only required to give a warning if he has knowledge of the dangerous ingredient or side effect, or if by the application of reasonable, developed, human skill and foresight he should have such knowledge. (Comment j. to Restatement, Second, Torts s 402A). But this does not mean a retail pharmacist, like the appellant, is under any obligation to

---

[18] Plaintiffs have never pled "Fraud on the FDA."  The FDA was bypassed entirely since the marketing was off label.
[19] The statute of limitations for claims based on fraud is the greater of six years from the date the cause of action accrued or two years from the time plaintiff discovers the fraud, or could with reasonable diligence have discovered it (CPLR 213(8)).  *Cusimano v. Schnurr,* 137 A.D.3d 527, 531, (2016) (8)).

independently test the drug's chemical structure for side effects or other possible risks." *Bichler v. Willing*, 58 A.D.2d 331, 335, (1977).  Obviously, Genzyme is a manufacturer not a retail pharmacist.

Second, In Covidien's motion to dismiss under 12(b)6 and Rule 9(b), the Progrip hernia mesh was the only device that did not meet the pleading standard for defective design, failure to warn, negligent misrepresentation, and consumer fraud under NYGBL §§ 349 and 350. However, the motion was denied for the NYGBL §§ 349 and 350 claims as to the Parietex mesh, and breach of implied warranty with regard to both meshes' defective design and the Parietex mesh's failure to warn, as well as Mrs. Dunham's claims for loss of consortium derived from any of those claims.  *Dunham v. Covidien LP*, No. 19 CIV. 2851 (LLS), 2019 WL 6341179, at *7 (S.D.N.Y. Nov. 27, 2019).  The factual allegations of fraud in the *Covidien* case were less specific than the current *Wilkins* case.  Indeed, *Covidien* specifically references inflammation as an injury as does John Cortina.

Third, "when the warning given to the prescribing doctor by the manufacturer through package inserts gives specific detailed information on the risks of the product, the manufacturer has been held absolved as a matter of law."  *Lawrence v. Sofamor*, S.N.C., No. 95-CV-1507, 1999 WL 592689, at *4 (N.D.N.Y. Aug. 2, 1999).  However, nothing specific in the warning label for Fabrazyme even discusses "low dose" or vesivirus or particulates.

Finally, Genzyme cites that "Under New York law, a claimant must adduce evidence showing that a failure to warn was a substantial factor in causing [plaintiff's] injury."  *Quintana v. B. Braun Med. Inc.,* No. 17-CV-06614 (ALC), 2018 WL 3559091, at *6 (S.D.N.Y. July 24, 2018)."   After citing these propositions, the defense then ignores the currently pled facts about the "bullshit data," the "~~lie~~ (sic) update" sent to John Cortina and the promotion of the Lubanda

study over the Vedder study where Genzyme counselled the Australian medical authorities not to use a blanket dose adjustment because it would be **insane**. SAC ¶ 465. The evidence is even presented as Bates numbered documents so that Genzyme can refer to its own files.  There is not a lack of specificity in the *Wilkins* case.

5)      Mr. Cortina also has valid claims sounding in both negligence and fraud for the concealment of the dangers of low doses like the other Plaintiffs who did not know that taking low doses would be "**insane.**"  The reliance causing his injuries is recognized in the Restatement (Second) of Torts under  Negligence Theories § 310 (Conscious Misrepresentation Involving Risk of Physical Harm), § 311 (Negligent Misrepresentation Involving Risk of Physical Harm), § 324A (Negligent Undertaking), § 402B (Misrepresentation of Material Fact) and Fraud Theories § 525 (Liability For Fraudulent Misrepresentation), § 324A(b) (Negligent Undertaking);  § 550 (Liability for Fraudulent Concealment), § 551 (Liability for Fraudulent Non-disclosure), § 552 (Information Negligently Supplied for the Guidance of Others), § 536 (Misrepresentations under a Statutory Duty to Inform), and § 557A (Fraudulent Misrepresentations Causing Physical Harm).

6)      Fraud and Breach of Fiduciary Duty are also properly pled for the same reasons that the claims of Trina Wilkins and the remaining Plaintiffs receiving low doses are properly pled. The communications from Genzyme led Mr. Cortina to believe "low dose" would have some efficacy in treating his disease despite Genzyme knowing otherwise.

