UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


TRINA WILKINS, ET AL,          )
                               )
                               )   CIVIL ACTION NO.
          Plaintiffs,          )   21-10023-DPW
                               )
v.                             )
                               )
                               )
GENZYME CORPORATION,           )
                               )
          Defendant.           )


MEMORANDUM AND ORDER
September 14, 2022

## Table of Contents

I. BACKGROUND......................................................... 4

A.   The Parties ................................................... 4

B.   Fabry Disease, Fabrazyme, and the 2009 Shortage ......... 5

C.   Prior Litigation ....................................... 6

1.   Hochendoner I: Consolidation in the District of Massachusetts ................................................ 7

2.   Hochendoner II: In the Court of Appeals for the First Circuit .................................................... 8

D.   The Instant Litigation ................................. 10

1.   Hochendoner III – Before Transfer: In the Southern District of Indiana ........................................ 10

2.   Hochendoner IV: After Transfer in the District of Massachusetts ........................................... 11

a.   Operative Second Amended Complaint .................. 11

b.   Proposed Third Amended Complaint ................... 14

E.   Genzyme's Asserted Grounds for Dismissal ............... 14

II. THRESHOLD CONSIDERATIONS................................. 15

A.   Choosing the Law ...................................... 16

B.   Amending the Complaint ................................ 16

III. MOTION TO DISMISS........................................ 17

A.   Subject Matter Jurisdiction ........................... 19

1.   Expiration of Claims ................................. 20

a.   Claims Related to Product Liability Under Indiana Law 21

b.   Claims Subsumed by Products Liability ............... 22

Under Indiana Law................................... 22

c.   Loss of Consortium Claims Under Indiana Law ........ 24

d.   Other State Statutes .............................. 25

2.   Accrual of Claims .................................... 26

a.   Harm Caused by Law Dosing and Contamination ........ 30

b.   Harm Caused by Sensitization ....................... 31

c.   Harm Caused by Fraud ............................... 31

d.   Summary ............................................ 32

3.   American Pipe Tolling ................................ 35

4.   Tolling Agreement .................................... 38

5.   Indiana Journey's Account Statute ................... 42

6.   What Is Preserved ....................................... 47

B.   Standing ............................................. 48

1.   Theories of Harm ..................................... 50

a.   Acceleration Theory .............................. 50

b.   Sensitization Theory ............................. 51

c.   Vesivirus Theory ................................. 51

d.   Life Expectancy Theory ........................... 52

e.   Financial Theory ................................. 52

2.   Success of the Five Theories of Harm ................. 52

IV. CLASS ACTION STATUS...................................... 56

V. MERITS.................................................... 57

A.   Rule 9(b) Heightened Pleading Standards .............. 58

B.   Negligence ........................................... 59

1.   Negligent Design Theory .............................. 61

2.   Negligent Manufacture Theory ......................... 62

3.   Failure to Warn Theory ............................... 62

C.   Negligence Per Se .................................... 64

D.   Strict Liability ..................................... 65

E.   Breach of Warranty ................................... 65

1.   Claims for Breach of Implied Warranties .............. 65

2.   Claims for Breach of Expressed Warranty .............. 68

F.   Florida Deceptive and Unfair Trade Practices ......... 69

G.   Indiana Product Liability Act and Kentucky Product
Liability Act ............................................ 70

H.   Kentucky Consumer Protection Act ..................... 72

I.   Virginia Consumer Protection Act ..................... 74

J.   Virginia False Advertising Act ....................... 75

K.   Fraud and Fraudulent Concealment ..................... 75

L.   Breach of Fiduciary Duty ............................. 78

M.   Unjust Enrichment .................................... 80

N.   Loss of Consortium ................................... 82

VI. THIRD AMENDED COMPLAINT................................. 82

VII. CONCLUSION............................................. 83

Fabrazyme is a drug prescribed to treat a rare genetic disorder, Fabry disease.  A shortage of the drug several years ago led numerous Fabry patients – among them Plaintiffs in this case - to sue Genzyme, Fabrazyme's manufacturer.  The First Circuit rejected Plaintiffs' claims in that litigation for lack of standing.  I now consider new litigation begun thereafter by Plaintiffs – in another federal district court outside the First Circuit - that seeks to improve on the pleadings the First Circuit rejected.  Most Plaintiffs now before me as a result of transfer of the litigation to this district again fail to establish standing.  But there are four who manage to do so on a basis recognized in the prior litigation.  Nevertheless, those Plaintiffs otherwise plead their claims inadequately as to the merits.  Accordingly, in the end I have determined to dismiss this action in its entirety with respect to all Plaintiffs.

## I.  BACKGROUND

### A.  *The Parties*

Plaintiffs are twenty-six named individuals who either suffer from Fabry disease and have taken Fabrazyme or are relatives of such individuals according to the now-operative complaint.  Second Amended Complaint ("SAC") at ¶¶1-26, ECF No. 67.  Among named Plaintiffs are citizens of California, Florida, Indiana, Massachusetts, Michigan, Nevada, New York, North Carolina, Pennsylvania, Washington, Tennessee, and Virginia.

Defendant Genzyme Corporation ("Genzyme") is a Massachusetts corporation with a principal place of business in Cambridge, Massachusetts; the company markets and sells Fabrazyme throughout the United States.  *Id.* at ¶27.

**B.   *Fabry Disease, Fabrazyme, and the 2009 Shortage***

Fabry disease arises in roughly 1 in 3,000 births.  SAC at ¶31.  The condition results from a missing or mutated gene for the enzyme alpha-galactosidase, which is needed to metabolize the fat globotriaosylceramide ("GL-3").  *Id.* at ¶32.  Without the enzyme, GL-3 builds up in cells, blood vessels, and organs, causing inflammation and death, typically from strokes, kidney failure, or heart enlargement.  *Id.*

Fabrazyme is a synthetic version of alpha-galactosidase. *Id.* at ¶¶33-34.  It cannot undo prior harm from Fabry disease but it mitigates the condition.  *Id.* at ¶35.  Because Fabrazyme metabolizes quickly, the standard regimen is to receive injections every two weeks.  *Id.* at ¶36.  Although at all relevant times Fabrazyme was the only medication for Fabry patients available in the United States; a competitor drug called Replagal® was sold in other countries.  *Id.* at ¶140.

A Fabrazyme shortage arose in June 2009 when Genzyme's production stalled due to various problems at its manufacturing facility.  *Hochendoner* v. *Genzyme Corp.*, 95 F. Supp. 3d 15, 18 (D. Mass. 2015) *("Hochendoner I")*, *aff'd in part, vacated in*

*part, remanded*, 823 F.3d 724 (1st Cir. 2016) *("Hochendoner II").*

These problems included a contamination of Genzyme's bioreactors with vesivirus.  SAC at ¶¶42-87.  "During this shortage, Genzyme adopted a rationing plan under which United States Fabry sufferers would be allocated less than the recommended dose, and newly diagnosed Fabry patients would not be prescribed the drug."  *Hochendoner I*, 95 F. Supp. 3d at 18.

## C.  *Prior Litigation*

Following the shortage, patients filed lawsuits against Genzyme in the Western District of Pennsylvania ("the *Hochendoner* action")[1] and in this Court ("the *Adamo* action"); I sometimes refer in this Memorandum to these actions collectively as the *Hochendoner/Adamo* actions.[2]  *See Hochendoner I*, 95 F.

---

[1] Certain of the plaintiffs now again before me — Amber Britton, George Demko, Michael Masula, Erin Masula, Thomas Olszewski, Darlene Cookingham, Thomas Stanziano, and Wendy Stanziano — were plaintiffs in the *Hochendoner* action originally filed in the United States District Court for the Western District of Pennsylvania on March 9, 2011. *See Hochendoner* v. *Genzyme Corp.*, No. 2:11-cv-00313-CB (filed Mar. 9, 2011, W.D. Pa.), ECF No. 1; No. 1:11-cv-10739-DPW (filed June 30, 2011, D. Mass.), ECF No. 29.

[2] The following plaintiffs now again before me — Trina Wilkins, James Bishop, Lisa Bishop, Toni Cordova, John Cortina, Jill Cortina, Mary Helton, Donovan Helton, D.J., Sydney Johnson, Damon LaForce, James Matthews, Eddie Viers, and Jeanne Wallace — were plaintiffs in the *Adamo* action originally filed in this Court on June 3, 2013.  S*ee Adamo* v. *Genzyme Corp.*, 1:13-cv-11336-DPW (filed June 3, 2013, D. Mass.), ECF No. 1. Additionally, several new Plaintiffs now before me are relatives of *Adamo* plaintiffs.  They include William McNew (surviving son of Teresa Viers), SAC ¶23, James and Samuel Wallace (surviving

Supp. 3d at 20-21; *see also Schubert* v. *Genzyme Corp.*, No. 2:12CV587DAK, 2013 WL 4776286, at *1 (D. Utah Sept. 4, 2013).[3] Upon transfer by the Western District of Pennsylvania to this Court in *Hochendoner I*, I consolidated the two actions and ruled on motions to dismiss in both matters.  95 F. Supp. 3d at 21.  I granted the motions to dismiss, finding that the complaint failed under Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure.  *Id.*  The First Circuit affirmed — "with one small exception," discussed below — based on standing, an issue not raised until appeal.  *Hochendoner II*, 823 F.3d at 728, 730 (1st Cir. 2016).

> 1.   *Hochendoner I*: Consolidation in the District of Massachusetts

I found the *Hochendoner/Adamo* complaints broadly described "three possible types of causation leading to three possible types of injury suffered by [p]laintiffs."  *Hochendoner I*, 95 F. Supp. 3d at 23.  The first causal chain posited that lower doses of Fabrazyme reduced the drug's effectiveness, leading to "a

___

sons of Joseph Wallace), *id.* ¶¶25-26, and Nate Brooks (spouse of Mary Helton), *id.* ¶10.

[3] An individual plaintiff, separate from the Plaintiffs here, sued Genzyme in *Schubert*.  Throughout their Second Amended Complaint, Plaintiffs cite extensively to the Proposed Fourth Amended Complaint in *Schubert*, which described internal communications at Genzyme concerning the Fabrazyme shortage. *Schubert* ended in June 2015 with a stipulated motion to dismiss with prejudice all claims and causes of action against Genzyme. *Schubert* v. *Genzyme Corp.*, 2:12-cv-00587-DAK (D. Utah dismissed June 24, 2015), ECF No. 195.

return of symptoms in Fabry patients." *Id.*  The second causal chain posited that lower doses of Fabrazyme accelerated the course of the disease.  *Id.*  The third causal chain posited that Genzyme's Fabrazyme vials were contaminated with particulate steel, glass, and rubber.  *Id.*

For the latter two alleged causal chains — acceleration and contaminants — I found the pleading insufficient to provide fair notice as required by Fed. R. Civ. P.8 as to which of the plaintiffs suffered injury under those theories.  *Id.* at 24. For the first causal chain — effectiveness reduction — I dismissed the counts for failure to state a claim under Fed. R. Civ. P.12(b)(6).  As a result, numerous state common law claims of negligence, negligence per se, strict liability, breach of warranty, loss of consortium, and claims under state consumer protection acts and state product liability acts were dismissed. *Id.* at 29-35.

2.  *Hochendoner II*: In the Court of Appeals for the First Circuit

On appeal, the *Hochendoner I* plaintiffs only pursued the acceleration and contaminant theories.  The First Circuit found these claims failed the Article III standing requirement. Standing, the First Circuit explained on appeal, requires a "plaintiff-by-plaintiff and claim-by-claim analysis" that "demands allegations *linking* each plaintiff to each of [the

alleged] injuries." *Hochendoner II,* 823 F.3d at 733 (emphasis added). The Court of Appeals observed that the complaints' allegations did not show a particularized injury because no specific information was referenced regarding the harm experienced by each individual plaintiff. *Id.* The Court of Appeals determined that the *Hochendoner I* plaintiffs made "no assertion at any point in the complaints that any specific plaintiff took or received a dose contaminated with particulate matter"; they simply alleged broadly that Genzyme produced contaminated Fabrazyme. *Id.* at 732.

However, the First Circuit reversed my order with respect to a somewhat different causation theory — the "increased risk" theory — which it found successfully alleged as to one plaintiff, James Mooney (not a plaintiff here). That theory, a variant of the "reduced effectiveness" theory, posited that, by forcing patients to forego Fabrazyme doses, Genzyme caused an "increased risk and severity of acute adverse reactions due to inconsistent infusion schedules," the complaint adequately alleged that Mr. Mooney suffered "an allergic reaction attributable to his exposure to a reduced dose of Fabrazyme." *Id.* at 733-35. The First Circuit further found the Mooney claims on that theory might satisfy Fed. R. Civ. P. 12(b)(6) and thus vacated the dismissal of those claims and remanded to

evaluate the pleading further to see whether the pleading was adequate.  *Id.* at 735.

Because it chose to affirm dismissal of plaintiffs' claims for lack of standing — that is, a dismissal for lack of subject matter jurisdiction, which "normally operates without prejudice" — the First Circuit directed on remand clarification that "the judgment is to operate without prejudice as to claims based on the acceleration and contaminant injuries."  *Id.* at 736.

**D.    *The Instant Litigation***

   1.    *Hochendoner III* – Before Transfer: In the Southern District of Indiana

Plaintiffs now before me were unsuccessful in settling their claims in the wake of remand.  Nearly four years later, on February 29, 2020, they filed the present action in the United States District Court for the Southern District of Indiana. *Wilkins* v. *Genzyme Corp.*, 20-cv-00051-TWP-DML (S.D. Ind. filed Feb. 29, 2020) ("*Hochendoner III*").[4]  On May 6, 2020, they filed a First Amended Complaint changing identification of the entity or entities alleged to be the defendant.  First Amended Complaint ("FAC"), *id.* (S.D. Ind. May 6, 2020), ECF No. 10.  On

---

[4] Although the first named plaintiff in *Hochendoner I* and *Hochendoner II* is not a plaintiff in the litigation transferred to my docket from the Southern District of Indiana, I will continue to refer to the case — before transfer as *Hochendoner III* and after transfer as *Hochendoner IV* — to emphasize its status as a descendant in the *Hochendoner* family of litigation.