7)      Breach of Fiduciary Duty is not seriously challenged.  Dr. Gruskin and the case managers used their positions as a health care professional to induce reliance and trust in Genzyme.

8)      Unjust enrichment is properly pled.  To state a claim for unjust enrichment under New York law, a plaintiff must allege that: "(1) the defendant was enriched, (2) at the expense of the plaintiff, and (3) that it would be inequitable to permit the defendant to retain that which is

claimed by the plaintiff." *Clifford R. Gray, Inc. v. LeChase Construction Services, LLC*, 31 A.D.3d 983, 988, 819 N.Y.S.2d 182, 187 (3d Dep't 2006); see also *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir.2004). *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 458 (S.D.N.Y. 2016). It is unconscionable that a company would force Americans to take and pay for a "low dose," while knowing such a dosing was **insane** for treating their disease. Retention of the money obtained by forcing patients to buy a useless drug to treat a fatal disease is fundamentally offensive.

### vi.   George Demko (Pennsylvania state resident and party to the original *Hochendoner* Action)

1)      George Demko's claims are only mentioned three times in Genzyme's motion. Genzyme objects to Mr. Demko pleading negligence per se under the FDCA. Pennsylvania law recognizes negligence per se alleging a violation of state and federal Pure Food and Drug acts, so the claims are valid. "[T]he doctrine of per se liability does not create an independent basis of tort liability but rather establishes, by reference to a statutory scheme, the standard of care appropriate to the underlying tort," which is especially true if the drug or device is used off label. *In re Orthopedic Bone Screw Products Liability Litigation*, 193 F.3d 781, 790 (3d Cir.1999). *Cabiroy v. Scipione*, 2001 PA Super 29, ¶ 14, (2001).

Second, regarding strict liability, Genzyme misapplies the rule of *Parkinson v. Guidant Corp.*, 315 F. Supp. 2d 741, 747–48 (W.D. Pa. 2004) (citing *Hahn v. Richter*, 673 A.2d 888, 890–91 (Pa. 1996)). Strict liability claims are barred by comment K to § 402A only to the extent a prescription drug is "properly prepared and accompanied by proper directions and warning." Restatement (Second) of Torts § 402A (1965). Mr. Demko proper alleges that the Fabrazyme was not properly prepared (i.e., defective) because it contained vesivirus and particulates. He

also alleges that the warnings were not proper given that it was to be used at a "low dose." SAC ¶

8.  The FDA never approved "low dose."   Genzyme also ignores Pennsylvania's approval of

Restatement (Second) of Torts § 402B (1965). "One engaged in the business of selling chattels

who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material

fact concerning the character or quality of a chattel sold by him is subject to liability for physical

harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even

though (a) it is not made fraudulently or negligently, and (b) the consumer has not bought the

chattel from or entered into any contractual relation with the seller" which is also properly pled.

"[W]e find that the pronouncements of our Supreme Court in Kassab and Salvador, together with

the rationale of Randy Knitwear, conclusively mandate the adoption of s 402B of the

Restatement (Second) of Torts of the law of this Commonwealth."  *Klages v. Gen. Ordnance

Equip. Corp*., 240 Pa. Super. 356, 368, (1976).  Genzyme was engaged in off-label marketing to

Mr. Demko personally through the Genzyme care representative and through his physician.  He

reasonably believed it would be of some use in treating his disease and would not be ineffective.

By withholding the information that the "low dose" drug was completely useless, that the data

supporting using low dose was "bullshit" and that Australian Fabry patients would be **insane** to

take it, the warnings were not "proper" under comment K and also constitute a separate tort under

§ 402B.   George Demko was in privity with Genzyme both through communications and as the

intended third-party beneficiary of the sale of Fabrazyme to his pharmacy as are all persons who

buy Fabrazyme.

As a note, while contract theories are routinely applied to consumer cases, both the federal

and state Pure Food and Drug Acts criminalize off label marketing.  It would be antithetical to

the purpose Pure Food and Drug statutes to "contract out" a criminally-prohibited exception that

injures a plaintiff in exactly the way that the Acts anticipate—the sale of untested, ineffective, and dangerous drugs to consumers.[20]

Moreover, "claims for monetary damages generally satisfy the injury-in-fact threshold." *Am. Fed'n of State Cty. &. Emps. v. Ortho-McNeil-Janssen Pharms., Inc.*, No. 08-CV-5904, 2010 WL 891150, at *3 (E.D. Pa. Mar. 11, 2010).