October 5, 2020, Plaintiffs filed the now-operative Second
Amended Complaint, naming Genzyme as the sole defendant.  SAC,
*id.* (S.D. Ind. Oct. 5, 2020), ECF No. 67.

### 2.    *Hochendoner IV*: After Transfer in the District of Massachusetts

In the wake of remand, the plaintiffs entered into
settlement negotiations with Genzyme.  During these
negotiations, the plaintiffs and Genzyme struck an agreement on
May 17, 2017 that tolled "[a]ny applicable statutes of
limitations pertaining to any matters asserted" during the
*Hochendoner I* and *Adamo* lawsuits.  [ECF No. 105-1 at ¶1]
Plaintiffs now before me were unsuccessful in settling their
claims.  I came to preside over this matter, now *Hochendoner IV*,
following transfer pursuant to 28 U.S.C. § 1404(a).  Transfer
Order*, id.* (S.D. Ind. Dec. 30, 2020), ECF No. 78.  Meanwhile, in
response to the pending motion to dismiss the Second Amended
Complaint in this litigation again in this Court, Plaintiffs
moved, ECF No. 105, to file a Third Amended Complaint, ECF No.
105-2.

### a.   *Operative Second Amended Complaint*

The operative Second Amended Complaint makes class
allegations as to payments for defective and/or ineffective
Fabrazyme, in addition to twenty-four individual counts.[5]  The

----

[5] Although these counts are labeled "individual" counts, they are

class allegations are under Fed. R. Civ. P. 23 on behalf of five representative plaintiffs,[6] the other plaintiffs named in the complaint, and "all others similarly situated," defined to include "any and all individuals residing in the United States of America and who have been diagnosed with Fabry disease, received Fabrazyme at any time from July 1, 2009 through March 2012 in a reduced dose amount, and who paid for the reduced dose Fabrazyme, either directly or through an insurance plan and the spouses of any such person."  ECF No. 67 at ¶342.  Plaintiffs say that I have subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

The individual claims include nine counts under common law (Counts 1-4, 20-24) and several under state statutes concerned with deceptive and unfair trade practices (Counts 5, 9, 11-14, and 18), product liability (Counts 6-7, 10, and 19), consumer protection (Counts 8 and 15), false advertising (Count 16), and wrongful death/survival (Count 17).

The individual claims, stated in the order presented in the Second Amended Complaint, are as follows:

1.  Negligence
2.  Negligence per se
3.  Strict Liability

---

still apparently pled in support of the class claims and each includes reference to "all others similarly situated."
[6] These five co-representative plaintiffs are Trina Wilkins, George Demko, Michael Masula, Thomas Olszewski, and Tom Stanziano.  SAC at ¶342.

4.  Breach of Warranty
5.  Florida Deceptive and Unfair Trade Practices Act Violation
6.  Indiana Products Liability Action Violation
7.  Product Liability Act of Kentucky Violation
8.  Kentucky Consumer Protection Act Violation
9.  Massachusetts Unfair and Deceptive Trade Practices Act Violation
10. Michigan State Product Liability Act Violation
11. Michigan State Law Deceptive Trade Practice Violation
12. Nevada State Law Deceptive Trade Practice Violation
13. North Carolina Unfair and Deceptive Trade Practices Act Violation
14. Pennsylvania Unfair Trade Practices Consumer Protection Law Violation
15. Virginia Consumer Protection Act Violation
16. Virginia Prohibition of False Advertising Violation
17. Virginia Wrongful Death or in the alternative Survival Action Claims
18. Washington Uniform Deceptive Trade Practices Act
19. Washington Product Liability Act Violation
20. Fraud
21. Fraudulent Concealment
22. Breach of Fiduciary Duty
23. Unjust Enrichment
24. Loss of Consortium

It is worth noting that Plaintiffs flag three ways in which the current lawsuit seeks to fix problems identified with their claims in *Hochendoner I* and *Hochendoner II*.  First, they say their injuries "are discussed individually and not in the aggregate."  Opposition to MTD at 6, ECF No. 108.  Second, they say Plaintiffs "who received 'low doses' plead 'acceleration' of their disease," an allegation they contend "is vetted pleading language as a cause of action" under the First Circuit's decision in *Hochendoner II*.  *Id.*  Third, they say they "plead anaphylactic reactions to 'low dose' Fabrazyme," which they contend is also vetted language under *Hochendoner II*.  *Id.*  I

observe also that Plaintiffs newly allege in the Second Amended Complaint extensive contamination of Fabrazyme dosages with vesivirus, the pathogen found in Genzyme's bioreactors that led to the Fabrazyme shortage.  *See* SAC at ¶¶42-87.

> b.   *Proposed Third Amended Complaint*

Although the Second Amended Complaint remains the operative pleading before me, Plaintiffs seek to file a Third Amended Complaint, ("TAC") ECF No. 105, which they say is appropriate in response to Genzyme's Motion to Dismiss (described below).  The Third Amended Complaint would bring four small changes.  First, it would attach a tolling agreement the parties entered into after the decision in *Hochendoner II*.  *Id.* ¶18.  Second, it would add allegations based on a draft of a letter that Genzyme included with its Motion to Dismiss.  *Id.* ¶20.  Third, it would drop causes of action under the Massachusetts Deceptive Trade Practices Act, Washington Uniform Deceptive Trade Practices Act, and Washington Product Liability Act.[7]  *Id.* ¶24.  Fourth, it would drop claims related to 2013 and 2015 contaminations at the Framingham Plant.  *Id.* ¶25.

## E.   *Genzyme's Asserted Grounds for Dismissal*

Defendant presents four grounds for dismissal of this case.

---

[7] Plaintiffs only directly reference dropping the Massachusetts claim, but the Washington claims are apparently withdrawn as well, since they do not appear in the proposed Third Amended Complaint.

First, Genzyme says the litigation should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, because all putative class claims that support federal jurisdiction are untimely and complete diversity is lacking between the parties.  In any event, Genzyme contends I should decline to exercise supplemental jurisdiction over any remaining state law claims.  Second, Genzyme contends each Plaintiff lacks standing as another reason to dismiss under Fed. R. Civ. P.12(b)(1).  Third, Genzyme contends Plaintiffs' claims all essentially sound in fraud and fail to meet the Fed. R. Civ. P.9(b) particularity standard.  Fourth, Genzyme contends Plaintiffs have failed to state a claim under Fed. R. Civ. P.8 and Fed. R. Civ. P.12(b)(6).

As to the proposed Third Amended Complaint, Genzyme says I should deny this request outright, because presenting another complaint at this point in the litigation would be prejudicial and is futile, since the proposed Third Amended Complaint will not overcome the inadequacies of the Second Amended Complaint that provide the basis for dismissal.

## II. THRESHOLD CONSIDERATIONS

I must identify at the outset two basic threshold considerations — choice of law and whether and how to treat a proposed amended complaint — that shape my approach to consideration of Genzyme's motion to dismiss contentions.

15

**A.    *Choosing the Law***

As alleged, this is a diversity case upon transfer from the United States District Court for the Southern District of Indiana, albeit said to have been raised under the Federal Class Action Fairness Act.  In these circumstances, "a federal court sitting in diversity or exercising supplemental jurisdiction over state law claims must apply state substantive law, but a federal court applies federal rules of procedure to its proceedings."  *Hoyos* v. *Telecorp Commc'ns, Inc.*, 488 F.3d 1, 5 (1st Cir. 2007) (citing *Gasperini* v. *Ctr. For Humanities, Inc.*, 518 U.S. 415, 427 (1996)).  For questions of state law, I follow Indiana choice-of-law rules, as would an Indiana federal court sitting in diversity.  *See AER Advisors, Inc.* v. *Fidelity Brokerage Servs., LLC*, 921 F.3d 282, 289 (1st Cir. 2019) ("[T]he transferee court applies the *state law* that the transferor court would have applied to any questions of *state law.*"); *Gre-Ter Enter., Inc.* v. *Mgmt. Recruiters Int'l, Inc.*, 329 F. Supp. 3d 667, 675 (S.D. Ind. 2018) (citing *Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  For questions of federal law, I apply federal law as interpreted by the First Circuit. *AER Advisors*, 921 F.3d at 289-91.

**B.  *Amending the Complaint***

Fed. R. Civ. P.15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or

16

the court's leave," and that the court "should freely give leave
when justice so requires." Fed. R. Civ. P.15(a)(2).  That said,
"amendments may be denied for several reasons, including 'undue
delay, bad faith, dilatory motive of the requesting party,
repeated failure to cure deficiencies, and futility of
amendment.'" *Hagerty ex rel. United States* v. *Cyberonics, Inc.*,
844 F.3d 26, 34 (1st Cir. 2016) (quoting *United States ex rel.
Rost* v. *Pfizer, Inc.*, 507 F.3d 720, 733-34 (1st Cir. 2007),
*overruled on other grounds by Allison Engine* v. *United States ex
rel. Sanders*, 553 U.S. 662 (2008)).  In this posture,
"'[f]utility' means that the complaint, as amended, would fail
to state a claim upon which relief could be granted." *Glassman*
v. *Computervision Corp.,* 90 F.3d 617, 623 (1st Cir. 1996).  In
canvassing Genzyme's contentions in support of the operative
Second Amended Complaint, I am alert to the implications for
allowing a proposed Third Amended Complaint to become the
operative pleading in the litigation.

### III. MOTION TO DISMISS

I address first the standard for a Rule 12(b)(6) motion,
the standard integral to other issues before me.  I "assume that
well-pleaded facts are true and ask whether such facts and
inferences reasonably drawn from those facts plausibly state a
claim." *Doe* v. *Pawtucket Sch. Dep't*, 969 F.3d 1, 7 (1st Cir.
2020) (citing *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)).

However, I do not accept "legal conclusions clothed as factual allegations." *Thompson* v. *JPMorgan Chase Bank, N.A.*, 982 F.3d 809, 811 (1st Cir. 2020) (citing *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555-56 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678.  The well-pleaded facts must permit me to "infer more than the mere possibility of misconduct." *Id.* at 679.  Plaintiffs must "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

I employ this Rule 12(b)(6) standard as well for Rule 12(b)(1) motions.  "Rule 12(b)(1) motions challenging subject-matter jurisdiction are divided into two categories: facial challenges and factual challenges." *Cebollero-Bertran* v. *Puerto Rico*, 4 F.4th 63, 69 (1st Cir. 2021).  In the posture of Genzyme's motion to dismiss, with its "facial challenges [Genzyme] raises a question of law without contesting the facts." *Id.*  Accordingly, "[t]he analysis is essentially the same as a Rule 12(b)(6) analysis: [I] accept the well-pleaded facts alleged in the complaint as true and ask whether the plaintiff has stated a plausible claim that the court has subject matter jurisdiction." *Id.*

Similarly, the standing analysis under Rule 12(b)(1) mirrors Rule 12(b)(6) analysis.  "[A]t the pleading stage, the

plaintiff bears the burden of establishing sufficient factual matter to plausibly demonstrate his standing to bring the action.  Neither conclusory assertions nor unfounded speculation can supply the necessary heft." *Hochendoner II*, 823 F.3d at 731.

With recognition that Genzyme suggests the proposed Third Amended Complaint is futile, I turn first to Genzyme's Motion to Dismiss as applied to the currently operative Second Amended Complaint.  *See supra* Section II.B.  But I reference points that would be added by the proposed Third Amended Complaint, when relevant.[8]  In addressing the Motion to Dismiss, I start with the arguments about subject matter jurisdiction.  This is because "federal courts are required to determine whether Article III jurisdiction exists prior to proceeding to the merits of the case."  *See United Seniors Ass'n, Inc.* v. *Philip Morris USA*, 500 F.3d 19, 23 (1st Cir. 2007).

## A.   *Subject Matter Jurisdiction*

Genzyme contends I lack subject matter jurisdiction because the claims underlying the CAFA class claims — the only aspect of this litigation that could support federal jurisdiction in the

---

[8] For purposes of this analysis, I ignore the 2013 and 2015 claims concerning the Framingham plant and the Massachusetts and Washington claims, all of which the plaintiffs have abandoned in the Third Amended Complaint.  *See supra* note 7 and accompanying text.

first place — are all time-barred.  For their part, Plaintiffs say tolling under *American Pipe & Const. Co.* v. *Utah*, 414 U.S. 538 (1974), Indiana's Journey Account Statute,[9] and a May 2017 tolling agreement[10] between the parties' work to preserve their claims.

I begin my analysis by identifying the relevant statutes of limitations and when Plaintiffs' claims accrued, in order to assess if and when any of the claims have expired.  I then address *American Pipe* tolling, the tolling agreement, and Indiana's Journey's Account Statute.

1.  <u>Expiration of Claims</u>

Because statutes of limitations are substantive law under federal direction, *see Guaranty Trust Co. of New York* v. *York*,

---

[9] Plaintiffs also reference the Massachusetts Savings Statute, but Massachusetts law does not apply in this circumstance, because I am directed by Massachusetts law to apply Indiana law. *See Hemric* v. *Reed & Price Mfg. Co.*, 739 F.2d 1, 3 (1st Cir. 1984) ("[W]e are aware of no case suggesting that Massachusetts would abandon the traditional rule that local law of the forum determines whether an action is barred by a statute of limitations.").

[10] A copy of this agreement is attached to the Third Amended Complaint and undisputed by the parties.  Although I have yet to rule on allowing the Third Amended Complaint, I consider its contents here.  "While, ordinarily, a district court's review under Rule 12(b)(6) is limited to consideration of the facts set forth in the complaint and the documents attached thereto, an exception exists for 'documents the authenticity of which are not disputed by the parties . . . .'" *Town of Acton* v. *W.R. Grace & Co. Conn. Techs.*, Inc., No. 13-12376-DPW, 2014 WL 7721850, at *5 (D. Mass. Sep. 22, 2014) (quoting *Watterson* v. *Page*, 987 F.2d 1, 3 (1st Cir. 1993)).