2)      Mr. Demko's claims are not opposed due to a statute of limitations, and he was covered under the tolling agreement.

3)      The choice of law for the statute of limitations is Pennsylvania under Indiana's borrowing statute and substantive Pennsylvania law.

4)      Genzyme's general objections to acceleration theory, particulate theory, vesivirus theory or combination theory are rebutted *supra* and are equally applicable to Mr. Demko's claims. SAC ¶ 8.   Impossibility pre-emptions similarly does not apply.  Claims for restitution are properly pled, and fraud is pled with particularity.

5)      The same rebuttal arguments that Trina Wilkins and the other plaintiffs have made herein apply equally to Mr. Demko's claims.

vii.   Mary Helton (Indiana state resident and party to the original *Adamo* Action)

1)      Mary Helton's claims are only mentioned once in Genzyme's motion as well. Genzyme notes that Ms. Helton was a party to the original *Adamo* Action.

---

[20] "In addition to causing inappropriate spending of Medicaid funds, off-label uses that are not medically accepted may expose patients to harm. Scholarly literature, as well as government warnings and testimony, have pointed out that possible patient harm may arise from off-label uses that are not medically accepted. Despite these dangers, and despite U.S. Food and Drug Administration (FDA) restrictions on off-label marketing, some pharmaceutical manufacturers have engaged in extensive efforts to market drugs for off-label uses, including uses that are not medically accepted."   And "individuals that recognize off-label drug promotion should report it to: The FDA at BadAd@fda.gov or 855-RX-BadAd (855-792-2323)"; See, https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Downloads/off-label-marketing-factsheet.pdf

2)      Ms. Helton took "low dose" Fabrazyme and was exposed to and injured by particulates and vesivirus as plead in SAC ¶ 9.  Her claims are not opposed due to a statute of limitations, and she was covered under the tolling agreement.

3)      The choice of law for the statute of limitations is Indiana and substantive Indiana law.

4)      Genzyme's general objections to acceleration theory, particulate theory, vesivirus theory, or combination theory are rebutted *supra* and are equally applicable to Ms. Helton's claims. SAC ¶ 9.  Impossibility pre-emptions similarly does not apply.  Claims for restitution are properly pled, and fraud is pled with particularity.

5)      The same choice of law and rebuttal arguments that Trina Wilkins and the other Plaintiffs have made herein apply equally to Ms. Helton's claims.

> viii.    Donovan Helton (Indiana state resident and party to the original *Adamo* Action as minor D.H.)

1)      Donovan Helton's claims are only mentioned once in Genzyme's motion. Genzyme notes that Mr. Helton was a party to the original *Adamo* Action.

2)      Mr. Helton was a minor when he took "low dose" and was exposed and injured by particulates and vesivirus as plead in SAC ¶ 11.

3)      The choice of law for the statute of limitations is Indiana and substantive Indiana law.

4)      Genzyme's general objections to acceleration theory, particulate theory, vesivirus theory, or combination theory are rebutted *supra* and are equally applicable to Mr. Helton's claims. SAC ¶ 1.  Impossibility pre-emptions similarly does not apply.  Claims for restitution are properly pled, and fraud is pled with particularity.

5)      The same choice of law and rebuttal arguments that Trina Wilkins and the other

Plaintiffs have made herein apply equally to Mr. Helton's claims.

> ix.   Sydney Johnson (Virginia state resident and party to the original *Adamo* Action)