326 U.S. 99, 110-12 (1945), I rely on Indiana choice-of-law principles.  Under those principles, statutes of limitations are treated as procedural, so Indiana's statutes of limitations apply.  *Autocephalous Greek-Orthodox Church of Cyprus* v. *Goldberg & Feldman Fine Arts Inc.*, 717 F. Supp. 1374, 1385 (S.D. Ind. 1989), *aff'd*, 917 F.2d 278 (7th Cir. 1990).  But there is an exception.  For statutory claims arising under the law of another state, that state's relevant statute of limitations applies.  *Shearer* v. *Thor Motor Coach, Inc.*, 470 F. Supp. 3d 874, 879 (N.D. Ind. 2020).  And there is an exception to this exception: If the statutory claim originated at common law, then Indiana's statutes of limitations still apply.  *Id.* at 879-880; *see also Big Rivers Elec. Corp.* v. *Gen. Elec. Co.*, 820 F. Supp. 1123, 1125-26 (S.D. Ind. 1992).

> a.  *Claims Related to Product Liability Under Indiana Law*

Indiana's statutes of limitations apply for all the common law claims here — as well as the claim under the Indiana Product Liability Act.  The common law claims are for negligence, negligence per se, strict liability, breach of warranty, fraud, fraudulent concealment, breach of fiduciary duty, unjust enrichment, and loss of consortium.

A two-year statute of limitations applies for the common law claims.  A two-year statute of limitations for claims

related to products liability, as alleged here, negligence, negligence per se, and strict liability, arises from the Indiana Products Liability Act. *See* Ind. Code § 34-20-3-1. Likewise, the statute of limitations is set at two years for breach of fiduciary duty under Indiana law. *See* Ind. Code § 34-11-2-4; *Shriner* v. *Sheehan*, 773 N.E. 2d 833, 846 (Ind. Ct. App. 2002).

> b.   *Claims Subsumed by Products Liability Under Indiana Law*

In Count Four, Plaintiffs allege various breaches of express and implied warranties under common law. [Dkt. No. 67 ¶¶ 361-64.] These claims are subsumed under the Indiana Product Liability Act for two reasons, and accordingly a two-year statute of limitations applies. First, where a breach of warranty claim is "tort-based," "several federal district courts and other panels of the [Indiana] Court of Appeals" have found the claim "subsumed into the [Indiana Product Liability Act]." *Kovach* v. *Caligor Midwest,* 913 N.E.2d 193, 197 (Ind. 2009); *see Cavender* v. *Medtronic, Inc.,* No. 3:16-CV-232, 2017 WL 1365354, at *7 (N.D. Ind. Apr. 14, 2017) ("[I]f it walks like a duck and quacks like a duck, it's a tort—not a breach of warranty claim— and it is subsumed by the [Indiana Product Liability Act]."). Although Plaintiffs pleaded that low-dose Fabrazyme "is not fit for the ordinary purpose for which it is customarily or foreseeably used" [Dkt. No. 67 ¶362(d)] — language framing

Plaintiffs' claim in warranty — Plaintiffs did not provide additional facts that set the claim outside of tort.  [*See generally* Dkt. No. 67 ¶¶362-64.]  *See Lyons* v. *Leatt Corp.,* No. 4:15-CV-17-TLS, 2015 WL 7016469, at *3 (N.D. Ind. Nov. 10, 2015) (using language that framed plaintiff's claim as a breach of warranty did not shield it from being subsumed under the Indiana Product Liability Act where it sounded in tort).  Second, Plaintiffs did not bring their claim for breach of warranty under the Indiana adoption of the Uniform Commercial Code, which is "independent" from the Indiana Products Liability Act and provides for different damages.  *Atkinson* v. *P & G-Clairol, Inc.,* 813 F. Supp. 2d 1021, 1024-25 (N.D. Ind. 2011).

Similarly, the claims sounding in fraud and in unjust enrichment are subject to the two-year statute of limitations, since this litigation continues to present a products liability case and the fraud and unjust enrichment claims arise out of that framework.  In Indiana, it is "the nature or substance of the cause of action, rather than the form of the action, which determines the applicability of the statute of limitations." *Shideler* v. *Dwyer*, 417 N.E.2d 281, 285 (Ind. 1981) (quoting *Koehring Co.* v. *Nat'l Automatic Tool Co.*, 257 F. Supp. 282, 292 (S. D. Ind. 1966), *aff'd*, 385 F.2d 414 (7th Cir. 1967) (per

curiam)).[11]  "Where an unjust enrichment claim arises out of a tort-based products liability claim as occurred here, Indiana would apply a two-year limitations period." *Juday* v. *Merck & Co.*, No. CV 16-1547, 2017 WL 1374527, at *3 (E.D. Pa. Apr. 17, 2017) (citing *Knutson* v. *UGS*, 2007 WL 2122192 at *5 (S.D. Ind. July 19, 2007) and *Schwindt* v. *Hologic, Inc.*, 2011 WL 3806511 at *7 (S.D. Ind. Aug. 26, 2011)), *aff'd*, *Juday* v. *Merck & Co Inc*, 730 F. App'x 107 (3d Cir. 2018).  The same is true for the fraud claims.  *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2007 WL 3334339, at *6 (E.D. La. Nov. 8, 2007) (finding under Indiana law that two-year statute of limitations applied to fraud claims in product liability suit).

> c.   *Loss of Consortium Claims Under Indiana Law*

Loss of consortium is a derivative claim, and thus tied to the relevant statute of limitations for the loved one's claim; consequently, it does not have a set statute of limitations but

---

[11] I recognize there is some debate about how far the Indiana Supreme Court will ultimately take this doctrine in claims as presented to be subsumed by other statutes of limitations based on "form."  *See Lewis* v. *Methodist Hosp., Inc.*, 326 F.3d 851, 854-56 (7th Cir. 2003).  The crux of this debate is that there are provisions in the Indiana code providing state statutes of limitations — including for fraud — and that such provisions may become meaningless if every claim is always read to be subsumed by another relevant statute of limitations.  Here, the framing of the litigation has firmly and consistently been in essence as a product liability case.  *Cf. In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2007 WL 3334339, at *6 (E.D. La. Nov. 8, 2007).

will rely upon that of the claim from which it is derived.  *See*
*Palmer v. Gorecki*, 844 N.E.2d 149, 157 (Ind. Ct. App. 2006).

> d.   *Other State Statutes*

All other claims brought are under statutes of other
states.  I find it unnecessary to scrutinize whether Indiana
courts would identify these claims as originating separately at
common law, because the claims in all events have expired for
purposes of Indiana law or the law of the other states, as I
will explain momentarily.  To frame that explanation, I observe
that the various state statutes of limitations are as follows:

- Three years for the Florida Deceptive and Unfair Trade
  Practices Act. Fla. Stat. § 95.11(3)(f); *Koski* v. *Carrier*
  *Corp.,* 347 F. Supp. 3d 1185, 1192 (S.D. Fla. 2017).

- One year for the Kentucky Products Liability Act.  Ky. Rev.
  Stat. Ann. § 413.140(1)(a).  *Bosch* v. *Bayer Healthcare*
  *Pharms., Inc.*, 13 F. Supp. 3d 730, 737 (W.D. Ky. 2014).

- Two years for the Kentucky Consumer Protection Act.  Ky.
  Rev. Stat. Ann. § 367.220(5).  *Arnold* v. *Liberty Mut. Ins.*
  *Co.*, 392 F. Supp. 3d 747, 766-67 (E.D. Ky. 2019).

- Three years for the Michigan Product Liability Act.  Mich.
  Comp. Laws § 600.5805(12); *McMan* v. *C.S. Bard, Inc.*, No.
  19-12670, 2021 WL 3079894, at *3 (E.D. Mich. July 21,
  2021).

- Six years for the Michigan Consumer Protection Act.[12]  Mich. Comp. Laws § 445.911(9).

- Four years for the Nevada Deceptive Trade Practices Act. Nev. Rev. Stat. § 11.190(2)(d).

- Four years for the North Carolina Deceptive Trade Practices Act.  N.C. Gen. Stat. § 75-16.2; *Dreamstreet Invs., Inc. v. MidCountry Bank.*, 842 F.3d 825, 830 (4th Cir. 2016).

- Six years for the Pennsylvania Consumer Protection Act.  42 Pa. Cons. Stat. § 5527(b); *Rodgers* v. *Lincoln Benefit Life Co.*, No. 19-cv-350, 2019 WL 4750193, at *2 (W.D. Pa. Sept. 30, 2019).

- Two years for the Virginia Consumer Protection Act.  Va. Code Ann. § 59.1-204.1.

- Two years for the Virginia False Advertising Act.  *Parker-Smith* v. *Sto Corp.*, 551 S.E.2d 615, 619 (Va. 2001).

- Two years for Virginia Wrongful Death/Survival Actions. Va. Code Ann. § 8.01-244.

2.  Accrual of Claims

With the expiration framework in place, I turn to the issue

---

[12] In Count 11, Plaintiffs allege a violation of the "Michigan State Law Deceptive Trade Practice" and cite to Mich. Comp. Laws § 445.903 *et seq.*  Plaintiffs' citation is actually to the Michigan Consumer Protection Act, and finding no "Michigan State Law Deceptive Trade Practice" Act, I have applied the Michigan Consumer Protection Act statute of limitations.

of when Plaintiffs' claims accrued.  "The determination of when
a cause of action accrues is generally a question of law."
*Cooper Indus., LLC* v. *City of S. Bend*, 899 N.E.2d 1274, 1280
(Ind. 2009).  I note that Indiana courts are inclined to
construe limitation provisions as "enacted upon the presumption
that one having a well-founded claim will not delay enforcing
it." *Shideler*, 417 N.E.2d at 283.  "They are practical and
pragmatic devices to spare the courts from litigation of stale
claims, and the citizen from being put to his defense after
memories have faded, witnesses have died or disappeared, and
evidence has been lost." *Havens* v. *Ritchey*, 582 N.E.2d 792, 794
(Ind. 1991) (quoting *Rohrabaugh* v. *Wagoner*, 413 N.E.2d 891, 893
(Ind. 1980)).

Under Indiana's discovery rule, a cause of action accrues
"when a party knows, or in the exercise of ordinary diligence
could discover, that . . . an injury had been sustained as a
result of the tortious act of another." *Strauser* v. *Westfield
Ins. Co.*, 827 N.E.2d 1181, 1185 (Ind. Ct. App. 2005).  The rule
"does not mandate that plaintiffs know with precision the legal
injury that has been suffered, but merely anticipates that a
plaintiff be possessed of sufficient information to cause him to
inquire further in order to determine whether a legal wrong has
occurred." *Perryman* v. *Motorist Mut. Ins. Co.*, 846 N.E.2d 683,
689 (Ind. Ct. App. 2006).  The question is whether "the acts and

circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist." *Id.* (quoting *Mitchell* v. *Holler*, 429 S.E.2d 793, 795 (S.C. 1993)). "Stated more succinctly, the law does not require a smoking gun in order for the statute of limitations to commence." *Id.*

To be sure, the doctrine of fraudulent concealment may toll the statute of limitations in certain circumstances. But "the affirmative acts of concealment must be calculated to mislead and hinder a plaintiff from obtaining information by the use of ordinary diligence, or to prevent inquiry or elude investigation." *Study* v. *State*, 24 N.E.3d 947, 956 (Ind. 2015) (quoting *Olcott Int'l. & Co., Inc.*, v. *Micro Data Base Sys., Inc.*, 793 N.E.2d 1063, 1072 (Ind. Ct. App. 2003)).

Examining the operative Second Amended Complaint, I can identify three types of harm alleged for purposes of accrual of claims. I consider at what point in time claims would have accrued in Indiana, using Indiana standards. Of course, statutes from Florida, Kentucky, Michigan, Nevada, North Carolina, Pennsylvania, and Virginia are still theoretically in play, since I have left to the side the question of whether any of these statutes cover claims originating at common law.

However, none of these states would apply a discovery rule
substantially more plaintiff-friendly than Indiana's.[13]

_____

[13] Florida law is at most no more generous to Plaintiffs than
Indiana law.  The Florida Supreme Court has said the delayed
discovery doctrine "generally provides that a cause of action
does not accrue until the plaintiff either knows or reasonably
should know of the tortious act giving rise to the cause of
action."  *R.R. v. New Life Cmty. Church of CMA, Inc.*, 303 So. 3d
916, 921 (Fla. 2020) (citation omitted).  The Florida discovery
rule only has a statutory basis for claims of fraud, products
liability, professional and medical malpractice, and intentional
torts based on abuse.  *Id.*
   Kentucky's discovery rule mirrors Indiana's.  *Fluke Corp.* v.
*LeMaster*, 306 S.W.3d 55, 60 (Ky. 2010) ("[A] cause of action
will not accrue until the plaintiff discovers (or in the
exercise of reasonable diligence should have discovered) not
only that he has been injured, but also that this injury may
have been caused by the defendant's conduct.")
   The Michigan Consumer Protection Act is no more generous than
Indiana in terms of discovery; it provides that an action "must
not be brought more than 6 years after the occurrence of the
method, act, or practice that is the subject of the action or
more than 1 year after the last payment in a transaction
involving the method, act, or practice that is the subject of
the action, whichever period of time ends at a later date."
Mich. Comp. Laws § 445.911(9).
   The Nevada Deceptive Trade Practices Act mirrors Indiana's
discovery rule by providing that "the cause of action shall be
deemed to accrue when the aggrieved party discovers, or by the
exercise of due diligence should have discovered, the facts
constituting the deceptive trade practice."  Nev. Rev. Stat. §
11.190(2)(d).
   The North Carolina Deceptive Trade Practices Act provides
simply that claims must be brought within four years of accrual.
N.C. Gen. Stat. § 75-16.2.  In general, "this statute commences
when the violations actually occur."  *Wood* v. *S. Carolina Bank &
Trust Co. of the Piedmont, N.A.*, No. 3:11-CV-00300, 2012 WL
395318, at *2 (W.D.N.C. Feb. 7, 2012). "However, when the
violation of the statute arises out of fraud, the statute of
limitations does not accrue until the unfair or deceptive act is
discovered or should have been discovered," which mirrors the
Indiana discovery rule.  *Id.*
   Pennsylvania's discovery rule is comparable to Indiana's.  The
limitations period may not begin "until the discovery of the

     *a.   Harm Caused by Law Dosing and Contamination*

The first type of harm is said to be caused by some combination of low dosing and contamination.  Both low dosing and contaminated doses are alleged to have begun in 2009.  *See* SAC at ¶¶1, 2, 6, 8, 9, 11–15, 17, 18, 20, 22, 24.  The allegations describe news coverage in 2009 about the viral contamination, SAC at ¶55, Genzyme's public communications about the shortage, *id.* at ¶207, ¶239, ¶273, and communications about non-viral contaminants, *id.* at ¶171.  Thus, Plaintiffs' claims accrued by the end of 2009.  This is well before the filing of the *Hochendoner* case in the Western District of Pennsylvania on

---

injury is reasonably possible."  *Miller* v. *Ginsberg*, 874 A.2d 93, 97 (Pa. 2005) (quoting *Dalrymple* v. *Brown*, 701 A.2d 164, 167 (Pa. 1997)).