1)      Sydney Johnson's claims are only mentioned twice in Genzyme's motion. Genzyme notes that Ms. Johnson was a party to the original *Adamo* Action and argues that strict liability is not recognized under Virginia law, which is correct.  However, "manufacturers and sellers of defective products can be held liable on theories of negligence and breach of the implied warranty of merchantability." *Featherall v. Firestone Tire & Rubber Co*., 219 Va. 949, 961–64; *Logan v. Montgomery Ward & Co.*, 216 Va. 425, 428, (1975); see also Va. Code §§ 8.2–314, 8.2–318 (1965). A personal injury or wrongful death claimant may recover for breach of warranty under Virginia law by establishing "(1) that the goods were unreasonably dangerous either for the use to which they would ordinarily be put or for some other reasonably foreseeable purpose, and (2) that the unreasonably dangerous condition existed when the goods left the defendant's hands." *Logan v. Montgomery Ward & Co.*, 216 Va. at 428, 219 S.E.2d at 687. A product can be "unreasonably dangerous" if defective in assembly or manufacture, see, e.g., *Matthews v. Ford Motor Co.*, 479 F.2d 399, 400 (4th Cir.1973), if imprudently designed, see, e.g., *Dreisonstok v. Volkswagenwerk, A.G.*, 489 F.2d 1066, 1071 (4th Cir.1974), or if not accompanied by adequate warnings about its hazardous properties, see, e.g., *Spruill v. Boyle-Midway, Inc.*, 308 F.2d 79, 85–86 (4th Cir.1962).  Bly v. Otis Elevator Co., 713 F.2d 1040, 1042–43 (4th Cir. 1983), on reh'g sub nom. Farish v. Courion Indus., Inc., 754 F.2d 1111 (4th Cir. 1985)

2)      Ms. Johnson was a minor when she took "low dose" and was exposed and injured by particulates and vesivirus as plead in SAC ¶ 12.

3)      The choice of law for the statute of limitations is Virginia under Indiana's borrowing statute and substantive Virginia law.

4)      Genzyme's general objections to acceleration theory, particulate theory, vesivirus theory, or combination theory are rebutted *supra* and are equally applicable to Ms. Johnson's claims. SAC ¶ 13.   Impossibility pre-emptions similarly does not apply.  Claims for restitution are properly pled, and fraud is pled with particularity.

6)      Ms. Johnson is both young and a female.  As such, she is one of the special classes that Genzyme already promised to monitor.   Fabrazyme FDA label: "17. PATIENT COUNSELING INFORMATION Patients should be informed that a Registry has been established in order to better understand the variability and progression of Fabry disease in the population as a whole and in women [see Use in Specific Populations (8.6)], and to monitor and evaluate long-term treatment effects of Fabrazyme."  SAC FN 4. Additionally, she is the most at risk of developing reproductive tract complications from vesivirus 2117 being selected for in growth in mammalian ovarian cells.  Since vesivirus is a Category B biodefense pathogen, infection is both a credible and substantial risk to her health in particular.

7)      Ms. Johnson properly pleads a violation of the Virginia Consumer Protection Act. Genzyme's only rebuttal is that injury is not plead with sufficient specificity, but does not mention the testimony and emails of Dr. Daniel Gruskin or the communications with the Australian medical authorities that a blanket dose adjustment would be **insane**.  Omission of its knowledge that the "low dose" data was "bullshit," constitutes a deceptive trade practice.

8)      The same rebuttal arguments also apply that Trina Wilkins and the other plaintiffs have made herein.

     x.     <u>Plaintiff D.J. (Virginia state resident and party to the original *Adamo* Action)</u>

1)     Plaintiff D.J.'s claims are only mentioned twice in Genzyme's motion.  Genzyme notes that D.J. was a party to the original *Adamo* Action and argues that strict liability is not recognized under Virginia law, which is correct.  However, as discussed supra. "manufacturers and sellers of defective products can be held liable on theories of negligence and breach of the implied warranty of merchantability." *Farish v. Courion Indus., Inc.*, 754 F.2d 1111 (4th Cir. 1985).

2)     Plaintiff D. J. is currently a minor SAC ¶ 13.   As such, the statute of limitations is tolled until he reaches majority.  Genzyme fails to note this in its aggregate arguments.  Va. Code Ann. § 8.01-229 (West).

3)     The choice of law for the statute of limitations is Virginia under Indiana's borrowing statute and substantive Virginia law.

4)     Genzyme's general objections to acceleration theory, particulate theory, vesivirus theory or combination theory are rebutted *supra* and are equally applicable to D.J.'s claims. SAC ¶ 13.   Impossibility pre-emptions similarly does not apply.  Claims for restitution are properly pled, and fraud is pled with particularity.

7)     Plaintiff D.J. properly pleads a violation of the Virginia Consumer Protection Act. The defense's only rebuttal is that injury is not plead with sufficient specificity but does not mention the testimony and emails of Dr. Daniel Gruskin or the communications with the Australian medical authorities that a blanket dose adjustment would be **insane**.  Omission of the information that the "low dose" data was "bullshit," constitutes a deceptive trade practice.