  The Virginia Consumer Protection Act is no more generous than Indiana law; it provides that "the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person or damage to property."  Va. Code Ann. § 8.01-230; *see* Va. Code Ann. § 59.1-204.1.  However, "claims for violation of the Consumer Protection Act that are based upon any misrepresentation, deception, or fraud shall be deemed to accrue when such fraud is discovered or by the exercise of due diligence reasonably should have been discovered."  *Skibinski* v. *Lunger,* No. 06-152, 2006 WL 1571820, at *3 (Va. Cir. Ct. June 7, 2006); *see* Va. Code. Ann. § 8.01-249.  Wrongful death/survival actions must come within two years after death of the injured person.  Va. Code Ann. § 8.01-244(B).  The limitations period for false advertising is based on the "catch-all" provision and does not specify a discovery rule.  *See Parker-Smith* v. *Sto Corp.,* 551 S.E.2d 615, 619 (Va. 2001); Va. Code Ann. § 8.01-248.

March 9, 2011, when a subset of plaintiffs asserted claims based on low dosing and contamination.

### b. *Harm Caused by Sensitization*

The second type of harm is that identified by the Court of Appeals in *Hochendoner II*, 823 F.3d at 733-35; the sensitization harm asserted by Mr. Mooney.  That harm is alleged to have arisen for some plaintiffs upon return to a full dose.  It applies for three named Plaintiffs: Trina Wilkins, Tom Stanziano, and Damon LaForce (and also Mr. Stanziano's wife, who brings a derivative action for loss of consortium).  *Id.* at ¶¶1, 14, 20, 118-19.  Their return to full dosage was in 2012, so accrual would have been by no later than the end of that year.

### c. *Harm Caused by Fraud*

The third type of harm concerns fraud.  These allegations derived from the 2009 contamination.  SAC at ¶128-340, 441-71.  Thus, there is a fair argument that plaintiffs should have been aware of this injury by the end of 2009.[14]  I acknowledge that,

---

[14] I note here that plaintiffs include in their complaint internal communications from Genzyme that are quite damning and show efforts to conceal information.  *See, e.g.*, SAC ¶220, ¶229 (showing Genzyme executive wrote to employee "Did we lie to the [Fabry Stakeholders Working Group?]," a group of physicians and patient advocates from which Genzyme sought endorsement).  The information being actively concealed, however, was not about contaminants or vesivirus — or even the limited effectiveness of low-dose Fabrazyme.  Rather, the information being actively concealed was the likelihood of an extended delay before full doses would be available.  The studies discussed in the complaint were publicly available, and it would have been

with fraud as alleged, Plaintiffs may have had a more difficult time recognizing the harm.  Nevertheless, even allowing Plaintiffs the benefit of a generous reading of the doctrine of fraudulent concealment, their claims would have accrued by the time the *Hochendoner* complaint was filed in the Western District of Pennsylvania on March 9, 2011.  In that complaint it was alleged that Genzyme "expressly or impliedly misrepresent[ed] that the reduced dose of Fabrazyme® was in accordance with statutory mandates and efficacious for use," and "instructed and/or through knowledge and consent reduced the dose of Fabrazyme® to dangerous, sub-efficacious and unapproved levels." Compl. ¶¶ 71(f), 83(k), *Hochendoner* v. *Genzyme Corp.*, No. 2:11-cv-00313 (W.D. Pa. Mar. 9, 2011), ECF No. 1.

      d.   *Summary*

To synthesize these conclusions, for purposes of Indiana law, the low-dose/contaminant-based claims and fraud-based

---

obvious that a lower dose was sub-optimal.  Plaintiffs make only passing mention of harm coming from this concealment.  They say in the body of their complaint that "[h]ad the true information about the supply situation been provided to [them] and their doctors, they would have acted with great urgency in September, 2009 to seek alternative treatment, such as Replagal®, through a compassionate use exemption or additional Fabrazyme through private arrangements with other patients and doctors."  SAC ¶299.  But they do not otherwise substantiate this point beyond that conclusory allegation.  They do not describe advice from their doctors or any efforts to obtain a compassionate use exemption that were reconsidered because of Genzyme's statements.

claims likely expired by the end of 2011 and certainly by March 2013.  The sensitization claims appear to have expired by the end of 2014.  The fraud claims conceivably expired by the end of 2011 and certainly by March 2013.

Turning to consider statutes of other states, any low-dose/contaminant-based claims or fraud-based claims under:

- The Florida Deceptive and Unfair Trade Practices Act likely expired by the end of 2013 and certainly by March 2015.

- The Kentucky Products Liability Act likely expired by the end of 2012 and certainly by March 2013.

- The Kentucky Consumer Protection Act likely expired by the end of 2011 and certainly by March 2013.

- The Michigan Product Liability Act likely expired by the end of 2012 and certainly by March 2014.

- The Michigan Consumer Protection Act likely expired by the end of 2015 and certainly by March 2017.

- The Nevada Deceptive Trade Practices Act likely expired by the end of 2013 and certainly by March 2015.

- The Pennsylvania Consumer Protection Act likely expired by the end of 2015 and certainly by the end of March 2017.

- The Virginia Consumer Protection Act likely expired by the end of 2011 and certainly by the end of March 2013.

- The Virginia False Advertising Act likely expired by the end of 2011 and certainly by the end of March 2013.

As for sensitization, I observe Ms. Wilkins is alleged to be a resident of both Kentucky as well as Indiana. Her Kentucky Product Liability claim expired by the end of 2013. And her Kentucky Consumer Protection claim expired by the end of 2014. The other relevant individuals are Mr. LaForce, who was a Virginia resident during low-dose treatment, and Mr. Stanziano and his wife, who are both Florida residents. SAC at ¶¶ 14, 20, 21. Mr. LaForce's claims under the Virginia Consumer Protection Act and the Virginia False Advertising Act would have expired by the end of 2014. Mr. Stanziano's claim under the Florida Deceptive and Unfair Trade Practices Act would have expired by the end of 2016. And any derivative claim for loss of consortium by his wife, Wendy Stanziano, would have expired by the end of 2016 as well.

Lastly, the Virginia Wrongful Death/Survival actions raised by Eddie Viers and Jeanne Wallace do not fit neatly into the paradigm just employed for the other claims. *See* SAC at ¶¶ 22, 24. As noted, these claims must be raised within two years of the deceased's death. The complaint specifies that Mr. Viers lost his wife Teresa Viers in September 2019. There is no information about when Ms. Wallace's husband Joseph Wallace died. Based on this information, the complaint is insufficient

34

as to Ms. Wallace's claim.   However, Mr. Viers' claim would have accrued in September 2019 and he would have until September 2021 to bring a claim – a deadline he met, since this lawsuit was filed in February 2020.   Thus, Mr. Viers has the only claim for Wrongful Death Survival not barred under a statute of limitation enforced by Indiana.

### 3.   *American Pipe* Tolling

On a different front, Plaintiffs and Genzyme debate the applicability of the Supreme Court's *American Pipe* tolling doctrine, which preserves the claims of putative class members when a class action is filed in court.   *See generally American Pipe & Const. Co.* v. *Utah*, 414 U.S. 538 (1974).   Although this debate is interesting, the parties overlook an important consideration.   *American Pipe* does not by its terms apply where a court sits in diversity, presiding over state law claims, as I do now.   *See Casey* v. *Merck & Co.*, 653 F.3d 95, 100 (2d Cir. 2011), *certified question answered*, 283 Va. 411, 722 S.E.2d 842 (2012).   Accordingly, to determine the applicability of *American Pipe* tolling, I must consider whether the relevant state courts have adopted this doctrine, in addition to whether the doctrine itself fits with the facts.   Moreover, I must consider whether the relevant states would be likely to adopt cross-jurisdictional tolling – that is, whether they would recognize

any relevant tolling for a class action filed outside of the state's courts.  *Id.*

    At the outset, I am of the view that *American Pipe* tolling is a poor fit for the facts of this case, even assuming the doctrine applies.  The doctrine has continued to introduce questions as different issues arise in class action litigation. The First Circuit has acknowledged relatively recent Supreme Court clarification that "[w]hile a putative class member may join an existing suit or file an individual action upon denial of class certification, a putative class member may not commence a class action anew beyond the time allowed by the untolled statute of limitations."  *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1, 16 (1st Cir. 2019) (citing *China Agritech, Inc.* v. *Resh*, 138 S. Ct. 1800, 1807 (2018)).  The First Circuit has even more recently extended this reasoning, holding that the Supreme Court in *China Agritech* "effectively ruled that the tolling effect of a motion to certify a class applies only to individual claims, no matter how the motion is ultimately resolved."  *Id.* at 17.  At least one district court outside the First Circuit has found this reasoning compelling. *See Torres* v. *Wells Fargo Bank, N.A.*, No. CV 17-9305 DMG (RAOx), 2019 WL 7169790, at *8 (C.D. Cal. Sept. 27, 2019).

    In this case, Plaintiffs argue the class claims have been tolled.  But that is directly at odds with *In re Celexa*.  I am,

of course, not directly bound by the First Circuit on this issue, but I have no reason to believe Indiana's courts would employ *American Pipe* tolling here.

The state law component to this equation gives all the more reason to doubt that Plaintiffs can rely on *American Pipe*. It appears that "[m]ost states, following the Supreme Court's reasoning in *American Pipe*, have adopted a rule allowing tolling during the pendency of a class action filed in their own courts." *In re Fosamax Prod. Liab. Litig.*, 694 F. Supp. 2d 253, 258 (S.D.N.Y. 2010), *aff'd sub nom. Casey* v. *Merck & Co.*, 678 F.3d 134 (2d Cir. 2012). But "[o]nly a small fraction of states have addressed the cross-jurisdictional tolling issue . . . and there is no clear consensus among them." *Id.* "Recognizing the lack of consensus on the issue and the frequently articulated concern of forum shopping, federal courts generally have been disinclined to import cross-jurisdictional tolling into the law of a state that has not ruled on the issue." *Id.*

Although the lower Indiana appellate court has adopted *American Pipe*-style tolling as a matter of state law, *Ling* v. *Webb*, 834 N.E.2d 1137, 1141-42 (Ind. Ct. App. 2005), Indiana courts have not explicitly adopted cross-jurisdictional tolling, *see In re Vioxx Prod. Liab. Litig.*, 2007 WL 3334339, at *6. For that reason, federal courts have been wary of assuming Indiana would recognize such tolling. *See id.*; *see also Shea* v. *Gen.*

*Motors LLC*, 567 F. Supp. 3d 1011, 1022 (N.D. Ind. 2021); *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1082 (D. Kan. 2009).  *But see In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 349 (E.D. Pa. 2004) (holding Indiana courts likely would observe cross-jurisdictional tolling for an antitrust claim).

Given this context and the fact that the doctrine seems inappropriate in this circumstance, in any event, I find *American Pipe* tolling unavailable for plaintiffs.

### 4.   Tolling Agreement

Plaintiffs also contend their claims are preserved by a tolling agreement.  The parties entered into an agreement on May 17, 2017[15] that provides:

> [a]ny applicable statutes of limitations pertaining to any matters asserted in the [*Hochendoner* and *Adamo* lawsuits] shall be tolled during the term of this Agreement beginning on [May 17, 2017], and Genzyme agrees it will not assert any defense of statute of limitations, laches or any similar defense based upon the passage of time during the term of this Agreement against the Plaintiffs or members of the putative class alleged in the Lawsuits.

Tolling Agreement, Mot. for Third Amended Compl., ECF No. 105-1, Ex. A.

Plaintiffs say this language saves them, but Genzyme points to the next sentence, which says that "[n]otwithstanding the foregoing, Genzyme does not waive and expressly reserves the

---

[15] Notably, this date falls after the expiration of all the claims as found above, except for a wrongful death claim.

right to assert any such defense based upon the passage of time *prior to* the effective date of this Agreement or the passage of time *after* the termination of this Agreement." *Id.* (emphasis supplied).

This contention presents me with a question of contract interpretation, as to which I turn to Indiana choice-of-law principles.  In Indiana, "[t]he court will consider all acts of the parties touching the transaction in relation to the several states involved and will apply as the law governing the transaction the law of that state with which the facts are in *most intimate contact*."  *Nat'l Union Fire Ins. Co. of Pittsburgh, PA* v. *Standard Fusee Corp.*, 940 N.E.2d 810, 814 (Ind. 2010) (emphasis in original) (quoting *W.H. Barber Co.* v. *Hughes*, 63 N.E.2d 417, 423 (Ind. 1945)).  There are five types of contact Indiana courts consider: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.*  Because none of these contacts applies here, and indeed there is no apparent state with the "most intimate contact" – this dispute being one that involves plaintiffs from many different states – I apply Indiana law.