8)     The same rebuttal arguments that Trina Wilkins and the other plaintiffs have made herein apply equally to D.J.'s claims.

xi.   Plaintiff Damon LaForce (Virginia state resident at time and party to the original *Adamo* Action).

1)   Damon LaForce's claims are mentioned more often in Genzyme's motion than other Virginia residents.  As with Sydney Johnson, he was a party to the original *Adamo* Action and Genzyme argues that strict liability is not recognized under Virginia law, which is correct.  However, as discussed *supra* "manufacturers and sellers of defective products can be held liable on theories of negligence and breach of the implied warranty of merchantability." *Farish v. Courion Indus., Inc.*, 754 F.2d 1111 (4th Cir. 1985).

2)   Footnote 12 of Genzyme's memorandum addresses its assertion that Mr. LaForce's claims are barred by the statute of limitations.  As a person who reacted with anaphylaxis on resumption of full doses, he has pled an injury according to the First Circuit in *Hochendoner* like prior Plaintiff James Mooney.  SAC ¶ 14.  However, Genzyme asserts that the deadline for a class action claim passed for his claim, Trina Wilkins' claim, and Thomas Stanziano's claims for "full dose" anaphylaxis.  Genzyme does not inform the court that this argument is foreclosed as being both tolled and estopped by the savings statute and the tolling agreement that Genzyme signed.  Indeed, the current class representatives from the *Hochendoner* action are the proper parties to continue to assert class status because they were the first to plead it under the CAFA.  Since the original class has not been ruled upon, assertion of a second group for class status within the same pleading would not make sense.

3)   The choice of law for the statute of limitations is Virginia under Indiana's borrowing statute and substantive Virginia law.

4)   Genzyme's general objections to acceleration theory, particulate theory, vesivirus theory, or combination theory are rebutted *supra* and are equally applicable to Mr. LaForce's claims. SAC ¶ 14.  Impossibility pre-emptions similarly does not apply.  Claims for restitution are

properly pled, and fraud is pled with particularity.

5)    Mr. LaForce properly pleads a violation of the Virginia Consumer Protection Act. The defense's only rebuttal is that injury is not plead with sufficient specificity but does not mention the testimony and emails of Dr. Daniel Gruskin or the communications with the Australian medical authorities that a blanket dose adjustment would be **insane**.  Omission of the information that the "low dose" data was "bullshit," constitutes a deceptive trade practice.

6)    The same rebuttal arguments that Trina Wilkins and the other plaintiffs have made herein apply equally to Mr. LaForce's claims.

xii.    Plaintiff Michael Masula (Pennsylvania state resident and party to the original *Hochendoner* Action)

1)    Michael Masula's claims are only mentioned in conjunction with George Demko's claims.  As discussed *supra*, Pennsylvania law recognizes negligence per se alleging a violation of state and federal Pure Food and Drug acts, so the claims are valid.  *In re Orthopedic Bone Screw Products Liability Litigation*, 193 F.3d 781, 790 (3d Cir.1999*).  Cabiroy v. Scipione*, 2001 PA Super 29, ¶ 14, (2001).

Second, regarding strict liability, Genzyme misapplies the rule of *Parkinson v. Guidant Corp.*, 315 F. Supp. 2d 741, 747–48 (W.D. Pa. 2004) (citing *Hahn v. Richter*, 673 A.2d 888, 890–91 (Pa. 1996)).  Strict liability claims are barred by comment K to § 402A only to the extent a prescription drug is "properly prepared and accompanied by proper directions and warning." Restatement (Second) of Torts § 402A (1965).  Like George Demko, Mr. Masula properly alleges that Fabrazyme was not properly prepared (i.e., defective) because it contained vesivirus and particulates.  Mr. Masula also alleges that the warnings were not proper given that it was to be used at a "low dose." SAC ¶ 15.  The FDA never approved "low dose."   Genzyme also ignores Pennsylvania's approval of Restatement (Second) of Torts § 402B (1965).  Genzyme was

engaged in off-label marketing to Mr. Masula personally through the Genzyme care representative and to his physician.  Mr. Masula reasonably believed it would be of some use in treating his disease and would not be ineffective.  By withholding the information that the "low dose" drug was completely useless, that the data supporting using low dose was "bullshit" and that Australian Fabry patients would be **insane** to take it, the warnings were not "proper" under comment K and also constitute a separate tort under § 402B.  Mr. Masula was in privity with Genzyme both through communications and as the intended third-party beneficiary of the sale of Fabrazyme to his pharmacy as are all persons who buy Fabrazyme.