Under Indiana law, "[c]onstruction of the terms of a written contract is a pure question of law for the court." *Peoples Bank & Tr. Co.* v. *Price*, 714 N.E.2d 712, 716 (Ind. Ct. App. 1999). "If the language of the instrument is unambiguous, the intent of the parties is determined from the four corners of that instrument," but if "a contract is ambiguous or uncertain, its meaning is to be determined by extrinsic evidence and its construction is a matter for the fact finder." *Id.* In general, "it is . . . appropriate to construe an ambiguous agreement against its drafter." *Trinity Homes, LLC* v. *Fang*, 848 N.E.2d 1065, 1068 (Ind. 2006). Further, I "should attempt to determine the intent of the parties at the time the contract was made as discovered by the language used to express their rights and duties." *Price*, 714 N.E.2d at 717. "The contract is to be read as a whole when trying to ascertain the intent of the parties." *Id.* I "must accept an interpretation of the contract which harmonizes its provisions as opposed to one which causes the provisions to be conflicting." *Id.*

I find as an initial matter the tolling agreement unambiguously preserves the claims that Plaintiffs made in the *Hochendoner I* litigation. The contract plainly says that "[a]ny applicable statutes of limitations pertaining to any matters asserted in the [*Hochendoner* and *Adamo* lawsuits] shall be tolled

during the term of this Agreement."  On its face I take this language to preserve Plaintiff's claims.

True, the next sentence says that "notwithstanding the foregoing" Genzyme still has "the right to assert any [timeliness] defense based upon passage of time prior to the [May 17, 2017]."

But I must read the contract as a whole.  The agreement also says that "[t]he parties desire to provide for additional time to allow them to complete the process of finalizing documentation giving effect to that agreement in principle." And the agreement recites that the parties' agreement is in part "to facilitate the orderly settlement and resolution of the Plaintiffs' claims."  *Id.*

For these provisions to exist in harmony, it would make no sense for the sentence that Genzyme highlights to drain the prior sentence of all meaning.  Genzyme's emphasized sentence makes sense as a clarification that the agreement does not save any claims not already made.  But by the same token the sentence reads naturally as a preservation of the claims that Plaintiffs already made in litigation, since that meaning is the one that would facilitate negotiations between the parties.

Accordingly, I find the tolling agreement preserves Plaintiffs' claims.  It is then an open question the exact extent of what is preserved and what Plaintiffs are allowed to

argue in a new action reliant on this tolling agreement.   I
address this issue *infra* in subsection IV.B.6.

### 5.   Indiana Journey's Account Statute

I turn meanwhile to Indiana's Journey's Account statute,
which Plaintiffs say is of further help in saving their claims.
This statute preserves claims after a lawsuit is dismissed in
certain circumstances.   The lawsuit cannot have been dismissed
for "negligence in the prosecution of the action," Ind. Code §
34-11-8-1(a)(1), and the new lawsuit must be filed within three
years after the prior action failed, *id.* § 34-11-8-1(b)(1).   "It
is well settled that in order for the saving power of the
[Journey's Account Statute] to apply, the decision ending the
previous suit must not have been a decision on the merits."
*Allen* v. *State*, 30 N.E.3d 1280, 1283 (Ind. Ct. App. 2015).
Overall, "[t]he Journey's Account Statute is designed to ensure
that the diligent suitor retains the right to a hearing in court
until he receives a judgment on the merits. Its broad and
liberal purpose is not to be frittered away by narrow
construction." *Vesolowski* v. *Repay*, 520 N.E.2d 433, 434 (Ind.
1988).

Genzyme argues that statute cannot apply because *American
Pipe* tolling doctrine makes clear that the right to file a new
class action cannot be tolled.   But *American Pipe* tolling is
irrelevant to the current question.   Indiana's statute is its

42

own independent method by which claims might be preserved. Indeed, the statute has been used by a federal court in Indiana to preserve class claims. *Leathermon* v. *Grandview Mem'l Gardens, Inc.*, No. 4:07-CV-137-SEB-WGH, 2011 WL 2445980, at *10 (S.D. Ind. June 15, 2011).

Thus, I move forward and inquire whether Plaintiffs' suit would satisfy these requirements. Plaintiffs do not seem to argue that the statute operated independently to allow for them to file this suit; they acknowledge that they "had three years to file a new action" and that the tolling agreement was signed not long before the statute would have lapsed. [*See* Opposition to Motion to Dismiss at 9, ECF No. 108] Specifically, the *Hochendoner/Adamo* suit was dismissed with respect to the current Plaintiffs on May 23, 2016, when the First Circuit released its ruling in *Hochendoner II*. *See* 823 F.3d at 724. The tolling agreement was signed on May 17, 2017. The window for the Journey's Account Statute to operate on its own closed on May 23, 2019. And the lawsuit now before me was filed on February 29, 2020.

The exact role then of the Journey's Account Statute in Plaintiffs' argument is unclear. Plaintiffs argue that Genzyme seeks for me to deprive them of "the protection of Indiana's savings statute and the parties' tolling agreement." Their best theory is seemingly that the statute helped to keep their claims

43

alive after the dismissal and the tolling agreement locked them in.  I see no Indiana caselaw on the interaction between tolling agreements and this statute, so I am reluctant to wade into uncharted, state-patrolled legal waters.  I note that Indiana courts have said the statute "is not an exception to the statute of limitations; it merely allows the continuation of a previous suit filed within the statute of limitations."  *Hayes* v. *Westminster Village N., Inc.*, 953 N.E.2d 114, 118 (Ind. Ct. App. 2011).  This characterization makes the statute seem less like a broad tolling device and more like a specific mechanism to allow claims to move forward when a suit has been filed.

Even so, to evaluate Plaintiffs' arguments thoroughly, I now will consider how the new complaint maps onto the prior action and whether it would seem like a permissible extension, timing aside.  First, I address the requirement that there be no negligence in the prosecution of the action.  "Examples of conduct which would likely be deemed negligence in prosecuting a case presumably include dismissal for failure to prosecute, dismissal for failure to comply with the discovery rules, failure to pay filing fees, and naming the wrong party."  *Dempsey* v. *Belanger*, 959 N.E.2d 861, 866 (Ind. Ct. App. 2011).  "The Journey's Account Statute's typical use is to save an action filed in the wrong court by allowing the plaintiff enough

time to refile the same claim in the correct forum." *Al-Challah* v. *Barger Packaging*, 820 N.E.2d 670, 672 (Ind. Ct. App. 2005).

Next, I consider the nexus needed between the prior claim and the new one. The Indiana Supreme Court has emphasized that "[a] plaintiff invoking the benefit of the [Journey's Account Statute] is not required to prove the second complaint is a 'continuation' of the first." *Eads* v. *Cmty. Hosp.*, 932 N.E.2d 1239, 1245 (Ind. 2010). "The two *must assert fundamentally the same claim*, but whether one suit is a 'continuation' of another is the result of meeting the test of subsections, (a) and (b), not the cause."[16] *Id.* (emphasis added).

In *Eads*, the plaintiff sought to bring a medical malpractice claim after previously bringing a general negligence claim. *Id.* In finding the two were "fundamentally the same claim," the court noted that "[b]oth complaints allege[d] identical historical facts and assert[ed]" the same basis for a claim, specifically the hospital's failure to ensure the plaintiff had "a safe means of egress." *Id.* The court also observed that "the source of a medical malpractice claim" was also "basic tort law" and "[t]here [were] no more legal elements

---

[16] As I have earlier observed in this memorandum, part (a) of the statute establishes the requirement that the plaintiff was unsuccessful in the earlier action on the basis of a cause other than negligence in the prosecution. Ind. Code § 34-11-8-1. Part (b) establishes when the new action may be brought.

to [the malpractice claim] than there [were] to other negligence torts." *Id.* at 1246 (quoting *Burke* v. *Capello*, 520 N.E.2d 439, 441 (Ind. 1988), *overruled in part by Vergara* v. *Doan*, 593 N.E.2d 185 (Ind. 1992)); *see also Land* v. *Int'l Bus. Machs. Corp.*, 108 F. Supp. 3d 632, 648-49 (S.D. Ind. 2015) (finding continuation permissible where complaint was "altered" only to name state entities as defendants, a procedural requirement).

The scenario in *Eads* may be contrasted with another case in which the parties changed and elements of the different claims – a 42 U.S.C. § 1983 claim versus gross negligence – were demonstrably distinct. *Eads*, 932 N.E.2d at 1246 (citing *McGill* v. *Ling*, 801 N.E.2d 678 (Ind. Ct. App. 2004)); *see also Sutton* v. *Scott*, 732 F. App'x 482, 483 (7th Cir. 2018) (Mem.) (finding "suit against the United States [that] sought to rescind [a] forfeiture" was "not remotely the 'same claim'" as "a tort action against one's lawyers," who were being sued for their representation earlier concerning the forfeiture).

I find that the operative Second Amended Complaint before me is close to satisfying the requirements of the Journey's Account Statute (except for the timing component), but I also find that it differs from that statute's customary function.  On the one hand, most of the claims are the same and use the same elements.  But on the other hand, entirely new causes of action have been added (wrongful death/survival; fraud; fraudulent

concealment; breach of fiduciary duty; unjust enrichment), and the facts have been substantially enhanced.

### 6.   What Is Preserved

As a general proposition, I have found preserved by the Tolling Agreement Plaintiffs' claims from the *Hochendoner I* litigation — with a possible assist from Indiana's Journey's Account Statute.  Thus the question becomes what claims were actually preserved.  Unfortunately, this issue was not addressed in the briefing.

The key phrase is in the tolling agreement: "[a]ny applicable statutes of limitations pertaining to any matters asserted in" the prior lawsuits.  The narrowest reading of this phrase is that precisely the same claims can be brought as were asserted in the prior action.  A slightly more expansive interpretation — one consonant, to my mind, with the type of continuation envisioned by Indiana's Journey's Account Statute — is that the same fundamental claims can be brought, with modifications that address flaws in the earlier action.  A more liberal reading than these initial two interpretations may be possible, also.  The phrase reads "any *matters* asserted" in the prior lawsuit.  "Matters" could refer not simply to specific claims but more broadly to the conduct discussed.  This interpretation could open the door to new causes of action that still focus on the same issues as in the earlier suit.

47

Given this array of possible meanings, I draw again on Indiana's principles for contract interpretation and find that the meaning on this point is ambiguous.  Thus, I am to consider extrinsic evidence that would shed light on the parties' agreement, but the current pleadings do not provide any extrinsic evidence.  I conclude then that the meaning of this part of the tolling agreement would be a factual issue in dispute, to be resolved at a later stage in this litigation, with implications for the claims that may be ultimately successful.  *See Banknorth, N.A.* v. *BJ's Wholesale Club, Inc.*, 394 F. Supp. 2d 283, 285-86 (D. Me. 2005) (explaining that although the defendant may raise meritorious arguments, "they require factual determinations more appropriately made at summary judgment or trial" and not on a motion to dismiss).

**B.  *Standing***

As the First Circuit advised in an earlier stage of this litigation, "[t]he heartland of constitutional standing is composed of the familiar amalgam of injury in fact, causation, and redressability."  *Hochendoner II*, 823 F.3d at 731.  For this case, injury and causation are most pertinent.

The injury must be "concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Susan B. Anthony List* v. *Driehaus*, 513 U.S. 149, 158 (2014) (citations and quotations omitted).  As the First Circuit explained in

addressing Plaintiffs' prior action, "concrete" means the injury "actually exist[s]" and "particularized" means a plaintiff has experienced harm "in a personal and individual way." *Hochendoner II*, 823 F.3d at 731 (quoting *Spokeo, Inc.* v. *Robins*, 578 U.S. 330, 339 (2016)).  Where, as here, plaintiffs allege a variety of injuries and "causal chains," the standing doctrine requires specific allegations "linking each plaintiff to each of these injuries." *Id.* at 733.  Although all alleged injuries may flow from the same set of facts, "a plaintiff who has been subject to injurious conduct of one kind" does not "by virtue of that injury" hold "the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."  *Blum* v. *Yaretsky,* 457 U.S. 991, 999 (1982).

For causation, a plaintiff must show that her injury is "fairly traceable to the challenged conduct of the defendant." *Sopkeo*, 578 U.S. at 338.  This "requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm."  *Katz* v. *Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012).  The connection "cannot be overly attenuated."  *Donahue* v. *City of Boston*, 304 F.3d 110, 115 (1st Cir. 2002).  "Because the opposing party must be the source of the harm, causation is absent if the injury stems from the independent action of a third party."  *Katz*, 672 F.3d at 71-72.

Although Plaintiffs embellish their pleadings from their initial suit in an attempt to establish standing, they are unsuccessful, with the exception of four Plaintiffs.  Overall, Plaintiffs improve on showing particularized harm compared with *Hochendoner/Adamo*, but none of the harm they successfully show is fairly traceable to misconduct by Genzyme (again with the exception of four Plaintiffs).  And other harm they allege fails because it is speculative or insufficiently alleged.

1.   Theories of Harm

I can discern five theories of injury in the Second Amended Complaint:

a.   *Acceleration Theory*

The first is an acceleration theory.  This theory posits that patients received defective Fabrazyme that caused Plaintiffs' Fabry symptoms to worsen at a faster pace than would have occurred with proper Fabrazyme.  This theory is analogous to the acceleration theory in the *Hochendoner/Adamo* action. This harm is alleged for almost every Plaintiff.  For each of these Plaintiffs, the complaint says the Plaintiff's "clinical status has deteriorated as the Fabry disease has accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria." *See, e.g.*, SAC at ¶¶1-2.  What follows then is a laundry list of

50

ailments.  These allegations do not specify what is meant by

"defective Fabrazyme."  The surrounding sentences refer both to

low dosing and vesivirus-contaminated Fabrazyme.

b.  *Sensitization Theory*

The second is a sensitization theory.  This theory posits

that some Plaintiffs (Ms. Wilkins, Mr. LaForce, and Mr.

Stanziano) became sensitized from low doses of Fabrazyme and

consequently experienced dangerous reactions upon returning to

full doses.  *See id.* at ¶¶1, 14, 20.  This theory is analogous

to the theory found successful for Mr. Mooney in the

*Hochendoner/Adamo* action.  *See Hochendoner II*, 823 F.3d at 734-

36.

c.  *Vesivirus Theory*

The third is a vesivirus theory.  This theory posits that

the presence of vesivirus in the Fabrazyme doses given to

Plaintiffs caused "vesivirus-induced vesiculating non-

anaphylactic rashes," as well as an increased "risk of

developing fulminating vesivirus infection, and vesivirus

induced hematological cancer." *See, e.g.*, SAC at ¶1-2.  This

theory is applied to almost every Plaintiff.  Plaintiffs allege

generally that Genzyme contaminated its bioreactors – containers

similar to fermentation tanks that are used to produce Fabrazyme

– with vesivirus at some point before July 2009.  *Id.* at ¶42.