Moreover, "claims for monetary damages generally satisfy the injury-in-fact threshold." *Am. Fed'n of State Cty. &. Emps. v. Ortho-McNeil-Janssen Pharms., Inc.*, No. 08-CV-5904, 2010 WL 891150, at *3 (E.D. Pa. Mar. 11, 2010).

2)      Mr. Masula's claims are not opposed due to a statute of limitations, and he was covered under the tolling agreement.

3)      The choice of law for the statute of limitations is Pennsylvania under Indiana's borrowing statute and substantive Pennsylvania law.

4)      Genzyme's general objections to acceleration theory, particulate theory, vesivirus theory, or combination theory are rebutted *supra* and are equally applicable to Mr. Masula's claims. SAC ¶ 15.  Impossibility pre-emptions similarly does not apply.  Claims for restitution are properly pled, and fraud is pled with particularity.

5)      The same rebuttal arguments that Trina Wilkins and the other plaintiffs have made herein apply equally to Mr. Masula's claims.

  xiii.    Plaintiff James Matthews (North Carolina state resident and party to the original *Adamo* Action

1)      James Matthews claims are only mentioned twice in Genzyme's motion.  First,

53

Genzyme argues that Mr. Matthews' claims cannot be predicated on a violation of the FDCA. However, Genzyme fails to point out that claims can be predicated on a violation of the various states Pure Food and Drug acts that concurrently regulate prescription drugs under *Wyeth v. Levine*. Moreover, the correct warning was not provided since the product was contaminated and was ineffective at "low dose". As such, his claims are valid. SAC ¶ 17.

2)      Genzyme then argues that strict liability is not recognize in North Carolina. While correct, North Carolina does allow claims based on inadequate warning or instruction, which includes a post-sale duty to warn. N.C. Gen. Stat. Ann. § 99B-5 and § 99B-5 (a) (2).

3)      Mr. Matthews claims are not opposed due to a statute of limitations except by suggestion in FN 12 of Genzyme's memorandum. As discussed *supra*, he was covered under the savings statute and the tolling agreement as were all the Plaintiffs.

4)      The choice of law for the statute of limitations is North Carolina under Indiana's borrowing statute and substantive North Carolina law.

5)      Genzyme's general objections to acceleration theory, particulate theory, vesivirus theory, or combination theory are rebutted *supra* and are equally applicable to Mr. Matthews' claims. SAC ¶ 17. Impossibility pre-emptions similarly does not apply. Claims for restitution are properly pled, and fraud is pled with particularity.

6)      The same rebuttal arguments that Trina Wilkins and the other plaintiffs have made herein apply equally to Mr. Matthews' claims.

7)      Regarding the North Carolina Unfair and Deceptive Trade Practices Act, Genzyme only argues that the Fabrazyme label was approved by the FDA. As detailed throughout the Second Amended Complaint, Genzyme knew that the drug was not being used according to the FDA label since it was being marketed and sold at "low doses." The FDA did not approve such as use, so the

claim is not pre-empted.  To the extent that Genzyme asserts that the misrepresentations were not egregious enough, Plaintiff points out that marketing a life-saving drug at a dose that is ineffective to dying patients shocks the conscience.  Genzyme's own case managers recognized that promoting a "low dose" gave patients false hope while draining their bank account.  See SAC ¶ 272.  "I think there is a fine line between containing the message and keeping people in the dark. This was not the time for mushroom management. (Keep them in the dark and watch them grow!) Without the complete picture, I felt like my communication with patients was inauthentic, stilted, and potentially damaging with some patients."

### xiv. Plaintiff Thomas Olszewski (Michigan state resident and party to the original *Adamo* Action

1) Thomas Olszewski is only mentioned once in Genzyme's memorandum, and as a party to the original *Adamo* action.  His state of residence is referenced in FN 12 of Genzyme's memorandum.  As discussed *supra*, he was covered under the savings statute and tolling agreement, as were all the Plaintiffs.