Genzyme named the particular strain of vesivirus "2117

(Allston)" for the manufacturing facility where it was detected (Allston, Massachusetts).  *Id.* at ¶47.

### d.   *Life Expectancy Theory*

The fourth is a life expectancy theory.  This theory posits that low doses of Fabrazyme decreased Plaintiffs' life expectancy.  *See, e.g.*, *id.* at ¶¶1-2.  This theory is also applied to almost every Plaintiff.

### e.   *Financial Theory*

The fifth is a financial theory.  This theory posits that Plaintiffs spent money on medically worthless medication, worthless "because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold."  *See, e.g.*, *id.* at ¶¶1-2.  This theory is also applied to almost every plaintiff.

### 2.   Success of the Five Theories of Harm

I now address whether any of the five theories of harm satisfy the requirements of constitutional standing.  Like the Court of Appeals in *Hochendoner II*, I find that only the sensitization theory succeeds.

The acceleration theory fails for insufficiently showing causation.  Plaintiffs' allegations repeatedly refer to "defective" Fabrazyme without specifying whether the problem was dosage or contaminants, a failure which undermines Plaintiffs'

claims.  Plaintiffs' open-ended pleading fails to make meaningful allegations of causal ties.

Moreover, there is no information to corroborate that any Plaintiff received a dose contaminated with vesivirus; the link to be drawn is apparently that Genzyme reported vesivirus at its plant and Plaintiffs experienced symptoms they claim — with no particularized allegation — resulted from contamination. Although the Second Amended Complaint describes distressing ailments suffered by numerous patients and attempts to connect them to "defective" doses of Fabrazyme, it does not for any Plaintiff provide information to show that the symptoms experienced were the result of "defective" dosing and not simply the progression of Fabry disease as would have occurred without the drug and perhaps even at a faster pace.  There is no information from a physician about symptoms or a comparison with symptom progression before "defective" doses.

The Second Amended Complaint does reference research from Europe showing that acceleration can occur and that "Europe banned 'low-dosing' entirely and required Genzyme Corporation to change the label to warn patients of possible acceleration of the Fabry-disease process."  SAC ¶98-99.  And the Second Amended Complaint states for various Plaintiffs that they have experienced an acceleration of symptoms due to "defective" doses.  But a study showing that acceleration *can* occur says

nothing of whether Plaintiffs themselves suffered acceleration. As the First Circuit made clear in the prior iteration of this suit, "[n]either conclusory assertions nor unfounded speculation can supply the necessary heft" to establish standing. *Hochendoner II*, 823 F.3d at 731.  As pleaded, Plaintiffs only speculate regarding the cause of their injuries.

The vesisvirus theory fails as well for insufficiently showing causation.  I have explained the weak basis plaintiffs provide for vesivirus being in a dose they received. Additionally, the specific symptom they describe for this injury theory — vesivirus-induced vesiculating non-anaphylactic rashes — is consistent with known side effects of Fabrazyme. Plaintiffs simply provide their say-so that these rashes are from vesivirus.  No plaintiff provides any particularized allegation of a vesivirus diagnosis or of the virus being detected in their body.

The vesivirus theory also fails for being too speculative, and the life expectancy theory fails for this reason, too.  With the vesivirus theory, the complaint states baldly that vesivirus exposure has increased the risk of certain health problems for Plaintiffs.  And with the life expectancy theory, the complaint states simply that low doses have resulted in a lower life expectancy.  But Article III standing requires showing harm that is "actual or imminent, not conjectural or hypothetical."  *Susan*

*B. Anthony List*, 573 U.S. at 158 (quoting *Lujan* v. *Defens. of Wildlife*, 504 U.S. 555, 560 (1992)).  These vague prognostications in the operative complaint now before me also are insufficient.

Finally, the financial theory also fails because it is insufficiently pled to show injury.  Plaintiffs spent money on a medication that they knew would come in a lesser quantity than what they usually purchased.  Their only arguments to show the medication was worthless are based on conclusory statements that the doses harmed them in some way.  *See, e.g.*, SAC ¶1.  But again, Plaintiffs do not offer any particularized allegation to show that low doses or a highly speculative contamination of vesivirus caused them harm.  The harm they describe is consistent with the progression of Fabry disease.

Nevertheless, the sensitization theory of standing succeeds, as it did before the First Circuit in *Hochendoner II*. Plaintiffs plausibly allege that "'[l]ow dosing' a protein like Fabrazyme increases the likelihood that Fabrazyme will induce an immune response against Fabrazyme itself because the immune system is more likely to interpret low-dose protein as a pathogen and become hypersensitive to subsequent injections."

SAC ¶104.  As a result, Mr. LaForce, Mr. Stanziano,[17] and Ms.
Wilkins all say they experienced anaphylactic response upon
returning to a full dose.  *Id.* at ¶¶1, 14, 20.  The allegations
here mirror the allegations in the prior suit but with some
specificity.  And Genzyme does not dispute the success of this
theory for the four remaining plaintiffs in their motion to
dismiss.

### IV. CLASS ACTION STATUS

To this point, I have found that the May 2017 tolling
agreement between the parties preserved Plaintiffs' claims – at
least in some form – but that only four Plaintiffs succeed in
establishing standing, and then on a narrow, idiosyncratic basis
(with one of these Plaintiffs doing so with a derivative loss-
of-consortium claim).  To maintain this action as a class action
under Rule 23 requires that the class be "so numerous that
joinder of all members is impracticable."  Fed. R. Civ.
P.23(a)(1).  Genzyme has not challenged whether Plaintiffs
satisfy the numerosity requirements.  But with only four
Plaintiffs who experienced a very specific type of injury, I
have doubts about whether this suit may proceed on a class

---

[17] Mr. Stanziano's wife, Ms. Stanziano, also sues through a
derivative loss-of-consortium claim on a surviving sensitization
claim by Mr. Stanziano.

action basis.[18]   At this point, I will evaluate the claims of these plaintiffs only on an individual basis.

## V. MERITS

I now must address the claims made by Ms. Wilkins, as a resident of Indiana and Kentucky, Mr. and Ms. Stanziano, as

---

[18] In *Rovinelli* v. *Trans World Entertainment Corporation* I had occasion to address a similar, though not identical, issue:  How and whether to proceed as to state law claims where "the pleaded matters [were not] properly dealt with through a class action in federal court."  *See* No. 19-11304-DPW, 2021 WL 752822, at *1 (D. Mass. Feb. 2, 2021).  There I found that the plaintiffs' allegations did not provide facts demonstrating "commonality and predominance that are required to adjudicate claims as a class action under Fed. R. Civ. [P.] 23."  *Id.*  I explained that the plaintiffs *never* had proper jurisdiction in federal court pursuant to the CAFA, and I struck the class allegations.  *Id.* at *13.  I then considered whether I had subject matter jurisdiction to proceed with respect to plaintiffs remaining claims, all brought under state law.  *Id.* I concluded that I would not exercise supplemental jurisdiction over the state law claims because the "jurisdictional hook" of the CAFA was improper, and the amount in controversy was insufficient for the "ordinary diversity of citizenship analysis."  *Id.* at *16.

The current matter presents different circumstances.  Genzyme is a citizen of Massachusetts, whereas the four remaining Plaintiffs are variously citizens of Indiana, Kentucky, Florida, and Virginia.  In most Counts, Plaintiffs "demand[ed] judgment against [Genzyme] in an amount in excess of $75,000.00," and pleaded both "*individually* and on behalf of all others similarly situated."  SAC ¶457 (emphasis added).  Although most of Plaintiffs' allegations containing injuries have been dismissed for standing, the remaining allegations, if proven, would likely have damages that could exceed $75,000.00.  Plainly, I cannot say to a legal certainty that the claim is for less.  *See Stewart* v. *Tupperware Corp.*, 356 F.3d 335, 338 (1st Cir. 2004) (explaining that a plaintiff's allegation of damages "controls" if it is "made in good faith," since "[i]t must appear to a legal certainty that the claim is really for less . . . to justify dismissal" when challenged (quoting *St. Paul Mercury Indem. Co.* v. *Red Cab Co.*, 303 U.S. 283, 288-89 (1938))).

Florida residents, and Mr. LaForce, as a Virginia resident. Notably, several of these claims — for fraud, fraudulent concealment, breach of fiduciary duty, and unjust enrichment – were not brought in the *Hochedoner I & II* litigation.  I nevertheless address them here.  As I explained above, however, whether these claims can be brought is a matter of factual dispute involving the meaning of the tolling agreement.

I address first whether the heightened pleading standards of Fed. R. Civ. P. 9(b) should apply and then examine each claim through the lens fashioned in that manner.  The standing theory I have found viable – the sensitization theory – is the one standing theory accepted in *Hochendoner II.*

## A.    *Rule 9(b) Heightened Pleading Standards*

Genzyme contends that all claims in the Second Amended Complaint "are grounded in allegations of fraudulent, misleading, or deceptive conduct," and so they must satisfy Rule 9(b)'s heightened pleading standards.

Genzyme also contends that Plaintiffs' "fraud claims are grounded in the same core theory as the rest of their product liability claims," and so the fraud claims should be subject to the two-year statute of applications relevant for product liability in Indiana.

Plaintiffs apparently agree with Genzyme's Rule 9(b) contention and point to the First Circuit's instruction that

"Rule 9(b)'s heightened pleading requirements apply not only to claims of fraud simpliciter but also to related claims as long as the central allegations of those claims 'effectively charge fraud.'" *Foisie* v. *Worcester Polytechnic Inst.*, 967 F.3d 27, 49 (1st Cir. 2020) (quoting *Mulder* v. *Kohl's Dep't Stores, Inc.*, 865 F.3d 17, 21-22 (1st Cir. 2017)).

Considering the theory of harm before me and how it interacts with the causes of action, I find Rule 9(b)'s pleading standards applicable to the denominated fraud claim. At bottom, though Plaintiffs make many allegations of Genzyme concealing information in their other claims, those claims are fundamentally about product liability and Rule 9(b) does not apply. I will return to a discussion of the fraud denominated claims in Section V.K. *infra*.

**B.  *Negligence***

The negligence claims asserted by Mr. LaForce and Mr. Stanziano (and derivatively Ms. Stanziano) fail. *See* SAC at ¶¶350-352. The negligence claims are brought under theories of products liability. *See, e.g., West* v. *Caterpillar Tractor Co., Inc.,* 336 So. 2d 80, 84 (Fla. 1976) ("Products liability deals with recourse for personal injury . . .resulting from the use of a product and, in the past, has covered actions for negligence. . . ."). Florida and Virginia both recognize three theories of negligence for products liability cases: negligent design,

negligent manufacture, and negligent failure to warn.[19]  *Powell* v. *Diehl Woodworking Mach., Inc.,* 198 F. Supp. 3d 628, 633 (E.D. Va. 2016) ("Virginia law only recognizes three products liability claims: negligent assembly or manufacture, negligent design, and failure to warn."); *Ugaz* v. *Am. Airlines, Inc.,* 576 F. Supp. 2d 1354, 1374–75 (S.D. Fla. 2008) ("In Florida, a product may be defective by virtue of a design defect, a manufacturing defect, or an inadequate warning.").

"To prove any products liability claim sounding in negligence, whether negligent design, negligent manufacture, or

---

[19] Plaintiffs seem to allege that Genzyme acted negligently by "fail[ing] to test or require the testing of the effects of reducing the dosage of Fabrazyme to unapproved levels." SAC ¶ 351(j.).  Florida and Virginia law do not recognize an independent negligence theory for failure to test a product. *See Horton* v. *Hoosier Racing Tire Corp.,* No. 8:15-cv-1453-T-17TGW, 2015 WL 12859316, at *4 (M.D. Fla. Dec. 15, 2015) ("Florida courts have refused to recognize an independent claim for negligent failure to test."); *Powell* v. *Diehl Woodworking Mach., Inc.,* 198 F. Supp. 3d 628, 633–34 (E.D. Va. 2016) (explaining the same). Rather, failure to test allegations must "fit [] into one of the traditional theories, or [be] dismiss[ed] [] altogether." *Powell,* 198 F. Supp. 3d at 634.  Plaintiffs do not plead this claim as a part of a recognized negligence claim.  Moreover, Plaintiffs do not show that they received a defective product or that Genzyme did not test the Fabrazyme they received.  Accordingly, this claim fails.

Additionally, Plaintiffs seem to allege negligence on the basis of "negligent[] monitor[ing]" and "negligent[] marketing." SAC ¶ 351(l.);(o.).  Setting aside whether Florida and Virginia law would recognize these theories of liability in a negligence products liability claim, Plaintiffs have not stated a claim based on these allegations because Plaintiffs fail to show causation.

the negligent failure to provide adequate warnings or instructions, a plaintiff must establish (1) that the defendant owed a duty of care toward the plaintiff, (2) that the defendant breached that duty, (3) that the breach was the proximate cause of the plaintiff's injury, and (4) that the product was defective or unreasonably dangerous." *Cooper* v. *Old Williamsburg Candle Corp.,* 653 F. Supp. 2d 1220, 1226 (M.D. Fla. 2009).  Plaintiffs cannot meet this burden.

###### 1.   Negligent Design Theory

A claim for negligent design requires showing a defect in the product caused Plaintiffs' injuries. *Wolicki-Gables* v. *Arrow Int'l, Inc.,* 641 F. Supp. 2d 1270, 1287 (M.D. Fla. 2009); *see Dodson* v. *C.R. Bard, Inc.,* No. 3:20cv596 (DJN), 2020 WL 7647631, at *5 (E.D. Va. Dec. 23, 2020) ("At minimum, [p]laintiff must provide some allegation that a design defect existed and that such a defect proximately caused [p]laintiff's injuries.").  Plaintiffs have not clearly alleged a defect.  As I have explained, Plaintiffs seem to allege that the Fabrazyme was defective due to contaminants or low dosage, *supra* Section III.B.1.a.; [SAC ¶¶ 2, 8, 351], but the pleadings are unclear and such "[a] bare allegation of a 'defect' is no more than a legal conclusion" that is insufficient to state a claim. *Ball* v. *Takeda Pharms. Am., Inc.,* 963 F. Supp. 2d 497, 505 (E.D. Va. 2013), *aff'd* 587 F. App'x 78 (4th Cir. 2014) (per curiam)

(Mem.).  Plaintiffs also fail to plead causation.  Plaintiffs do not demonstrate that they ever took "defective Fabrazyme," and, as a result, cannot show that "defective Fabrazyme" caused their alleged injuries.