2) The only substantiative argument that Genzyme proffers is that the original *Hochendoner* action was dismissed for failure to assert that "low dose" Fabrazyme is completely and utterly useless in treating Fabry disease.  That is remedied in the current complaint.  SAC ¶ 18. More importantly, the complete lack of utility of "low dose" was exactly what Genzyme did not want patients, doctors, or payors (and this court) to know.  The pleadings now assert that taking "low dose" Fabrazyme would be **insane**, as discussed *supra*.  This evidence cannot reasonably be challenged at the pleading stage because it is from Genzyme's own files as revealed in the unsealed *Schubert* complaint.

3) Genzyme argues that the sale of "low dose," vesivirus contaminated, and particulate contaminated Fabrazyme is a pre-empted exemption under the Michigan Consumer Protection Act.

However, the statute does not impose a regulated/unregulated dichotomy for exemption.  Instead, the statute reads:  Sec. 4. (1) This act does not apply to… the following:  (a) A transaction or conduct <u>specifically authorized</u> under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States.   No one authorized Genzyme to sell "low dose," vesivirus contaminated, or particulate contaminated Fabrazyme.  In fact, such sales are criminalized as discussed *supra*.  Since Genzyme did not seek authorization to sell Fabrazyme in such conditions, the exemption does not apply.

   xv.   Plaintiff Thomas Stanziano (Florida state resident and party to the original
         *Hochendoner* Action)

1)      Genzyme presents four arguments concerning the claims of Thomas Stanziano. First, it argues that the statute of limitations has passed for Mr. Stanziano and the other Plaintiffs belonging to the group that suffered anaphylactic responses on resumption of full dose like Mr. Mooney in the original Adamo complaint.  SAC ¶ 20.   Mr. Stanziano was a party to the tolling agreement, so that is not possible.  The CAFA does not play a role as explained for Plaintiff Damon LaForce and Trina Wilkins.

Second, the defense argues that Florida does not recognize negligence per se based in the FDCA.  However, Mr. Stanziano's claim is based on the violations of the Florida Pure Food and Drug Acts, not the FDCA.

Finally, Genzyme argues that Mr. Stanziano was not in privity with Genzyme for his breach of express warranty claim.  This is not true.  Florida has adopted § 552 of the Restatement (Second) of Torts "finding that the party who negligently transmitted the false information may be held liable when the recipient is able to establish a negligent misrepresentation cause of action as set forth in the Restatement (Second) of Torts section 552 (1977)."  *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 335 (Fla. 1997).  *See also First Fla. Bank, N.A. v. Max*

*Mitchell & Co.*, 558 So. 2d 9, 15 (Fla. 1990). Independent of this adoption, Florida recognized privity where there is a third party beneficiary. The pharmacy only buys a drug subject to a prescription for the named Plaintiff's treatment. The intended beneficiary of a drug prescription is not the pharmacy, but the patient. "[I]t is not necessary that the third-party beneficiary is named in the contract. See *Fla. Power & Light Co. v. Mid–Valley, Inc.*, 763 F.2d 1316, 1321 (11th Cir.1985). "The parties' pre- or post-contract actions may establish their intent." *Id. Dingle v. Dellinger*, 134 So. 3d 484, 488 (Fla. Dist. Ct. App. 2014).[21] *See also* "Third-party beneficiaries of warranties express or implied." Fla. Stat. Ann. § 672.318 (West)

2)      In footnote 12 of its memorandum Genzyme argues that Mr. Stanziano's claims are barred by the applicable statute of limitations. As a person who reacted with anaphylaxis on resumption of full doses, he has pled an injury according to the First Circuit in *Hochendoner* like prior Plaintiff James Mooney. SAC ¶ 14. However, Genzyme asserts that the deadline for a class action claim has passed for his claim, Trina Wilkins' claim, and Mr. Stanziano's claims for "full dose" anaphylaxis. Genzyme does not inform this court that this argument is foreclosed as being both tolled and estopped by the savings statute and the tolling agreement that the defense signed. Indeed, the current class representatives from the *Hochendoner* action are the proper parties to continue to assert class status because they were the first to plead it under the CAFA. Since the original class has not been ruled upon, assertion of a second group for class status within the same pleading would not make sense.

3)      The choice of law for the statute of limitations is Florida under Indiana's borrowing statute and substantive Florida law.