### 2.   Negligent Manufacture Theory

The negligent manufacture theory fails along the same lines as the negligent design theory — Plaintiffs do not show a causal connection between the manufacturing defects they allege (contamination) and their relevant injuries (sensitization). *Cooper*, 653 F. Supp. 2d at 1226; Va. Prac. Tort and Personal Injury Law § 15:15 ("[A] plaintiff may not recover for damages in a product liability action absent a legally sufficient causal link between the alleged wrong and the plaintiff's resulting damages.").

### 3.   Failure to Warn Theory

In general, "a manufacturer has a duty to warn its customers of risks posed by its products." *Higgins* v. *Forest Lab'ys,* 48 F. Supp. 3d 878, 884 (W.D. Va. 2014).  The failure-to-warn theory, however, fails in the face of the learned intermediary doctrine, which instructs that a drug manufacturer's duty to warn extends to a patient's physician, but not to the patient, based on the proposition that a physician has the expertise to read warning labels and advise patients.  *See id.* (describing this doctrine in Virginia

courts); *Small* v. *Amgen, Inc.*, 723 F. App'x 722, 724-25 (11th Cir. 2018) (per curiam) (explaining the same under Florida law). Accordingly, a "[p]laintiff must show [it is] more likely than not the warning to the physician was inadequate and the warning did not sufficiently inform the prescribing physician about the risks involved in prescribing the drug." *Chase* v. *Novartis Pharm. Corp.*, 740 F. Supp. 2d 1295, 1297 (M.D. Fla. 2006) (internal quotations omitted) (applying Florida law); *see also Higgins*, 48 F. Supp. 3d at 884-87 (describing doctrine in similar terms for Virginia).

If a physician is independently aware of a risk associated with a medication, then the patient has no claim against the manufacturer, regardless of any warnings provided. *See Higgins*, 48 F. Supp. 3d at 893 (granting summary judgment on failure-to-warn claim on these grounds); *see also Tillman* v. *C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1335 (M.D. Fla. 2015) ("[T]he failure of the manufacturer to provide the physician with an adequate warning is not the proximate cause of a patient's injury if the prescribing physician had independent knowledge of the risk that an adequate warning should have communicated.").

Plaintiffs' allegations in this matter are thus insufficient to support a failure-to-warn claim. Although Plaintiffs allege that Genzyme "failed to provide adequate warnings, cautions, and directions concerning the dangers and

63

limitations of the 'low dose' of Fabrazyme" and "expressly and impliedly misrepresent[ed] that injection with Vesivirus-containing Fabrazyme is harmless," SAC ¶¶351(k.), they have not provided any allegation about what their doctors knew or what they advised, let alone the warnings that Genzyme provided.

### C. *Negligence Per Se*

Mr. LaForce and Mr. Stanziano (and derivatively Ms. Stanziano) also make claims for negligence per se. Mr. LaForce's claim fails because the relevant provision of Virginia law he cites, Va. Code Ann. § 54.1-3461 et seq., applies to adulterated products, while the viable standing theory identified in *Hochendoner II* is not based on adulteration. *See* 823 F.3d at 732-33. The Stanzianos' claims fail because they do not identify what portions, if any, of Florida law Genzyme violated. *See* SAC at ¶352 n.10. In Plaintiffs' narrative Opposition to Genzyme's Motion to Dismiss, Mr. Stanziano says his claim is "based on the violations of the Florida Pure Food and Drug Acts," but he does so without specifying what provision of the Florida law Genzyme violated. Accordingly, the Stanzianos fail to state a claim because they do not specify that there was a "violation of a statute which establishes a duty upon a party to take precautions to protect a particular class of persons from a particular injury or type of injury."

*Hesterly* v. *Royal Caribbean Cruises, Ltd.,* 515 F. Supp. 2d 1278, 1287 n.6 (S.D. Fla. 2007).

**D.   *Strict Liability***

Mr. LaForce's claim for strict liability stumbles at the threshold because, as he admits, Virginia does not permit strict product liability claims.  *See Harris* v. *T.I. Inc.*, 413 S.E. 2d 605, 609-10 (Va. 1992).

The Stanzianos' strict liability claims fail more particularly because any claim based on failure to warn cannot avoid the learned intermediary doctrine, as described above, and they do not demonstrate a causal connection between any alleged defect in the Fabrazyme Mr. Stanziano actually received and his injury.  In Florida, to make a claim against a manufacturer "on the theory of strict liability tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonably dangerous condition of the product, and the existence of a *proximate causal connection* between such condition and the user's injuries or damage."  *Siemens Energy & Automation, Inc.* v. *Medina*, 719 So.2d 312, 315 (Fla. Dist. Ct. App. 1998) (emphasis added) (quoting *West* v. *Caterpillar Tractor Co.*, 336 So.2d 80, 87 (Fla. 1976)).

**E.   *Breach of Warranty***

<u>1.   Claims for Breach of Implied Warranties</u>

Mr. LaForce and the Stanzianos bring claims for breach of

implied warranties of merchantability or fitness.  SAC ¶362.
The claims for breach of implied warranty of merchantability
fail because Mr. LaForce and the Stanzianos show no defect in
the Fabrazyme actually received.  *See* Fla. Stat. § 672.314
(defining in relevant part that merchantable good is "fit for
the ordinary purposes for which such goods are used"); Va. Code
Ann. § 8.2-314 (same); *see also Egbebike* v. *Wal-Mart Stores E.,
LP*, No. 3:13-cv-865-J-34MCR, 2014 WL 3053184, at *6 (M.D. Fla.
July 7, 2014) (requiring plaintiff to prove that there is a
defect in the product to sustain a claim for breach of implied
warranty of merchantability for defective product under Florida
law).

The Stanzianos' claims for breach of implied warranty of
merchantability and fitness also fail because they do not
adequately allege how Mr. Stanziano was in privity with Genzyme.
*See Cruz* v. *Mylan, Inc.*, No. 8:09-CV-1106T17-EAJ, 2010 WL
598688, at *2 (M.D. Fla. Feb. 17, 2010).  Although the complaint
states Mr. Stanziano "was in privity with Genzyme throughout his
treatment with his Genzyme case coordinator as well as being
registered in the Genzyme sponsored Fabry Registry," the
complaint does not allege that he and Genzyme had a buyer-seller
relationship.  *See id.* ("A plaintiff who purchases a product,
but does not buy it directly from the defendant, is not in
privity with that defendant" (quoting *T.W.M.* v. *Am. Med. Sys.,*

*Inc.*, 886 F. Supp. 842, 844 (N.D. Fla. 1995).); *cf. id.* (recognizing exceptions to this rule for express warranties, but not implied warranties, where a buyer has an extensive relationship with a manufacturer).

Mr. LaForce's claim for breach of implied warranty of fitness also fails.  First, Virginia's statute refers specifically to a "buyer" and a "seller," but Genzyme did not sell directly to Mr. LaForce.  I do recognize that it is not completely clear from Virginia caselaw if these facts on their own bar Mr. LaForce from bringing this claim.  *See Bayliner Marine Corp.* v. *Crow*, 509 S.E.2d 499, 503 (Va. 1999) (seemingly not barring on this ground a claim brought by a buyer against a manufacturer, where purchase was made through an exclusive dealer).  But second, if the claim is not barred for lack of direct sales relation, it still would fail because Plaintiffs must prove that Genzyme "at the time of contracting [had] reason to know" a "particular purpose for which the goods [were] required and that [the plaintiffs] [] rel[ied] on [Genzyme's] skill or judgment to select or furnish" the Fabrazyme.  *See* Va. Code Ann. § 8.2-315.  Neither Mr. LaForce nor the Stanzianos have pled this sufficiently because they do not explain how Genzyme would have perceived their reliance when Genzyme would necessarily have understood that Fabrazyme patients made decisions under the care of a physician.

2.   Claims for Breach of Expressed Warranty

The claims for breach of express warranty fail because neither Mr. LaForce nor the Stanzianos trace their injuries to any specified breaches of an express warranty.  The complaint alleges:

> [1] [Genzyme] expressly warranted in the Fabrazyme product insert that Fabrazyme reduces globotriaosylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition; . . .
>
> [2] [Genzyme] expressly warranted in the Fabrazyme product insert that Fabrazyme is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using 'low dose' for such an indication; . . .
>
> [3] in affirmatively representing that the drug given at full dosage would be sold to citizens at various dates, but breached such promises repeatedly since June 2009; . . .
>
> [4] in expressly and impliedly warranting that a "low dose" of Fabrazyme was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; . . .
>
> [5] in expressly and impliedly misrepresenting that injection with vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements regarding medical safety of vesivirus injection as false.

SAC at ¶¶362(a), 362(b), 362(m), 362(n), 362(q).

Causation is an essential element for a breach of warranty claim. *See* 77A C.J.S. Sales § 484. But the plaintiffs do not show how the breach of any such warranties led to their anaphylactic reactions upon returning to a full dose.

Additionally, with the exception of the third and fifth enumerated items, Plaintiffs do not sufficiently establish that Genzyme made these warranties. I addressed similar allegations in *Hochendoner I* and noted that the language that Plaintiffs cited from the package insert contained "dosing directions, indicating the dosage at which the FDA [had] approved Fabrazyme® and in the context of which the 'Indications and Usage' statement must be read." *Hochendoner I*, 95 F. Supp. 3d at 32. "Nowhere does the package insert state that a lower dosage would be as efficacious for use in the treatment of Fabry disease as the dose recommended on the packaging and by the FDA. Nowhere does the package insert state that a lower dosage is FDA-approved." *Id.*

## F.   *Florida Deceptive and Unfair Trade Practices*

Despite Mr. Stanziano claiming financial injury in addition to personal injury, I have only found viable his standing theory based on personal injury. Thus, the Stanzianos' claims under the Florida Deceptive and Unfair Trade Practices Act fails because the law "expressly states that it 'does not apply to . . . [a] claim for personal injury." *Echols v. RJ Reynolds Tobacco*

69

*Co.*, No. 13-cv-14215, 2014 WL 5305633, at *5 (S.D. Fla. Oct. 15, 2014) (quoting Fla. Stat. § 501.212(3)) (dismissing claim because damages sought for personal injury).

### G.   *Indiana Product Liability Act and Kentucky Product Liability Act*

Ms. Wilkins' claims under the Indiana Product Liability Act and the Kentucky Product Liability Act fail for reasons similar to those that render the negligence product liability claims of the Stanzianos and Mr. LaForce inadequate.

Like Florida and Virginia, Indiana and Kentucky recognize product liability claims based on manufacturing defects, design defects, and failures to warn. *See Brewer* v. *PACCAR, Inc.*, 124 N.E.3d 616, 621 (Ind. 2019); *Clark* v. *Hauck Mfg. Co.*, 910 S.W.2d 247, 251 (Ky. 1995) (Barker, J.), *overruled on other grounds by Martin* v. *Ohio Cnty. Hosp. Corp.*, 295 S.W.3d 104 (Ky. 2009).

A manufacturing defect claim will fail for lack of causation. *Jarrett* v. *Wright Med. Tech., Inc.*, No. 1:12-cv-00064-SEB-DML, 2021 WL 4307026, at *8 (S.D. Ind. Sept. 22, 2021); *Red Hed Oil, Inc.* v. *H.T. Hackney Co.*, 292 F. Supp. 3d 764, 773 (E.D. Ky. 2017) ("Regardless of the theory a plaintiff pursues, he must show causation in a products liability case.").

As for a design defect claim, like Mr. LaForce and the Stanzianos, Ms. Wilkins does not specify in the Second Amended Complaint a theory of design defect under either Indiana law or

Kentucky law.  Under Indiana law, plaintiffs bringing a products liability claim based on an alleged design defect "must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances of *designing the product*."  *TRW Vehicle Safety Sys., Inc.* v. *Moore,* 936 N.E.2d 201, 209 (Ind. 2010) (emphasis added) (quoting Ind. Code § 34-20-2-2).  Kentucky law requires "establish[ing] existence of an alternative, safer design that is practical under the relevant circumstances."  *Primal Vantage Co., Inc.* v. *O'Bryan,* __S.W.3d__, 2022 WL 3641122, at *12 (Ky. Aug. 18, 2022) (Minton, C.J.).  *But see Kaiser* v. *Johnson & Johnson,* 947 F.3d 996, 1014 (7th Cir. 2020) (explaining that Indiana law does not require proof of an alternative design, though it "can be relevant to design-defect liability").

In her narrative opposition to Genzyme's motion to dismiss her Kentucky claim, Ms. Wilkins does say that she shows a design defect "in that Fabrazyme is a pharmaceutical and therefore Genzyme is strictly liable for the effects of vesivirus and particulates on [her] vesivirus infection and her inflammation and her accelerated disease process."  And she says further "[t]he product was defectively designed in that it was administered at 'low' dose which makes it impossible to treat Fabry disease."  These allegations do not state a claim under either Indiana or Kentucky law.  The first point she makes is

off the mark because what she really alleges is a manufacturing defect, and in any event that claim fails for causation.  The second point fails as well because although low-dose Fabrazyme may be less effective than full dose – as was certainly known to patients and their doctors – the complaint does not show that low-dose Fabrazyme "makes it impossible to treat Fabry disease."

The failure-to-warn claims fail because of the learned intermediary doctrine in both Kentucky and Indiana, in the same way the claims brought by Mr. LaForce and Mr. Stanziano fail under Florida and Virginia law.  *See Larkin* v. *Pfizer, Inc.*, 153 S.W.3d 758, 762-770 (Ky. 2004) (describing and adopting the doctrine); *Ortho Pharm. Corp.* v. *Chapman*, 388 N.E.2d 541, 548 (Ind. Ct. App. 1979) ("[A] manufacturers [sic] duty to warn extends only to the medical profession, and not the ultimate users.").