---

[21] "[T]he third party intended beneficiary exception to the rule of privity is not limited to will drafting cases." Hodge v. Cichon, 78 So.3d 719, 722 (Fla. 5th DCA), review denied, 99 So.3d 942 (Fla.2012); Winston v. Brogan, 844 F.Supp. 753, 756 (S.D.Fla.1994) (citing Greenberg v. Mahoney Adams & Criser, P.A., 614 So.2d 604, 605 (Fla. 1st DCA 1993)). *Id.*

4)      Genzyme's general objections to acceleration theory, particulate theory, vesivirus theory or combination theory are rebutted supra and are equally applicable to Mr. Stanziano's claims. SAC ¶ 19.   Impossibility pre-emption similarly does not apply.  Claims for restitution are properly pled, and fraud is pled with particularity.

6)      The same rebuttal arguments apply that Trina Wilkins and the other plaintiffs have made herein.

xvi.    Plaintiff Theresa Viers (deceased) as represented by her Executor Eddie Viers (Virginia state resident and party to the original *Adamo* Action)

1)      Genzyme relies entirely on its argument for other plaintiffs to apply to the Decedent and her Estate with one exception.  It argues that the correct cause of action is Wrongful Death and not a Survival Action.  However, the Virginia Supreme Court has ruled that both can be pled in the alternative, but election is required based on the determination of the jury based on the proximate cause of death.  Since Genzyme is disputing causation, both causes of action are properly pled under Virginia law.   "[W]e hold that the circuit court did not err in overruling Centra Health's motion to strike the evidence as to the administrators' personal injury survival claim.  *Centra Health, Inc. v. Mullins,* 277 Va. 59, 80 (2009).

2)      As with the prior Plaintiffs, the rebuttal arguments also apply with special reference to Virginia Plaintiffs, Sydney Johnson and Plaintiff D.J.  SAC ¶ 22.

xvii.   Plaintiff Joseph Wallace (deceased) as represented by her Executor Jeanne Wallace (Virginia state resident and party to the original *Adamo* Action)

1)      As with Plaintiff Viers, Genzyme relies entirely on its argument for other plaintiffs to apply to the Decedent and his Estate with one exception.  It argues that the correct cause of action is Wrongful Death and not a Survival Action.  However, since Genzyme is disputing

causation, both causes of action are properly pled under Virginia law.   *Centra Health, Inc. v. Mullins,* 277 Va. 59, 80 (2009).

  2)  As with the prior Plaintiffs, the rebuttal arguments also apply with special reference to Virginia Plaintiffs, Sydney Johnson and Plaintiff D.J.  SAC ¶ 22.

## V.  CONCLUSION

  WHEREFORE, Plaintiffs respectfully request that this Honorable Court deny Genyzme Corporation's Motion to Dismiss and order a responsive pleading be filed within fourteen (14) days of this Honorable Court's ruling.

<div style="margin-left:40%">

For the Plaintiffs,


*/s/ C. Allen Black, Jr.*
C. Allen Black
PA I.D. No. 202501
Law Office of C. Allen Black, Esq.
322 North Shore Drive
Bldg. 1B, Ste. 200
Pittsburgh, PA 15212
Telephone: 412.908.3268
Email: drallenblack@gmail.com

*/s/ Jonathan M. Gesk*
Jonathan M. Gesk, Esquire
PA I.D. No. 05678
Gesk Moritz, LLC
14 East Main Street
Carnegie, PA 15106
Telephone: (412) 429 – 9100
Email: jgesk@gesklaw.com

</div>

Date:  September 1, 2021

## CERTIFICATE OF SERVICE

I, Jonathan M. Gesk, hereby certify that on September 1, 2021, I filed the foregoing Plaintiffs' Memorandum of Law in Opposition to Genzyme Corporation's Motion to Dismiss Second Amended Complaint electronically with the U.S. District Court for the District of Massachusetts using the CM/ECF system and caused it to be served on all registered participants via the Notice of Electronic Filing.

Dated: September 1, 2021          /s/ Jonathan M. Gesk

                                   Jonathan M. Gesk, Esquire
                                   PA I.D. No. 205678
                                   Gesk Moritz, LLC
                                   14 East Main Street
                                   Carnegie, PA 15106
                                   Telephone: (412) 429 – 9100
                                   Email: jgesk@gesklaw.com