## H.   *Kentucky Consumer Protection Act*

The Kentucky Consumer Protection Act prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce."  Ky. Rev. Stat. Ann. § 367.170.  To prove a violation of the Act, a plaintiff must show that they "(1) purchase[d] or lease[d] goods or services (2) for personal, family or household purposes and (3) [was] injured as a result of a seller's prohibited practice or act."  *Simpson* v. *Champion*

*Petfoods USA, Inc.,* 397 F. Supp. 3d 952, 961 (E.D. Ky. 2019) (Bertelsman, J.).

Genzyme says that Ms. Wilkins's claim under the Kentucky Consumer Protection Act "fails as a matter of law because [she] has not sufficiently alleged that she purchased Fabrazyme directly from Genzyme such that she was in privity with Genzyme."  Genzyme also says that, even if she did show she was in privity, her claim would fail because it is inadequately alleged.

As to the first argument, the Second Amended Complaint says that Ms. Wilkins "was in privity with Genzyme throughout her treatment with her Genzyme case care coordinator as well as being registered in the Genzyme sponsored Fabry Registry."  SAC at ¶1.  While the complaint does not show explicitly a buyer-seller relationship, Kentucky allows an exception where "'express warranties were clearly intended for the product's consumers,' even if the warranties did not 'expressly state that they run directly to the intended consumers.'"  *Yonts* v. *Easton Tech. Prods., Inc.*, 676 F. App'x 413, 420 (6th Cir. 2017) (quoting *Naiser* v. *Unilever U.S., Inc.*, 975 F. Supp. 2d 727, 739-40 (W.D. Ky. 2013)).  However, this exception does not extend to implied warranties.  *See Naiser*, 975 F. Supp. 2d at 739 (observing, in deciding to recognize exception to privity rule involving an express warranty, that the most recent

Kentucky Supreme Court decision not to find an exception involved an implied warranty).

Thus, to the extent this exception applies, Ms. Wilkins might be able to make an argument based on express warranties. But this argument fails based on causation, for the same reasons identified in discussing the warranty claims brought by Mr. LaForce and the Stanzianos.  "The breach of the express warranty must have caused the injury," Ky. Prod. Liab. L. § 6:2, which Ms. Wilkins does not demonstrate.

## I.   *Virginia Consumer Protection Act*

Mr. LaForce may not bring a claim under the Virginia Consumer Protection Act, because sales of Fabrazyme are regulated by the U.S. Food and Drug Administration.  The Act does not apply to "[a]ny aspect of a consumer transaction which aspect is authorized under laws or regulations of this Commonwealth or the United States, or the formal advisory opinions of any regulatory body or official of this Commonwealth or the United States."  Va. Code Ann. § 59.1-199(A).  Thus, for example, a federal court has found that plaintiffs could not sue a company for representations made "in advertisements and other marketing materials concerning the safety and effectiveness" of a medical device, because regulations about the device were "authorized and regulated by the FDA under federal law."  *Ali* v.

*Allergan USA, Inc.*, No. 12-cv-115, 2012 WL 3692396, at *19 (E.D. Va. Aug. 23, 2012).

## J.   *Virginia False Advertising Act*

Mr. LaForce's claim under the Virginia False Advertising Act fails for the same reason I found inadequate a claim under the Act in *Hochendoner I*.  As I explained there, "[u]nder Va. Code § 59.1-68.3, a plaintiff may bring a claim for losses resulting from an 'untrue, deceptive or misleading' 'promise, assertion, representation, or statement of fact' in an advertisement."  *Hochendoner I*, 95 F. Supp. 3d at 33 n.13 (quoting Va. Code Ann. § 18.2-216).  But Mr. LaForce has not sufficiently "alleged that Genzyme made any untrue or deceptive statements regarding the efficacy of Fabrazyme® at a lower dosage."  *See id.*

## K.   *Fraud and Fraudulent Concealment*

The fraud claims asserted by Mr. LaForce and the Stanzianos fail because they cannot trace the harm they experienced to information that Genzyme is alleged to have withheld intentionally.  I note that here Rule 9(b)'s heightened pleading requirements apply in full force.  *See supra* Section V.A.

The elements of fraud in Florida are: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4)

*consequent injury by the party acting in reliance* on the
representation." *Butler* v. *Yusem*, 44 So. 3d 102, 105 (Fla.
2010) (per curiam) (emphasis added) (quoting *Johnson* v. *Davis*,
480 So.2d 625, 627 (Fla. 1985)).  The elements in Florida for
fraudulent concealment are similar.[20]

In Virginia, a plaintiff bringing a fraud action "bears the
burden of proving by clear and convincing evidence" these
elements: "(1) a false representation, (2) of a material fact,
(3) made intentionally and knowingly, (4) with intent to
mislead, (5) reliance by the party misled, and (6) *resulting
damage to the party misled*." *Richmond Metro. Auth.* v. *McDevitt
St. Bovis, Inc.*, 507 S.E.2d 344, 346 (Va. 1998) (emphasis added)
(quoting *Evaluation Rsch. Corp.* v. *Alequin*, 439 S.E.2d 387, 390
(Va. 1994)).  Virginia does not have a separate cause of action
for fraudulent concealment, though "[c]oncealment of a material
fact by one who knows that the other party is acting upon the
assumption that the fact does not exist constitutes actionable

---

[20] A claim for fraudulent concealment in Florida must show (1)
the defendant "concealed or failed to disclose a material fact";
(2) the defendant "knew or should have known the material fact
should be disclosed"; (3) the defendant "knew [its] concealment
of or failure to disclose the material fact would induce the
plaintiffs to act"; (4) the defendant "had a duty to disclose
the material fact"; and (5) "the *plaintiffs detrimentally relied
on the misinformation*." *Hess* v. *Philip Morris USA, Inc.*, 175
So. 3d 687, 691 (Fla. 2015) (emphasis added) (quoting *R.J.
Reynolds Tobacco Co.* v. *Martin*, 53 So.3d 1060, 1068 (Fla. Dist.
Ct. App. 2010)).

fraud." *Bank of Montreal* v. *Signet Bank,* 193 F.3d 818,827 (4th Cir. 1999) (quoting *Allen Realty Corp.* v. *Holbert,* 318 S.E.3d 592, 597 (Va. 1984)).  "In all cases of fraud [under Virginia law] the plaintiff must prove that it acted to its detriment in actual and justifiable reliance on the defendant's misrepresentation (or on the assumption that the concealed fact does not exist)."  *Id.*

Thus, Plaintiffs must allege some form of injury that resulted from them relying on Genzyme's alleged false statements or concealment.  They do not do so.  The only information that Plaintiffs can plausibly show Genzyme concealed was that the Fabrazyme shortage would last longer than initially forecast. As I observed earlier at footnote 14 in this Memorandum, Plaintiffs say at paragraph 299 of the complaint that "[h]ad the true information about the supply situation been provided to [them] and their doctors, they would have acted with great urgency in September, 2009 to seek alternative treatment, such as Replagal®, through a compassionate use exemption or additional Fabrazyme through private arrangements with other patients and doctors."  SAC ¶299.  But Plaintiffs do not plead with any particularity how they relied on Genzyme's statements in deciding not to pursue alternative treatment, arrangements, or a compassionate use exemption.  They do not allege, for

example, any communications involving their medical providers that they actually reconsidered due to Genzyme's statements.

**L.    *Breach of Fiduciary Duty***

The claims brought by Mr. LaForce and the Stanzianos for breach of fiduciary duty fail because they do not establish a fiduciary duty between Genzyme and customers taking Fabrazyme.

In Florida, "[c]ourts have found a fiduciary relation implied in law when 'confidence is reposed by one party and a trust accepted by the other.'" *Cap. Bank v. MVB, Inc.*, 644 So. 2d 515, 518 (Fla. Dist. Ct. App. 1994) (quoting *Dale* v. *Jennings*, 107 So. 175, 179 (Fla. 1925)). "A fiduciary relationship must be established by competent evidence, and the burden of proving such a relationship is on the party asserting it." *Orlinsky* v. *Patraka*, 971 So.2d 796, 800 (Fla. Dist. Ct. App. 2007). "[A] party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Orlinsky*, 971 So. at 800 (Fla. Dist. Ct. App. 2007) (quoting *Watkins* v. *NCNB Nat'l Bank of Fla., N.A.*, 622 So.2d 1063, 1065 (Fla. Dist. Ct. App. 1993)).

In Virginia, "there is a fiduciary relationship 'when special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence.'"

*Allen Realty Corp.* v. *Holbert*, 318 S.E.2d 592, 595 (Va. 1984) (quoting *H-B P'ship* v. *Wimmer*, 257 S.E.2d 770, 773 (Va. 1979)). "[T]o establish breach of a fiduciary duty, a plaintiff must show that (1) the defendant owed a fiduciary duty (2) the defendant breached that duty and (3) damages resulted from the breach." *Tech Sys., Inc.* v. *Pyles*, 630 F. App'x 184, 187 (4th Cir. 2015) (per curiam).

Plaintiffs mention a few features of their relationship with Genzyme to show the company owed them a fiduciary duty. First, they say Genzyme "maintained and still maintains a close personal relationship with Plaintiffs, including monitoring their health both through individual case managers and through the Fabry registry clinical trial." SAC at ¶474. Second, "[w]hen a shortage of Fabrazyme was imminent, Genzyme undertook to create a body of experts for reviewing the effectiveness and safety of 'low-dose' Fabrazyme which included doctors and employees of Genzyme." *Id.* at ¶475. Third, Genzyme "created further fiduciary duties by affirmatively undertaking to 'protect the most vulnerable patients' who were the American Fabry patients and then telling each individual plaintiff that it would protect them even though Genzyme knew that Americans did not have free-market access to Replagal." *Id.* at ¶477.

The relationship between Genzyme and Fabry patients may appear closer than a standard relationship between a

manufacturer and a consumer, but I do not find that Florida or Virginia would recognize this to be a fiduciary relationship. The complaint does not say where the statements attributed to Genzyme about protecting vulnerable patients come from.  More importantly, patients still saw their own doctors and would necessarily have known they were dealing with a private company. As discussed above, Florida and Virginia both follow the doctrine of the learned intermediary.  The assumption in these states appears to be that a patient relies on her doctor when making medical decisions, not the manufacturer.

## M.   *Unjust Enrichment*

The unjust enrichment claims that Mr. LaForce and the Stanzianos bring against Genzyme also fail.

In Florida, the elements for an unjust enrichment action are: "(1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Agritrade, LP* v. *Quercia*, 253 So.3d 28, 33 (Fla. Dist. Ct. App. 2017) (quoting *Peoples Nat'l Bank of Com.* v. *First Union Nat'l Bank of Fla.*, 667 So.2d 876, 879 (Fla. Dist. Ct. App. 1996)).  "Equitable" is meant to reference the idea of fairness "and does not mandate that unjust enrichment be

construed as seeking only an equitable, as opposed to a legal, remedy." *Duty Free World, Inc.* v. *Miami Perfume Junction, Inc.*, 253 So.3d 689, 694 (Fla. Dist. Ct. App. 2018).

In Virginia, the elements of an unjust enrichment claim are: "(1) [the plaintiff] conferred a benefit on [the defendant]; (2) [the defendant] knew of the benefit and should reasonably have expected to repay [the plaintiff]; and (3) [the defendant] accepted or retained the benefit without paying for its value." *Schmidt* v. *Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008). The doctrine "effects a 'contract implied in law' requiring one who accepts and receives goods, services, or money from another to make reasonable compensation for those services." *James G. Davis Constr. Corp.* v. *FTJ, Inc.*, 841 S.E.2d 642, 647 (Va. 2020). "Typical examples of unjust enrichment involve a payment or overpayment under a mistake of fact . . . or the acceptance of services without a contract for those services." *Id.* (internal citation omitted).

Mr. LaForce and the Stanzianos say this doctrine applies because "it would be unjust to allow Genzyme to retain the monies it charged" for low-dose Fabrazyme, when it knew the low doses sold were "ineffective and dangerous." SAC at ¶484. They say "[t]he scale and level of deception is so unconscionable that restitution to the individual Plaintiffs and disgorgement of the entire monies derived from the sale of 'low-dose' and

[v]esivirus contaminated Fabrazyme is required in equity."  *Id.*
at ¶485.

This argument is unpersuasive.  As I discussed in relation
to the financial standing issue, Plaintiffs have not shown that
what they received from Genzyme was something of lesser value
than what they intended to purchase or that they were operating
"under a mistake of fact" as to what they would receive.  *Cf.*
*Hochendoner I*, 95 F. Supp. 3d at 32 (observing, in discussing an
argument on warranties, "[a] shop owner does not warrant that
one cup of sugar (the only cup in stock) will make as sweet a
cake as the two cups of sugar for which the recipe calls").
Under the sensitization theory, Plaintiffs may have been harmed
by the product, but that is an issue for tort law.

### N.   *Loss of Consortium*

Ms. Stanziano's loss of consortium claim fails because it
is derivative of Mr. Stanziano's claims, which as indicated in
this general discussion I will dismiss.  *See Gates* v. *Foley*, 247
So.2d 40, 45 (Fla. 1971) (explaining that loss of consortium "is
a derivative right and [wife] may recover only if her husband
has a cause of action against the same defendant").

### VI. THIRD AMENDED COMPLAINT

Having found Plaintiffs' Second Amended Complaint
inadequate, even incorporating the new information asserted in
the proposed Third Amended Complaint, I will deny the request to

file a Third Amended Complaint because doing so would be futile in light of the shortcomings identified for dismissing the Second Amended Complaint.

### VII. CONCLUSION

For the reasons set forth above, Genzyme's Motion [ECF No. 102] to Dismiss is GRANTED with respect to all claims made by Plaintiffs.  All claims are dismissed without prejudice, except for the claims I address on the merits, which are claims asserted by Mr. LaForce, Mr. Stanziano, Ms. Stanziano, and Ms. Wilkins concerning harm they experienced due to sensitization to Fabrazyme.  I DENY as futile the Motion [ECF No. 105] to file a Third Amended Complaint.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE